# FTC SUMMARY JUDGMENT EXHIBIT 28

## SUPPLEMENTAL DECLARATION OF KENDRA FREEMAN

## SUPPLEMENTAL DECLARATION OF KENDRA FREEMAN
## PURSUANT TO 28 U.S.C. § 1746

I, Kendra Freeman, hereby state that I have personal knowledge of the facts set forth below and am competent to testify about them.  If called as a witness, I could and would testify as follows:

1. I am a citizen of the United States and am over eighteen (18) years of age.  I am a Paralegal Specialist ("Paralegal") for the Federal Trade Commission.  I am presently assigned to the Division of Financial Practices in the FTC's Bureau of Consumer Protection.  My mailing address is 600 Pennsylvania Avenue, NW, Mail Stop CC-10232, Washington, D.C. 20580.

2. I have been a Paralegal with the FTC since September 2017.  Prior to the FTC, I was a paralegal with the Department of Justice.  My responsibilities for the FTC include investigating suspected violations of consumer protection laws, including the FTC Act.  In the normal course of carrying out my investigative responsibilities, I regularly use Internet search engines, electronic databases, spreadsheet software, and other software-based investigative and organizational tools.

3. I have been assigned to work on the FTC's litigation in *FTC v. OMICS Group Inc.*, Case No. 2:16-cv-02022-GMN-VCF (D. Nev.).  The defendants in this case include OMICS Group Inc., iMedPub LLC, Conference Series LLC, and Srinubabu Gedela ("Defendants").

4. In August 2004, staff in the FTC's Bureau of Economics issued a report entitled *Consumer Fraud in the United States: An FTC Survey.*  The report is publically available on the FTC's website at www.ftc.gov/sites/default/files/documents/reports/consumer-fraud-united-states-ftc-survey/040805confraudrpt.pdf.  A true and correct copy of the report is attached hereto as **Attachment A**.

5. On or about May 18, 2018, I visited the website www.ariessys.com/software/editorial-manager/, which contains a product description of Aries Systems Corporation's Editorial Manager®.  A true and correct copy of that webpage is attached hereto as **Attachment B**.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _18_ day of May, 2018, in Washington, D.C.

Kendra Freeman

SJX28 - 3

# ATTACHMENT A

**FEDERAL TRADE COMMISSION**

# Consumer Fraud in the United States: An FTC Survey

## Federal Trade Commission Staff Report
### August 2004



SJX28 – 5

# Consumer Fraud in the United States: An FTC Survey



## Staff Report of the
## Bureaus of Economics and Consumer Protection
## Federal Trade Commission

Keith B. Anderson

August 2004

# Federal Trade Commission

| | |
|---|---|
| Timothy J. Muris | Chairman |
| Mozelle W. Thompson | Commissioner |
| Orson Swindle* | Commissioner |
| Thomas B. Leary | Commissioner |
| Pamela Jones Harbour | Commissioner |
| | |
| Luke M. Froeb | Director, Bureau of Economics |
| J. Howard Beales, III | Director, Bureau of Consumer Protection |

The author is an economist in the Bureau of Economics of the Federal Trade Commission.  The views expressed in this report are those of the author and do not necessarily reflect the views of the Federal Trade Commission or any individual Commissioner.

* Commissioner Swindle did not participate in this matter.

# Acknowledgments

John Yun and Hajime Hadeishi made major contributions to the econometric analyses in Chapters 4 and 5 respectively.  Without their hard work and expert advice, the study would not be what it is.  James Lacko, Jesse Leary, Alan Mathios, and David Newhouse provided extremely useful advice on methodological issues.  The survey was conducted by Public Opinion Strategies, and Bill McInturff, Elizabeth Frontczak and Tom Dewhurst of that firm made significant contributions to the survey design, as did various staff in the Bureau of Consumer Protection of the FTC.  Christopher Kelley and David Yans provided valuable assistance in coding open-ended responses.  Dawne Holz in the Office of Consumer and Business Education in the Bureau of Consumer Protection was responsible for the formatting of the report.  Drafts were reviewed and valuable editorial suggestions provided by Howard Beales, Pauline Ippolito, Lydia Parnes, Paul Pautler, Nat Wood, and Kial Young.  Assistance was also provided by Carolyn Samuels, Stefano Sciolli, Marie Tansioco, and Lance Toler.

*iv*

# Table of Contents

List of Tables.................................................................................................................vii

List of Figures............................................................................................................... ix

Executive Summary ................................................................................................ ES-1

**Chapter 1:  Introduction** .............................................................................................1
Other Studies .............................................................................................................2

**Chapter 2:  Description of the Survey**.......................................................................7
Types of Fraud Investigated........................................................................................7
Specific Types of Fraud ........................................................................................8
More General Problems That May Be Associated With Fraud .......................17
Switching of Long Distance Telephone Service Providers ..............................18
Victims of Fraud or Targets of Fraud?.....................................................................19
Consumer Purchasing Behavior ..............................................................................20

**Chapter 3:  Which Types of Frauds Are the Most Common?** ...............................25
The Number of Victims ............................................................................................25
The Number of Incidents .........................................................................................30
Media Employed .......................................................................................................37
The Cost of an Incident of Fraud ............................................................................38
Open-Ended Descriptions of Fraudulent Experiences..........................................41

**Methodological Appendix to Chapter 3** .................................................................45

**Chapter 4:  Who is a Victim of Fraud?**...................................................................49
Characteristics Analyzed .........................................................................................49
Methodology.............................................................................................................52
Analysis of Aggregate Measures of Risk ................................................................54
Race and Ethnicity...............................................................................................55
Current Income ....................................................................................................62
Future Income ......................................................................................................63
The Burden of Debt .............................................................................................65
Age ........................................................................................................................68
Marital Status.......................................................................................................69
Other Characteristics ..........................................................................................69
The Likelihood of Being a Victim of Specific Frauds ............................................70
Slamming vs. Frauds ...........................................................................................71
Different Types of Frauds ....................................................................................74
The Role of Language ..............................................................................................75
Conclusion ...............................................................................................................76

*Consumer Fraud in the United States: An FTC Survey*

**Chapter 5:  Who Complains?** ..................................................................................**79**

   Complaint Data Collected ....................................................................79

   To Whom Do Consumers Complain? .........................................................80

   Characteristics of Those Who Complain ...................................................82

      Internet Usage ...........................................................................84

      Education Level .........................................................................96

      Age .........................................................................................97

      Income ....................................................................................98

      Gender and Marital Status .........................................................99

      Race and Ethnicity ..................................................................100

      Method of Payment .................................................................101

   How Satisfied Are Those Who Complain? .................................................102

      Entity To Whom Complaint Was Made .......................................103

      Amount Lost ..........................................................................108

      Internet Usage, Education, Marital Status, Gender, and Age .............108

      Income ..................................................................................109

      Race and Ethnicity ..................................................................109

      Payment Mechanism ...............................................................110

   Conclusion ..........................................................................................111

**Chapter 6:  Conclusion** ....................................................................................**115**

   Issues for Future Studies .......................................................................117

**Appendix A:  The Survey Instrument** .....................................................................**A-1**

SJX28 - 11

# List of Tables

Table ES-1:   The Most Common Types of Consumer Fraud ....................................................ES-3

Table ES-2:   Percent of Survey Participants Who Are Victims of Frauds,
by Single Characteristic ......................................................................................ES-8

Table 2-1:    Consumer Responses to Solicitations ........................................................................21

Table 3-1:    Estimated Number of Adults Who Were Victims of Fraud or Had Their Long
Distance Telephone Service Changed Without Permission,
One Year Period Prior to the Survey ....................................................................26

Table 3-2:    Estimated Number of Incidents of Fraud or of Unauthorized Changes in Long
Distance Telephone Service, One Year Period Prior to the Survey.........................32

Table 3-3:    Number of Incidents Experienced by Victims ...........................................................35

Table 3-4:    Fraud Incidents by Type of Product Involved ...........................................................36

Table 3-5:    How Victims First Learned About the Product or Service Involved in Frauds........38

Table 3-6:    Distribution of Estimated Losses Per Incident for Different Types of Frauds .........40

Table 3-7:    Responses to Open-Ended Question About The Type of Fraud Experienced..........41

Table 3-8:    Closed-End Responses of Survey Participants Who Described Frauds That
Occurred in the Last Year in Answer to Open-Ended Question ..............................43

Table 4-1:    Distribution of Values for Explanatory Variables .....................................................50

Table 4-2:    Percent of Survey Participants Who Are Victims, By Single Characteristic ...........56

Table 4-3:    Likelihood of Being a Victim, Probit Estimation, Marginal Effects,
Aggregate Measures............................................................................................59

Table 4-4:    Likelihood of Being a Victim, Probit Estimation, Marginal Effects,
Individual Problems ............................................................................................72

Table 5-1:    To Whom Did Consumers Complain? ......................................................................80

Table 5-2:    Percent of Consumers Who Complained, By Type of Problem .............................82

Table 5-3:    Percent of Consumers Who Complain, By Single Characteristic ...........................86

Table 5-4:    Likelihood of Filing a Complaint, Probit Estimation, Marginal Effects,
Complaints Filed with Anyone............................................................................88

Table 5-5:    Likelihood of Filing a Complaint, Probit Estimation, Marginal Effects,
Complaints Filed with Official Sources ................................................................90

Table 5-6:    Likelihood of Filing a Complaint, Probit Estimation, Marginal Effects,
Complaints Filed with Seller or Manufacturer......................................................92

Table 5-7:    Likelihood of Filing a Complaint, Probit Estimation, Marginal Effects,
Complaints Filed with Bank or Credit Card Company ...........................................94

Table 5-8:    Degree of Satisfaction with Results of Complaints ...............................................103

*Consumer Fraud in the United States: An FTC Survey*

Table 5-9:   Satisfaction with the Results of a Complaint, By Single Characteristic ...............104

Table 5-10:   Satisfaction with Results of Complaints, Probit Estimation, Marginal Effects .....106

Table 5-11:   Marginal Effects by Fraud Type, Conditional-Mean-Imputation Probit Equations ................................................................................................................................112

# List of Figures

Figure ES-1: Most Common Types of Consumer Fraud ............................................................ES-2

Figure ES-2: Victims of Fraud, By Race and Ethnicity .........................................................ES-4

Figure ES-3: Victims of Fraud, By Expected Income - Three Years Future ............................ES-5

Figure ES-4: Victims of Fraud, By Comfort with Current Level of Debt ...............................ES-6

Figure ES-5: Victims of Fraud, By Age.................................................................................ES-6

Figure 3-1:   Specific Types of Fraud, By Number of Victims ..................................................29

Figure 3-2:   Specific Types of Fraud, By Number of Incidents ...............................................31

Figure 3-3:   Media Used to Promote Frauds ...........................................................................37

Figure 3-4:   Median Dollars Lost, By Specific Type of Fraud.................................................40

Figure 4-1:   Likelihood of Being a Victim, By Race and Ethnicity ..........................................55

Figure 4-2:   Likelihood of Being a Victim, By Expected Change in Future Income.................64

Figure 4-3:   Likelihood of Being a Victim, By Comfort with Current Level of Debt ...............66

Figure 4-4:   Likelihood of Being a Victim, By Age.................................................................67

Figure 4-5:   Likelihood of Being a Victim, Fraud Compared to Slamming ..............................74

Figure 5-1:   Likelihood of Complaining, By Internet Usage ....................................................84

Figure 5-2:   Likelihood of Complaining, By Education ...........................................................96

Figure 5-3:   Likelihood of Complaining, By Age ....................................................................97

Figure 5-4:   Likelihood of Complaining, By Gender................................................................99

Figure 5-5:   Likelihood of Complaining, By Race and Ethnicity ...........................................100

Figure 5-6:   Complaint Satisfaction, By Party Complained To ..............................................103

Figure 5-7:   Complaint Satisfaction, By Payment Mechanism...............................................110

SJX28 - 14

*Consumer Fraud in the United States: An FTC Survey*

*x*

# Executive Summary

Consumer frauds pose a threat to consumers and the economy.  Even the most wary and sophisticated consumers may fall victim to fraudulent offers – in the mail, in the media, and on the Internet.  To learn more about the extent of consumer fraud and to enhance our understanding of its victims, the Federal Trade Commission ("FTC") last year commissioned a survey of 2,500 randomly-chosen adults about their consumer experiences during the previous year.

This survey will help the FTC better serve fraud victims through law enforcement and education.  The survey was designed, in part, to assist the agency in determining whether information in the FTC's Consumer Sentinel database of fraud complaints is representative of consumers' actual experiences with fraud in the marketplace.  The survey provides the agency with a broader snapshot of fraud in America which, in addition to helping target law enforcement actions, will allow the FTC to target education campaigns more precisely towards particular consumer groups who are at risk of falling victim to fraud but who may not complain to the FTC about their experiences.

Rather than asking generally whether survey participants had fallen victim to "fraud" in the past year, the survey targeted ten specific types of fraud and two additional situations that frequently indicate that a fraud may have occurred.[1] The ten specific frauds were selected because they cover the most prevalent types of complaints reported in the FTC's complaint database and are frauds that have frequently led to FTC enforcement actions.  The survey also asked about "slamming" – a situation in which a consumer's long distance telephone service is switched from one carrier to another without the consumer's permission. Although the FTC's complaint database includes many consumer complaints concerning slamming, slamming is somewhat different than the other consumer problems covered by the survey.  (Unlike many of the other problems, victims of slamming do receive something of value, in that they are still able to make long distance telephone calls, though not via the carrier they have chosen; and therefore it is difficult to determine the extent of the injury.)  In addition, telephone service is regulated by the Federal Communications Commission, rather than the FTC.  Slamming is therefore considered separately.

---

[1.] The ten specific types of fraud were (1) paying an advance fee to obtain a loan or credit card that a consumer was promised or guaranteed to receive, (2) being billed for a buyers' club membership a consumer did not agree to purchase, (3) purchasing credit card insurance, (4) purchasing credit repair services, (5) paying money or making a purchase to receive a promised prize and then not receiving the prize or receiving a prize that was not as promised, (6) being billed for Internet services a consumer did not agree to purchase, (7) purchasing a membership in a pyramid scheme, (8) being billed for information services provided either over the Internet or by pay-per-call telephone service that a consumer had not agreed to purchase, (9) making a payment to someone who represented that as a result of making the payment a consumer would receive a government job, and (10) purchasing a business opportunity where the seller made earnings claims that were not realized or promised assistance that was not provided.  The two more general situations were (1) paying for a product or service that a consumer does not receive and (2) being billed for a product, other than the specific products identified above, that a consumer had not agreed to purchase.

*Consumer Fraud in the United States: An FTC Survey*

## What are the Top Problems Identified by the Survey?

The survey suggests that nearly 25 million adults in the U.S. – 11.2 percent of the adult population – were victims of one or more of the consumer frauds covered by the survey during the previous year.  More than 35 million incidents of these various frauds occurred during the year.[2]

### Advance Fee Loan Scams

The most frequently reported type of consumer fraud was advance fee loan scams, which involve a consumer paying money to a seller prior to receiving a  promised or guaranteed loan or credit card.  FTC rules prohibit charging such an advance fee in the context of telemarketing.



**Figure ES-1**
**Most Common Types of Consumer Fraud**

Some 4.5 million consumers – 2.1 percent of U.S. adults – made such payments, but did not receive the promised loan or credit card in the year covered by the survey.  Some survey participants reported that they had paid for a promised loan or credit card more than once during the last year.  As a result, an estimated 6.5 million incidents of this fraud occurred during the year, or three incidents per 100 adults.

### Buyers' Club Memberships

The second most commonly reported fraud covered by the survey was being billed for a membership in a buyers' club or for a buyers' guide publication without having agreed to join the club or purchase the publication.  Some four million U.S. adults – 1.9 percent of the adult population – were unwittingly billed for memberships in these clubs or for such buyers' guides in the year prior to the survey.  An estimated 4.8 million incidents of this type of fraud took place during that time.

---

[2] As discussed in the report, these estimates are based on somewhat conservative assumptions regarding who is considered to be a victim.  (See page 11.)  Figures on the number of victims and their characteristics are based on data that has been appropriately weighted, using weights supplied by the contractor who conducted the survey, to adjust for sampling and response rate issues.

### *Credit Card Insurance and Credit Repair*

The third and fourth most common frauds were also related to credit: An estimated 3.3 million adults bought insurance as protection against the unauthorized use of credit cards, and some 2.0 million adults paid for credit "repair" services.  Fraudulent operators sell credit card insurance by claiming that card holders face considerable financial risk if their credit cards are misused. This costly insurance, however, is generally unnecessary because federal law limits consumer liability to $50, and credit card companies often do not require consumers who report a lost, stolen, or misused credit card to pay anything. Credit repair frauds may involve paying money to someone who falsely promises to have truthful, negative information removed from a consumer's existing credit record.  Credit repair frauds also may involve paying for information about how to establish a new credit record by using a number other than a Social Security number to apply for credit.  Both of these types of credit repair are illegal.

**Table ES-1: The Most Common Types of Consumer Fraud**

| Type of Problem | Number of Victims[a] (millions of adults) | Number of Incidents[b] (millions) |
|---|---|---|
| Paid an advance fee to obtain a loan or credit card that you were promised or guaranteed you would receive | 4.55 | 6.55 |
| Billed for buyers' club memberships you did not agree to purchase | 4.05 | 4.80 |
| Purchased credit card insurance | 3.35 | 4.60 |
| Purchased credit repair | 2.00 | 2.45 |
| Paid money or made a purchase to receive a promised prize and did not receive the prize or prize was not as promised | 1.80 | 2.40 |
| Billed for Internet services you did not agree to purchase | 1.75 | 1.90 |
| Purchased a membership in a pyramid scheme | 1.55 | 2.55 |
| **Total, Specific Types of Fraud Included in the Survey** | **18.35** | **27.40** |
| | | |
| **Total, Any Type of Fraud, Specific or General, Included in the Survey** | **24.45** | **35.45** |
| | | |
| **Unauthorized Changes in Long Distance Telephone Service ("Slamming")** | **13.90** | **17.60** |
| | | |
| **Total, Any Fraud Covered by Survey or Unauthorized Changes in Long Distance Service** | **35.60** | **53.00** |

**Notes.**

a  Individuals are included only once in these counts, even if they experienced multiple incidents of the relevant fraud.  Numbers are rounded to the nearest 0.05 million.  Numbers will not add to totals, because some individuals experienced several types of fraud.

b  Each incident of fraud is included in these counts, including multiple incidents for an individual.  Numbers are rounded to the nearest 0.05 million.  Numbers may not add to totals, because of rounding.

Source: Tables 3-1 and 3-2.

*Consumer Fraud in the United States: An FTC Survey*

### *Telephone Slamming*

The survey also found that an estimated 13.9 million consumers experienced unauthorized changes in long distance telephone service – 6.5 percent of the U.S. adult population.  Indeed, some consumers reported that they were slammed more than once: An estimated 17.6 million incidents of slamming occurred during the year preceding the survey.

## Frauds Are Mass Marketed

The survey revealed that 33.0 percent of fraud victims first learned about an offer or product that turned out to be fraudulent from a printed source, including newspaper or magazine ads, direct mail solicitations, catalogs, and posters. Telemarketing was the first source of contact in 16.8 percent of the frauds reported by survey participants; the Internet – including email and web sites – was the first contact in 14 percent of cases.

## Who Is Most Likely to be a Victim?

Some consumers are more likely to become victims of fraud than others.  The study found that race or ethnicity, expectations about future income, and comfort with one's level of debt were all associated with the likelihood of being a victim of fraud.

### *Racial and Ethnic Minorities*

The survey found that members of several racial and ethnic minorities were much more likely to be victims of fraud than non-Hispanic whites. Of non-Hispanic whites, 6.4 percent had been victims of one or more of the frauds covered by the survey during the previous year.[3]



**Figure ES-2
Victims of Fraud
By Race and Ethnicity**

- Hispanics: 14.3%
- African Americans: 17.1%
- American Indians / Alaska Natives: 33.8%
- Non-Hispanic Whites: 6.4%
- Others: 7.3%

---

[3.] Although the numbers in the text are the results of simple cross-tab comparisons of members of different racial and ethnic groups, the results are qualitatively the same after controlling for demographic differences such as income and education.

Those who are American Indians or Alaska Natives were at greatest risk: Almost 34 percent of survey participants in this group had been victims of one or more of the frauds covered by the survey in the preceding year – more than five times the percentage of victims among non-Hispanic whites.[4]

Both Hispanics and African Americans were more than twice as likely to be victims of consumer fraud as non-Hispanic whites.  Some 14.3 percent of Hispanics and 17.1 percent of African Americans interviewed had been victims of one or more of the frauds in the survey during the prior year.  On the other hand, only 7.3 percent of participants who were assigned to the "Other" racial category – which includes those who identified themselves as Asian, as Hawaiian or Other Pacific Islander, or as belonging to more than one racial group – were victims.

### Consumers Who Expect Large Changes in Their Future Income

The survey also indicated that consumers who anticipate a large change in their incomes in the next three years were more than twice as likely to be victims of fraud as those who expect their incomes to remain stable.  Only five percent of survey participants who expected their



**Figure ES-3
Victims of Fraud
By Expected Income – Three Years Future**

| Much Lower | Slightly Lower | About the Same | Slightly Higher | Much Higher |
| 11.0% | 7.2% | 5.0% | 9.6% | 14.2% |

incomes to remain largely unchanged over the next three years reported being victims of one or more of the frauds examined.  By contrast, 11.0 percent of survey participants who expected their incomes to be much <u>lower</u> and 14.2 percent of those who expected their incomes to be much <u>higher</u> in the next three years were victims.

---

[4] While the number of survey participants who described themselves as American Indians or Alaska Natives was small, the difference in the rate of fraud between this group and non-Hispanic whites is statistically significant, as are all of the differences highlighted in the Executive Summary.

SJX28 - 20

*Consumer Fraud in the United States: An FTC Survey*

### Consumers Who Are Uncomfortable with Their Current Debt

Consumers who had more debt than they could comfortably handle also were more likely to be fraud victims. Only 2.7 percent of consumers without debt reported being victims of fraud. On the other hand, 19.2 percent of the survey participants who felt that they had too much debt indicated they had been victims of fraud – more than seven times the risk faced by those without any current debt.



### The Elderly Do Not Experience More Fraud

The FTC survey found that consumers 65 years old or older did not experience more fraud than those who were younger.



## Who Complains About Consumer Fraud?

In 29.3 percent of cases of fraud or slamming, consumers did not complain to anyone about their experience. When consumers did complain, they most frequently complained to the seller or manufacturer of the product or service involved. Based on the survey results, an estimated 53.7 percent of consumers who experienced an incident complained to the seller or manufacturer, and 18.6 percent directed their complaints to a bank or credit card company. An estimated 8.4 percent of consumers complained to an "official source" – a local, state,

or federal government agency or a Better Business Bureau.  Knowing which types of consumers complain and to whom will help the FTC determine the representativeness of the Consumer Sentinel database of fraud complaints.

### Women and Younger Consumers More Likely to Complain

Women and younger consumers were more likely to complain when they believed they had been defrauded.  An estimated 74.5 percent of women who were victims complained to someone about their experience.  For men, the complaint rate was 10 percentage points lower.  Similarly, almost 75 percent of consumers under the age of 35 complained, compared to 55.4 percent of consumers between 55 and 64.

The survey found that those consumers who used a credit card were no more or less likely to complain than those who used another payment mechanism.  However, consumers who used a credit card were more likely to complain to a bank or credit card company, and less likely to complain to an official source.  At the same time, consumers who used an online payment service were more likely to complain to an official source – twice as likely as those who paid with cash, and about ten times as likely as those who paid with a credit card.

### Credit Card Users More Likely to be Satisfied with Results of Complaints

Overall, almost 60 percent of survey participants who complained said they were either "very" satisfied or "somewhat" satisfied with the result of their complaint; 40 percent indicated that they were either "not too satisfied" or "not at all satisfied."

Consumers who complained were more likely to be satisfied with the results when they had used a credit card in the transaction (62.6 percent were satisfied) than when they had paid with cash (28.0 percent were satisfied).  Those who did not lose money were more likely to be satisfied (77.0 percent were satisfied) than those who did.  Still, 28.2 percent of those who lost $100 or more said that they were satisfied with the result of their complaint.

Public Opinion Strategies conducted the telephone survey for the FTC, and developed the survey instrument together with staff in the FTC's Bureau of Economics and Bureau of Consumer Protection.  This report is based on the survey and subsequent analysis of the data by staff of the Bureau of Economics. In analyzing the results of the survey, particular assumptions and methodologies were employed.  In each instance, the assumptions are set forth in the report, with an explanation of the reasons a particular route was chosen.  Although alternative approaches would yield differences in specific estimates, the staff does not believe they would noticeably alter the report's central conclusions.

*Consumer Fraud in the United States: An FTC Survey*

**Table ES-2: Percent of Survey Participants Who Are Victims of Frauds, by Single Characteristic**

**A.  By Race and Ethnicity**

|  | Fraud Only | Fraud and Unauthorized Changes in Long Distance Service |
|---|---|---|
| Hispanics | 14.3% | 26.7% |
| African Americans | 17.1% | 24.1% |
| American Indians or Alaska Natives | 33.8% | 38.0% |
| Non-Hispanic Whites | 6.4% | 12.5% |
| Others | 7.3% | 11.7% |

**B.  By Expected Income Three Years in the Future**

|  | Fraud Only | Fraud and Unauthorized Changes in Long Distance Service |
|---|---|---|
| Will be much lower | 11.0% | 21.3% |
| Will be slightly lower | 7.2% | 12.7% |
| Will be about the same | 5.0% | 11.4% |
| Will be slightly higher | 9.6% | 15.3% |
| Will be much higher | 14.2% | 23.5% |

**C.  By Comfort with Current Level of Debt**

|  | Fraud Only | Fraud and Unauthorized Changes in Long Distance Service |
|---|---|---|
| More debt than can comfortably handle | 19.2% | 27.3% |
| About as much debt as can comfortably handle | 9.1% | 15.4% |
| Could handle more debt than currently have | 8.1% | 15.1% |
| Do not have any personal debt | 2.7% | 8.6% |

**D.  By Age**

|  | Fraud Only | Fraud and Unauthorized Changes in Long Distance Service |
|---|---|---|
| 18 - 24 | 8.3% | 11.4% |
| 25 - 34 | 11.1% | 18.4% |
| 35 - 44 | 11.1% | 18.2% |
| 45 - 54 | 8.7% | 17.4% |
| 55 - 64 | 6.1% | 10.7% |
| 65 and over | 4.7% | 10.9% |

# Chapter 1:  Introduction

One of the key functions of the Federal Trade Commission ("FTC" or "the Commission")  is to protect consumers from fraudulent, deceptive, and unfair practices.  The Commission has brought many law enforcement actions against individuals and businesses who injure consumers by making fraudulent representations.  In addition, the Commission seeks to educate consumers about how they can protect themselves from fraud.

From fiscal year 1995 through fiscal year 2003, the Commission and its law enforcement partners brought 2,215 law enforcement actions directed at fraudulent operators, including those who promote Internet frauds, fund-raising fraud, fraudulent offers promising consumers a credit card in return for the payment of an advance fee, and Internet auction fraud.  Of these actions, the Commission brought 522 cases itself.[1]  The Commission estimates that its anti-fraud law enforcement actions in fiscal years 2002 and 2003 saved consumers more than $1.15 billion.[2]  Moreover, in fiscal year 2003 alone, the Commission estimates that it distributed 28 million copies of its various consumer education publications, either in paper form or electronically, to raise awareness of the latest frauds.[3]

The Commission's law enforcement experience shows that the problem of consumer fraud is large.  However, law enforcement may not provide a comprehensive picture of the types and extent of frauds in the marketplace – it shows only the extent of the harms caused by the firms the Commission sues.  Nor is comprehensive information on the extent of consumer fraud readily available from other sources.

To develop more systematic information on the extent of consumer fraud, the Federal Trade Commission commissioned a survey of consumer experiences with fraud.  The survey was conducted in late May and early June of 2003.  This study reports on the FTC staff's analysis of the results of that survey.

Chapter 2 describes the various kinds of consumer fraud covered by the survey.  Chapter 3 presents basic survey results, including estimates of the number of U.S. consumers who were victims of these various frauds, as well as the number of incidents of these frauds.  How much money consumers typically lost if they were victims and how the fraudulent offers were promoted to consumers are also examined.  Chapter 4 examines whether the likelihood of being a victim varies with consumers' demographic characteristics, such as age or level of

---

[1]. For the fiscal year 2003 figures, see Federal Trade Commission, Budget Summary, Fiscal Year 2005 Congressional Justification, p. 4.  (Found at  http://www.ftc.gov/ftc/oed/fmo/budgetsummary05.pdf, visited March 2, 2004.)  For the 1995 to 2002 figures see Federal Trade Commission Performance Report for Fiscal Year 2002, p. 17.  (Found at http://www.ftc.gov/opp/gpra/prfy2002.pdf, visited March 2, 2004.)

[2]. *Id.*, p. 17.

[3]. Budget Summary, p. 17.

*Consumer Fraud in the United States: An FTC Survey*

education.  Finally, Chapter 5 discusses which consumers are more or less likely to complain about being a victim of a fraud and which consumers are more likely to be satisfied with the results of any complaints they make.  The remainder of Chapter 1 is devoted to a brief review of other studies that provide empirical data on consumer fraud.

## Other Studies

Only a limited amount of empirical work has been done on consumer fraud and its victims.  The National Institute of Justice in the U.S. Department of Justice ("DOJ") sponsored a November 1991 survey of a random sample of 1,246 consumers aged 18 and over.[4]  This survey, which asked participants about their experiences with specific types of problems, found that 15 percent of participants had been the victim of a successful personal fraud in the 12 months prior to the interview.[5]  However, in 10 percent of these cases, the consumer lost no money.  Therefore, 13 percent of survey participants reported suffering direct monetary injury as a result of a successful fraud.[6]

The DOJ researchers also found that the likelihood of being a victim of a successful fraud and of losing money varied with a consumer's age and level of education.  They found that older consumers were less likely to be victims.  Also, those who had not graduated from high school were less likely to be a victim than were those who had more education.[7]

A second source of information on consumer experiences with fraud is a series of surveys conducted for AARP.  One of these surveys, from December

---

[4.] The results of this survey have been published in a number of places including Richard M. Titus, Fred Heinzelmann, and John M. Boyle, "Victimization of Persons by Fraud," *Crime and Delinquency*, 41 (January 1995), pp. 54-72.

[5.] Titus et al., report that their survey was designed to measure both attempts to defraud and successful efforts.  However, in several of the areas included in the survey, it is not clear that consumers would be able successfully to identify an attempt to defraud them, unless they actually fell for the scam.  For example, the survey asked whether "anyone [had] ever sold or tried to sell you what they claimed was a lottery ticket, or a ticket of admission, which turned out to be fake" and whether "anyone [had] promised you a prize, a free vacation, or a free sample, which later turned out not to be free or ended up costing you more than the prize, vacation or sample was worth."  (Survey questions 9 and 17.  The survey questions are reprinted at pages 68 - 71 of Titus et al.)  Because it seems unlikely that consumers would, in many cases, know whether someone had attempted to defraud them, the FTC survey was designed to inquire only about cases where the attempt to defraud was successful.

[6.] The results of this survey are not directly comparable to those of the FTC survey because they deal with different types of fraud.  In particular, the DOJ survey asked about several "local" fraud problems, such as problems with automobile or appliance repairs and with home repairs and improvements that were not included in our survey.  In addition, several of the frauds examined in the current study were not included in the DOJ survey.

[7.] Titus et al., p. 60.  These authors claim that individuals with a masters degree or beyond are also less likely to be a victim of fraud than those with intermediate levels of education.  However, this result appears to be based on attempted frauds, not successes.  When FTC staff examined only the successful frauds reported in the DOJ survey, we found no significant differences in the DOJ data among groups with a high school education or beyond.

1998, involved interviews with 1,504 adults over the age of 18.[8]  The sampling procedure was designed to allow the survey results to be projected to the population at large.  Based on this survey, AARP reported that "Three quarters of those in the study (74%) report that they had at least one bad experience when buying a product or service in the year preceding the interview."[9]  This figure was derived from responses to a series of questions about specific things that may have happened to consumers when making a purchase.  These included whether consumers had purchased "a product that was defective, or did not work properly," whether "a product or service you bought was not received in the time it was promised," and whether "you were given a written estimate for repair work, but the final bill turned out to be much higher than the estimate."[10]  Although each of these problems may result in consumer injury, it is not clear that all such occurrences would constitute a fraudulent offer.

A better measure of the extent of consumer fraud comes from the question from the AARP survey that asked "Thinking about all the bad experiences you have EVER had as a consumer, was there ever a time you felt you were the subject of a MAJOR consumer swindle or fraud?"  Seventeen percent of survey participants answered this question affirmatively.[11]  One weakness of this question, however, is that it failed to define what was meant by a major swindle or fraud.  Each consumer was left to define the term for him or herself.  Thus, there is likely to be inconsistency in the answers given by different consumers.

In addition to estimating the share of adults who had been a victim of a bad buying experience or a major fraud or swindle, AARP analyzed how these figures varied with the consumer's age.  They found that older consumers – those who were 65 or over – were less likely to report that they felt that they were deceived or taken advantage of during a purchase transaction within the last year.  Although 80 percent of consumers between 18 and 49 reported feeling deceived or taken advantage of in the last year, only 72 percent of those between 50 and 64 years of age and only 60 percent of those who were at least 65 did so.[12]  Similarly, although 19 percent of consumers under the age of 65 said that they had been the

---

[8]  See, American Association of Retired Persons, *Consumer Behavior, Experiences and Attitudes: A Comparison by Age Group*, 1999.  AARP conducted another consumer experience survey in December 2002 and January 2003.  (See, AARP, *2003 Consumer Experience Survey: Insights on Consumer Credit Behavior, Fraud and Financial Planning*, 2003.)  Because the 2002-03 survey was limited to consumers who were at least 45 years old, however, the results of that survey are not directly comparable to the findings of the FTC survey.

[9]  *Id.*, p. 19.

[10]  *Id.*

[11]  *Id.*, p. 21.  Although the FTC survey relies primarily on specific questions about particular types of consumer experiences, it did include a question similar to the one in the 1998 AARP survey:  "Now, thinking about your experiences as a consumer, was there ever a time when you felt you were a victim of a consumer fraud?"  (Survey question 10)  Twenty-eight percent of participants in the FTC survey answered this question in the affirmative.

[12]  *Id.*, p. 19.

*Consumer Fraud in the United States: An FTC Survey*

victim of a major consumer fraud or swindle sometime during their lifetime, only 8 percent of senior citizens indicated that they had been a victim.[13]

In addition to its consumer experience surveys, AARP has conducted two other empirical studies of telemarketing fraud – one in 1996 and one in 2003.[14]  The samples used in these studies, however, are not random samples of consumers, but samples of known fraud victims.[15]  As such, the studies cannot be used to estimate the incidence of consumer fraud.  Rather, their purpose is to understand the characteristics of those who are victims of frauds.  In addition, the samples consisted solely of older consumers – those age 50 and over in the 1996 study and those 45 and above in the 2003 study.

The 1996 study found that

Victims in this survey ... are more affluent and more educated than other people age 50 and older....  Almost all victims own their own homes, and close to a third have college degrees.  Just under half (43%) have annual household incomes of $30,000 or more compared with just over a third (38%) of all adults 50 and older....  Forty-three percent have assets, not including home equity, of at least $50,000 and 28 percent report assets of $100,000 or more.[16]

The study also found that victims are not socially isolated, contrary to what has often been suggested.[17]  In addition, the study found that victims say that they do not like telemarketing calls, they try to avoid them, and they are skeptical of the sales presentations.  Furthermore, 90 percent of victims believe that it is acceptable to hang up on a persistent telemarketer, though the study suggests that some of the victims have trouble actually hanging up.[18]

---

[13] *Id.*, at 21. Interestingly, AARP found that the percentage of consumers who felt that they had been a victim of a major fraud or swindle was highest for those between 50 and 64 years of age.  Of this group, 23 percent said that they had been a victim at some point in their lives.  This compares with 18 percent of those under age 50 and 8 percent of those 65 and over.

[14] American Association of Retired Persons, *Telemarketing Fraud Victimization of Older Americans: An AARP Survey*, 1996, and AARP Foundation, *Off the Hook: Reducing Participation in Telemarketing Fraud*, 2003.

[15] In the 2003 study of fraud victims, AARP did include a randomly-drawn sample of consumers so that they could compare the characteristics of victims to those of the population at large.  In the 1996 study, the findings for victims were compared with the results of a random survey of all consumers that had been conducted by the contractor for another client in the previous year.

[16] AARP (1996), p. 7.

[17] *Id.*, p. 4.

[18] *Id.*, p. 10.  The authors of the study acknowledge that it is difficult to know whether the opinions expressed in the survey represent the views of victims at the time they were victimized or whether their views changed as a result of their fraudulent experiences.

In addition, it is not clear that the sample of victims included in this survey is demographically representative of victims in general.  The sample used in the 1996 study was drawn from lists of victims of nine frauds.  The lists were provided by the District Attorney for Denver, Colorado, and the Florida State

*(continued...)*

In the 2003 study of fraud victims, AARP examined the characteristics of victims of two different types of frauds – a lottery scam and an investment scam. The study found that the characteristics of victims of the two types of fraud differ from each other and from the general population of those age 45 and over.[19] Further, it found that many victims tend to deny that they have been the victim of a fraud and to understate the amount of money they have lost as a result.[20]

In conclusion, only a few recent studies examine consumer fraud and its victims.  This FTC study is designed to add to our knowledge by providing more current information on consumer fraud generally and more detailed information on the specific types of fraud most frequently reported in the Commission's Consumer Sentinel fraud complaint system.  The results of this survey will permit the Commission to target education campaigns and law enforcement initiatives more precisely towards particular consumer groups who are most at risk of falling victim to fraud but who may not have complained to the FTC about their experiences.

---

[18] (...continued)
Attorney General.  At least six of the nine victim lists included only victims who had either complained to authorities or who had filed affidavits as part of the legal proceedings.  The demographic characteristics of those who have filed complaints, or have been willing to provide affidavits, may not be representative of all victims across a wide range of frauds.  Chapter 5 of this study investigates how the likelihood of complaining varies across groups with different demographic characteristics and finds that women, consumers who make relatively greater use of the Internet, those with more education, and younger victims are more likely to complain.

[19] *Off the Hook*, p. A-10.

[20] *Id.*, p. A-15.  The study's authors point out, however, that at least some of the under-reporting may have been the result of the way the survey questions were structured.  The questions that were used to decide whether a person admitted to being a victim of a fraud asked about sending money to "callers from organizations you are not personally familiar with."  If, as is sometimes believed to happen, fraudsters attempted to gain the victims' confidence by making multiple calls to a victim before asking for money, then the victims may have felt that they knew the organization before they sent any money.

   In addition, because the AARP study was designed to learn about actual victims of a fraud, the survey caller asked to speak with the particular victim.  (See, *Off the Hook*, Appendix C-3.)  This may have made participants less willing to admit to being a victim of a fraud than in a more anonymous survey, such as the present one, where the name of the individual being interviewed is never collected.

*Consumer Fraud in the United States: An FTC Survey*

SJX28 - 29

# Chapter 2:  Description of the Survey

To learn more about the types and extent of fraud perpetrated on U.S. consumers, the Federal Trade Commission commissioned a telephone survey of 2,500 randomly-chosen adults.[21]  The survey was conducted between May 20 and June 3, 2003, and asked participants about their experiences during the year prior to the interview.

## Types of Fraud Investigated

Although most consumers have some notion of what fraud is, those notions may differ.  In designing the survey, we were therefore concerned about simply asking whether participants had experienced fraud.[22]  If some participants included certain types of experiences as fraud, while others did not, the resulting measures of the incidence of fraud would be subject to considerable measurement error, and the study would be less useful.

To avoid this problem, we constructed the survey to focus on specific experiences that consumers might have had and which might have been fraudulent, rather than solely asking generally whether the consumer had experienced fraud.[23]  Participants were first told:

> Now we would like to ask you about some types of frauds that happen to consumers.  Since there are a lot of ways in which a consumer might be cheated or be a victim of fraud, I am going to read you descriptions of some ways in which consumers are sometimes cheated or become victims of fraud.  Please tell me which of these things, if any, have happened to you in the past year.

---

[21] The survey was conducted for the Commission by Public Opinion Strategies.  The survey instrument was developed collaboratively by the contractor and staff in the Commission's Bureau of Economics and Bureau of Consumer Protection.  The sample was drawn proportional to the number of adults in each state and also to obtain the correct ratio of female to male interviewees.  It was conducted using a random digit dialing sampling methodology.  The contractor provided weights to adjust for sampling and response rate issues.  Unless otherwise noted, the results reported here are based on the weighted survey results.

[22] The word "we" as used in this report refers to the author of the study and/or the staff of the Bureaus of Economics and Consumer Protection.  It does not refer to the Federal Trade Commission or any of the Commissioners.

[23] Before asking about the specific types of fraud, one question asked participants if they ever felt they "were the subject of a consumer fraud." (Survey question 9)  Approximately one half of those who indicated that they had such an experience were then asked to describe the event that led to this feeling.  The responses to this question are discussed below.

*Consumer Fraud in the United States: An FTC Survey*

We asked about ten specific types of experiences designed to cover many of the frauds that have led to FTC enforcement actions.  In addition, we asked about two more general types of experiences that may indicate fraud.  Finally, we asked participants whether their long distance service had been changed without their authorization.[24]

### Specific Types of Fraud

In deciding which frauds to include in the survey, we focused on those that have generated the greatest number of complaints in the FTC's Consumer Sentinel database of fraud complaints.

### Advance Fee Loans and Credit Cards

The FTC frequently receives complaints about offers for a loan or credit card in return for the payment of a fee.[25]  These offers, which are often directed to consumers with tarnished credit records, require that the consumer pay the fee before the promised loan or credit card is received.  In most instances, however, consumers who pay the required fee do not receive the promised loan or credit card.  Indeed, it is a violation of the Telemarketing Sales Rule to ask for a payment before delivering a promised credit card or loan, if the offer is made by telephone.[26]

To assess the frequency with which this problem occurs, the survey asked "In the past YEAR, have you paid money to anyone who promised or guaranteed to provide you with a credit card or loan, other than a mortgage loan, but required you to pay a fee before receiving the credit card or loan?"[27]  As with all of the

---

[24] Questions about the various types of frauds were asked in a randomized fashion, though questions about similar types of frauds – *e.g.*, those related to unauthorized billing or those related to employment or business opportunities – were asked together.  The randomization routine involved first randomizing the areas of inquiry and then randomizing the order of the questions within the area.  When participants indicated that they had had a particular experience about which they were being asked, all of the follow-up questions were then asked before the questions related to different types of frauds were resumed.  The complete survey instrument is included in the Appendix.

In addition to the specific areas discussed in the text, the survey also asked participants whether in the last year they had "purchased something where the item ... received turned out to be of substantially lower quality than what was originally represented...."  (Survey question 50)  We have not included responses to this question in this report.  When participants who indicated that they had such an experience were asked to describe how the item they received differed from what they expected (Survey question 55), the descriptions very often seemed to involve something that was more of a bad purchase experience than an experience with fraud.

[25] *See, e.g., FTC v. Assail, Inc., et al.,* Civ. No. W03CA007 (W.D. Tex. (filed Jan. 9, 2003)) (FTC Matter Number X030021); *FTC v. 9094-5114 Quebec, Inc.*, Civ. No. 03 C 7486 (N.D. Ill. (filed Oct. 23, 2003)) (FTC Matter No. X040003); *FTC v. ClickForMail.com, Inc.*, Civ. No. 03 C 3033 (N.D. Ill. (filed May 7, 2003)) (FTC Matter No. X030054); *FTC v. Bay Area Bus. Council, Inc.*, Civ. No. 02 C 5762 (N.D. Ill. (filed Aug. 13, 2002)) (FTC Matter No. X020103).

[26] See Telemarketing Sales Rule, 16 C.F.R. 310.4(a)(4).

[27] Survey question 16.  Mortgage loans were excluded from the question because it is common business practice for those applying for a mortgage loan to pay for items such as credit reports and property appraisals before the loan is approved.

8

types of fraud in the survey, participants who answered in the affirmative were then asked "How many times has this happened to you in the past year?"[28]  These participants also were asked whether they had actually received the promised loan or credit card.[29]  Only those who had not received the promised loan or credit card were considered to be victims of a fraud.[30]

## Credit Repair

Consumers who have trouble obtaining credit because of negative information in their credit records are sometimes targets of offers claiming that the seller, in exchange for a fee, will help the consumer improve his or her credit record and thus enable the consumer to obtain credit.  The survey asked specific questions about two types of so-called "credit repair" schemes, both of which are illegal under the Credit Repair Organizations Act.[31]

The first type of scheme involves a false claim that the seller can remove derogatory information from a credit report – even though it is accurate and even though the credit reporting agency is legally permitted to include the information in the credit report – and thereby improve the consumer's ability to obtain credit. Consumers are generally required to make an up-front payment to obtain these services.  Not surprisingly, little, if any, of the negative information is actually removed after consumers pay the required fee.[32]  To assess the extent of this fraud, survey participants were asked: "In the past YEAR, have you paid money to anyone who promised or guaranteed to remove negative, but true, information from your credit record, but failed to get the information removed?"[33]

In the second type of scheme, the seller promises – in exchange for a payment – to tell consumers how to create a new identity to use in applying for credit. Typically, the seller directs the consumer to obtain a new personal identification number, often an employer identification number ("EIN"), and then to use this number in applying for credit, rather than his or her Social Security number.  The seller claims that by using the new identity on credit applications, the consumer

---

28  Responses concerning the number of times the event occurred are coded in the same question as the original question.  Thus, the responses to question 16 show both whether the person indicated that they paid money for a loan or credit card and, if so, how many times this happened in the last year.

29  Survey question 17.  As with all follow-up questions, those participants who indicated that they had paid an advance fee for a loan or credit card more than one time in the past year were asked to focus on the most recent time they had done so in answering this question.

30  About 27 percent of those who said that they had paid money to obtain a promised credit card or loan said that they had actually received the credit card or loan.

31  Pub. L. No. 104-208, 110 Stat. 3009 (September 30, 1996).

32  *See, e.g., FTC v. ICR Services, Inc.*, Civ. No. 03 C 5532 (N.D. Ill. (filed Aug. 8, 2003)) (FTC Matter No. X030077); *FTC v. Jordan Maxwell*, Civ. No. 03-0128 (C.D. Cal. (filed Jan. 7, 2003)) (FTC Matter No. X030030).

33  Survey question 13.  Although the survey question only asked about instances where the participant paid money for credit repair services that were not, in fact, provided, the Credit Repair Organizations Act makes it illegal for a credit repair organization to charge or pay for any credit repair services in advance of providing those services in full.  (15 U.S.C. 1679c(b)).

*Consumer Fraud in the United States: An FTC Survey*

can hide derogatory credit report information from potential lenders.  The survey question related to this scheme was: "In the past YEAR, have you paid money to anyone who promised or guaranteed to provide information to help you create a new credit identity or new credit record?"[34]

## Credit Card Insurance

The final credit-related fraud we examined involves the sale of insurance that purportedly protects consumers from unauthorized charges to their credit card accounts.  Federal law limits consumers' liability for the misuse of their credit cards to $50,[35] and credit card companies often do not require that consumers pay even this amount.  Nevertheless, some fraudulent operators attempt to defraud consumers by misrepresenting that card holders face considerable financial risk if their credit cards are misused.  These operators then offer to sell consumers insurance to protect against this purported risk.[36]

To examine this type of offer, participants were asked: "In the past YEAR, have you paid money to anyone who promised or guaranteed to provide insurance to protect you against the unauthorized use of your credit cards?"[37]

## Unauthorized Billing for Buyers' Club Memberships

The survey also examined the practice of billing consumers without their consent for memberships in a buyers' club or for publications that promise to show the consumer how to save money.  A buyers' club is designed to permit consumers to purchase products at a lower price than is generally available, and buyers' clubs are not inherently problematic.

The Commission has taken action against the deceptive marketing of buyers' clubs, however.[38]   In recent years, for example, sellers have offered a membership in a buyers' club as an add-on or "upsale item" at the end of a telemarketing sale.  Having completed the sale that ostensibly was the reason for the call, the telemarketer then offers the consumer a free trial membership in a buyers' club as a "thank you."

_____

[34] Survey question 14.

[35] 15 U.S.C. 1643 (2004).  See also, Federal Trade Commission, Bureau of Consumer Protection, Office of Consumer and Business Education, *FTC Consumer Alert: Credit Card Loss Protection Offers: They're the Real Steal*, October 2000, at http://www.ftc.gov/bcp/conline/pubs/alerts/lossalrt.htm.

[36] *See, e.g., FTC v. Pac. First Benefit LLC.*, Civ. No. 02 C 8678 (N.D. Ill. (filed Dec. 2, 2002)) (FTC Matter No. X030010); *FTC v. 1492828 Ontario, Inc.*, Civ. No. 02 C 7456 (N.D. Ill. (filed Oct. 17, 2002)) (FTC Matter No. X030001); *FTC v. Efficient Telesales Services, Inc.*, Civ. No. 02 C 3776 (N.D. Ill. (filed May 28, 2002)) (FTC Matter No. X020069); *FTC v. Consumer Alliance, Inc.*, Civ. No. 02 C 2429 (N.D. Ill. (filed Apr. 4, 2002)) (FTC Matter No. X020076).

[37] Survey question 15.

[38] *See, e.g., FTC v. Wellquest Int'l*, Civil Action No. 03-5002 (C.D. Cal. (filed Jul. 10, 2003)) (FTC Matter No. X030074); *FTC v. Preferred Alliance, Inc.*, Civil Action No. 1:03-CV0405 (N.D. Ga. (filed Feb. 12, 2003)) (FTC Matter No. X030022); *US v. Richard L. Prochnow*, Civil Action No. 02-CV-917 (N.D. Ga. (filed Apr. 9, 2002)) (FTC Matter No. X020054).

Sometimes the membership is offered as a negative option, whereby the credit card that the consumer used to make the initial purchase is automatically charged for the price of the membership unless the consumer cancels the membership by the end of the free trial period.  If the seller does not make the negative option clear, however, consumers may agree to accept the free trial offer believing that the membership will not continue beyond the free trial period unless the consumer affirmatively takes steps to continue the membership.[39] Consequently, consumers are charged for the membership without their authorization.[40]

Buyers' clubs were just one of several problems involving unauthorized billing that were covered by the survey.  This section of the survey began with a general question about whether, in the last year, participants had "been billed for a product or service which [they] did not agree to purchase or were ... billed for an amount that was substantially more than [they] expected to pay."[41]  Participants who answered in the affirmative were then asked a series of questions designed to learn more about the products or services involved.  In the case of buyers' club memberships, the survey asked whether participants had been billed for "a publication or membership in a club that the seller told [them] would allow [them] to purchase something for a lower price than is generally available" but that they had not agreed to purchase.[42]

With regard to unauthorized billing, FTC staff recognizes that sometimes consumers may be billed for a product they did not order as a result of an honest mistake by a legitimate business.  We do not want to count such mistakes as frauds.  The survey, therefore, asked participants who indicated that they had experienced a billing-related problem whether they had sought a refund from the seller.  When a refund had been sought, the survey then asked whether the seller provided a refund or other adjustment that the purchaser found acceptable.[43] Survey participants who answered in the affirmative are not considered to be

---

[39]  Indeed, consumers may only be informed about the negative option in introductory membership information that is mailed to them after they have agreed to accept the free trial membership.  This information is often sent by third-class bulk mail and many consumers do not open the mail because it appears to be unsolicited promotional materials.

[40]  The Commission addressed this problem in the amendments to its Telemarketing Sales Rule ("TSR") that became effective March 31, 2003.  Under the revised TSR, sellers are prohibited from using a consumer's credit card account that the seller had previously obtained to charge for a membership that automatically converts from a free trial unless the consumer repeats at least part of the account number to the seller and gives his or her express agreement to be billed for the membership.  (*See* 16 CFR 310.4(a)(6)(i).)

[41]  Survey question 18.

[42]  Survey question 21.  It should be noted that, as worded, this question would not capture all problems that may arise with buyers' clubs.  For example, consumers who bought a membership in a buyers' club and later found that the membership did not provide the promised amount of savings would not answer this question affirmatively.

[43]  Survey questions 26 and 27, which were asked following all affirmative responses to questions 19 through 22.

*Consumer Fraud in the United States: An FTC Survey*

victims of a fraud in most instances, because they did not suffer any monetary harm as a result of the billing error.[44]

Participants who did not ask for a refund are somewhat harder to categorize. Some who failed to seek a refund probably did fall victim to fraud and would not have obtained a refund if they had asked for one. Others were likely dealing with legitimate firms and would have received one – and thus should not be considered victims of fraud. To address this issue, we have assumed that, had they asked, the same fraction would have received a refund as is observed for those who did ask. We make this assumption separately for each type of problem where the survey asked about refunds. For example, about half of those who asked for a refund after experiencing unauthorized billing for a buyers' club membership actually received one. We therefore assumed that half of those who reported problems with buyers' club memberships but did not ask for a refund would have received one had they asked. We therefore considered only half of those who did not ask for a refund to be victims of fraud.[45]

---

[44] We have not applied this principle to consumers who suffered from unauthorized changes in their long distance telephone service ("slamming"), however. Because of the nature of the problem, all consumers who report having experienced slamming are counted as victims, even though they may not have suffered any monetary harm.

With respect to consumers who obtained refunds, we recognize that some of them may, in fact, have been defrauded. In some cases, for example, fraudulent operators may provide refunds to consumers who complain – particularly if the consumer complains to a Better Business Bureau or a legal authority. In this way, the fraudulent operator can appear responsive to consumer complaints and therefore avoid attracting the attention of law enforcement, while continuing to profit from consumers who are less aggressive. Moreover, consumers who obtain refunds nonetheless experience some injury because they must spend time and effort to obtain the refund or other adjustment.

The survey did not ask specific questions about whether consumers sought and obtained refunds for some of the other types of fraud – *e.g.*, the credit frauds discussed above. Victims of all frauds were asked how much money they had paid, however, and how much they had lost, as part of the fraudulent transaction. As with consumers who explicitly indicated that they had obtained a refund, consumers who indicated that they had not paid anything or that they had not lost anything as a result of a transaction are generally not considered to be victims of a fraud for purposes of this study. (See discussion at page 19, below.)

[45] Our decision to treat as non-victims of fraud both those consumers who received refunds and those consumers who we project through imputation might have obtained refunds had they made such a request is a conservative one. It not only reduces the numbers for victims of fraud but it may initially seem to be at odds with some of the cases brought by the Commission. However, we do not believe that analysis used in a study such as this can be applied to the FTC's fraud cases or vice versa. For example, the FTC has sued a number of companies that operate high-volume, low-dollar fraudulent credit card billing schemes to charge consumers' credit card accounts without their authorization. *See, e.g., FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176 at 1201 (C.D. Cal. 2000). In such cases, the FTC frequently argues that most or even all of the transactions are fraudulent. After a trial, the court in J.K. Publications found that more than 90 percent of the transactions were demonstrably fraudulent. Even so, only about 15 percent of the more than $40 million billed to consumers was credited or refunded to victims before the FTC brought its case. Applying the standard used in this study to the facts in that case would have yielded a result whereby consumers who received refunds – and even some who did not – would have been excluded from the pool of victims, when in reality virtually all of the transactions associated with the defendants were fraudulent. Applying the analysis from such cases to this study, however, would lead to an equally erroneous result. In the context of a randomized telephone study, we have very limited information about the nature of the businesses with whom the consumers were interacting. Therefore, to presume that either all or none of these transactions are fraudulent would be unsupportable. Consequently, we have adopted the more conservative approach explained above for the purposes of this study, but would not endorse its application to fraud cases brought by the FTC.

12

### Unauthorized Billing for Internet-Related Services

The survey also examined unauthorized billing involving the provision of Internet-related services.  In particular, we inquired whether consumers had been billed for either Internet access services or a web site that they had not agreed to purchase.[46]  This problem is illustrated by the Commission's action against certain promoters of web-based "yellow-page" services that promised to list a small business in a yellow-page style directory.  These sellers promised to provide consumers with a copy of the proposed web page and a free trial period for the service.[47]  Consumers agreed to receive the trial page believing that they could examine the page and then decide whether to pay for the service after the trial period.  The promised copy of the page often did not appear, however, and the seller began billing the consumer before the expiration of the supposed trial period.  Often these charges appeared on the consumer's telephone bill, where they were frequently overlooked and just paid.

### Unauthorized Billing for Information Services

The Commission's cases have also involved unauthorized billing for information services, such as adult entertainment, gambling, or psychic services. These services can be provided either over the Internet or over a pay-per-call telephone line, such as a 900-number.  In some cases, consumers have had their Internet service rerouted without their knowledge, resulting in very high charges for access to the information services provided.[48]  In other cases, the marketer of the information service persuaded consumers to provide credit card information supposedly for purposes unrelated to billing – such as to verify that the individual was of legal age – and then used the card number to bill consumers.[49]

To investigate this type of problem, survey participants were asked if they had experienced a billing problem "while purchasing 900 number pay-per-call or Internet information services, such as adult entertainment, gambling, or psychic services."[50]

---

[46]  Survey question 19 asked whether survey participants had the experience of being billed for a service that they had not agreed to purchase or of being billed for an amount that was substantially more than they anticipated paying "while purchasing Internet-related services, such as Internet access or a web-site."  As with other unauthorized billing problems, consumers who requested and received a refund were not counted as victims.

[47]  *See, e.g., FTC v. Epixtar Corp., et al.*, Civ. No. 03-CV-8511 (DAB) (S.D. N.Y. (filed Oct. 28, 2003)) (FTC Matter No. X040008).

[48]  *See, e.g., FTC v. Alyon Technologies, Inc., et al.*, Civ. No. 1:03-CV-1297(RWS) (N.D. Ga. (filed May 13, 2003) (FTC Matter No. X030053); *FTC v. BTV Industries, Inc.*, Civ. No. CVS-02-0437-LRH-PAL (D. Nev. (filed Mar. 27, 2002)) (FTC Matter No. X020029); *FTC v. Verity International, Ltd.*, Civ. No. 00 Civ 7422 (LAK) (S.D. N.Y. (filed Oct. 2, 2000) (FTC Matter No. X010001).

[49]  *See, e.g., FTC v. The Crescent Publishing Group, Inc., et al.*, Civ. No. 00 Civ. 6315 (LAK) (S.D. N.Y. (filed Aug. 23, 2000)) (FTC Matter No. X000114); *FTC v. J.K. Publications*, Civ. No. CV-99-0444 ABC (AJWx) (C.D. Cal. (filed Jan. 19, 1999) (FTC Matter No. X990014).

[50]  Survey question 20.  Again, those who asked for and received a refund were not considered to be victims.

*Consumer Fraud in the United States: An FTC Survey*

## Pyramid Schemes

The survey also addressed the sale of pyramid marketing schemes.[51]  Pyramid schemes often claim that purchasers will operate their own businesses selling a particular product or service and that they will make money both from their own sales and from those of others they recruit to join the program.  Although such a business may look like a legitimate multi-level marketing program, it differs because the income earned by participants comes ultimately from recruiting, rather than the sale of products or services to consumers.  Most participants in pyramid schemes lose money because the program really just transfers money from those who have joined most recently to those who have been involved for a longer period of time.  At any point in time, the vast majority of those who have joined the program – often 90 percent or more – will not have recouped the money they paid to join.[52]

To learn about the extent of problems with pyramid offerings, survey participants were first asked whether, in the past year, they had "paid anyone for an opportunity to operate [their] own business, such as a work-at-home plan, a business opportunity or a franchise."[53]  To learn whether the business was a pyramid, participants were then asked whether they were "led to believe that most of the money [they] earned from this business would be from recruiting others to join the business, rather than from the sale of products."[54]

## Business Opportunity Offerings With False Earnings Claims or False Offers of Assistance

Business opportunity offerings also sometimes involve false promises that purchasers will make a large amount of money.  Similarly, sellers sometimes make false promises that they will provide purchasers with assistance in finding customers or locations.  For example, sellers of fraudulent vending machine business opportunities may promise to provide high-volume locations where purchasers can place their machines.[55]

---

[51] Commission cases against promoters of pyramid schemes have included *FTC v. NexGen300.com, Inc.*, Civ. No. CIV'03 120 TUC WDB (D. Az. (filed Feb. 18, 2003)) (FTC Matter No. X030035); *FTC v. Trek Alliance, Inc.*, Civ. No. CV-02-9270 JSL (AJWx) (C.D. Cal, (filed Dec. 6, 2002)) (FTC Matter No. X030011); *FTC v. Skybiz.com, Inc.*, Civ. No. 01CV0396K (E) (N.D. Okla. (filed May 30, 2001)) (FTC Matter No. X010046).

[52] See, *e.g.*, Vander Nat, Peter J., and William W. Keep, "Marketing Fraud: An Approach for Differentiating Multilevel Marketing from Pyramid Schemes," *Journal of Public Policy & Marketing*, 21 (Spring 2002), pp. 139-151.

[53] Survey question 31.  As in the other areas of the survey, participants who indicated that they had made such a purchase were then asked how many times they had made such a purchase in the last year. Those who indicated that they had made more than one such purchase were then asked to focus on the most recent such purchase in answering the remaining questions in this area.

[54] Survey question 33.

[55] Commission cases against promoters of fraudulent business opportunities have included *FTC v. Ameritel Payphone Distributors, Inc.*, Civ. No. 00-514-CIV Gold/Simonton (S.D. Fla. (contempt entered Apr. 9, 2004)) (FTC Matter No. X000012); *FTC v. Greeting Cards of Am.*, Civ. No. 03-60746-CIV Gold (S.D. Fla.

(continued...)

14

SJX28 - 37

Business opportunity offerings generally include some package of information, equipment, and services that purportedly will enable the consumer to establish and operate a successful business.  Such offerings often appeal to consumers who have little or no business experience because they supposedly provide everything needed to own and operate the business.  By promising that the business is certain to make at least a specific income, a seller can lead potential purchasers – particularly those without experience operating their own businesses – to believe that there is little risk in purchasing the business.  Similarly, claims that the seller will provide consumers who purchase their business opportunity offerings with customers or selling locations can convince potential purchasers that they do not need to do much work to operate this business and that they are highly likely to succeed.

To measure the extent of problems with false earnings claims, survey participants who indicated that they had purchased a business opportunity were asked whether they had been "led to believe that [they] would earn a certain amount of income or profit from this business."  Those who answered in the affirmative were then asked "Did you earn at least roughly as much money as you had been led to expect?"  Similarly, participants were asked whether they had been promised "help in locating customers who would use [their] services or allow [them] to sell [their] products from their premises," and, if so, whether they had obtained the promised assistance.[56]  Victims of this type of fraud are limited to those who said that they had not made as much as had been promised or that they had not received the assistance that had been promised.[57]

---

[55] (...continued)
(filed Apr. 21, 2003)) (FTC Matter No. X030044); *FTC v. Medical-Billing.com*, Inc., Civ. No. 3-02CV0702P (N.D. Tex. (filed Apr. 5, 2002)) (FTC Matter No. X020046); *FTC v. Accent Marketing, Inc.*, No. 02-0405-CB-M (S.D. Ala. (filed Jun. 4, 2002)) (FTC Matter No. X020066).

[56] As discussed above, the question about whether a participant had purchased a business opportunity was question 31 in the survey.  Question 36 asked about unrealized earnings claims, while question 37 asked about promises of assistance that was not received.

When writing the questions to include in the survey, staff intended that survey participants would include information about various types of work-at-home schemes that have generated complaints to the Commission's Consumer Sentinel system.  It is possible, however, that some participants would not have interpreted the survey question in that way.  This is particularly likely where consumers have been involved with something like an envelope stuffing or product assembly work-at-home scheme, which consumers may consider as a job offering rather than a business opportunity.

[57] Given that the survey was limited to purchases that had been made in the last year, it is possible that some business-opportunity purchasers who indicated that they had not realized the promised level of earnings will do so in the future.  It is not uncommon for a business to have lower earnings when it is just getting started than after the business has been in operation for some period of time.

Of 19 participants who said that they had purchased a business opportunity other than a pyramid, seven said that they had been led to believe that they would earn a certain amount of money from the business.  Of these, five said that they had earned as much as they had been promised.  Seven of the 19 also said that they had been promised assistance in locating customers and, of those, six said that the promised assistance had been provided.

*Consumer Fraud in the United States: An FTC Survey*

### Government Job Promises

The survey also asked about a type of employment fraud in which the seller guarantees or represents that it is highly likely that consumers will obtain a government job.  Often, these offers promise jobs with the Postal Service.  The ads often look like "Help Wanted" ads, but in fact they are not placed by the government or anyone who can provide the promised jobs.  Rather, they typically are offers to sell a course or study guide that supposedly will improve the consumer's score on a test that is allegedly required to obtain the promised job.  It is not clear that the materials offered can actually improve consumers' scores, and in any event the ads frequently are run in areas where the test will not even be offered because there are no job vacancies to be filled.[58]

To identify consumers who had fallen victim to this type of misrepresentation, survey participants were asked "In the past year, have you paid anyone who promised that you would obtain a job at the U.S. Postal Service or another branch of state or federal government?"  Those who answered in the affirmative were then asked "Did you get the job that was promised?"[59]  Anyone who had not received the promised job was considered a victim of this type of fraud.[60]

### Prize Promotions

The final specific type of fraud investigated in the survey involves offers of free prizes.  Prize promotions have been another frequent source of fraudulent representations and consumer complaints to the FTC.  In these schemes, sellers tell consumers that they have won a prize – or that they have won one of four or five possible prizes – but that they must buy a product or make some other payment before they can receive their prize.  Even when the seller does not directly tell consumers that they must make a purchase, consumers may be misled into believing that they are more likely to win the prize if they make a purchase.  Alternatively, consumers may be told that they have to attend a sales presentation to receive the promised prize.[61]

---

[58] The FTC sued a promoter of a government job promotion fraud in *FTC v. American Career Services, Inc.*, Civ. No. 02-0593-CB-M (S.D. Ala. (filed Aug. 5, 2002)) (FTC Matter No. X020094).

[59] Survey questions 32 and 38.

[60] In fact, of the ten survey participants who indicated that they had paid for such an offer, nine said that they had not obtained the promised job, while the tenth person either indicated that he or she did not know or refused to answer the question.

[61] Commission cases against promoters of fraudulent prize offerings, including lottery scams, have included *FTC v. Dillon Sherif, et al.*, Civ. No. CV02-0294C (W.D. Wa. (filed Feb. 7, 2002)) (FTC Matter No. X020018); *FTC v. World Media Brokers, Inc., et al.*, Civ. No. 02-C-6985 (N.D. Ill. (filed Sept. 30, 2002)) (FTC Matter No. X020110); *FTC v. Global Network Enterprises, Inc., et al.*, Civ. No. SAC V 00-625GLT (ANX) (C.D. Ca. (filed Jun. 26, 2000)) (FTC Matter No. X000083).

Sometimes, even though consumers make the payment or attend the presentation, they do not receive the promised prize or find that the prize they receive is not what had been promised.[62]  The survey sought to investigate this problem through a series of questions.  First, it asked whether, in the last year, anyone had told survey participants that they had won a prize or been selected to receive an award, such as money, a free vacation, or some other product or service.  Those who answered affirmatively were then asked whether they had been told that they had to pay something, purchase a good or service, or attend a sales presentation to receive the prize or award, and if so, whether they had made "the required payment or purchase or [had attended] the required sales presentation."  Finally, those who indicated that they had fulfilled the applicable requirements were asked whether they had received the promised gift or award and, if so, whether the award had been "essentially what had been described to [them]."[63]

### More General Problems That May Be Associated With Fraud

In addition to the ten specific types of frauds described above, the survey also asked consumers whether they had experienced two more general problems that may indicate fraud.

### Billing Problems, Other Products

In addition to asking participants if they had been billed for the particular products or services described above without their consent, the survey also asked more generally whether the participant had been billed for "some other product or service" that they had not agreed to purchase.[64]

### Paid But Not Received

The survey also sought information about consumers who paid for a product or service but never received it.  The Federal Trade Commission often receives complaints from consumers who report that they purchased an item and paid for it, but the seller never provided it.  To gauge the extent of this problem, the survey asked participants: "Other than the things we have already discussed, in the past year have you purchased something which you paid for but NEVER received?"[65]

---

[62] Prize promotions are regulated by a variety state and federal laws.  *See e.g.*, Telemarketing Sales Rule, 16 C.F.R. 310.3(a)(2)(iv)-(v).  A prize promotion could be unlawful even if the promised prize is awarded.  For the limited purposes of this survey, however, we elected not to include any instance where a consumer received the prize that was promised.  This is again an effort to ensure that our estimates are conservative given the limitations of the survey data.  As we explained in footnote 45, underline supra, the assumptions used for the purposes of this survey may not be applicable to calculations of injury in the FTC's fraud cases where many more facts about the transactions may be available.

[63] Survey questions 39 through 44.

[64] Survey question 22.  The specific types of unauthorized billing covered by the survey are discussed above.

[65] Survey question 45.

*Consumer Fraud in the United States: An FTC Survey*

As with problems of unauthorized billing, if consumers fail to receive a product for which they paid, this failure may indicate that the seller was engaged in fraud.  Alternatively, it may simply indicate a mistake made by an honest seller. As with the questions about billing, we attempted to differentiate between the legitimate and illegitimate by asking about the seller's willingness to provide a refund or to make some other adjustment that was satisfactory to the purchaser.[66] A willingness to make such an adjustment may indicate that the seller is more likely to be legitimate and just made a mistake, whereas a seller who refuses to make an adjustment or who makes it overly difficult for the consumer to obtain one is more likely to have fraudulent intentions.[67]

### Switching of Long Distance Telephone Service Providers

The final problem investigated by the survey was the extent to which consumers had their long distance telephone service switched from one provider to another without their permission.  To inquire about this practice – commonly referred to as "slamming" – the survey asked: "And in the past year, has your long distance telephone service been switched to another company without your knowledge or consent?"

Although we included unauthorized telephone service switching in the survey, this problem differs in some key respects from the others included in the survey.  In the other areas we investigated, victims often obtain nothing of value in return for the money they pay.  In these cases, the minimum amount of injury to the consumer can be approximated by the amount of money paid.

The same cannot be said about the switching of consumers' long distance service.  Although consumers (and businesses that provide long distance service) are harmed by slamming, consumers who are slammed can make long-distance calls and therefore receive something for the money they pay.  Thus, the consumer injury from this practice is often primarily annoyance, loss of consumer choice, time spent undoing the switch, and any costs – such as fees to switch service – that are incurred in doing so.[68]

In addition, although consumers often complain to the FTC about slamming, telephone service is regulated by the Federal Communications Commission. Because of all these differences, this report discusses slamming separately from the other problems examined.

---

[66] See survey questions 47 and 48.

[67] As with the cases of unauthorized billing, when the seller provided a refund or other acceptable adjustment, we do not consider the incident to be fraud.  In addition, we assume that only a portion of those who did not seek a refund were victims of fraud.  (See page 12, above.)  As with unauthorized billing, excluding instances in which the consumer obtained a refund or other adjustment for an undelivered product may understate the extent of fraud, because some fraudulent sellers may make refunds to complaining consumers in order to appear legitimate and increase the likelihood that they can escape the attention of law enforcement.

[68] The survey did not ask about any fees that consumers had to pay to return to their preferred carrier.

18

## Victims of Fraud or Targets of Fraud?

The survey questions were designed to identify consumers who were actual victims of frauds and not those who may have been the target of an unsuccessful attempt to defraud them.  For example, participants were asked whether they had paid anyone for services designed to improve their credit records or create a new record.  They were not asked whether anyone had attempted to sell them services that would improve or replace their credit records.

Nonetheless, in some cases the survey responses suggest that participants may have reported on attempted fraud.  For example, participants who indicated that they had experienced a particular problem, such as paying someone to improve their credit record, were asked how much they paid for the service and how much they lost.[69]  In answering these questions, participants sometimes indicated that they had not paid anything or that they had not lost anything.

These responses may indicate that the participant was not an actual victim of a fraud but was reporting on an attempted fraud.  In other cases, participants may have initially fallen for an offer, but obtained a refund or otherwise stopped payment.[70]  In deciding how to treat these consumer responses, we adopted a relatively conservative approach.  First, we included consumers as fraud victims only if they appeared to have lost money.[71]  Similarly, we did not include consumers who indicated that they obtained a refund or other adjustment that the consumer found to be satisfactory.[72]  Finally, we included only some consumers

---

[69] See survey question 64, which was a follow-up question asked each time participants indicated that they had experienced one of the types of problems included in the survey.  Where participants indicated that they had experienced the problem more than once in the last year, these questions were asked of the most recent event.

[70] For example, if consumers used a credit card to pay for an item but realized before paying the bill that the offer was not as represented, they may have disputed the charge and refused to pay. (See, *e.g.*, Federal Trade Commission, Bureau of Consumer Protection, Office of Consumer and Business Education, *FTC Facts for Consumers: Fair Credit Billing*, March 2002, at http://www.ftc.gov/bcp/conline/pubs/credit/fcb.htm.)

[71] The one exception to this principle involves unauthorized switching of long distance telephone service.  As discussed above, the primary loss in such cases is the annoyance, time, loss of consumer choice, and any fees incurred in switching back to the consumer's preferred carrier.

[72] The percentage of survey participants who indicated that they had experienced a particular type of problem but that they had not lost any money or had obtained a refund ranged from 0 percent (for those who had purchased a business opportunity and did not realize the promised level of earnings or did not receive the promised assistance) to 74 percent (for those who were billed for an Internet service that they had not agreed to purchase).  Across the ten specific frauds examined, 46 percent of those who had experienced a problem indicated that they had not lost any money or had received a refund, and are therefore not counted as victims of frauds.  Including the two more general types of frauds, the percentage of those who obtained a refund or otherwise lost no money rises to 53 percent.

By excluding instances in which participants initially fell for a fraudulent offer but were able to avoid losing money, we are understating the number of consumers who suffered some form of injury as a result of the fraudulent offer.  In particular, consumers who succeeded in stopping payment or obtaining a refund may have had to expend significant time and effort to do so.  This time and effort is a form of injury from the fraudulent offer, because the consumers could have done something else with that time if they had not been victimized.

*Consumer Fraud in the United States: An FTC Survey*

who did not seek a refund.[73]  By these exclusions, we have attempted to avoid treating legitimate business errors as fraud.

## Consumer Purchasing Behavior

Before turning to an examination of the incidence of the various types of fraud in the next chapter, it is worthwhile to consider briefly what participants said in response to several questions about purchases made in response to telemarketing, television, or direct mail solicitations.[74]  Table 2-1 provides the responses to these questions both in aggregate and by the age of the participant.

First, of the 2,500 consumers who participated in our survey, 85.8 percent indicated that they had received at least one telemarketing call in the last year.[75]  The percentage varies significantly, however, depending on the consumer's age. Of those between 25 and 64 years of age, 88.6 percent said that they had received a telemarketing call in the last year.  However, only 74.8 percent of those between 18 and 24 and 79.6 percent of those 65 and over said that they had received telemarketing calls.[76]

The survey then asked whether the participant had made a purchase or a charitable contribution in response to a telemarketing call.  Considering purchases first, 3.7 percent of participants indicated that they had made at least one purchase in response to a telemarketing call from a company with whom they had not previously done business.  More than half of those who reported such purchases – 56.9 percent – said that they had made only one such purchase, while another 21.3 percent said that they made two purchases.[77]

Individuals between 25 and 34 were the most likely to make a purchase from a company with whom they had not previously done business in response to a telemarketing call, with 6.4 percent saying that they had made at least one such purchase in the last year.  The percentage declined in older groups – only 1.4 percent of participants aged 65 or over said that they had made such purchases in the last year.  Younger consumers also were less likely than the 25 to 34 year old

---

[73] For a more complete discussion of the treatment of cases in which refunds were not sought, see page 12.

[74] See survey questions 1 through 6.  In future research, we intend to examine whether making purchases in response to solicitations in these media has any relationship to the likelihood of being a victim of fraud.

[75] We note that the survey was conducted prior to the implementation of the Commission's National Do Not Call Registry.

[76] The differences among age groups are jointly significant at the 1 percent level.  Individually, the percentage of consumers between 18 and 24 years of age and of those aged 65 or older who had received a telemarketing call in the last year are each significantly lower than for those between 25 and 64 years of age at the 1 percent level.

[77] We do not report the average number of such purchases because the average value would be highly affected by the one individual who indicated that he or she had made 25 such purchases.  The next highest number reported was 7.

*Chapter 2:  Description of the Survey*

**Table 2-1:    Consumer Responses to Solicitations**

| Percent of consumers who, in the past year, have | Overall | By Age | | | | | | Sig.[a] |
|---|---|---|---|---|---|---|---|---|
| | | 18-24 | 25 - 34 | 35 - 44 | 45 - 54 | 55 - 64 | 65 and over | |
| Received a telemarketing call | 85.8% | 74.8% | 87.3% | 89.9% | 89.5% | 87.5% | 79.6% | *** |
| Purchased something in response to a telemarketing call from a company with whom you have not previously done business | 3.7% | 1.8% | 6.4% | 4.9% | 3.8% | 3.2% | 1.4% | *** |
| Contributed to a charity to which you have not previously donated in response to a telemarketing call | 7.9% | 7.5% | 12.3% | 10.2% | 5.7% | 7.9% | 4.7% | *** |
| Placed an order for a product by telephone, Internet, or mail after receiving an unsolicited piece of mail from a company with whom you have not previously done business | 9.1% | 7.5% | 13.4% | 9.3% | 9.4% | 8.3% | 6.5% | ** |
| Placed an order for a product by telephone, Internet, or mail after seeing a television advertisement or infomercial | 22.3% | 21.4% | 25.3% | 24.7% | 24.4% | 19.7% | 17.7% | * |
| Purchased something from an Internet web site | 37.9% | 38.4% | 52.0% | 50.5% | 43.5% | 28.3% | 14.5% | *** |

**Note.**

a  Indicates joint statistical significance of differences across age groups.

*** significant at 1 percent level

** significant at 5 percent level

* significant at 10 percent level

SJX28 - 44

*Consumer Fraud in the United States: An FTC Survey*

group to make such purchases: only 1.8 percent of participants between 18 and 24 reported making at least one such purchase in the last year.[78]

Turning to charitable contributions made in response to a telemarketing call, more than twice as many participants – 7.8 percent – reported that they made a contribution to a new charity in response to a telemarketing solicitation within the last year.  Forty-four percent of those who reported such contributions contributed to only one new charity, while another 26 percent say that they contributed to two.[79]

The variation in the likelihood of making contributions in response to a telemarketing call across different age groups is quite similar to the pattern of making purchases.  As with telemarketing purchases, those between the ages of 25 and 34 had the highest probability of making contributions to a new charity in response to a telemarketing call, with 12.3 percent of this group saying that they had done so in the last year.  Consumers aged 65 and over were the least likely to have made a contribution to a new charity, with only 4.7 percent indicating that they had done so.[80]  However, the difference among age groups is less pronounced in the case of contributions: Whereas consumers between 25 and 34 years of age were 4.5 times as likely as those 65 and over to have made a purchase in response to a telemarketing call, they were only 2.6 times as likely to have made a charitable contribution.

The survey also asked about purchases made after seeing a television advertisement or infomercial, and about purchases made in response to an unsolicited direct mail solicitation.  In both cases, the survey asked participants only about orders made by telephone, mail, or Internet.  If consumers receive an ad in the mail or see an ad on television but then visit a store before making a purchase, they presumably have an opportunity to see the merchandise before buying.

---

[78] The differences among age groups are jointly significant at the 1 percent level.  Individually, the differences in the percentage of consumers making telemarketing purchases is significant at the 1 percent level in comparing the rate for those aged 65 and over to that for those who are between 25 and 34.  The differences are significant at the 5 percent level in comparing the rate for those aged 18 to 24 or for those aged 55 to 64 to that for those aged 25 to 34.  The difference between the 45 to 54 year old group and the 25 to 34 group was significant at the 10 percent level.

[79] Again, the presence of an extreme response from one individual – in this case a person who said that he or she made 200 such contributions – makes an average value unreliable.

[80] Unlike telemarketing purchases, the youngest group of consumers – those between 18 and 24 – do not have the second lowest likelihood.  Those between 45 and 54 were less likely to make contributions than those between 18 and 24.

Again, the differences among age groups are jointly significant at the 1 percent level.  Individually, the difference in the percentage of consumers making telemarketing contributions is significant at the 1 percent level in comparing those aged 65 and over to those who are between 25 and 34.  The difference is significant at the 5 percent level in comparing the rate for consumers aged 45 to 54 to the rate for those aged 25 to 34, while the difference between the 18 to 24 year old group and the 25 to 34 year old group is significant at the 10 percent level.

22

The third line of Table 2-1 presents data on purchases made in response to a direct mail solicitation.  Without visiting a store, 9.1 percent of participants reported making a purchase from someone with whom they had not previously done business in response to such a solicitation.  Just under 40 percent of those who made such purchases said that they made only one purchase.  Another 27 percent said that they made two purchases, while an additional 21 percent made three or four purchases.

Purchases made in response to a television advertisement or infomercial were clearly the most popular of the purchasing behaviors in Table 2-1.  Almost one-quarter of participants – 22.2 percent – said that they had ordered a product in response to a television advertisement or infomercial without visiting a store.[81]  As with purchases made in response to direct mail, just under 40 percent of those who made purchases in this way said that they had done so only once in the last year.  Almost 30 percent said that they had made two such purchases, while about 15 percent said that they had done so three or four times in the last year.

For purchases in response to both direct mail and television advertisements or infomercials, differences across age groups follow the same pattern as for telemarketing purchases and contributions.  Consumers between 25 and 34 are the most likely to respond and those over 65 are the least likely.  Indeed, the pattern for direct mail purchases is very similar to that for telemarketing contributions.[82]  The differences across age groups, however, are less pronounced in the case of purchases made in response to a television advertisement or infomercial without visiting a store.[83]  Although those aged 25 to 34 were still the most likely to make such purchases and those 65 or over the least likely, they were only 1.4 times as likely as those over 65 to have made them.

---

[81]  To some extent the higher rate of response here may be caused by the fact that, unlike the questions discussed previously, the survey did not specify that purchases in response to a television ad or infomercial had to involve a company with which the consumer had not previously done business.

[82]  Across age groups, the differences in the likelihood of making purchases in response to direct mail solicitations are jointly significant at the 5 percent level.  Individually, the rate for those aged 65 and over differed significantly from that for those aged 25 to 34 at the 1 percent level, while the rate for consumers aged 45 to 54 differed from the rate for the 25-to-34 group at the 5 percent level of significance.  The rate for 35 to 44 year olds differed from the 25-to-34 rate at the 10 percent level of significance.

[83]  For consumers who had made a purchase in response to a television advertisement or infomercial, the age variables are jointly significant at only the 10 percent level.  The difference in the percentage making such purchases in the 65 and over group and those between 25 and 34 was significant at the 1 percent level, while the difference between the 55 to 64 year old group and the 25 to 34 year old group was significant at the 10 percent level.

*Consumer Fraud in the United States: An FTC Survey*

Finally, the survey asked consumers if they had made any purchases from an Internet web site in the last year.[84]  Thirty-eight percent of participants indicated that they had.  Among those who made Internet purchases, 25 percent indicated that they had made at least ten Internet purchases in the last year, and the median number of purchases was four.[85]

Purchases from Internet sites vary strongly with age.  More than half of consumers between 25 and 44 years of age said that they had made at least one purchase from an Internet web site in the past year.  The rate of purchase for those who were older was considerably lower.  For those in the 55 to 64 year old group, 28.3 percent said that they had made an Internet purchase in the last year, and only 14.5 percent of those aged 65 or over had done so.[86]

---

[84] As with purchases in response to a television ad or infomercial, the question about purchases from an Internet web site did not specify that purchases involve a company with which the consumer had not previously done business.  The survey did not include a specific question asking whether purchases had been made in response to email, whether or not the email was unsolicited commercial email.

[85] An average number of purchases is not reported because it is heavily influenced by five participants who said that they made 200 or more purchases during the year.

[86] Across age groups, the differences in the likelihood of having made an Internet purchase are jointly significant at the 1 percent level.  Individually, the rates for those in the 18 to 24, 55 to 64, and 65 and over groups are significantly different from the rate for the 25 to 34 year old group at the 1 percent level.  The difference between the 45 to 54 year old group and the 25 to 34 year old group is significant at the 5 percent level.

SJX28 - 47

# Chapter 3:  Which Types of Frauds Are the Most Common?

In Chapter 2, we detailed the various problems explored in our survey.  This chapter  examines which of these problems is most common and their overall frequency.  Our goal is to answer two important questions:  First, how many consumers are victims of these frauds and/or slamming?  Second, how many incidents of these problems occur?[87]  We also discuss the types of media used by fraudulent operators to convey their offers to consumers.  Finally, we present evidence on the costs to consumers resulting from the frauds and slamming examined in the survey.

## The Number of Victims

As shown in Table 3-1, the survey results suggest that 16.3 percent of adult Americans were victims of one or more of the frauds covered by the survey and/or of slamming during the year before the survey.[88]  Extrapolating this result to the

---

[87]  In considering the estimates of the extent of fraud – both the estimates of the number of victims and the number of incidents – it is important to keep in mind that some participants may not be aware that they were victims.  This is particularly likely with frauds that involve being billed for a product or service that the consumer had not agreed to purchase.  In many enforcement actions, the Commission has found that consumers have failed to notice charges placed on their credit card or telephone bills by fraudulent operators and have simply paid them.  In the case of monthly recurring charges, this frequently happens for some months before the consumer notices the charge.  Because such consumers would not be aware that they had been victimized, they could not describe the fraud in the survey.

There is also a possibility that some participants in the survey who were victims of one or more of the problems addressed may not have admitted that they were victims.  In its most recent research on telemarketing fraud, AARP interviewed consumers who were known to have been victims of a foreign lottery scam or of an investment scam.  Among other questions, the AARP survey asked participants whether they had been a victim of a major scam or swindle in the last three years in connection with "telephone callers from organizations you are not personally familiar with."  Only one-half of the known lottery victims and 27 percent of known investment victims answered this question in the affirmative.  (AARP Foundation, *Off the Hook: Reducing Participation in Telemarketing Fraud*, 2003, p. C-28.)  That is, at least half of the known victims apparently denied that they had been a victim.

We have no way of knowing whether we have a similar problem with our results.  Nevertheless, several differences between our survey and the one done by AARP may reduce the likelihood and extent of any denial of victimization.  First, as AARP notes in its study, the fact that the question in that study focused on telephone calls from organizations with which the consumer was not personally familiar may have led some victims to answer the question in the negative because they felt that they were familiar with the organization that scammed them.  (*Id.*, p. A-15)  The questions related to experiences with telephone fraud in our survey did not focus on telemarketing calls from an unfamiliar source.  Second, our survey did not ask consumers to indicate whether or not they were a victim.  Rather, it asked about specific events that consumers might have experienced.  Finally, because AARP wanted to interview known victims, they had to ask for specific individuals by name.  In contrast, consumers participating in our survey were never asked to give their names and interviewers did not ask to speak with specific individuals.  This procedure increased the degree of anonymity afforded participants and may have reduced the likelihood that they would deny having a particular experience.

[88]  The survey was conducted between May 20 and June 3, 2003, and therefore the results measure the extent of the various types of fraud during the last seven months of 2002 and the first five months of 2003.

(continued...)

*Consumer Fraud in the United States: An FTC Survey*

**Table 3-1:  Estimated Number of Adults Who Were Victims of Fraud or Had Their Long Distance Telephone Service Changed Without Permission, One Year Period Prior to the Survey[a]**

| Type of Problem | | Number of Adults (millions)[b] | Percent of Population[b] |
|---|---|---|---|
| Victims of Any Fraud Covered by the Survey or Unauthorized Changes in Long Distance Service | | 35.60 (32.45 - 38.75) | 16.3% (14.9% - 17.8%) |
| | | | |
| Victims of Unauthorized Changes in Long Distance Telephone Service ("Slamming") | (1) | 13.90 (11.75 - 16.10) | 6.5% (5.5% - 7.5%) |
| | | | |
| Victims of Any Type of Fraud, Specific or General, Included in the Survey | | 24.45 (21.85 - 27.10) | 11.2% (10.0% - 12.5%) |
| | | | |
| Victims of Specific Types of Fraud Included in the Survey | | 18.35 (15.95 - 20.70) | 8.4% (7.3% - 9.5%) |
| Paid an advance fee to obtain a loan or credit card that you were promised or guaranteed you would receive[c] | (2) | 4.55 (3.30 - 5.80) | 2.1% (1.5% - 2.7%) |
| Billed for buyers' club memberships you did not agree to purchase | (3) | 4.05 (2.95 - 5.20) | 1.9% (1.4% - 2.4%) |
| Purchased credit card insurance | (4) | 3.35 (2.35 - 4.40) | 1.6% (1.1% - 2.0%) |
| Purchased credit repair | (5) | 2.00 (1.15 - 2.85) | 0.9% (0.5% - 1.3%) |
| Paid money or made a purchase to receive a promised prize and did not receive the prize or prize was not as promised | (6) | 1.80 (1.10 - 2.55) | 0.8% (0.5% - 1.2%) |
| Billed for Internet services you did not agree to purchase | (7) | 1.75 (1.05 - 2.45) | 0.8% (0.5% - 1.1%) |
| Purchased a membership in a pyramid scheme[d] | (8) | 1.55 (0.80 - 2.30) | 0.7% (0.4% - 1.1%) |
| Billed for information services provided either over the Internet or by pay-per-call that you had not agreed to purchase | (9) | 0.80 (0.25 - 1.35) | 0.4% (0.1% - 0.6%) |
| Made a payment to someone who represented that you would receive a government job | (10) | 0.65 (0.10 - 1.20) | 0.3% ((x)[e] - 0.6%) |
| Purchased a business opportunity where promised earnings were not realized or promised assistance was not provided | (11) | 0.45 (0.05 - 0.90) | 0.2% ((x) - 0.4%) |
| Victims of More General Types of Fraud Included in the Survey | | 7.35 (6.00 - 8.75) | 3.4% (2.8% - 4.0%) |
| Billed for a product or service you did not agree to purchase or billed an amount significantly more than you expected, products other than those identified above | (12) | 4.60 (3.50 - 5.70) | 2.1% (1.6% - 2.6%) |
| Paid for a product but did not receive it | (13) | 2.90 (2.05 - 3.80) | 1.4% (1.0% - 1.8%) |

**(Notes on next page)**

**Table 3-1 (cont.)**

**Notes.**

a   Projections are based on U.S. population of 217.76 million adults aged 18 and over as of July 1, 2003.  (See U.S. Census Bureau, Population Division, Table ST-EST2003-01res: Annual Estimates of the Resident Population by Selected Age Groups of the United States and States: July 1, 2003 and April 1, 2000.)  Numbers are rounded to the nearest 0.05 million and percentages to the nearest 0.1 percent.  Amounts for individual categories will not sum to totals because some individuals are victims of more than one of the listed categories.

b   Because we surveyed a sample of 2,500 individuals and not the entire adult population, there is uncertainty in these estimates.  The numbers in parentheses in the table indicate the bounds of the 95 percent confidence intervals for the various estimates.  For example, there is a 95 percent probability that the true number of victims of one or more of these problems lies between 32.45 million and 38.75 million consumers or between 14.9 percent and 17.8 percent of adults in the United States.

   Estimates in row (1) are significantly greater than those in all other rows, those in rows (2) and (12) are greater than those in rows (5) - (11) and (13), those in row (3) and (4) are significantly greater than those in rows (5) - (11), those in row (13) are significantly greater than those in rows (6) through (11), those in rows (5) - (7) are significantly greater than those in rows (9) - (11), and those in row (8) are greater than those in row (11).  (All reported significant differences are significant at the 5 percent level or above.)

c   These estimates assume that participants who said that they were required to pay an advance fee, but also said that they had received the promised loan, were not victims.  If these participants are also considered to be victims, there were an estimated 6.20 million victims of advance fee loan or credit card scams.

d   Participants who purchased membership in a pyramid scheme and who said that they had earned as much money as had been promised are not counted as victims.  If these participants are considered to be victims, the estimated number of victims rises to 1.80 million.

e   (x) denotes a value of less than 0.05 percent.

*Consumer Fraud in the United States: An FTC Survey*

U.S. adult population suggests that 35.60 million individuals were victims during that year.[89]

Notably, more than any single type of fraud, the problem that survey participants reported most frequently was having their long distance telephone service switched from one carrier to another without their permission.  Of participants in the survey, 6.5 percent reported that they had been slammed during the last year.  Projecting to the entire U.S. adult population, we find that 13.90 million individuals experienced this problem.

Considering the different types of frauds investigated by the survey, we find that an estimated 24.45 million adults – 11.2 percent of the adult population in the United States – were victims of one or more of the frauds examined in the survey, including both the ten specific and the two general types of frauds.[90]  We further estimate that 18.35 million adults – 8.4 percent of the U.S. adult population – experienced one or more of the ten specific frauds studied, while  approximately 7.35 million individuals – 3.4 percent of the population –  experienced one or both of the two more general fraud problems included in the survey.  Based on the survey results, we estimate that most victims who experienced the specific frauds – more than 87 percent – experienced only one of the ten types.[91]

---

[88] (...continued)
As discussed in the Methodological Appendix to this chapter, in some cases it was only possible to estimate a probability that a participant in the survey had been the victim of one or more types of fraud.  In estimating the number of victims, both in total and for the specific types of frauds, these individuals were included, weighted by the appropriate probabilities.  We make similar assumptions in estimating the total number of incidents.

[89] The figures for the total number of victims or of the total number of incidents are simply extrapolations of the results of the survey findings to the entire U.S. adult population.  Such an extrapolation is appropriate because the survey was a random survey of adults in the United States.

Because we surveyed a sample of 2,500 individuals and not the entire adult population, there is uncertainty in these estimates.  The figures in the table in parentheses indicate the bounds of the 95 percent confidence intervals for the various figures.  For example, there is a 95 percent probability that the true number of victims of one or more of these problems lies between 32.45 million and 38.75 million adult Americans or between 14.9 percent and 17.8 percent of adults in the United States.

As discussed in the previous chapter, one of the issues we had to resolve in estimating the number of victims of fraud was how to treat participants who had a particular experience that might have been a fraud but who had not attempted to obtain a refund.  In arriving at the estimates presented in the text, we have assumed that some percentage of those who did not seek a refund would have received one if they had asked.  We therefore do not treat everyone who did not seek a refund as a victim – rather, we count only the number of consumers who we estimate would not have received a refund even if they had asked. (See page 12, above.)

[90] To avoid double counting, each participant who experienced multiple incidents of any single type of fraud is counted as one victim when arriving at the estimates of the number of victims of fraud in total and of each of the types of fraud he or she experienced.  On the other hand, when we estimate the number of incidents of fraud, the experiences of such persons account for multiple incidents. Because of the way victims are counted, the estimates of the number of victims of individual frauds do not add up to the total number of victims of any fraud, since one overall victim could be a victim of more than one of the fraud types.

[91] The maximum number of specific frauds experienced by one victim was three. Approximately 0.6 percent of survey participants experienced both one or more specific frauds and one or more of the general frauds.  Including both specific and general frauds, 89 percent of victims experienced only one type of fraud and, again, the maximum number of types of fraud experienced by any one individual was three.

*Chapter 3:  Which Types of Frauds Are the Most Common?*

Table 3-1 and Figure 3-1 provide estimates of the number of consumers who experienced each of the ten specific types of frauds covered in the survey.[92]  The fraud that affected the largest number of participants was the payment of an advance fee for a "guaranteed"



loan or credit card that the consumer never received.  An estimated 4.55 million individuals – 2.1 percent of all adults in the United States – were victims of this fraud.[93]

The second most frequently reported specific fraud was being billed for a membership in a buying club or for a publication that claims to tell the consumer how to save money while purchasing some type of product where the consumer had not agreed to purchase the membership or publication.  This fraud was reported by 1.9 percent of survey participants, implying that 4.05 million U.S. adults were victims in the year before the survey was conducted.  Ranking third, the purchase of credit card insurance was also reported by more than one percent

---

[92]  In estimating the number of victims for each type of fraud, we had to account for those consumers who said that they did not know whether they had been a victim of a particular type of fraud.  In addition, we had to deal with cases in which data on the amount of money lost was not available, either because the participant did not answer the relevant question or because the participant had multiple experiences, since the questionnaire only asked about the amount of money lost in the most recent incident in such cases.  The Methodological Appendix to this chapter discusses our treatment of these issues.

[93]  While 2.1 percent of survey participants indicated that they had paid a fee to receive a promised, but undelivered, credit card or loan, an additional 0.8 percent indicated that they had made such a payment and had actually received the promised credit card or loan.

We have some reason to question whether the survey results may include more than just advance fee loan frauds.  Survey participants who indicated that they had paid an advance fee to someone who promised them a loan or credit card were asked how they first learned about the offer and how they made the purchase.  In about half of these cases, participants indicated that they had first learned about the offer from a direct mail solicitation.  Of these, half also said that they also purchased the credit card or loan through the mail.  In the FTC staff's enforcement experience, most advance fee loans are not marketed or sold through the mail.  We therefore wonder whether some survey participants have confused the offer of a credit card that has an annual fee which will be paid <u>after</u> the credit card is obtained with an advance fee offer where the fee must be paid <u>before</u> the credit card or loan is received.  In any future research, care should be taken to make sure that it is possible to differentiate between these two types of fees.

*Consumer Fraud in the United States: An FTC Survey*

of survey participants (3.35 million victims, 1.6 percent of participants).[94]  By contrast, less than 0.5 percent of the adult population appears to have experienced (i) being billed for information services provided either over the Internet or by pay-per-call telephone service that they had not agreed to purchase (800,000 victims, 0.4 percent of the adult population), (ii) a phony offer of assistance in obtaining a government job (650,000 victims, 0.3 percent of the adult population), or (iii) purchasing a business opportunity involving false earnings claims or false promises of assistance (450,000 victims, 0.2 percent of the population).[95]

A general follow-up question at the end of the specific fraud questions did not produce evidence of any major frauds missed by the specific questions.[96]

## The Number of Incidents

While Table 3-1 and Figure 3-1 report our estimates of the number of individuals who experienced the various types of frauds and slamming during the year prior to the survey, Table 3-2 and Figure 3-2 provide estimates of the number of incidents of each type of fraud and of slamming that occurred during that year and the number of incidents per one hundred adults.  Because Table 3-1 is reporting on the number of victims, a consumer who had multiple experiences with the same type of fraud is only counted once in Table 3-1.  In Table 3-2

---

[94]  There may be some over-reporting of the instances of credit card insurance fraud.  Almost one-third of survey participants who said that they had purchased credit card insurance said that they first learned about the offer from their credit card company or credit card statement.  We are not aware of credit card issuers selling the kind of fraudulent credit card insurance we sought to measure in this survey.  We therefore wonder whether consumers are reporting on some other kind of offer – perhaps insurance to continue payments in the event that the card holder becomes unemployed or disabled.  Again, future surveys should attempt to more clearly identify the fraudulent offers.

[95]  Although Table 3-1 ranks the various types of fraud from most to least frequent on the basis of the estimated number of victims of each type of fraud, it is important to note that some of the apparent differences between the number of victims of different types of fraud are not statistically significant.  Significant differences are indicated in note b of the table.

[96]  After asking about the 10 specific and the two more general forms of fraud explicitly examined in the survey, participants were asked if "there were any other occasions in the past year that [they] felt a person or company had cheated [them] out of money or property." (Survey question 59)  Again, those who indicated that they had such an experience were asked to describe what had happened.  Of the 2,500 survey participants, 104 answered in the affirmative when asked about other events.  Of these, 88 provided a description of the event.  In only a few cases did these descriptions provide a usable description of a fraudulent encounter.  Of those few observations, six described problems in receiving rebates or discounts that they had been promised when buying a product or service.  Three participants complained about problems with charges on a telephone bill – either being charged on the basis of a cell phone plan other than the one the consumer had selected or problems with the billing of long distance services.  Finally, one person described a problem with a magazine seller who automatically renewed a subscription at the end of the subscription term and placed the charge on the consumer's credit card, and another person described a problem with an online reservation service that failed to pay for a lodging reservation after the consumer paid the online service for the lodging.

Of course, we cannot rule out the possibility that other significant frauds exist but were not reported in answer to this question.  Another survey question that preceded the specific fraud questions did reveal evidence of other types of fraud, including fraudulent charitable solicitations, that were not covered in the survey.  We discuss this evidence at the end of the chapter.

and Figure 3-2, however, consumers who paid someone to improve their credit record several different times during the year would be counted multiple times because they had experienced credit repair fraud multiple times.[97]



**Figure 3-2**
**Specific Types of Fraud**
**By Number of Incidents**

Source: Table 3-2

Projecting the results of the FTC survey to the U.S. adult population, Table 3-2 shows that an estimated 53.00 million incidents of the frauds covered by the survey and slamming occurred during the preceding year.[98]  This amounts to 24.3 incidents per one hundred adults.  As with the number of victims, slamming accounted for the largest number of incidents.  This category alone accounted for one-third of all incidents reported – a projected 17.60 million occurrences during the year preceding the survey, or 8.1 incidents per one hundred U.S. adults.

---

[97] Similarly, participants who experienced more than one type of fraud only count once in the total figures in Table 3-1.  In Table 3-2, each incident of each type of fraud is counted separately in calculating the total number of incidents.

[98] When survey participants were asked how many times they had a particular experience, the responses were coded one, two, three, four or more, or don't know.  In estimating the number of incidents, we have conservatively assumed that responses coded as "four or more" were in fact equal to four.  Although this procedure may lead to a slight downward bias in the estimated number of incidents, we do not believe that the bias is significant.  First, we expect that most of those who said "four or more" in fact had the experience four times.  The number of participants reporting that they had an experience a particular number of times declines strongly as the number of events increases.  In 73 percent of cases, those who were victims of a particular type of fraud indicated that it had only happened once in the past year.  Those reporting two events of the same type of fraud accounted for 16 percent of cases, and those reporting three incidents accounted for only 4 percent.  In only 6 percent of cases did participants say that they had experienced four or more incidents of a single type of fraud.  Thus, even if the average value for those who answered "four or more" was five rather than four, the average number of incidents would only increase by 4 percent.

When participants indicated that they had a particular kind of experience but did not know how many times it had happened to them, we set the number of incidents equal to the average of the number of incidents for that type of fraud reported by other participants who reported having the experience and who indicated the number of times it happened.  Similarly, as discussed in the Methodological Appendix, if participants said that they did not know whether they had experienced a particular type of event, we assigned them a probability of having had the experience equal to the percentage of affirmative responses given by those who knew whether they had the experience.  We also assumed that the number of incidents these participants experienced was equal to the average number of incidents for participants who said that they had the experience and knew how many times it had happened, multiplied by the probability that they had the experience.  Finally, when participants reported multiple experiences of a particular type of event, the probability that they suffered monetary loss on incidents other than the first one was assumed to be equal to the percentage of incidents in which such monetary loss was reported.

*Consumer Fraud in the United States: An FTC Survey*

**Table 3-2:    Estimated Number of Incidents of Fraud or of Unauthorized Changes in Long Distance Telephone Service, One Year Period Prior to the Survey[a]**

| Type of Problem | | Number of Incidents (millions)[b] | Incidents per Hundred Adult Americans[b] | Incidents Per Victim |
|---|---|---|---|---|
| **Total, Any Fraud Covered by the Survey or Unauthorized Changes in Long Distance Service** | | **53.00** <br> **(47.35 - 58.65)** | **24.3** <br> **(21.7 - 26.9)** | **1.50** |
| | | | | |
| **Unauthorized Changes in Long Distance Telephone Service ("Slamming")** | **(1)** | **17.60** <br> **(14.65 - 20.50)** | **8.1** <br> **(6.7 - 9.4)** | **1.25** |
| | | | | |
| **Total, Any Type of Fraud, Specific or General, Included in the Survey** | | **35.45** <br> **(30.90 - 39.95)** | **16.3** <br> **(14.2 - 18.3)** | **1.45** |
| | | | | |
| **Total, Specific Types of Fraud Included in the Survey** | | **27.40** <br> **(23.25 - 31.50)** | **12.6** <br> **(10.7 - 14.5)** | **1.50** |
| Paid an advance fee to obtain a loan or credit card that you were promised or guaranteed you would receive[c] | (2) | 6.55 <br> (4.55 - 8.55) | 3.0 <br> (2.1 - 3.9) | 1.45 |
| Billed for buyers' club memberships you did not agree to purchase | (3) | 4.80 <br> (3.40 - 6.20) | 2.2 <br> (1.6 - 2.9) | 1.15 |
| Purchased credit card insurance | (4) | 4.60 <br> (3.10 - 6.15) | 2.1 <br> (1.4 - 2.8) | 1.35 |
| Purchased a membership in a pyramid scheme[d] | (5) | 2.55 <br> (1.20 - 3.85) | 1.2 <br> (0.6 - 1.8) | 1.60 |
| Purchased credit repair | (6) | 2.45 <br> (1.35 - 3.55) | 1.1 <br> (0.6 - 1.6) | 1.20 |
| Paid money or made a purchase to receive a promised prize and did not receive the prize or prize was not as promised | (7) | 2.40 <br> (1.35 - 3.45) | 1.1 <br> (0.6 - 1.6) | 1.30 |
| Billed for Internet services you did not agree to purchase | (8) | 1.90 <br> (1.10 - 2.70) | 0.9 <br> (0.5 - 1.2) | 1.10 |
| Billed for information services provided either over the Internet or by pay-per-call that you had not agreed to purchase | (9) | 0.85 <br> (0.25 - 1.45) | 0.4 <br> (0.1 - 0.7) | 1.10 |
| Made a payment to someone who represented that you would receive a government job | (10) | 0.65 <br> (0.10 - 1.20) | 0.3 <br> ((x)[e] - 0.6) | 1.00 |
| Purchased a business opportunity where promised earnings were not realized or promised assistance was not provided | (11) | 0.55 <br> (0.05 - 1.25) | 0.3 <br> ((x) - 0.6) | 1.20 |
| **Total, More General Types of Fraud Included in the Survey** | | **8.05** <br> **(6.50 - 9.60)** | **3.7** <br> **(3.0 - 4.4)** | **1.10** |
| Billed for a product or service you did not agree to purchase or billed an amount significantly more than you expected, products other than those identified above | (12) | 4.85 <br> (3.65 - 6.05) | 2.2 <br> (1.7 - 2.8) | 1.05 |
| Paid for a product or service but did not receive it | (13) | 3.20 <br> (2.20 - 4.20) | 1.5 <br> (1.0 - 1.9) | 1.10 |

**(Notes on next page)**

**Table 3-2 (cont.)**

**Notes.**

a   Projections are based on U.S. population of 217.76 million adults aged 18 and over as of July 1, 2003.  (See U.S. Census Bureau, Population Division, Table ST-EST2003-01res: Annual Estimates of the Resident Population by Selected Age Groups of the United States and States: July 1, 2003 and April 1, 2000.)  Numbers are rounded to the nearest 0.05 million and percentages to the nearest 0.1 percent.  Totals may not equal the sum of individual figures due to rounding.

b   The numbers in parentheses are 95 percent confidence intervals.  Estimates in row (1) are significantly greater than those in all other rows, those in rows (2) and (12) are significantly greater than those in rows (5) - (11) and (13), those in rows (3) and (4) are significantly greater than those in rows (5) - (11), those in row (5) - (8) are significantly greater than those in rows (9) - (11), and those in row  (13) are greater than those in rows (8) - (11).  (All reported significant differences are significant at the 5 percent level or above.)

c   These estimates assume that participants who said that they were required to pay an advance fee, but also said that they had received the promised loan, were not victims.  If these participants are also considered to be victims, there were an estimated 9.75 million incidents of an advance fee loan or credit card scams.

d   Participants who purchased membership in a pyramid scheme and who said that they had earned as much money as had been promised are not counted as victims.  If these participants are considered to be victims, the estimated number of incidents rises to 3.15 million.

e   (x) denotes a value of less than 0.05.

*Consumer Fraud in the United States: An FTC Survey*

Considering both the specific and the general types of frauds covered by the survey – but excluding slamming – an estimated total of 35.45 million incidents of fraud occurred during the year prior to the survey.  That is, there were 16.3 incidents per hundred adults in the United States.  Considering just the ten specific frauds, we estimate that there were a total of 27.40 million incidents during the year.  In general, the numbers in Table 3-2 and Figure 3-2 show that the types of fraud that had the most victims also had the most incidents.[99]  Where the rankings vary between Tables 3-1 and 3-2, the differences in the number of incidents of the relevant types of fraud are not statistically significant.[100]

Table 3-2 also includes the number of incidents per victim for each type of fraud.  On average, survey participants who suffered at least one incident of fraud or of slamming had a total of 1.50 incidents.[101]  For the ten specific frauds covered by the survey, the average number of incidents per victim is also 1.50.  For the ten specific frauds individually, the average number of incidents per victim ranges from 1.60 (for those who purchased a membership in a pyramid scheme) to 1.00 (for those who made a payment to someone who represented that they would receive a government job).

Table 3-3 shows the number of different incidents encountered by those who were victims of fraud or of fraud and slamming.[102]  Whether we examine the ten specific frauds covered by the survey, all frauds covered by the survey, or include unauthorized changing of long distance telephone service in addition to fraud, we find that 71 percent to 74 percent of victims experienced only a single incident during the year before the survey was taken.  Between 17 percent and 19 percent of victims experienced two separate incidents, and 6 to 8 percent experienced

---

[99.] The wording of the question about the number of incidents of a particular type of fraud may have biased the number of reported incidents upward for the questions about being billed for an item that the participant had not agreed to purchase.  Participants who indicate, for example, that they were billed for a buyers' club membership that they did not agree to purchase were then asked "How many times has this happened to you in the last year?" (Survey question 21)  It is possible that participants who received multiple bills for the same item responded to this question by indicating the number of bills they had received, while we would have preferred to consider this a single incident involving a single item.  Although we cannot rule out the possibility that some participants responded this way, a comparison of the average number of times participants reported an incident occurring for the four types of false billing problems (Survey questions 19 through 22) with the average number of times reported for other problems suggests that this response problem is not widespread.  Indeed, on average, participants who reported experiencing a false billing problem reported that the problem happened less frequently than those who were victims of other types of fraud – an average value of 1.36 for false billing problems compared to 1.62 for other types.

[100.] The significance of differences in the number of incidents among the categories is indicated in footnote b of Table 3-2.

[101.] This number includes both multiple incidents of the same type of problem and incidents of more than one type of problem.  As shown in the table, the average victim of slamming suffered 1.25 incidents of slamming, while the average victim of all frauds suffered 1.45 incidents.  This result is consistent with the conclusion that the average victim of fraud and/or slamming suffered 1.50 incidents, because some victims of fraud were also victims of slamming.

[102.] See the Methodological Appendix for a description of how we handled instances in which there was uncertainty as to whether or not an event constituted a fraud.

**Table 3-3:    Number of Incidents Experienced by Victims**

| Total Number of Incidents | Specific Frauds Only | All Fraud | All Fraud & Slamming |
|---|---|---|---|
| 1 | 71.2% | 74.1% | 72.0% |
| 2 | 19.1% | 16.7% | 17.7% |
| 3 | 8.2% | 6.5% | 6.5% |
| 4 | 1.1% | 2.3% | 3.0% |
| 5 | 0.5% | 0.4% | 0.7% |
| 6 | 0.0% | 0.0% | 0.0% |
| 7 | 0.0% | 0.0% | 0.2% |

**Note.**  Figures may not sum to 100 percent due to rounding.

three separate incidents.  Analyzing frauds only, the highest number of incidents reported by an individual was five; the highest number was seven if we include slamming.

In general, we believe that Table 3-2 provides the most accurate estimates that can be derived from the survey results, because these estimates represent types of frauds specifically addressed in the survey.  Nevertheless, it is also useful to consider the number of incidents classified by the product involved, as set forth in Table 3-4.[103]  In general, the products with the greatest number of incidents track the most frequent frauds shown in Table 3-2.  In particular, the seven top

---

[103.] To develop these numbers we had to estimate the share of the two more general types of frauds that involved different products.  The information from which these estimates are derived came from questions 23 and 49, which asked participants what the product was when they (a) indicated that they had received an unauthorized bill related to a purchase of a product other than one of those covered by the ten specific frauds or (b) indicated that they had paid for a product but never received it.

One reason the product-specific estimates are somewhat less reliable than the previous estimates is that, in a significant number of cases, we did not receive usable information about the product involved in the problematic transaction.  For example, in the responses to survey question 23, we did not get product information for 11 of the 38 participants who had lost money.  That is, in 11 of the 38 cases where participants were asked what the product was, the response is either coded as "other" or as "don't know / refused."  Similarly, in 5 of 24 cases where participants were asked about the product involved where participants said that they had paid for a product but not received it, the answer was either "other" or "don't know / refused."

The fact that many of the estimates in Table 3-3 are parts of the various types of fraud that the survey asked about and that they may be sums of various pieces of different categories creates a problem for the estimation of confidence intervals.  This problem occurs because the portion to be allocated to a specific category is a random variable based on survey responses as is the overall estimate of the number of incidents involved.  In general, the properties of the product of two random variables are not well known.  To deal with this problem, we used simulation to estimate confidence intervals when the estimates involved more than the sum of random variables.  We simulated 1,000 values of the function that provided the required estimate.  After ranking the estimates from largest to smallest, we then deleted the largest and smallest 2.5 percent of the simulated values.  This procedure gave us our estimate of the 95 percent confidence interval.

*Consumer Fraud in the United States: An FTC Survey*

**Table 3-4:    Fraud Incidents by Type of Product Involved[a]**

| Product | Number of Incidents (millions)[b] |
|---|---|
| Advance fee loans or credit cards | 6.50<br>(4.55 - 8.55) |
| Buyers' clubs | 4.95<br>(3.60 - 6.30) |
| Credit card insurance | 4.60<br>(3.10 - 6.15) |
| Telephone and Internet services (not including information services provided over the Internet or pay-per-call telephone) | 3.15<br>(2.05 - 4.20) |
| Pyramid scheme | 2.55<br>(1.20 - 3.85) |
| Credit repair | 2.45<br>(1.35 - 3.55) |
| Prizes | 2.40<br>(1.35 - 3.45) |
| Household and kitchen items | 1.20<br>(0.40 - 2.00) |
| Business opportunities | 0.95<br>(0.15 - 1.70) |
| Government job offers | 0.65<br>(0.10 - 1.20) |
| Magazines | 0.65<br>((x)[c] - 1.50) |
| Clothing and apparel | 0.55<br>((x) - 1.10) |
| Computers: hardware and software | 0.45<br>((x) - 1.00) |
| Cars and automobile accessories | 0.45<br>((x) - 1.00) |
| Information services provided over the telephone | 0.45<br>((x) - 0.95) |
| Health care products | 0.40<br>((x) - 0.85) |
| Travel services (including vacations) | 0.30<br>((x) - 0.65) |
| CDs, video tapes, or DVDs | 0.25<br>((x) - 0.70) |
| Information services provided via the Internet | 0.15<br>((x) - 0.45) |
| Real estate (including timeshares) | 0.05<br>((x) - 0.20) |

**Notes.**

a  Projections are based on U.S. population of 217.76 million adults aged 18 and over as of July 1, 2003.  (See U.S. Census Bureau, Population Division, Table ST-EST2003-01res: Annual Estimates of the Resident Population by Selected Age Groups of the United States and States: July 1, 2003 and April 1, 2000.)

The sum of the estimates in the table are less than the total number of incidents shown in Table 3-2, because some incidents could not be assigned to any of the product categories.

b  Numbers are rounded to the nearest 0.05 million.  Numbers in parentheses are 95 percent confidence intervals.

c  (x) denotes a value of less than 0.05.

*Chapter 3:  Which Types of Frauds Are the Most Common?*

products in Table 3-4 are also the top frauds in Table 3-2.[104]  Among the top dozen categories in Table 3-4, however, we also find "Household and kitchen items" (number 8), "Magazines" (number 11), and "Clothing and apparel" (number 12), which do not appear in Table 3-2.[105]

## Media Employed

The survey also asked how consumers first learned about the frauds to which they fell victim. This information, set forth in Table 3-5 and Figure 3-3, further contributes to our understanding of consumer fraud.[106]



Figure 3-3
Media Used to Promote Frauds

Print advertising – including newspaper and magazine advertising, direct mail solicitations, catalogs, and posters – was the most frequently cited source of information for offers that turned out to be fraudulent, accounting for one third of the fraudulent offers covered by the survey.  Telemarketing was the second most commonly cited source, at 17 percent, and the Internet accounted for 14 percent. The Internet figure includes instances in which consumers learned of the offer through an auction site, a non-auction web site, or email.  Finally, television and radio advertising, including television infomercials, was cited as the initial source of information for just over ten percent of fraudulent offers.

---

[104] The only change in rank among these seven involves the product identified as "Telephone and Internet Services" in Table 3-4.  The largest portion of this category is the seventh-ranked fraud category in Table 3-2, "Billed for Internet services you did not agree to purchase."  In some cases, however, consumers who indicated that they were victims of the general categories of unauthorized billing for products other than those specified elsewhere and paid for a product that was never received identified the product as being "telephone and Internet services."  Adding these experiences to the unauthorized billing for Internet services category makes this category number four on the product list in Table 3-4.

[105] We also note that the number of incidents involving business opportunities in Table 3-4 is greater than the number of incidents for "Purchased a business opportunity where promised earnings were not realized or promised assistance was not provided" in Table 3-2.  This result reflects responses to the questions about products that consumers had paid for but never received, in which a few survey participants indicated that they had paid for business opportunities but never received them.

[106] These data are based on responses for incidents of fraud and do not include unauthorized changing of long distance telephone service.  Approximately 85 percent of survey participants who reported being slammed said that they first learned of the slamming when they received their telephone bill.

*Consumer Fraud in the United States: An FTC Survey*

**Table 3-5:    How Victims First Learned About the Product or Service Involved in Frauds[a]**

| Media | Number of Incidents (millions)[b] | Percent[b] |
|---|---|---|
| **Total, All Fraud Incidents (Specific and More General)** | **35.45** | **100%** |
| Print advertising[c] | 11.65 (9.05 - 14.60) | 33.0% (26.0% - 39.9%) |
| Telemarketing | 5.95 (3.90 - 8.20) | 16.8% (11.2% - 22.3%) |
| Internet and Email[d] | 4.90 (3.10 - 6.85) | 14.0% (8.8% - 19.1%) |
| Television or radio advertising[e] | 3.70 (2.10 - 5.50) | 10.6% (6.1% - 15.2%) |
| Only realized being charged when received a bill | 2.55 (1.25 - 4.05) | 7.3% (3.4% - 11.1%) |
| Other media | 6.50 (4.50 - 8.75) | 18.4% (12.7% - 24.2%) |

**Notes.**

a  Numbers are rounded to the nearest 0.05 million and percentages to the nearest 0.1 percent.  Estimates for individual categories may not add to totals due to rounding.

b  Numbers in parentheses are 95 percent confidence intervals.

c  Includes newspaper and magazine advertising, direct mail advertising including catalogs, and posters.

d  Includes Internet auction sites as well as other Internet sites.

e  Includes television infomercials.

## The Cost of an Incident of Fraud

It is also useful to consider the costs to consumers from the different types of frauds examined here.  In reporting victims' costs, we rank monetary losses in ascending order and look at the costs incurred by victims in the 25th, 50th, and 75th percentiles of those who reported losing money as a result of a particular type of fraud.[107]  We use this approach because a few participants reported very large losses from the fraud.[108]  Because we have been unable to verify these very large amounts,[109] we believe that our approach provides a more representative picture of the losses victims typically incur than would the average of the reported values or the totals of reported losses.

---

[107.] Participants who indicated that they experienced one of the types of problems covered by the survey were asked separately how much they had paid and how much they had lost in connection with the incident. (Survey question 64)  In computing the losses, we used the smaller of the amount paid and the amount lost.

[108.] Seventy-five percent of the 320 survey participants who reported that they experienced one or more of the types of fraud investigated here and who said that they paid or lost money as a result incurred a loss of $630 or less.  Six of the victims each reported losses of $5,000 or more; two of these six victims reported losses in excess of $40,000, while two more reported losses between $15,000 and $16,000.  These six victims accounted for almost one half of the total losses for all 320 victims.  Clearly, these values would substantially affect any average or total value.

[109.] We attempted to recontact nine participants who had reported that they had paid and lost very large amounts.  Of these nine, we reached two.  One was an elderly woman whose initial responses indicated that she had paid $16,000 for credit card insurance.  When asked whether this figure was correct, she indicated

(continued...)

Among those participants who lost money as a result of one or more of the frauds considered here, the median victim lost $220.[110]  That is, fifty percent of those who lost money as a result of one or more of these frauds had total losses of $220 or less, while the other fifty percent had total losses of $220 or more.[111]  The 25 percent of victims who lost the least lost a maximum $40 in total (the 25th percentile amount), while the 25 percent of victims who lost the most lost a minimum of $630 in total (the 75th percentile amount).

In addition to estimating overall losses per victim, we provide estimates of losses per incident for several of the types of fraud we investigated.[112]  These figures, set forth in Table 3-6 and in Figure 3-4, provide estimates of the losses incurred each time a consumer is a victim of a particular type of fraud.

The median (50th percentile) estimates show that the level of loss differs substantially depending on the type of fraud.  Of the types of fraud for which we can provide estimates, only one involved a median payment in excess of $100 – credit repair fraud.  The median loss for victims of this fraud was $300.  Twenty-five percent of victims of this type of problem reported paying $100 or less, while another quarter reported paying $1,000 or more.  The median payment by those who purchased a membership in a pyramid scheme was the second highest – $100 – with 25 percent of the victims of this type of fraud losing $700 or more.  For the other four specific fraud categories we examined, the median value ranged between $50 and $60.

---

[109] (...continued)
that she was quite old and that she could only remember that she had purchased the insurance and that it did not do what she had been told it would do.  She could not remember what she had paid.

The second person indicated that he had been billed four times during the previous year for a membership in a buyers' club that he had not agreed to purchase and had been billed once for an Internet-related service that he had not agreed to buy.  His initial interview indicated that the last time he received an unauthorized bill for a membership in a buyers' club (which was supposed to allow him to purchase books, records, or compact discs), he paid $2,695 for the membership.  His interview also indicated that he had paid $2,695 for the unauthorized Internet service for which he had been billed.  When we contacted this individual again, he indicated that he had actually only paid $39.95 for the buyers' club membership, though he may initially have been billed for $2,695.  When asked about the incident that involved being billed for an unauthorized Internet-related service, he indicated that he simply could not remember the transaction.

Thus, we could not verify any of the large loss figures.  Rather, we established that there were potential problems with two of the figures.  Another indication of potential problems with some of the high-value loss figures came from a comparison of the open-ended responses to survey question 11 and the responses to the closed-ended questions about fraud experiences.  The interview report on one individual indicated that this person had paid $3,995 for a pyramid scheme.  The person described the same event in responding to question 11, however, and there the amount paid was indicated to be $40 – probably indicating an actual payment of $39.95.

[110] This is our estimate of the individual's total loss across all of the types of fraud and reflects the fact that some individuals had multiple experiences with the same type of fraud.  The figures in the subsequent discussion, and in Table 3-6, are on a per incident basis.

[111] We do not include in these figures any amounts paid to a telephone company to which a consumer's long distance telephone service was changed without permission.  As discussed previously (see page 18, above), the amount paid for such service is not a measure of the injury caused by slamming.  In addition, the survey did not ask about any costs consumers may have incurred to switch back to their preferred carrier.

[112] We do not provide figures for the other types of fraud because there were too few observations – less than ten – to provide meaningful figures.

*Consumer Fraud in the United States: An FTC Survey*



**Table 3-6:    Distribution of Estimated Losses Per Incident for Different Types of Frauds[a]**

| Type of Fraud | Percentile | | | Number of Obs. |
|---|---|---|---|---|
| | 25th | 50th | 75th | |
| **Specific Types of Fraud Included in the Survey[a]** | | | | |
| Purchased credit repair | $100 | $300 | $1,000 | 14 |
| Purchased a membership in a pyramid scheme | $40 | $100 | $700 | 14 |
| Purchased credit card insurance | $30 | $60 | $300 | 18 |
| Billed for Internet services you did not agree to purchase | $40 | $60 | $100 | 11 |
| Paid an advance fee to obtain a loan or credit card that you were promised or guaranteed you would receive | $30 | $60 | $125 | 32 |
| Billed for buyers' clubs memberships that you did not agree to purchase | $25 | $50 | $100 | 22 |
| **More General Types of Fraud Included in the Survey** | | | | |
| Billed for a product you did not agree to purchase or billed significantly more than you expected, other products | $80 | $100 | $300 | 30 |
| Paid for a product but did not receive it | $30 | $40 | $130 | 18 |

**Notes.**  These estimates are based on responses about the amount paid or lost on the last time a person was a victim of a particular type of fraud and include only those who were classified as being a victim the last time they had a particular type of experience.

a   Values were not computed for other types of fraud because there were fewer than 10 observations.

## Open-Ended Descriptions of Fraudulent Experiences

The description of consumers' fraud experiences set forth above is based on responses to specific questions about specific types of potentially fraudulent transactions.  Prior to asking those specific questions, the survey also asked consumers about their experiences with fraud more generally.  Participants were asked if they had ever thought they were the subject of a consumer fraud.[113]  In response, 28 percent of participants indicated that they had been a victim at some point in time, and just over 40 percent of those participants – 12 percent of all survey participants – reported that this had happened in the last year.[114]

A random sample of approximately one half of those who indicated that they felt they had been the victim of a fraud were then asked to describe what had happened.[115]  The responses to this question are tabulated in Tables 3-7 and 3-8.  In coding the responses, we first attempted to classify responses as describing a fraud, describing some kind of identity theft, or describing a bad purchase experience.[116]  For those who appeared to be describing some form of fraud, staff then sought to classify the type of fraud involved.[117]

**Table 3-7:   Responses to Open-Ended Question About The Type of Fraud Experienced**

| | Number of Responses | | | |
|---|---|---|---|---|
| | Total | | Incident Occurred in Last Year | |
| | **Number** | **Percent of Total** | **Number** | **Percent of Total** |
| **Total Number of Responses** | **286** | | **119** | |
| Described a fraud | 71 | 24.8% | 32 | 26.9% |
| Described an identity theft | 26 | 9.1% | 11 | 9.2% |
| Described a bad purchase experience | 55 | 19.2% | 19 | 16.0% |
| Response is unclear or describes none of the above | 134 | 46.9% | 57 | 47.9% |

---

[113.] Survey question 9.

[114.] Survey question 10.  Roughly 20 percent of participants who indicated that they felt that they had been a victim of a consumer fraud said that the incident occurred one to two years ago and another 20 percent said it happened two to five years ago.  An additional 15 percent said that the experience occurred more than five years ago.  We focus on incidents within the last year for two reasons.  First, consumers are more likely to accurately recall events that occurred in the last year.  Second, these responses should match those in the closed-ended questions which only asked about events in the last year.

[115.] Survey question 11.  This question was limited to half of participants because of budgetary considerations.

[116.] Examples of responses that were coded as bad purchase decisions include "I bought a golf club and called around and found out they charged 30 percent more" and "I purchased a product from an infomercial, a forty dollar literature book.  When I received it, I was absolutely speechless.  It had some information, but not forty dollars' worth."

[117.] The responses to this question were independently coded by two Bureau of Economics' research assistants.  Disagreements in the coding were resolved in discussion with the primary author of this study.

*Consumer Fraud in the United States: An FTC Survey*

As shown in Table 3-7, only about 25 percent of survey participants who described an incident described one that appeared to be actual consumer fraud. This was true both for experiences that occurred in the last year and for all experiences. Another 9 percent described incidents of some type of identity theft. Nineteen percent of those answering this question – 16 percent of those who said the incident had occurred in the last year – reported events that appeared to be more of a bad purchase experience than an actual fraud. Finally, in nearly one half of cases, the survey participant did not provide enough information to enable us to categorize the experience.

Table 3-8 shows the particular type of fraud described by those whose experience appeared to involve an incident of fraud. The table provides this information both for all incidents of fraud, as well as just those that occurred in the last year. For the latter, we have further examined the participants' responses to the survey's specific fraud questions to determine whether those participants also included the incident in their specific responses.[118]

In more than half of the 32 cases where a participant's response to the general question described an incident of fraud that happened in the last year, the incident involved a fraud that was not covered by the more specific questions in the survey. This result strongly suggests that the survey questions do not capture all types of consumer fraud and that care must be taken in generalizing the results of this survey to reflect all consumer fraud.

In seven of the 17 cases of frauds not specifically covered by the survey, the participant described a situation that involved fraudulent fund-raising for a charity. We did not include this type of fraud in the specific survey questions because we were concerned that most consumers would have no way of knowing that the charity to which they had contributed was not legitimate or that the money was not being used in the way they had been told. However, the large number of participants who described a fraudulent charitable solicitation may suggest that at least some consumers can identify fraudulent solicitations and that fraudulent charitable solicitations may be a significant problem.[119]

In 15 responses to the general question, the participant described a type of fraud covered by the specific questions included in the survey. Table 3-8 shows that nearly three-quarters of these participants also described these events in their responses to the specific questions.

The survey asked about fraud both in an initial, more general question, and then in a series of specific questions. This structure allows us to learn something about the ability of the more general approach to capture the full extent of fraud. This question is of interest because some surveys have only used the more general

---

[118.] Because the specific questions asked only about events that occurred in the last year, it is not possible to do a similar analysis for events that occurred more than a year ago.

[119.] In any future survey, it may be useful to consider asking about charity fraud.

42

**Table 3-8:    Closed-End Responses of Survey Participants Who Described Frauds That Occurred in the Last Year in Answer to Open-Ended Question**

| Type of Fraud | Number of Open-Ended Responses | | Matching Closed-End Responses | | Does Not Fit Questions Asked |
|---|---|---|---|---|---|
| | Total | Last Year | Yes | No | |
| Charity frauds | 9 | 7 | – | – | 7[a] |
| Shop-at-home / Catalog sales | 8 | 1 | – | – | 1[b] |
| Unauthorized changing of telephone service | 6 | 3 | 3 | 0 | 0 |
| Magazines | 6 | 3 | 1 | 2 | 0 |
| Prizes / Sweepstakes | 6 | 2 | 2 | 0 | 0 |
| Travel / Vacations | 5 | 2 | – | – | 2[c] |
| Advanced fee loans or credit cards | 4 | 1 | 1 | 0 | 0 |
| Buyers' clubs | 4 | 3 | 2 | 0 | 1[d] |
| Internet auctions | 3 | 3 | 1 | 1 | 1[e] |
| Pyramids / Multi-level marketing schemes / Chain letters | 2 | 2 | 1 | 1 | 0 |
| Telephone: pay-per-call services | 2 | 0 | – | – | – |
| Office supplies / Toner | 1 | 0 | – | – | – |
| Other | 13 | 5 | – | – | 5 |
| **Total**[f] | **70** | **32** | **11** | **4** | **17** |

**Notes.**

a   Closed-ended questions in the survey did not ask about bogus charity solicitations.

b   The consumer described a situation in which a seller called and claimed that the consumer owed the seller money. The consumer insisted that she did not owe the money.

c   One consumer's response referred to a call about a trip to Las Vegas, to which the consumer never responded. The other said that someone called to say that the consumer had won a free trip for which she had purportedly applied.  The consumer informed the caller that she had not applied for any such trip.  Neither of these situations would have been covered by the closed-end questions.

d   One consumer's response described a situation in which the consumer had in fact purchased something that may have been a membership in a buyers' club which had not delivered the promised savings.  The closed-end questions only asked about buyers' clubs that the consumer had been billed for but had not agreed to purchase.

e   One consumer's response dealt with a situation in which a purchase had been made, after which the consumer was informed that the item was already gone.  Later the item arrived, though the consumer was no longer interested in the item.  The seller told the consumer to return the item and that the seller would reimburse the consumer for the shipping costs.  However, the shipping costs have not yet been returned.  The closed-end questions dealt with situations in which the consumer had paid for the product but not received it or been charged substantially more than expected.  However, they did not deal with a dispute over shipping costs.

f   Numbers may not add to totals because individual observations are weighted and then rounded.

*Consumer Fraud in the United States: An FTC Survey*

approach.  In addition, if the more general approach is sufficient, researchers considering future surveys could use it and avoid the extra cost and complexity of the detailed, specific questions.

To address this issue, we examined the responses to the general question about whether the participant had been the "subject of a consumer fraud."  We compared these responses to the answers to the specific fraud questions.  We found that only one-third of victims, as measured by the specific fraud questions, also reported that they had been a victim in response to the more general questions.[120]  That is, two-thirds of those who met our definition of fraud from the specific questions did not indicate that they were victims when the question was posed more generally.  This strongly suggests that the general approach should not be used in attempting to measure the overall level of fraud experienced by consumers.[121]  It appears necessary to probe specifically about the particular events that the researcher considers to be fraud to accurately draw out this information in a survey context.

---

[120]  More precisely, only one-third of victims both answered "yes" to question 9, which asked whether there ever was a time when the participant felt that he or she was the subject of a consumer fraud," and "during the last year" to question 10, which asked about the last time the participant felt that he or she was a subject of a fraud.  Another 27 percent said that they had been a victim of consumer fraud but not in the last year, while almost 40 percent said that they had never been the subject of a consumer fraud in answering the general question.

[121]  The general approach is even less successful, in fact, in capturing the desired information than the one-third figure suggests.  Those who answered the general question in the affirmative often described something other than fraud when asked to describe the event that led them to conclude that they had been the subject of a fraud.  We found that only about 40 percent of these responses described experiences that we considered to be frauds.  Combining these two pieces of information, we find that only a small fraction – 13 percent (40 percent of one-third) – of fraud victims indicated that they were victims of fraud in response to the more general question.

# Methodological Appendix to Chapter 3

To estimate the number of victims and the number of incidents of the various frauds covered by the survey, we needed to determine whether a participant in the survey experienced a particular type of fraud and, if so, how many times in the last year.  Given that we only considered an event to be a fraud if the victim lost money, we also needed to know whether money was lost.

Accordingly, the survey specifically asked participants whether they had experienced various events that could have been frauds and also asked for some information about the amount of money that had been paid and the amount lost.  For example, question 13 sought to elicit information about the extent of credit repair fraud.[122]  This question asked participants whether "[i]n the past year, [they had] paid money to anyone who promised or guaranteed to remove negative, but true, information from [their] credit record, but failed to get the information removed."  Participants who answered this question in the affirmative were then asked how many times they had this experience in the past year.

Individuals who answered question 13 in the affirmative also were asked for additional details about their experience, including how much money they had paid and how much money they had lost.[123]  Participants who indicated that they had the relevant experience more than once in the last year, however, were only asked the follow-up questions about the most recent incident.  Thus, assuming that the participant provided answers to all of the questions, we have information on the amount of money that was lost the last time, but not for prior occurrences.

Based on their survey responses, it is easy to determine whether some participants were victims of fraud.  For example, those who reported that they did not have the relevant experience – such as those who had not paid anyone for credit repair services – were obviously not victims.  Similarly, participants who said that they had paid to have their records repaired but then either indicated that they had paid nothing or that they had not lost anything also were not considered victims for purposes of this study.[124]  (For purposes of this appendix, we will say that these participants experienced an incident, but not a money-losing incident. In the context of the overall report, these participants are not victims of fraud.) On the other hand, each participant who said that he or she had the experience once and lost money – *i.e.*, the person had a money-losing incident – was considered a victim.

---

[122.] Credit repair includes both promises to repair an existing credit record, which is covered by question 13, and the sale of information about how to create a new credit record, which is covered by question 14.

[123.] Survey question 64.

[124.] In determining the amount of money lost, we used the smaller of the amount that was said to be paid and the amount that was lost.  However, if one or the other of these figures was missing, we used the figure that was provided.

*Consumer Fraud in the United States: An FTC Survey*

Making this determination is more difficult for participants who indicated that they had been involved with multiple incidents, because we only collected information about monetary loss for the most recent incident. Those who lost money as a result of the last incident were clearly victims during the year, but we do not know how many money-losing incidents they experienced because we did not ask whether they lost money in the previous incidents. Moreover, where participants did not lose money in the last incident, not only can we not determine how many money-losing incidents were experienced, we cannot even tell for certain whether the participant was ever a victim.

Although the limitations of the data collected in the survey do not permit us to determine whether an individual is a victim and/or how many incidents he or she experienced in these situations, we can make certain assumptions about the probability that such a person is a victim and the expected number of money-losing incidents. Using these assumptions, we can then estimate the total number of consumers who were victims and the total number of money-losing incidents that occurred during the year.

In developing the estimates, we assume that the likelihood that a consumer lost money in a particular incident for which we lack data is equal to the percentage of money-losing incidents for which we do have data. That is, if we have data showing that consumers lost money in 8 of 20 incidents, we assume that there is a 40 percent probability that money was lost in each incident for which we do not have data.

Using this information, we can then determine the likelihood that a participant was a victim and the estimated number of money-losing incidents experienced based on the number of incidents reported by other survey participants. For example, a participant who indicated that she experienced multiple incidents and that she lost money as a result of the last incident was obviously a victim. Furthermore, her most recent experience was an incident of fraud because she lost money. There is also some likelihood that previous incidents were incidents of fraud. Given that money was lost in 40 percent of incidents for which we have information, we assume that there is a 40 percent likelihood that each of this participant's prior incidents also involved lost money. Thus, if this participant reported a total of two encounters, we assign an expected value of 1.4 money-losing incidents to her.[125] If she reported three or more encounters, the estimated number of total money-losing incidents is set equal to one for the most recent incident, which we know involved the loss of money, plus 0.4 times the number of incidents in excess of one.

Next, consider a participant who had multiple incidents but did not lose money as a result of the most recent incident. We know that this participant was not a victim the last time, but we do not know whether he was a victim the

---

[125.] By assigning the average value in each case where we do not know whether money was lost, we undoubtedly understate the variance in our estimates of the number of victims.

previous times.  Assuming again that money is lost 40 percent of the time, there is a 40 percent probability that he was a victim in each earlier incident.  Thus, if he had a total of two encounters, there is a 40 percent likelihood that he was a victim in the first incident and therefore a 40 percent chance that he was a victim overall.  Furthermore, the expected number of money-losing incidents involving this participant is 0.4.  If he had a total of three encounters and did not lose money on the last one, the probability that he was a victim rises to 64 percent, and the expected number of money-losing incidents rises to 0.8.[126]

Additional complications arise because survey participants sometimes did not know the answer to a question or refused to answer.  As with the problem discussed above, we deal with these problems by assuming that missing values are equal to the mean of the values for those who gave information.  Thus, for those who said that they did not know whether they had experienced a particular type of fraud or who refused to answer the question, we assume that the likelihood that they were victims equaled the percent of victims among those who had answered the question.  We also estimate the number of money-losing incidents for such participants as being equal to the probability of being a victim times the average number of money-losing incidents among those who reported that incident.  Similarly, when participants indicated that they had the experience in question but did not know how many times, we assumed that the number of incidents was equal to the average number of incidents reported by those who answered the question.[127]

Finally, where participants indicated that they had experienced at least one incident of a particular type of problem, but did not answer the question about the amount of money that was involved, we do not know whether the participants were victims as a result of the last incident.  We treat such participants the same way we treat participants whom we know were not victims in the last incident.  However, in this situation, we are uncertain about the results of each incident the participant experienced.  Thus, again assuming that money was lost in 40 percent of incidents, we assume that there is a 40 percent probability of being a victim for those participants who experienced one incident, but did not indicate whether money was lost.  For participants who had two incidents and did not indicate whether money was lost the most recent time, the probability of being a victim is 64 percent.

Given the assumptions listed above, we determined the likelihood that each participant in our survey was a victim of each of the types of fraud we

---

[126.] In general, the likelihood that a person is a victim in at least one of n incidents about which we do not know whether money was lost is $(1 - (1-P)^n)$ where P is the probability that money is lost in any single incident.  If we know that no money was lost in the most recent incident, n is equal to the total number of incidents encountered by the consumer minus one.

[127.] The fact that we simply assume that each missing value is equal to the mean of the reported values rather than using a value drawn from a random distribution with the mean and variance of the relevant distribution will lead us to understate the variance in the number of victims and the number of incidents.

*Consumer Fraud in the United States: An FTC Survey*

considered.  We also estimated the number of money-losing incidents involving that individual.  Computing the mean and variance of these values across the individuals in the survey gives us estimates of the percent of participants who were victims of each type of fraud and of the number of incidents per hundred participants.  We also have estimates of the variance in these two figures, so we can calculate the confidence intervals reported in Tables 3-1 and 3-2.

Given the approach discussed above, our estimates of the number of incidents experienced by an individual are not limited to integer values.  In Table 3-3, we have rounded fractional values to the nearest integer value.

# Chapter 4:  Who is a Victim of Fraud?

This chapter examines the characteristics of survey participants who were victims of fraud or who experienced an unauthorized change in their long distance telephone service.

## Characteristics Analyzed

The survey included questions about the racial and ethnic background of participants.  We use this information to examine whether members of particular minority groups face different risks of being a victim than non-Hispanic whites.[128]  The survey asked about standard demographic variables, including age, education, gender, and marital status, and we include those variables in our analysis.

We also asked about participants' financial situation.  In addition to the commonly-used measure of current income, we asked about two novel measures of consumers' financial well being.  First, we asked survey participants how they expected their income to change in the next three years.[129]  We included this question to determine whether consumers who expected their incomes to fall face a greater risk of becoming victims of fraud, or whether they may be less willing to take financial risks and thus are less likely to become victims.

Second, we asked participants about the amount of debt they had.  As with future income, this measure is based on the consumer's perception.  Participants were asked how comfortable they were with their current level of debt – did they have more debt than they could handle or could they handle more debt?[130]  Here,

---

[128] Information on the racial and ethnic backgrounds of survey participants was gathered from two different questions.  First, question 84 asked whether the person was of "Hispanic or Latino origin."  Question 85 then asked participants to select one or more racial categories that best indicated their race.  We pooled the responses to these two questions.  Those who indicated that they were of Hispanic or Latino origin were considered to be Hispanic, while those who did not indicate that they were Hispanic were assigned to racial categories on the basis of their responses to question 85.

In collecting information on the races of survey participants, we used the five minimum categories recommended by the Office of Management and Budget.  (See, "Provisional Guidance on the Implementation of the 1997 Standards for Federal Data on Race and Ethnicity," December 15, 2000.)  Given the size of our survey and our focus on the national population, these basic racial and ethnic categories are sufficiently large to allow statistical analysis if there are sizable differences between the groups.

We note that question 85 permitted participants to indicate that they belonged to more than one racial group.  A small percentage of participants indicated that they belonged to multiple racial groups, and we have included them in the "Other race" category.

[129] Survey question 80 asked "Thinking ahead to three years from now, how do you think your income will compare to your income today?  Do you think it will be (a) Much lower, (b) Slightly lower, (c) About the same, (d) Slightly higher, or (e) Much higher?"

[130] The question asked was "And thinking for a moment about your personal debt on which you currently make interest payments.  I am talking about your debts you partially pay-off each month for things like mortgages, credit cards, personal loans or car loans.  Would you say the amount of debt you currently have is (a) More than you can handle financially, (b) About as much as you can handle financially, or (c) You could handle more debt than you currently have?" (Survey question 81)

*Consumer Fraud in the United States: An FTC Survey*

**Table 4-1:   Distribution of Values for Explanatory Variables**[a]

| | Observations By Characteristic | |
|---|---|---|
| | **Number** | **Percent**[b] |
| **Race and Ethnicity** | | |
| Hispanics | 158 | 6.3% |
| African Americans | 162 | 6.5% |
| American Indians or Alaska Natives | 28 | 1.1% |
| Non-Hispanic Whites | 1,777 | 71.1% |
| Other | 95 | 3.8% |
| Not known | 300 | 11.2% |
| **Gender** | | |
| Female | 1,303 | 52.1% |
| Male | 1,197 | 47.9% |
| Not known | 0 | 0.0% |
| **Marital Status** | | |
| Single | 1,147 | 45.9% |
| Married | 1,353 | 54.1% |
| Not known | 0 | 0.0% |
| **Age** | | |
| 18 - 24 | 190 | 7.6% |
| 25 - 34 | 390 | 15.6% |
| 35 - 44 | 411 | 16.4% |
| 45 - 54 | 494 | 19.8% |
| 55 - 64 | 367 | 14.7% |
| 65 and over | 505 | 20.2% |
| Not known | 143 | 5.7% |
| **Education** | | |
| Did not complete high school | 200 | 8.0% |
| Graduated from high school | 813 | 32.5% |
| Attended some college or post-secondary technical or vocational school | 637 | 25.5% |
| Graduated from college or more | 744 | 29.8% |
| Not known | 106 | 4.2% |
| **Current Income** | | |
| Less than $20,000 | 359 | 14.4% |
| $20,000 - $40,000 | 586 | 23.4% |
| $40,000 - $60,000 | 359 | 14.4% |
| $60,000 - $80,000 | 292 | 11.7% |
| $80,000 - $100,000 | 211 | 8.4% |
| Over $100,000 | 189 | 7.6% |
| Not known | 504 | 20.2% |

**(Table continued on next page)**

**Table 4-1 (cont.)**

|  | Observations By Characteristic | |
|---|---|---|
|  | Number | Percent[b] |
| **Expected Future Income** |  |  |
| Will be much lower | 99 | 4.0% |
| Will be slightly lower | 172 | 6.9% |
| Will be about the same | 759 | 30.4% |
| Will be slightly higher | 870 | 34.8% |
| Will be much higher | 334 | 13.4% |
| Not known | 266 | 10.6% |
| **Current Debt** |  |  |
| More debt than can comfortably handle | 181 | 7.2% |
| About as much debt as can comfortably handle | 923 | 36.9% |
| Could handle more debt than currently have | 778 | 31.1% |
| Do not have any personal debt | 349 | 14.0% |
| Not known | 268 | 10.8% |
| **Total Sample Size** | **2,500** | **100.0%** |

**Notes.**

a   The numbers and percentages in this table are based on unweighted responses.  Numbers reported elsewhere are weighted, unless otherwise noted.

b   Percentages may not add to 100 percent due to rounding.

*Consumer Fraud in the United States: An FTC Survey*

we sought to determine whether consumers who feel pressured by their current debt level are willing to take greater risks in an attempt to eliminate the debt or behave more cautiously to avoid increasing their debt further.

Table 4-1 shows the distribution of survey participants by each of these characteristics.[131]

## Methodology

Using the survey responses, we examine whether the characteristics described above affect the likelihood that consumers have experienced one or more of the types of fraud studied and/or slamming.  In this analysis, we principally examine two aggregate measures of victimization.  First, we examine whether a participant was a victim of one or more of these problems – *i.e.*, experienced at least one type of fraud and/or experienced the unauthorized switching of his or her long distance service.[132]  Second, we then consider only whether a participant experienced one or more of the frauds – that is, we exclude participants who were victims only of slamming.  Then, we briefly examine separately several of the specific frauds and slamming.[133]

In conducting our analysis, we have used two different statistical methodologies.[134]  The first approach was to focus on each of a number of characteristics – age, gender, income level, education, race and ethnicity – and to scrutinize simple cross-tabulations that show the percentage of participants within each group (*e.g.*, aged 18 to 24, or with an income between $40,000 and $60,000, or college-educated) who were victims of a particular type of fraud or slamming.  This formulation provides information about whether the problem being examined occurred more often in certain groups.

---

[131] Unlike most of the numbers provided in this report, the numbers in Table 4-1 are not weighted.  For each characteristic, the table also shows the number of participants who did not provide answers to the relevant questions and whom we therefore cannot categorize.

[132] In this analysis, participants are considered to be a victim of a particular type of fraud if they indicated that they had a particular experience at least once and had lost money as a result the last time they had the experience.  Participants who did not have the experience or who had the experience only once and did not lose any money as a result (or said that they received a refund) are not considered to be victims.  As discussed previously, those who indicated that they had a particular experience more than once in the last year were only asked about the amount of money they lost the last time they had the particular experience.  Therefore, it was not possible to determine whether participants who indicated that they had an experience multiple times, but who said that they had not lost money the last time it occurred, were victims or not.  These participants were therefore excluded from the relevant analysis, as were those who indicated that they did not know whether they had a particular experience.

[133] As discussed in footnote  below, we also did some preliminary analysis of the number of incidents experienced by those who were victims.

For some types of frauds, there were so few victims among the survey participants that reasonable statistical inferences could not be drawn from the data.  We did not attempt to estimate relationships when we had complete data for fewer than ten victims of the particular type of fraud.

[134] In examining the determinants of the various specific types of fraud, we only use the probit analysis discussed below.

This approach has at least one limitation, however.  Consider, for example, participants in different age groups.  The simple cross-tabulation methodology does not tell us whether any differences in the prevalence of a particular problem in fact flow from the precise characteristic under review – here, one's age group – or whether such differences arise from other attributes that may differ between one age group and another.  For example, those in the 18-to-24 group – the youngest age group in our survey – tend to have lower incomes and less education than those in older groups (at least in part because they are still in school or are just beginning their careers).[135]  Thus, if we found that those in the 18-to-24 group were, say, more likely to be victims, we would not know whether this phenomenon arose merely from the fact that these victims are young, or whether perhaps it resulted from this group's lower income or education level.

To help determine which factors are ultimately responsible for the results we find, we also used a second approach – a probit regression analysis that simultaneously measures the differences associated with each of the characteristics.[136]  This technique allowed us to ascertain, for example, whether

---

[135]  Only about 7 percent of survey participants in the 18 to 24 group have a college degree, whereas 17 to 19 percent of those between 25 and 54 have a college degree.  Almost one quarter of the 18 to 24 year olds have an income of less than $20,000.  In contrast, only 12 percent of those between 45 and 54 years of age had incomes of this level.

[136]  We use a probit analysis because, for each individual included in the regression, the dependent variable has one of two values, indicating that the person has been a victim within the last year or the person has not been a victim.  In such situations, technical considerations mandate that a technique like probit be used.  (For a detailed treatment of probit analysis, see John H. Aldrich and Forrest D. Nelson, *Linear Probability, Logit, and Probit Models*, Sage University Paper Series on Quantitative Applications in the Social Sciences, No. 07-045, Sage Publications, 1984, or William H. Greene, *Econometric Analysis* 3rd edition, Prentice Hall, Inc., 1997.)

As is common in using regression analysis to analyze survey results, problems arise because not every participant answers every question asked.  We have used two common approaches to deal with this problem.  First, we use Complete Case Analysis, where we only include in the analysis observations for those who provided answers to all of the questions used in the analysis.  If missing values occur at random, complete case analysis will provide unbiased, though inefficient, estimates of the parameters of interest.  If there is a correlation between missing values on one variable and the value of other variables, however, the resulting estimates may be biased.  The second approach we use is known as Conditional Mean Imputation.  This approach uses the relationships among the various variables in a model to estimate the most-likely value for those instances where the value of a variable is missing.  This approach improves the efficiency of our estimates and reduces the likelihood of biased estimates.  However, the estimated variances on the coefficients may be biased downward with the result that the measures of statistical significance are overstated.  (See Roderick J.A. Little and Donald B. Rubin, "The Analysis of Social Science Data With Missing Values," in *Modern Methods of Data Analysis*, John Fox and J. Scott Long, editors, Sage Publications, 1990, pp. 374-409.  *See also* Roderick J.A. Little and Donald B. Rubin, *Statistical Analysis With Missing Data*, Second Edition, Wiley-Interscience, 2002.  For a recent application of this approach, see Philip DeCicca, Donald Kenkel and Alan Mathios, "Putting Out the Fires: Will Higher Taxes Reduce the Onset of Youth Smoking?," *Journal of Political Economy*, 110 (February 2002), pp. 144-169.)

In implementing the conditional-mean-imputation procedures with our categorical variables, when it was possible to convert a categorical variable to a continuous variable, we did so prior to performing the imputation.  After the imputation, we then recreated the categorical variable by assigning an observation to the category implied by the imputed value.  When this was not possible, we created separate dummy variables for each of the values of the categorical variables and generated imputed values for each of the dummy variables.  We then use these values, which can be considered estimates of the likelihood that the individual fell within each category, in the final regression.

*Consumer Fraud in the United States: An FTC Survey*

younger consumers are more likely to be victims than older consumers with comparable levels of income, education, etc.  In other words, we can determine more precisely the likely cause(s) of any differences in victimization.

Depending on the question posed, one or the other of these approaches – simple cross-tabulation or probit regression analysis – may be the more appropriate way to measure the association between two variables.  For example, if we want to evaluate whether to undertake an educational campaign in Spanish aimed at teaching consumers how to avoid being victims of fraud, it may be more important just to know that Hispanics are at greater risk of becoming victims – and less important to determine whether the elevated risk stems from different levels of education or income.  Similarly, the simple cross-tabulation results may be more useful in deciding whether to run an educational campaign in a publication directed at senior citizens.  On the other hand, to gain a more comprehensive understanding of differences among victims, we would use the more complex probit regression methodology – which controls for the effects of other factors – to determine which factor has the greatest association with the likelihood of becoming a victim.

## Analysis of Aggregate Measures of Risk

Tables 4-2 and 4-3 present the results of our analysis of the likelihood of being a victim of fraud or slamming and of fraud alone.  In addition, Figures 4-1 through 4-4 highlight some of the more interesting results.  Table 4-2 and the figures set forth the results of the simple cross-tab analysis, showing the relationships between the percentage of participants who were victims and the single characteristic being analyzed.  Table 4-3 provides the results of our probit analysis.[137]

---

[137.] Table 4-4 provides the results of probit analyses for individual types of frauds and for the unauthorized changing of long distance service.  The numbers in both Tables 4-3 and 4-4 are the estimated marginal effects for each group.  For example, in the first column of figures in Panel A of Table 4-3, the coefficient for "African Americans" is 0.0738.  This indicates that the results from the conditional-mean-imputation estimation show that African Americans are 7.38 percentage points more likely to be victims of a fraud or slamming than non-Hispanic whites.  (The coefficients in the table are reported as decimals, not percentages.)  The marginal effect of each variable is calculated by computing the estimated likelihood of being a victim for each survey participant, assuming that the participant has the baseline value of the characteristic examined and further assuming the participant's actual characteristics for the other variables in the equation.  Averaging these estimated probabilities across all individuals gives us the average likelihood of being a victim in the base case.  We then estimate the likelihood that a participant would be a victim if he or she has the characteristic for which the marginal effect is being calculated and his or her actual characteristics for the other variables in the equation.  Again, averaging across all individuals gives us the estimated average likelihood under this scenario.  The difference between these two averages is then the estimated marginal effect.

*Chapter 4:  Who is a Victim of Fraud?*

### Race and Ethnicity

Members of several minority groups are significantly more likely to be victims than are non-Hispanic whites. Whether we look at the likelihood of being a victim of fraud or slamming, or the likelihood of being a victim of fraud alone, the differences across racial and ethnic groups are jointly significant at the 1 percent level. We found that consumers in certain minority groups are more likely to be victims both in the simple cross-tab analysis and in the more sophisticated probit analysis, and in both the analysis of fraud or slamming and fraud alone. The cross-tab results for race and ethnicity are presented in Figure 4-1 and in Panel A of Table 4-2.



**Figure 4-1**
**Likelihood of Being a Victim**
**By Race and Ethnicity**

**Fraud and Unauthorized Changes in Long Distance Service**

Hispanics 26.7%, African Americans 24.1%, American Indians / Alaska Natives 38.0%, Non-Hispanic Whites 12.5%, Others 11.7%

**Fraud Only**

Hispanics 14.3%, African Americans 17.1%, American Indians / Alaska Natives 33.8%, Non-Hispanic Whites 6.4%, Others 7.3%

Source: Table 4-2

*Consumer Fraud in the United States: An FTC Survey*

**Table 4-2:   Percent of Survey Participants Who Are Victims, By Single Characteristic**[a]

**A.  By Race and Ethnicity**

|  | Fraud and Unauthorized Changes in Long Distance Service | Fraud Only |
|---|---|---|
| Hispanics | 26.7% | 14.3% |
| African Americans | 24.1% | 17.1% |
| American Indians or Alaska Natives | 38.0% | 33.8% |
| Non-Hispanic Whites | 12.5% | 6.4% |
| Others | 11.7% | 7.3% |
| *Number of Observations* | 1864 | 1852 |

**B.  By Current Income**

|  | Fraud and Unauthorized Changes in Long Distance Service | Fraud Only |
|---|---|---|
| Less than $20,000 | 17.5% | 8.7% |
| $20,000 to $40,000 | 18.2% | 12.5% |
| $40,000 to $60,000 | 14.3% | 6.7% |
| $60,000 to $80,000 | 16.1% | 10.8% |
| $80,000 to $100,000 | 11.3% | 5.2% |
| Over $100,000 | 15.3% | 6.8% |
| *Number of Observations* | 1698 | 1684 |

**C.  By Expected Income Three Years in the Future**

|  | Fraud and Unauthorized Changes in Long Distance Service | Fraud Only |
|---|---|---|
| Will be much lower | 21.3% | 11.0% |
| Will be slightly lower | 12.7% | 7.2% |
| Will be about the same | 11.4% | 5.0% |
| Will be slightly higher | 15.3% | 9.6% |
| Will be much higher | 23.5% | 14.2% |
| *Number of Observations* | 1889 | 1873 |

**D.  By Comfort with Current Level of Debt**

|  | Fraud and Unauthorized Changes in Long Distance Service | Fraud Only |
|---|---|---|
| More debt than can comfortably handle | 27.3% | 19.2% |
| About as much debt as can comfortably handle | 15.4% | 9.1% |
| Could handle more debt than currently have | 15.1% | 8.1% |
| Do not have any personal debt | 8.6% | 2.7% |
| *Number of Observations* | 1882 | 1869 |

**(Table continued on next page)**

56

**Table 4-2 (cont.)**

E.  <u>By Age</u>

|  | Fraud and Unauthorized Changes in Long Distance Service | Fraud Only |
|---|---|---|
| 18 - 24 | 11.4% | 8.3% |
| 25 - 34 | 18.4% | 11.1% |
| 35 - 44 | 18.2% | 11.1% |
| 45 - 54 | 17.4% | 8.7% |
| 55 - 64 | 10.7% | 6.1% |
| 65 and over | 10.9% | 4.7% |
| *Number of Observations* | 1979 | 1967 |

F.  <u>By Marital Status</u>

|  | Fraud and Unauthorized Changes in Long Distance Service | Fraud Only |
|---|---|---|
| Single | 13.6% | 8.1% |
| Married | 16.0% | 8.5% |
| *Number of Observations* | 2101 | 2089 |

G.  <u>Gender</u>

|  | Fraud and Unauthorized Changes in Long Distance Service | Fraud Only |
|---|---|---|
| Male | 14.8% | 8.3% |
| Female | 14.9% | 8.4% |
| *Number of Observations* | 2101 | 2089 |

H.  <u>By Education</u>

|  | Fraud and Unauthorized Changes in Long Distance Service | Fraud Only |
|---|---|---|
| Did not complete high school | 14.6% | 7.5% |
| Graduated from high school | 14.4% | 7.7% |
| Attended some college or post-secondary technical or vocational school | 17.1% | 11.1% |
| Graduated from college or more | 13.7% | 7.0% |
| *Number of Observations* | 2014 | 2003 |

**Note.**

a  Based on all observations where it is clear whether the person was a victim or not and where we know the specific characteristic for that individual.

57

*Consumer Fraud in the United States: An FTC Survey*

### American Indians or Alaska Natives[138]

Among survey participants, American Indians or Alaska Natives had the greatest likelihood of reporting that they had been a victim. As shown in the top part of Figure 4-1, 38.0 percent of American Indians or Alaska Natives indicated that they had been victims of fraud or slamming within the last year.[139] Compared to the 12.5 percent of non-Hispanic whites who were victims, American Indians or Alaska Natives were 25.5 percentage points more likely to be victims. This difference is statistically significant at the 1 percent level.[140] Considering only consumers who were victims of one or more of the frauds examined in the survey (Fraud Only), we again find that the American Indian or Alaska Native group has the greatest likelihood of being a victim. Almost 34 percent of this group were victims in the last year – a figure that is more than 27 percentage points above that for non-Hispanic whites. (These values are shown in the bottom part of Figure 4-1.) Again, the difference is significant at the 1 percent level. In sum, these simple results suggest that American Indians or Alaska Natives are more than three times as likely as non-Hispanic whites to be victims of fraud or slamming and more than five times as likely to be victims of fraud alone.

The probit analysis presented in Table 4-3 paints a very similar picture. The conditional-mean-imputation results in Panel A show that American Indians or Alaska Natives were 28 percentage points more likely than non-Hispanic whites to have been a victim of fraud or slamming, and the results in Panel B show that they were 31 percentage points more likely to have been a victim of fraud alone. These differences are both significant at the 1 percent level.[141] The complete case analyses show essentially the same: after controlling for other variables, we find that American Indians or Alaska Natives are more than three times as likely to have been a victim of fraud or slamming as a non-Hispanic white and more than five times as likely to have been a victim of fraud alone.[142]

---

[138] Among the categories OMB suggests using to collect racial data is "American Indians or Alaska Natives." Because we used this category collecting the data, we use this term consistently throughout this report.

[139] As in the previous chapter, results here are based on a weighted analysis.

[140] Some caution may be advised in interpreting this result. Although the result is statistically significant, the survey included only 28 American Indians or Alaska Natives.

[141] The level of significance for coefficients in the various regressions are reported in the tables that contain the regression results.

[142] This conclusion is true in both the complete case and the conditional-mean-imputation equations. In calculating the ratio of the likelihood of being a victim, we use the average likelihoods for the two groups as described in footnote  above.

*Chapter 4:  Who is a Victim of Fraud?*

**Table 4-3:    Likelihood of Being a Victim, Probit Estimation, Marginal Effects, Aggregate Measures**

**A.  All Frauds and Unauthorized Changes in Telephone Service**

| | Conditional Mean Imputation (1) | | Complete Cases Only (2) | |
|---|---|---|---|---|
| **Race and Ethnicity (Relative to Non-Hispanic Whites)** | | | | |
| Hispanics | 0.1302 | *** | 0.1432 | *** |
| African Americans | 0.0738 | ** | 0.0748 | ** |
| American Indians or Alaska Natives | 0.2797 | *** | 0.3137 | *** |
| Other | -0.0109 | | -0.0038 | |
| *Joint Significance* | | *** | | *** |
| **Gender (Relative to Male)** | | | | |
| Female | 0.0041 | | 0.0002 | |
| **Marital Status (Relative to Married)** | | | | |
| Single | -0.0438 | ** | -0.0486 | ** |
| **Age (Relative to 35 - 44)** | | | | |
| 18 - 24 | -0.0781 | ** | -0.0836 | ** |
| 25 - 34 | -0.0189 | | -0.0111 | |
| 45 - 54 | 0.0006 | | 0.0314 | |
| 55 - 64 | -0.0504 | * | -0.0481 | |
| 65 and over | -0.0184 | | -0.0088 | |
| *Joint Significance* | | * | | ** |
| **Education (Relative to High School Graduate)** | | | | |
| Did not complete high school | 0.0030 | | -0.0108 | |
| Attended some college or post-secondary technical or vocational school | 0.0199 | | 0.0039 | |
| Graduated from college or more | 0.0084 | | -0.0072 | |
| *Joint Significance* | | ns | | ns |
| **Current Income (Relative to $40,000 to $60,000)** | | | | |
| Less than $20,000 | 0.0586 | ** | 0.0720 | ** |
| $20,000 - $40,000 | 0.0480 | ** | 0.0581 | ** |
| $60,000 - $80,000 | 0.0168 | | 0.0167 | |
| $80,000 - $100,000 | -0.0327 | | -0.0291 | |
| Over $100,000 | 0.0184 | | 0.0283 | |
| *Joint Significance* | | * | | ns |
| **Expected Future Income (Relative to Future Income Unchanged)** | | | | |
| Will be much lower | 0.1070 | *** | 0.1121 | ** |
| Will be slightly lower | 0.0332 | | 0.0532 | |
| Will be slightly higher | 0.0346 | * | 0.0356 | |
| Will be much higher | 0.1196 | *** | 0.1213 | *** |
| *Joint Significance* | | *** | | *** |
| **Current Debt (Relative to Having Too Much Debt)** | | | | |
| About as much debt as can comfortably handle | -0.0740 | ** | -0.0751 | ** |
| Could handle more debt than currently have | -0.0601 | * | -0.0654 | * |
| Do not have any personal debt | -0.1290 | *** | -0.1114 | *** |
| *Joint Significance* | | *** | | * |
| *Number of Observations* | 2101 | | 1509 | |
| *Percent Positive Values* | 14.86% | | 16.76% | |
| *Chi-square for Overall Significance* | 102.94 | *** | 80.76 | *** |

**(Table continued on next page)**

*Consumer Fraud in the United States: An FTC Survey*

**Table 4-3 (cont.)**

B.  **All Frauds**

| | Conditional Mean Imputation (1) | | Complete Cases Only (2) | |
|---|---|---|---|---|
| **Race and Ethnicity (Relative to Non-Hispanic Whites)** | | | | |
| Hispanics | 0.0581 | ** | 0.0617 | ** |
| African Americans | 0.0605 | *** | 0.0662 | ** |
| American Indians or Alaska Natives | 0.3125 | *** | 0.3518 | *** |
| Other | 0.0031 | | 0.0050 | |
| *Joint Significance* | | *** | | *** |
| **Gender (Relative to Male)** | | | | |
| Female | 0.0037 | | -0.0021 | |
| **Marital Status (Relative to Married)** | | | | |
| Single | -0.0194 | | -0.0211 | |
| **Age (Relative to 35 - 44)** | | | | |
| 18 - 24 | -0.0371 | | -0.0401 | |
| 25 - 34 | -0.0194 | | -0.0134 | |
| 45 - 54 | -0.0225 | | -0.0042 | |
| 55 - 64 | -0.0338 | | -0.0340 | |
| 65 and over | -0.0228 | | -0.0145 | |
| *Joint Significance* | | ns | | ns |
| **Education (Relative to High School Graduate)** | | | | |
| Did not complete high school | 0.0104 | | -0.0007 | |
| Attended some college or post-secondary technical or vocational school | 0.0287 | * | 0.0177 | |
| Graduated from college or more | 0.0104 | | 0.0041 | |
| *Joint Significance* | | ns | | ns |
| **Current Income (Relative to $40,000 to $60,000)** | | | | |
| Less than $20,000 | 0.0286 | | 0.0389 | |
| $20,000 - $40,000 | 0.0514 | *** | 0.0638 | *** |
| $60,000 - $80,000 | 0.0291 | | 0.0353 | |
| $80,000 - $100,000 | -0.0215 | | -0.0192 | |
| Over $100,000 | 0.0086 | | 0.0145 | |
| *Joint Significance* | | ** | | ** |
| **Expected Future Income (Relative to Future Income Unchanged)** | | | | |
| Will be much lower | 0.0544 | * | 0.0761 | ** |
| Will be slightly lower | 0.0391 | | 0.0596 | ** |
| Will be slightly higher | 0.0396 | *** | 0.0416 | ** |
| Will be much higher | 0.0832 | *** | 0.0959 | *** |
| *Joint Significance* | | *** | | *** |
| **Current Debt (Relative to Having Too Much Debt)** | | | | |
| About as much debt as can comfortably handle | -0.0526 | ** | -0.0547 | * |
| Could handle more debt than currently have | -0.0583 | ** | -0.0656 | ** |
| Do not have any personal debt | -0.1143 | *** | -0.1120 | *** |
| *Joint Significance* | | *** | | *** |
| *Number of Observations* | 2089 | | 1492 | |
| *Percent Positive Values* | 8.33% | | 9.67% | |
| *Chi-square for Overall Significance* | 110.49 | *** | 83.92 | *** |

**Notes.**

 *** significant at 1 percent level

  ** significant at 5 percent level

   * significant at 10 percent level

ns not significantly different from zero in joint test

SJX28 - 83

### Hispanics

Hispanics have the second highest likelihood of being a victim of fraud or slamming.  The results of the cross-tab analysis, set forth in both Figure 4-1 and Table 4-2, show that 26.7 percent of Hispanic survey participants were victims.  The rate of victimization among Hispanics is more than 14 percentage points greater than the percentage of non-Hispanic whites and is somewhat greater than the figure for African Americans.  Considering victims of fraud alone, the percentage of Hispanics who were victims is still almost 8 percentage points higher than for non-Hispanic whites.  Thus, whether we examine fraud alone or include slamming, Hispanics are more than twice as likely to be victims as non-Hispanic whites, and the differences are statistically significant at the 1 percent level.[143]

The probit regression results in Table 4-3 again paint a very similar picture:  We estimate that Hispanics have a 13 or 14 percentage point greater likelihood of being a victim of fraud or slamming than non-Hispanic whites, and a 6 percentage point greater risk of being a victim of fraud alone.  These differences are both statistically significant.[144]  After controlling for all other factors, Hispanics are twice as likely to be victims of fraud or slamming as non-Hispanic whites.  For fraud alone, the risk for Hispanics is about 1.8 or 1.9 times that for non-Hispanic whites.

### African Americans

As with Hispanics and American Indians or Alaska Natives, African Americans have a greater likelihood of being a victim than do non-Hispanic whites.  The cross-tab results indicate that African Americans are almost 12 percentage points more likely to be victims of fraud or slamming, and more than 10 percentage points more likely to be victims of fraud alone.  For both measures, the risk faced by African Americans is significantly greater than that faced by non-Hispanic whites at the 1 percent level of statistical significance.  The regression results in Table 4-3 also show that African Americans are more likely to be victims than non-Hispanic whites, and the differences are statistically significant.[145]

---

[143] The differences between Hispanics and African Americans are not statistically significant.

[144] When looking at the combination of victims of fraud and/or slamming, the differences are significant at the 1 percent level.  Looking only at victims of fraud, the differences are significant at the 5 percent level.

[145] Comparing the data for Hispanics and African Americans, the cross-tab results in Table 4-1 show that Hispanics are 2.6 percentage points more likely to be victims if we look at fraud and slamming together.  When we look at fraud alone, Hispanics are 2.8 percentage points less likely to be victims.  Neither of these differences is statistically significant.  After controlling for other factors, the regression results in Table 4-2 show that Hispanics are 6 to 7 percentage points more likely to be a victim of fraud or slamming, and less than one-half of one percentage point less likely to be a victim of fraud alone.  Again, these differences are not statistically significant.

*Consumer Fraud in the United States: An FTC Survey*

Thus, in the simple cross-tab analysis, African Americans are almost twice as likely to be victims of fraud or slamming and more than 2.5 times as likely to be victims of fraud alone as compared to non-Hispanic whites.  In the regression analysis, they are just over 1.5 times as likely to be victims of fraud or slamming and 1.85 to 1.90 times as likely to be victims of fraud alone.

### Asians, Native Hawaiians or Other Pacific Islanders, and Multi-Racial

A small number of participants identified themselves as Asians, Native Hawaiians or Other Pacific Islanders, American Indians or Alaska Natives, or as belonging to more than one racial group.  Only the group of participants who identified themselves as American Indian or Alaska Native were statistically different from the base group in cross-tabulation tests to examine whether these small groups had a statistically significant higher or lower incidence of fraud or slamming compared to non-Hispanic whites.  For this reason, the remaining smaller racial groups were combined into a category titled "Other" for the analysis contained in this report.  This combination is consistent with standard statistical practice.  Of participants included in the "Other" category, 39 percent identified themselves as Asian, 11 percent identified themselves as Native Hawaiian or Other Pacific Islander, and 50 percent identified themselves as belonging to two or more racial categories.

We find that the small number of participants who are included in this "Other" group are no more or less likely to be a victim than are non-Hispanic whites.  Whether we consider fraud alone or include slamming in addition to fraud, the victimization rate for this group is within 1.1 percentage points of the rate for non-Hispanic whites.  None of the differences are statistically significant.  This is the case in both the cross-tab analysis and in the regressions.

### Current Income

The simple cross-tab analysis suggests that current income has little effect on a consumer's risk of being a victim.  Panel B of Table 4-2 presents the differences in the percentage of participants who were victims of fraud or slamming, categorized according to their current income.  These differences are not statistically significant, either individually or jointly.  Considering victims of fraud alone, the overall relationship between income and the percentage of victims is significant at the 5 percent level.  However, there is no clear pattern to the relationship.  Those with incomes between $20,000 and $40,000 have the highest likelihood of victimization – 12.5 percent – while those with incomes between $60,000 and $80,000 face the second highest likelihood – 10.8 percent.  Consumers in the intervening group – with incomes between $40,000 and $60,000 – have the second lowest rate of victimization – 6.7 percent.[146]

---

[146] The only statistically significant difference is between the $20,000 to $40,000 income group and the $40,000 to $60,000 group.  That difference is significant at the 5 percent level.

The results of the probit analysis in Table 4-3 suggest that, after controlling for factors other than income, consumers with lower incomes – incomes of $40,000 or below – may be somewhat more likely to be a victim of fraud or slamming than consumers with incomes in the $40,000 to $60,000 range.  In those regressions, the coefficients for incomes of less than $20,000 and those for incomes between $20,000 and $40,000 are both significantly greater than zero and suggest that consumers in these income groups have a 5 to 7 percentage point increased risk of being a victim.[147]  The regression results suggest that consumers with incomes under $20,000 are about 50 percent more likely to be a victim of fraud or slamming than those with incomes between $40,000 and $60,000.  Consumers with incomes in the range of $20,000 to $40,000 have an increased risk of about 40 percent.

The probit analysis of the likelihood of being a victim of fraud alone yields the same result as the cross-tabs: Consumers with incomes in the $20,000 to $40,000 range are more likely to be victims of fraud than those with incomes of $40,000 to $60,000.  However, the difference in risk between those with incomes under $20,000 and those with incomes of $40,000 to $60,000 is not statistically significant.

### Future Income

Consumers' expectations about future changes in their incomes have a statistically significant effect on the likelihood that they will become a victim.  The pattern is consistent whether we look at victims of fraud or slamming or at victims of fraud alone, and for both the cross-tab and the probit results.[148]

As shown in Figure 4-2 and in Panel C of Table 4-2, the simple cross-tab analysis finds that the rate of victimization is lowest for consumers who expect their incomes to remain steady over the next three years.  Consumers who expect their incomes to be either slightly higher or slightly lower have a somewhat greater risk of being victims.[149]  Finally, consumers who expect large changes in their incomes – either large increases or large decreases – have the highest risk

---

[147.] The coefficients for incomes under $20,000 and for those between $20,000 and $40,000 are both significant at the 5 percent level in the regressions analyzing the likelihood of being a victim of fraud or slamming.

[148.] The effect of expected changes in future income is jointly significant at the 1 percent level in all of the cross-tab and regression results.

[149.] The difference between those who expect their incomes to be slightly higher in the next three years and those who expect their incomes to remain stable is significant at the 5 percent level when we examine both fraud and slamming.  When we examine fraud alone, the difference is significant at the 1 percent level.  The differences between those who expect their incomes to be slightly lower and those who expect them to be the same are not statistically significant.

*Consumer Fraud in the United States: An FTC Survey*

of being victims.[150] The probit results in Table 4-3 present the same picture.[151] Regardless of whether we look simply at the relationship between the likelihood of being a victim and expected future income changes or use regression analysis to control for other factors, we find that consumers who anticipate large changes in their incomes are, roughly, at least twice as likely be a victim as consumers who anticipate stable incomes.[152]



Figure 4-2
Likelihood of Being a Victim
By Expected Change in Future Income

Fraud and Unauthorized Changes in Long Distance Service

Fraud Only

Source: Table 4-2

---

[150.] The difference between those who expect large declines in their incomes and those who expect no change is significant at the 5 percent level for both fraud and slamming combined and fraud alone. The difference between those who expect a large increase in income and those who expect no change is significant at the 1 percent level in both cases.

[151.] In the probit analysis, the differences in risk for those who expect a slight decline in their future income and those who expect their incomes to remain about the same are significant only in the complete case analysis of being a fraud victim alone. The differences for those who expect a slight increase in income are significant when we look only at victims of fraud alone. When we look at fraud and slamming, the coefficient is only significant at the 10 percent level in the conditional-mean-imputation results and as, noted previously, this methodology may overstate significance. Those who expect to have much lower future incomes face an increased risk that is significant at the 5 percent level whether we are looking at victims of fraud or slamming or victims of fraud alone in three of the four reported regressions, while those who expect to see much higher incomes face an increased risk that is significant at the 1 percent level in all four regressions.

[152.] Looking at both fraud and slamming, the simple analysis suggests that those who expect large declines in their incomes face an 85 percent higher risk than those who expect their incomes to be stable. In the complete case regression analysis, this group has a 90 percent increase in risk.

64

-*Chapter 4:  Who is a Victim of Fraud?*

The reasons for this pattern of results are not clear.  The fact that consumers who expect their incomes to decline significantly are more likely to be victims is consistent with the hypothesis that these consumers are willing to take greater risks to avoid the decline.[153]  This hypothesis does not explain why those who anticipate large future increases in income are at greater risk, however.  One possible explanation for this result is that many consumers who say they expect their incomes to rise significantly in the future may be overly optimistic about their futures.  They may also be overly optimistic about their ability to distinguish between fraudulent and honest offers from which they can profit.[154]

### The Burden of Debt

How consumers feel about their ability to handle their existing debt is also significantly related to the likelihood that they will be victims.  Specifically, those who feel that they have more debt than they can handle are the most likely to be victims.  The data presented in Panel D of Table 4-2 and in Figure 4-3 suggest that consumers who feel that they have too much debt are more than three times as likely to be victims of fraud or slamming compared to consumers who have no debt – 27.3 percent of survey participants with too much debt were victims versus 8.6 percent of those with no debt.  The effect is even greater for fraud alone, where those who felt they had too much debt were more than 7 times as likely to have been victims.[155]  Consumers who stated that their level of debt was about right or that they could handle additional debt were less likely to be victims than those whose debt level was too high, but were more likely than those with no debt.[156]  Overall, consumers' perception of the burden of their debt bears a significant relationship to the likelihood of being victims.[157]

---

[153] This effect should be present in particular when we look at frauds such as business opportunities, in which purchasers believe that the offering will allow them to earn money or make profits in the future. However, we do not have sufficient data regarding these types of frauds from which to estimate statistical relationships for them alone.

[154] If we had found an increased risk for those who expect large increases in their incomes only in the simple cross-tab results and not in the regression results, we might conclude that the greater risk applies primarily to young consumers who are just starting out.  However, the fact that the increased risk also appears in the regression results – where we controlled for age and education – suggests that this hypothesis is not the explanation.

Interestingly, in Table 4-4, which provides the results of probit analysis for specific types of frauds, we find that consumers who anticipate much higher levels of income in the future are significantly more likely to be victims of credit record fraud and of advance fee loan scams.

[155] In both cases, the differences between those with too much debt and those with no debt are statistically significant at the 1 percent level.

[156] Comparing the likelihood of being a victim for those with about as much debt as they can handle and those who say they can handle additional debt to the risk faced by those who said they had no debt, we find that the differences are significant at the 1 percent level.

[157] We also examined whether consumers who had more debt than they could handle were more likely to be victims of specific types of fraud.  As shown in Table 4-4, we found that these consumers were more likely to have purchased credit card insurance than consumers who were more comfortable with their debt. This type of fraud was the only one for which these consumers faced a significantly higher risk.

*Consumer Fraud in the United States: An FTC Survey*

Although the probit analysis presented in Table 4-3 paints a similar picture, the differences in risk among the various levels of perceived debt are somewhat smaller once we control for other factors.[158] The cross-tab results suggest that consumers with too much debt are more than three times as likely to have been a victim of fraud or slamming. However, the ratio falls to 1.9 after we control for other factors.  Looking at fraud alone, the regression results show that those who feel overburdened by their debt are 2.7 times as likely to have been a victim, compared to 7 times as likely in the simpler analysis.



**Figure 4-3**
**Likelihood of Being a Victim**
**By Comfort with Current Level of Debt**

**Fraud and Unauthorized Changes in Long Distance Service**

**Fraud Only**

Source: Table 4-2

These results are also consistent with the hypothesis that consumers who are worried about their financial futures are more likely to take risks.  For example, consumers who struggle to meet their current debt obligations may be more likely to fall for schemes that promise to provide a way out of their present

---

[158.] Whether considering victims of fraud or slamming or victims of fraud alone, and whether considering the simple cross-tabs or the probit results, the overall effect of the consumer's perceived ability to service existing debt is jointly significant at the 1 percent level, with one exception.  (In the complete case regression analysis of all frauds and slamming, the level of debt variables are jointly significant at only the 10 percent level.)  Analyzing individual effects in the cross-tab results, the proportion of victims is significantly lower, at the 1 percent level, for consumers who say that the level of their debt is about right, that they could handle more debt, or that they have no debt, as compared to those who say that they have more debt than they can handle.

*Chapter 4:  Who is a Victim of Fraud?*

situation.[159]  The results may also reflect a general difference among consumers with respect to their willingness to take risks.  Consumers who are more willing to take risks may be more likely to have uncomfortably high levels of debt and may also be more likely to be victims of fraudulent offers.  At the other end of the spectrum, consumers who report having no existing debt may be more conservative in most financial matters, which in turn may explain why they are less likely to be victims.[160]



Figure 4-4
Likelihood of Being a Victim
By Age

[159.] As noted earlier, we were not able to estimate the risk of victimization for most specific frauds, including business opportunity fraud.  The purchase of credit card insurance is the only specific type of fraud for which we found that consumers with too much debt faced a significantly increased risk of victimization. (See Table 4-4.)

[160.] We also estimated a version of the probit equations that included variables that would allow an interactive effect between having too much debt and the consumer's expectations of changes in future income.  This version of the equation, which was run only for fraud alone and using only the complete case analysis, suggests that consumers who believe that they currently have more debt than they can comfortably handle and who expect their incomes to be much lower three years from now are at a significantly greater risk of being victims than either those who have too much debt but expect their incomes to remain stable or those who expect their incomes to fall but do not currently have more debt than they can comfortably handle.  Indeed, for consumers who do not have too much debt, expecting a future decrease in income does not seem to lead to an increased risk.  For those who expect their incomes to rise significantly in the next three years, there is an increased risk of being a victim.  However, this effect appears to be independent of whether the consumer has too much debt.  There is no additional effect of both anticipating a large positive change in income and having too much debt.

67

*Consumer Fraud in the United States: An FTC Survey*

### Age

Not controlling for other factors, we find that older consumers – those aged 55 or over – are less likely to be victims than younger consumers. These data are reported in Figure 4-4 and in Panel E of Table 4-2. Although 17 to 19 percent of survey participants between 25 and 54 years old were victims of fraud or slamming, the proportion falls to just under 11 percent for those who are 55 or older.[161] Similarly, we find that 11 percent of participants in the 25 to 44 age group were victims of fraud alone, compared with only 5 or 6 percent of those in the 55 and over age group.[162] The data also suggest that consumers in the youngest age group – 18 to 24 years of age – are somewhat less likely to have been a victim than those in the 25 to 54 age group. This effect is only significant when looking at both fraud and slamming, and then is only significant at the 10 percent level.

After we control for other factors, age does not have as much of an effect on the likelihood of being a victim of fraud or slamming. Although age was significant at the 1 percent level in the simple analysis, the overall relationship is significant only at the 5 or 10 percent level in the regression results reported in Table 4-3. Of particular interest, we find that the significantly lower likelihood for consumers aged 55 and older that we found in the simple analysis falls away once we control for other factors. Although the regression results suggest that the risk to older consumers is slightly lower than for those aged 35 to 44, the differences are generally not statistically significant.[163] The only significant age relationship in the regression results is that the youngest consumers – those between 18 and 24 – are less likely to be a victim of fraud or slamming.[164]

For fraud alone, age was even less important once we control for other factors. None of the age coefficients reported in Panel B of Table 4-2 are statistically significant and overall the age variables are not significant.

Perhaps the most noteworthy finding here is that consumers aged 65 or over do not appear to be at greater risk of being a victim than those who are somewhat younger. Indeed, the cross-tab results suggest that seniors face the lowest risk of being a victim. In the probit results in Table 4-3, however, we find that

---

[161] The difference in the fraction of consumers who were victims is significant at the 1 percent level if we compare the rates for those aged 55 to 64 or those aged 65 and above to the rate for those aged 35 to 44.

[162] The differences for those aged 55 to 64 and those aged 65 and over compared to those between 35 and 44 are significant at least at the 5 percent level.

[163] The only significant coefficient is for those between 55 and 64 in the conditional-mean-imputation equation. However, we cannot be confident that this result is not an artifact of the estimation technique we used because the statistical significance of coefficients tends to be overstated when conditional mean imputation is used.

[164] The results in Table 4-4 also show that the younger consumers are less likely to be victims of slamming alone.

seniors have about the same risk as younger consumers once we control for other factors.[165]

### Marital Status

There is some suggestive evidence that consumers who are married may be at somewhat greater risk of being victims than those who are single.  Panel F of Table 4-2 shows that, without controlling for other effects, the proportion of survey participants who are married and who were victims of fraud or slamming is more than 2 percentage points higher than for those who are single.  The proportion who were victims of fraud alone is less than 1 percentage point greater.  Neither of these differences is statistically significant.

When we control for other factors in the probit analyses, as shown in Table 4-3, we find slightly stronger results – married consumers face a 4 to 5 percentage point greater risk of being a victim of fraud or slamming and about a 2 percentage point increase in the risk of being a victim of fraud alone.  Only the difference in the risk of fraud or slamming combined is statistically significant.

It is not clear why consumers who are married should be at greater risk.  One possibility is that survey participants who are married reported both their own experiences and those of their spouse.  If that is the case, it could reflect either a weakness in the survey design or the fact that both spouses suffer financial loss when either one is a victim of the type of problems investigated here.[166]

### Other Characteristics

In addition to the characteristics discussed above, we also examined the relationship between gender and education level and the likelihood of being a victim of fraud and/or slamming.[167]  We present the results of the simple cross-tab analysis on these two variables in Panels G and H of Table 4-2.  Gender had no significant effect on the likelihood of being a victim regardless of whether

---

[165.] The finding that seniors are not more likely to be victims is consistent with the findings of the earlier studies.  See, Richard M. Titus, Fred Heinzelmann, and John M. Boyle, "Victimization of Persons by Fraud," *Crime & Delinquency*, 41 (January 1995), p. 60, and American Association of Retired Persons, *The Behavior of Older Consumers: An AARP Study*, 1994, pp. 3, 9.

[166.] In the analysis of specific types of problems in Table 4-4, we find only one specific problem for which we can identify a statistically significant increased risk for married consumers – slamming.  By contrast, those who are married are significantly less likely to be victims of credit repair or credit card insurance frauds.  In each of these cases, however, the effects are only significant at the 10 percent level in one of the regressions and are insignificant in the other one.  Thus, these results should be taken as quite tentative.

[167.] In addition, we conducted some preliminary analysis of whether the number of incidents experienced by victims varied based on the victims' particular characteristics.  Because the number of observations in this analysis is limited – between 144 and 159 depending on the particular variable when we include only victims of fraud and between 271 and 296 when we include victims of slamming – we only examined the effect of each characteristic individually.  Even then, there were no statistically significant relationships between demographic characteristics and the average number of incidents experienced, with one exception.

(continued...)

*Consumer Fraud in the United States: An FTC Survey*

we looked at fraud and slamming or just fraud alone or whether we controlled for other factors using the more complex probit analysis. With two very minor exceptions, education also had no effect on any of the measures.[168]

## The Likelihood of Being a Victim of Specific Frauds

In Table 4-4, we report the results of probit analyses of the likelihood of being a victim of four individual types of frauds, as well as the likelihood of being a victim of an unauthorized change in long distance telephone service.[169] We also conducted statistical tests to determine whether the effect of the various consumer characteristics included in the analysis differs depending on the type of fraud or slamming examined. Some earlier studies have found that consumers at the greatest risk of becoming a victim of one type of fraud have different characteristics than consumers who are most likely to fall for a different type of fraud. In particular, in its most recent study on consumer fraud, AARP reported that consumers who are most likely to fall for a foreign lottery fraud have different characteristics than those most likely to fall for an investment fraud.[170] Our survey includes different frauds than those investigated by AARP. In addition, the AARP study was limited to persons aged 45 or older, while our

---

[167] (...continued)
Although our analysis is therefore only suggestive of differences that may exist, some apparent differences are worth mentioning. For example, we find that American Indian or Alaska Native victims, on average, appear to experience more incidents per victim than non-Hispanic white victims. The difference is statistically significant at the 5 percent level when we look at both fraud and slamming – an average of 2.15 incidents per victim for American Indians or Alaska Natives and 1.45 for non-Hispanic whites. Considering frauds alone, American Indian or Alaska Natives victims average 1.95 incidents while non-Hispanic whites average 1.50 incidents. This difference is not statistically significant. Care must be taken in interpreting both of these results, however, because the number of American Indian or Alaska Native victims in the sample is small. The data also suggest that Hispanic victims of fraud alone experienced somewhat fewer incidents per victim than non-Hispanic white victims – 1.25 incidents per victim on average for Hispanics and 1.45 incidents per victim for non-Hispanic whites. Again, however, the difference here is not statistically significant.

The extent to which the average number of incidents per victim varies with current income is also interesting, though the differences are not statistically significant. Consumers with incomes under $20,000 appear to have more incidents per victim than those with incomes in excess of $40,000. Victims of frauds alone with incomes under $20,000 averaged 1.75 incidents, while victims with incomes over $40,000 averaged 1.40 incidents.

Finally, victims between 25 and 34 averaged 1.65 incidents per fraud victim – the highest average for any age group. In comparison, fraud victims aged 45 to 54 averaged 1.40 incidents per victim and those aged 65 or over averaged 1.50 incidents per victim. None of these differences is statistically significant.

[168] In the cross-tab analysis results for fraud alone in Panel H of Table 4-2, consumers who had taken some college courses or had attended technical school after high school had a higher risk of being a victim than those who had recently graduated from high school. This difference was significant at the 10 percent level, and the overall relationship between education level and likelihood of being a victim was significant at the 10 percent level. We find a similar weak relationship in the regression analysis of fraud only in the conditional-mean-imputation results.

[169] As discussed in footnote  above, we chose to conduct the probit analysis of these frauds because we felt that we had data for enough victims to permit meaningful statistical analysis.

[170] AARP (2003).

survey included consumers as young as 18.  We therefore sought to determine whether our survey yielded similar findings.

In investigating this issue, we conducted two sets of tests.  First, we compared the characteristics of victims of slamming to those of victims of fraud alone.  Second, we examined whether there were significant differences in victim characteristics among four specific types of frauds.

### *Slamming vs. Frauds*

We found significant differences in the characteristics of victims of slamming compared to victims of one or more of the frauds considered in the study.[171]  In particular, we found that the racial and ethnic characteristics and consumers' expectations about future changes in their incomes had differing relationships to the likelihood of being a victim of slamming and the risk of being a victim of fraud.[172]

We can understand some of the differences here by comparing the coefficients in the first column of Table 4-4 – which show the relationships between the various characteristics and the likelihood of being a victim of slamming – to those in Panel B of Table 4-3.  We note that although African Americans and American Indian or Alaska Natives have a significantly higher risk of being victims of frauds than non-Hispanic whites, the same is not true for their risk of being slammed.  The only group that shows a significantly higher risk of being slammed is Hispanics.

In addition, Panel B of Table 4-3 shows that expected future changes in income affect the likelihood of being a victim of fraud.  By contrast, Table 4-4 shows no significant relationship between expected future income changes and the likelihood of being a victim of slamming.  These results are not necessarily surprising.  If expected future income changes affect the likelihood of victimization because they reflect differences in the willingness to take risks, we should find this relationship only in the likelihood of being a victim of fraud.  With slamming, the consumer's long distance service is changed without the consumer's approval or even knowledge – and it is therefore unrelated to the consumer's willingness to take risks.  As such, the likelihood of being slammed is unlikely to be related to consumers' view of their future financial situation.  In addition, we see a similar pattern in the relationship between consumers' comfort with their current debt and the likelihood of being a victim of fraud, but not the likelihood of being slammed, although the differences are not statistically significant.

The simple cross-tab analysis shows similar results, as presented in Figure 4-5.

---

[171.] We only conducted these tests using the observations for which we had complete data.

[172.] In the aggregate test, we found a difference that is significant at the 5 percent level.  The differences in the effect of the race and ethnicity variables are significant at the 10 percent level, as are the differences in the effect of expected future income changes and current income levels.

*Consumer Fraud in the United States: An FTC Survey*

**Table 4-4:   Likelihood of Being a Victim, Probit Estimation, Marginal Effects, Individual Problems[a]**

| | Problem | | | | |
|---|---|---|---|---|---|
| | Unauthorized Changes in Telephone Service (1) | Credit Repair Fraud (2) | Credit Card Insurance Fraud (3) | Advance Fee Loan Fraud (4) | Buyers' Club Fraud (5) |
| **Race and Ethnicity (Relative to Non-Hispanic Whites)** | | | | | |
| Hispanics | 0.0991 *** | 0.0228 *** | 0.0197 -/** | 0.0112 | 0.0122 |
| African Americans | 0.0303 | -0.0003 | 0.0028 | 0.0170 | 0.0163 * |
| American Indians or Alaska Natives | 0.0090 | 0.1223 *** | (n)[b] | 0.1661 *** | 0.0438 **/* |
| Other | -0.0194 | 0.0051 | (n) | (n) | 0.0022 |
| *Joint Significance* | *** | *** | ns/* | *** | */ns |
| **Gender (Relative to Male)** | | | | | |
| Female | 0.0000 | 0.0013 | -0.0092 */** | -0.0119 | -0.0037 |
| **Marital Status (Relative to Married)** | | | | | |
| Single | -0.0159 -/* | 0.0029 -/* | 0.0094 */- | 0.0035 | -0.0072 |
| **Age (Relative to 35 - 44)** | | | | | |
| 18 - 24 | -0.0404 */** | -0.0019 | -0.0048 | (n) | -0.0047 |
| 25 - 34 | 0.0012 | 0.0021 | (n) | 0.0042 | -0.0126 |
| 45 - 54 | 0.0080 | 0.0044 | -0.0024 | -0.0211 ** | -0.0170 ** |
| 55 - 64 | -0.0275 */- | 0.0037 | 0.0059 | -0.0260 * | -0.0198 ** |
| 65 and over | -0.0008 | 0.0003 | 0.0096 | (n) | -0.0215 ** |
| *Joint Significance* | */** | ns | ns | **/* | * |
| **Education (Relative to High School Graduate)** | | | | | |
| Did not complete high school | -0.0101 | 0.0001 | -0.0052 | -0.0177 | -0.0047 |
| Attended some college or post-secondary technical or vocational school | -0.0113 | 0.0037 | -0.0014 | 0.0088 | 0.0012 |
| Graduated from college or more | -0.0016 | 0.0003 | 0.0039 | -0.0154 -/* | -0.0009 |
| *Joint Significance* | ns | ns | ns | ns/* | ns |
| **Current Income (Relative to $40,000 to $60,000)** | | | | | |
| Less than $20,000 | 0.0191 | 0.0018 | -0.0012 | 0.0224 | 0.0094 |
| $20,000 - $40,000 | -0.0009 | 0.0053 | 0.0057 | 0.0210 */- | 0.0147 ** |
| $60,000 - $80,000 | -0.0064 | -0.0027 | 0.0211 **/- | 0.0041 | -0.0011 |
| $80,000 - $100,000 | 0.0012 | (n) | (n) | (n) | 0.0176 ** |
| Over $100,000 | 0.0069 | 0.0013 | 0.0055 | (n) | 0.0111 |
| *Joint Significance* | ns | ns | ns | ns | **/* |

72

*Chapter 4:  Who is a Victim of Fraud?*

| | | | | | |
|---|---|---|---|---|---|
| **Expected Future Income (Relative to Future Income Unchanged)** | | | | | |
| Will be much lower | 0.0408 | (n) | (n) | 0.0259 | 0.0134 |
| Will be slightly lower | -0.0198 | 0.0055 -/** | -0.0002 | (n) | 0.0076 |
| Will be slightly higher | -0.0083 | 0.0028 -/** | 0.0031 | 0.0147 | -0.0008 |
| Will be much higher | 0.0144 | 0.0173 *** | -0.0008 | 0.0411 ***/** | -0.0027 |
| *Joint Significance* | ns | *** | ns | **/* | ns |
| **Current Debt (Relative to Having Too Much Debt)** | | | | | |
| About as much debt as can comfortably handle | -0.0118 | -0.0067 | -0.0027 | 0.0013 | 0.0032 |
| Could handle more debt than currently have | -0.0036 | -0.0025 | -0.0156 | 0.0086 | -0.0043 |
| Do not have any personal debt | -0.0190 | -0.0073 | -0.0187 */- | -0.0044 | (n) |
| *Joint Significance* | ns | ns | ** | ns | ns |
| *Number of Observations* | 2469 | 2150 | 1726 | 1288 | 2102 |
| *Percent Positive Values* | 6.46% | 7.54% | 1.15% | 2.62% | 1.16% |
| *Chi-square for Overall Significance* | 45.79 ***/** | 174.35 *** | 144.85 *** | 70.48 *** | 123.52 *** |

**Notes:**

a  Marginal effects are based on conditional-mean-imputation regressions.  Where significance levels differ between conditional-mean-imputation and complete-case regressions, the significance levels are indicated as a/b where "a" is the significance level of the conditional-mean-imputation regression and "b" is the significance of the complete-case regression.  Reported coefficients as well as number of observations are reported only for the conditional-mean-imputation regressions.  A "-" in either "a" or "b" denotes that the coefficient was not significant in that regression.

*** significant at 1 percent level

** significant at 5 percent level

* significant at 10 percent level

ns not significantly different from zero in joint test

b  (n) denotes that no victims who had this characteristic were victims of this type of fraud.

*Consumer Fraud in the United States: An FTC Survey*

## Different Types of Frauds

Our second set of tests compared the effect of the various characteristics across four specific types of fraud included in the survey: (i) credit repair fraud, (ii) credit card insurance fraud, (iii) advance fee loan fraud, and (iv) unauthorized billing for a buyers' club membership. These tests show significant differences, in total, in the effect of various individual characteristics on the likelihood of being a victim of one of these frauds.[173]

We find that the relationship with age differs significantly depending on the type of fraud involved.[174]  We can obtain some understanding of these differences by examining the coefficients for the probit regressions for individual types of fraud, which are reported in Table 4-4.  For example, the likelihood of becoming a victim of credit card insurance fraud or credit card repair fraud does not vary across age groups.  However, consumers in the 25 to 34 and 35 to 44 age groups are significantly more likely to be victims of advance fee loan fraud than those between 45 and 54.  In addition, those aged 35



Figure 4-5
Likelihood of Being a Victim
Fraud Compared to Slamming

---

[173.] Testing for whether there are differences in any of the coefficients included in the model, we find that we can reject the hypothesis that there are no differences at the 1 percent level.

[174.] The differences in the coefficients on the age variables across the four individual types of fraud are jointly significant at the 1 percent level.

to 44 are significantly more likely to have been a victim of unauthorized billing for a buyers' club membership than are older consumers.

Race and ethnicity also have differing relationships with the likelihood of being victim of various types of fraud, though the differences are only jointly significant at the 10 percent level.  The results reported in Table 4-4 show that Hispanics have a significantly higher likelihood of being a victim of credit repair fraud and credit card insurance fraud than non-Hispanic whites.  African Americans have a significantly greater likelihood of becoming a victim of unauthorized billing for a buyers' club membership, while American Indians or Alaska Natives are more likely to experience credit repair fraud, advance fee loan fraud, or unauthorized billing for a buyers' club membership.

## The Role of Language

One group that may be particularly vulnerable to fraudulent offers is consumers who have limited English-language proficiency.  This may include people who have only been in this country for a short amount of time.  The survey did not elicit information about whether participants were recent immigrants or had limited proficiency in English.  Therefore, we cannot say anything definitive about this possibility.[175]   The survey did, however, ask about languages other than English that were spoken in the participant's home.   Using this information we may be able to obtain some preliminary insight into the role of English proficiency in the risk of becoming a victim of fraud.

Using the responses to the question about languages spoken, as well as the responses to the racial and ethnic questions, we identified those participants who said that they were of Hispanic or Latino origin and who also said that Spanish and English were the only languages spoken at home.[176]  This group may include a relatively high percentage of recent immigrants or consumers with limited English proficiency.  We would, of course, expect that any finding of vulnerability to fraud is generally applicable to all immigrant populations with limited English proficiency.  However, Spanish speaking Hispanics were the only group for which we had enough observations to conduct a meaningful test.

---

[175.] Another factor that limits our ability to address this issue is that the survey was only conducted in English.  As a result, consumers who have serious problems communicating in English are unlikely to have participated.  Some consumers with limited proficiency may have participated in the survey anyway, while others may reasonably have declined to do so.

[176.] Survey question 78 asked participants "Other than English, what other languages, if any, are spoken in your home?"  In responding to this question, participants could identify multiple languages that were spoken in their homes.  When participants indicated that, in addition to English, they spoke Spanish and one or more other languages at home, we excluded them from the variable for Hispanics who spoke Spanish at home, which we were using as a proxy for limited English language proficiency.  It seemed less likely that consumers living in households where multiple languages other than English are spoken would be the recent immigrants who have difficulty with the English language.

75

*Consumer Fraud in the United States: An FTC Survey*

In an attempt to measure the effect of language, we experimented with a variant of the victim equations reported in Table 4-3 that included a variable denoting those Hispanics who said that Spanish was spoken at home.[177]  The results of this estimation suggest that Hispanics who speak Spanish at home are more likely to have been victims of fraud or slamming than Hispanics who do not speak Spanish at home – specifically, either 4.6 or 5.6 percentage points more likely, depending on whether we look at the complete-case or conditional-mean-imputation results.  For fraud alone, we find virtually no difference between Hispanics who speak Spanish at home and those who do not – either 0.3 or 0.1 percentage points depending on which regression we examine.  Finally, for slamming alone, we find that Hispanics who speak Spanish at home are between 4.5 and 5.0 percentage points more likely to have been victims.

None of the differences are statistically significant.  In part this may be a result of the small number of Hispanic survey participants who did not speak Spanish at home or who spoke other languages in addition to Spanish: 110 (of 157) Hispanic participants indicated that Spanish was the only language other than English spoken in their homes.  Furthermore, as noted above, our measure of whether a consumer is likely to have limited English proficiency is not very precise.  Because the differences are not significant, our findings can only be taken as suggestive that a difference may exist.

The fact that we find tentative evidence suggesting that those who speak Spanish at home are more likely to be victims of the unauthorized switching of long distance telephone service is perhaps important, because telephone service is almost exclusively marketed by telemarketing.  If limited English proficiency causes some consumers to be at greater risk for fraud or slamming, we would expect that this would be particularly true in telemarketing where the ability to understand a verbal offer quickly is particularly important.[178]

## Conclusion

The likelihood that consumers will become victims of one or more of the frauds covered by our survey or that their long distance telephone service will be changed without their approval is related to consumers' characteristics.  For example, members of several minority groups  – American Indians or Alaska Natives, Hispanics, and African Americans – are more likely to be victims than non-Hispanic whites.

---

[177.] We do not presume that Hispanics who speak Spanish at home necessarily have limited English proficiency.  We do expect, however, that a larger percentage of those in the Spanish-speaking Hispanic group have limited English proficiency than would be true for Hispanics who report that they do not speak Spanish in their homes.  Thus, a finding that consumers in the Spanish-speaking Hispanic group are more likely to be victims would be consistent with the hypothesis that having a limited command of the English language increases the risk of being a victim.

[178.] Although consumers who are victims of slamming have not agreed to have their long distance service switched from one carrier to another, they have often been contacted by the competing carrier who seeks to get them to agree to change.

We also find that consumers aged 65 and over do not appear more likely to be victims than younger consumers.  While not unique to our results, this finding runs contrary to some conventional wisdom about the relationship between age and the likelihood of being a victim of fraud.

The likelihood of being a victim also depends on consumers' perceptions of their present and future financial health.  Those who anticipate large changes in their future income – whether positive or negative – are more likely to be victims than those who anticipate that their incomes will remain about the same.  Furthermore, those who feel that they have more debt than they can comfortably handle are more likely to be victims.

Finally, we find that the demographic characteristics we have examined are related to the likelihood of experiencing different problems in different ways.  The characteristics of those who are most likely to have had their long distance telephone service changed without authorization differ from the characteristics of those who face the greatest risk of being the victim of a fraud.  Similarly, the characteristics of those at the greatest risk vary depending on the type of fraud.

*Consumer Fraud in the United States: An FTC Survey*

SJX28 - 101

# Chapter 5:  Who Complains?

This chapter examines whether and to whom consumers complain when they experience an incident that appears to be fraud or slamming.  We first consider what actions, if any, survey participants took in response to their experience.  We then examine how the likelihood of complaining varies with the individual characteristics of the victim and with the type of fraud or slamming at issue.  Finally, we consider the extent to which consumers who did complain were satisfied with the outcome of their complaints.

## Complaint Data Collected

Survey participants who indicated they had experienced an incident of apparent fraud or slamming were asked what actions, if any, they took in an effort to resolve the incident.[179]  If participants provided only a general response – such as saying that they did nothing, stopped buying from the company, or talked to their family or friends – they were then asked whether they had "reported" their experiences to anyone, and if so to whom.[180]  We have combined the responses to these questions to form the data on complaining behavior.

In this chapter, we examine a somewhat broader set of incidents than we examined in earlier chapters.  Specifically, in previous chapters we counted as incidents of actual fraud only those incidents in which consumers lost money.[181]  We recognize, however, that whether consumers lose money as a result of a particular incident may depend on whether they complain.  For example, consumers who use a credit card to pay for a transaction may be able to avoid paying for the item in question if they complain to their credit card company.  Similarly, consumers may obtain a refund of any money they paid if they complain to the company with which they transacted business.  As such, whether consumers complained may have affected whether we counted their experience as an incident of fraud in our earlier analyses.  In this chapter, we examine <u>all</u> instances in which survey participants reported experiencing an apparent fraud – regardless of whether they ultimately lost money – in order to more fully understand complaining behavior.

---

[179.] Survey question 66.  This question was asked each time a survey participant indicated that he or she had experienced a type of fraud or had experienced slamming.  The question was asked in an open-ended form, and participants were invited to provide multiple responses.

[180.] Survey question 67 and 68.  Participants were asked the two follow-up questions if their response to question 66 only included the following:  (1) Did nothing, (2) Asked for a refund or replacement, (3) Stopped payment or refused to pay, (4) Stopped buying from the company, (5) Consulted a lawyer or other professional, (6) Complained to family or friends / told family or friends not to buy from the seller, (7) Other, or (8) Don't know / refused.

[181.] The one exception involved slamming.

*Consumer Fraud in the United States: An FTC Survey*

**Table 5-1:   To Whom Did Consumers Complain?**

|  |  | Percent of Victims |
|---|---|---|
| **Did Not Complain** |  | **29.3%** |
| Did nothing | 23.6% |  |
| Stopped buying from the company | 4.1% |  |
| Talked with family or friends, told them not to buy from the seller | 2.0% |  |
| **Complained to an Official Source** |  | **8.4%** |
| Complained to a Better Business Bureau | 3.5% |  |
| Complained to a local consumer agency or local police | 2.4% |  |
| Complained to the state Attorney General or state consumer agency | 1.6% |  |
| Complained to a federal agency, including the Federal Trade Commission | 1.4% |  |
| **Complained to a Seller or Manufacturer** |  | **53.7%** |
| Complained to a sales person or someone else at the firm that sold the product | 30.6% |  |
| Asked for a refund or replacement | 14.2% |  |
| Complained to the phone company | 12.4% |  |
| Complained to the product manufacturer | 3.2% |  |
| **Complained to a Bank or Credit Card Company** |  | **18.6%** |
| Complained to a credit card company | 9.0% |  |
| Stopped payment or refused to pay | 7.3% |  |
| Complained to a bank | 3.5% |  |
| **Other** |  | **2.4%** |
| Consulted a lawyer or other professional | 2.4% |  |

**Note.**

Based on 753 incidents of fraud reported by survey participants.  Includes both incidents where the victim lost money as a result of the incident and those where no money was lost.  Figures may sum to more than totals because individuals may have taken more than one of the listed actions.

## To Whom Do Consumers Complain?

Table 5-1 provides statistics on the percentages of incidents of apparent fraud or slamming in which survey participants complained to various entities. Specifically, the table shows the percentage of cases in which consumers complained to (1) a seller or manufacturer, (2) an institution responsible for making payment for the item – *i.e.*, a bank or credit card company, and (3) "an official source," defined as a local, state, or federal government agency, or a Better Business Bureau.[182]

[182]  The unit of observation for these statistics is experiencing one of the problems covered by the survey.  Those consumers who experienced more than one of the types of problems examined in the survey will account for more than one observation in this analysis.  Because participants who indicated that they suffered the same type of problem more than one time in the last year were only asked about any actions they took in response to the most recent incident of that type, a participant who had the same problem multiple times will only be a single observation in the analysis.  On the other hand, participants who experienced none of the problems examined in the survey will not be represented at all.

Only about 15 percent of consumers who complained to one of the three entities – a seller or manufacturer, a bank or credit card company, or an official source – also complained to another of these entities.  In only three instances did a consumer report complaining to all three entities.

In 29.3 percent of incidents consumers did not complain to any of the entities listed.  In almost 24 percent of cases, consumers say that they did not do anything, while others said that they stopped buying from the company or talked with family or friends and suggested that they not buy from the company.

In 53.7 percent of incidents, consumers complained to the relevant seller or manufacturer.  Parsing these complaints down further, we find that consumers complained to the seller in 30.6 percent of all cases and to a telephone company in 12.4  percent of all cases.[183]  In another 14.2 percent of cases, consumers indicated generally that they requested a refund or replacement.[184]  In 18.6 percent of cases, consumers complained to a bank or credit card company.

Consumers complained to an official source only 8.4 percent of the time.  The most frequently cited official source was the Better Business Bureau; consumers filed complaints with a BBB in 3.5 percent of incidents.  Consumers complained to a federal agency, including the Federal Trade Commission, in only 1.4 percent of cases.[185]

Our analysis indicates that the likelihood that consumers complain when they experience an apparent fraud or slamming varies depending on the type of problem experienced.  As illustrated by Table 5-2, consumers who were billed for an Internet-related service that they had not agreed to purchase were the most likely to complain – more than 88 percent complained to someone.  By contrast, consumers who had purchased a pyramid scheme were the least likely to complain – less than one-quarter indicated that they had complained.[186]

---

[183] We have included consumers who complained to the telephone company with those who complained to a seller, rather than with credit card companies and banks, because more than 75 percent of the complaints filed with the telephone company involved situations in which the telephone company was likely acting as a seller.

[184] Presumably, requests for refunds or replacements were directed to the seller or manufacturer, although the survey did not ask whether such was the case.

[185] AARP also collected information about complaints filed by consumers who were victims of frauds as part of their 1993 survey of consumer behavior.  (American Association of Retired Persons, *The Behavior of Older Consumers: An AARP Study*, 1994.)  In general, the pattern of complaints reported by consumers in that survey are not significantly different from the pattern we found in this survey.  There are no significant differences between the surveys in terms of the share of consumers who reported that they did nothing in response to being a victim of fraud.  There are also no significant differences in the share of consumers who contacted a local consumer agency or local consumer help line, the Better Business Bureau, or an agency of the federal government.  The only significant difference involved those who said that they reported their experience to a state Attorney General or state consumer protection agency: whereas 6 percent of consumers in the 1993 AARP survey said they reported their experience to state authorities, only 2 percent of consumers in the current survey said they did so.  This difference is significant at the 1 percent level of statistical significance.

[186] The Chi-square test for differences in the rate of complaining by type of problem is statistically significant at the 1 percent level.  (In conducting this test it was necessary to drop the government jobs and business opportunities categories because there are too few consumers who experienced these types of frauds to meet the necessary statistical properties to conduct a Chi-square test.)

(continued...)

Case 2:16-cv-02022-GMN-VCF   Document 97-1   Filed 05/22/18   Page 105 of 180

*Consumer Fraud in the United States: An FTC Survey*

**Table 5-2:   Percent of Consumers Who Complained, By Type of Problem**

| Type of Problem | Percent Who Complained |
|---|---|
| Billed for Internet services you did not agree to purchase | 88.4% |
| Long distance service changed without permission ("Slamming") | 75.3% |
| Billed for information services provided either over the Internet or by pay-per-call that you had not agreed to purchase | 75.0% |
| Billed for a buyers' club membership that you had not agreed to purchase | 71.3% |
| Purchased credit repair | 65.4% |
| Paid an advance fee to obtain a loan or credit card that you were promised that you would receive | 44.9% |
| Purchased credit card insurance | 39.1% |
| Made a payment to someone who represented that you would receive a government job[a] | 37.5% |
| Paid money or made a purchase to receive a promised prize and did not receive the prize or prize was not as promised | 34.8% |
| Purchased a business opportunity where promised earnings were not realized or promised assistance was not provided | 33.3% |
| Purchased a membership in a pyramid scheme | 22.7% |
| Other problems | |
| Paid for a product but did not receive it | 83.3% |
| Billed for a product that you did not agree to purchase, other than products included above | 83.2% |

**Note.**

a   Based on fewer than ten incidents.

## Characteristics of Those Who Complain

As with our analysis of victimization in the previous chapter, we use both simple cross-tabulations and probit regression analysis here to examine the relationship between the likelihood that the consumer complained and the characteristics of the consumer as well as the type of transaction involved.  Table 5-3 provides the cross-tab results showing the relationship between the percentage of incidents in which a consumer complained and the individual characteristic being analyzed – whether a characteristic of the consumer or of the transaction.  Figures 5-1 through 5-4 show the results of this analysis for a few of the most interesting variables.  In both the figures and Table 5-3, we do not differentiate among complaints filed with different entities.  Rather, we include all cases in which the consumer complained to at least one source, whether an official source, a seller or manufacturer, or a bank or credit card company.

---

[186] (...continued)
We find similar variations across types of fraud when we examine the percentage of consumers who complained to a seller or manufacturer or to a bank or credit card company.  The correlation between the percentage of consumers who complained to sellers when they experienced different problems and the percentage who did not complain at all is -0.9233.  The correlation between the percentage who complained to a bank or credit card company and those who did not complain is -0.6474.

SJX28 - 105

As we discussed earlier, cross-tabs tell us whether consumers with a particular characteristic are more or less likely to complain than those who do not have that characteristic.[187]  However, the cross-tabs do not tell us whether any relationship is truly due to that particular characteristic or whether it is the result of other characteristics that occur frequently along with the first one.  To address this limitation, we also used probit regressions in an effort to isolate more clearly which factors are actually related to the likelihood that a consumer will complain.

Table 5-4 provides the results of the probit analyses showing the marginal effects of the various characteristics on the likelihood that the consumer complained to one or more of the entities listed in Table 5-1.  We also ran separate regressions for complaints to the three types of entities – a seller or manufacturer, a bank or credit card company, and an official source.  These results are reported in Tables 5-5 to 5-7.[188]

In our analysis of complaining behavior, we consider many of the same characteristics that we used in analyzing victimization, including race and ethnicity, education, age, gender, and marital status.[189]  We also include two additional variables – Internet use and method of payment.[190]

With respect to Internet use, we expect that consumers who are comfortable using the Internet may be more likely to file complaints.  It is possible to file complaints online for some entities.[191]  Because this method of complaining may be more convenient and less burdensome than complaining in writing or over the telephone, consumers who use the Internet may be more likely to complain.

In measuring Internet use, we draw upon responses to a question that asked whether survey participants had used the Internet to make any purchases in the

---

[187] See page 52, above.

[188] As in our analysis of victimization, the regressions here are probits, because the dependent variable indicates either that a complaint was filed or that one was not filed.  As in the earlier analysis, we have run regressions using only those observations for which we had values for all of the included variables (complete case analysis) and also regressions in which conditional mean imputation was used to provide estimates for missing values of the independent variables.  Because of a limitation in the statistical package we were using and the number of variables included in the equations being estimated here, it was not possible to include all variables in the imputation estimation.  In order to reduce the number of variables to a number our software could handle, we first used a step-wise regression routine to identify those variables that were making the least contribution in the imputation equation.  Based on the results of this analysis, we then dropped enough variables from the imputation routine to meet the limitations of the statistical program.

[189] We have not included the future income or debt level variables in the model here because it is not clear why these variables should affect complaining behavior.

[190] In our regression analysis of complaining behavior, we also allow the proportion of consumers who complain to vary across different types of frauds.  The marginal effects for various types of fraud and for slamming are reported in Table 5-11.

[191] For example, victims of frauds can complain to the Federal Trade Commission by visiting http://www.ftc.gov/complaint, and victims of Identity Theft can file a complaint at http://www.consumer.gov/idtheft.  Complaints about telemarketing calls received after a consumer's phone number has been placed on the National Do Not Call Registry can be filed at http://www.donotcall.gov.

*Consumer Fraud in the United States: An FTC Survey*

last year, and if so, how many.[192]  From these responses we have constructed a variable indicating whether the person (i) made no Internet purchases, (ii) made one to three Internet purchases, or (iii) made four or more Internet purchases.[193]

We also examined the relationship between the method of payment and the likelihood of complaining.  For example, some consumers who pay for a transaction with a credit card can complain about the transaction to their credit card company.  In fact, federal law provides consumers with certain rights when they have paid for a transaction with a credit card.[194]  Thus, consumers who use a credit card to pay for a fraudulent offer may be more likely to complain than those who use other means of payment.[195]

We next discuss how various consumer characteristics are related to the likelihood that consumers will complain.

### Internet Usage

The simple cross-tab analysis, which is reported in Figure 5-1 and Panel A of Table 5-3, suggests that consumers who make greater use of the Internet are more likely to file a complaint.  For example, complaints were filed in 78 percent of cases when consumers



Figure 5-1
Likelihood of Complaining
By Internet Usage

Source: Table 5-3

---

[192.] Survey question 4.  The survey did not ask whether participants actually filed a complaint online.

[193.] In any future surveys, it may be useful to ask consumers what method they used for filing complaints rather than constructing such a variable.

[194.] For a discussion of consumers' billing dispute rights, see Federal Trade Commission, Bureau of Consumer Protection, Office of Consumer and Business Education, *FTC Facts for Consumers: Fair Credit Billing*, March 2002, at http://www.ftc.gov/bcp/conline/pubs/credit/fcb.htm.

[195.] In addition to creating variables for the various types of payment mechanisms, we created an additional variable to indicate situations in which the consumer was not asked about payment mechanism. The survey only asked about the payment mechanism if consumers indicated that they had actually paid money in the course of the transaction at issue.  This approach may not have captured instances in which consumers disputed a charge to their credit card, because an individual who disputes a fraudulent charge does not actually pay the disputed amount.  As such, it is not clear how survey participants who used credit cards and disputed the charges would have answered the question about how much they paid – some may have answered that they paid nothing, and thus were not asked how they paid for the item.

(continued...)

SJX28 - 107

said that they made four or more purchases on the Internet in the last year, while complaints were filed in only 65 percent of cases when consumers made no Internet purchases. Overall, the difference in complaint levels across the three levels of Internet usage is significant at the 1 percent level using this method of analysis.[196]

Once we control for other characteristics that might affect the likelihood of complaining, however, the relationship between Internet use and the likelihood of filing a complaint is no longer significant. These results are shown in Table 5-4. Although there may be a slight increase in the likelihood a consumer who made a purchase online will file a complaint, these differences are not statistically significant, either jointly or individually.[197]

The relationships between Internet usage and several of the other variables included in our regressions may explain this, at least in part. Younger consumers and those with higher levels of education are more likely to have made Internet purchases.[198] In addition, Internet users are more likely to have paid for the fraudulent transaction with a credit card and less likely to have used cash

---

[195] (...continued)
We considered including the amount paid as an additional determinant of whether a complaint was filed, because the benefit of complaining should be greater when more money is at stake. We were concerned, however, that in some cases the figures reported for amount paid may not reflect the amount charged for the fraudulent offer, but rather the amount that the consumer lost as a result of the transaction. This possibility seems particularly likely when a credit card is used to pay for a transaction. Consumers who use a credit card and who realized that they have been the victim of a fraud before paying the bill have the opportunity to dispute the charge and to refuse payment. As a result, we suspect that some consumers who used credit cards would answer that they had not paid anything for the item in question (rather than report the price of the item). It is the price of the item – that is, the amount of money that would be lost if no complaint is made – that should affect the likelihood of complaining. Therefore, in those cases, the available data would not reflect the appropriate price. Thus, we did not include the amount paid in the final model.

[196] The difference in the likelihood of complaining between consumers who made four or more Internet purchases and those who made no Internet purchases is significant at the 1 percent level. There is no significant difference between those with no online purchases and those who made one to three such purchases.

[197] The coefficient on four-or-more Internet purchases is significant at the 10 percent level in the conditional-mean-imputation equation. As noted previously, however, the conditional-mean-imputation technique tends to overstate significance levels. Therefore, one should probably rely more on the insignificance of the coefficient in the complete case regression. When we look at the separate regression analyses of complaints to official sources, complaints to sellers or manufacturers, and complaints to banks or credit card companies in Tables 5-5 to 5-7, we find no significant effect of Internet usage.

[198] The percentage of survey participants who said that they had made four or more Internet purchases in the last year rose from 5.8 percent for those who did not have a high school diploma to 43.5 percent for those with a college degree. The relationship between the level of Internet purchases and the level of education is significant at the 1 percent level. Looking at the relationship between age and Internet use, we find that the percentage of consumers making four or more Internet purchases falls from 38.1 percent of those between 25 and 34 to 8.3 percent for those who were 65 or over. The relationship between age and the level of Internet use is also significant at the 1 percent level.

*Consumer Fraud in the United States: An FTC Survey*

**Table 5-3:   Percent of Consumers Who Complain, By Single Characteristic**

**A.  By Purchases Made on the Internet in the Last Year**

|  | Percent Who Complained |
|---|---|
| None | 64.6% |
| One to three purchases | 68.1% |
| Four or more purchases | 77.8% |
| *Number of Observations* | 753 |

**B.  By Education**

|  | Percent Who Complained |
|---|---|
| Did not complete high school | 66.0% |
| Graduated from high school | 61.7% |
| Attended some college or post-secondary technical or vocational school | 69.8% |
| Graduated from college or more | 78.1% |
| *Number of Observations* | 733 |

**C. By Age**

|  | Percent Who Complained |
|---|---|
| 18 - 24 | 72.9% |
| 25 - 34 | 73.1% |
| 35 - 44 | 70.8% |
| 45 - 54 | 72.2% |
| 55 - 64 | 55.4% |
| 65 and over | 62.5% |
| *Number of Observations* | 730 |

**D.  By Gender**

|  | Percent Who Complained |
|---|---|
| Male | 64.2% |
| Female | 74.5% |
| *Number of Observations* | 753 |

**E.  By Marital Status**

|  | Percent Who Complained |
|---|---|
| Single | 66.7% |
| Married | 71.5% |
| *Number of Observations* | 753 |

**(Table continued on next page)**

86

**Table 5-3 (cont.)**

**F.  By Current Income**

| | Percent Who Complained |
|---|---|
| Less than $20,000 | 65.8% |
| $20,000 to $40,000 | 65.3% |
| $40,000 to $60,000 | 73.3% |
| $60,000 to $80,000 | 73.3% |
| $80,000 to $100,000 | 61.4% |
| Over $100,000 | 88.3% |
| *Number of Observations* | 671 |

**G.  By Race and Ethnicity**

| | Percent Who Complained |
|---|---|
| Hispanics | 70.8% |
| African Americans | 55.7% |
| American Indians or Alaska Natives | 64.7% |
| Non-Hispanic Whites | 72.1% |
| Others | 71.4% |
| *Number of Observations* | 702 |

**H.  By Method of Payment**

| | Percent Who Complained |
|---|---|
| Credit card | 72.1% |
| Cash | 62.9% |
| Check | 70.3% |
| Online payment system | 75.0% |
| Seller took money directly from the consumer's checking account | 76.9% |
| Seller placed charge on consumer's telephone bill | 66.7% |
| Money order | 52.8% |
| *Number of Observations* | 440 |

87

*Consumer Fraud in the United States: An FTC Survey*

**Table 5-4:**    **Likelihood of Filing a Complaint, Probit Estimation, Marginal Effects, Complaints Filed with Anyone**[a]

| | Conditional Mean Imputation (1) | | Complete Cases Only (2) | |
|---|---|---|---|---|
| **Race and Ethnicity (Relative to Non-Hispanic Whites)** | | | | |
| Hispanics | 0.0171 | | 0.0108 | |
| African Americans | -0.0942 | * | -0.1319 | ** |
| American Indians or Alaska Natives | 0.0106 | | 0.0649 | |
| Other | 0.0090 | | -0.0321 | |
| *Joint Significance* | | ns | | ns |
| **Gender (Relative to Male)** | | | | |
| Female | 0.0833 | *** | 0.0816 | ** |
| **Marital Status (Relative to Married)** | | | | |
| Single | -0.0390 | | -0.0665 | * |
| **Age (Relative to 35 - 44)** | | | | |
| 18 - 24 | 0.1044 | | 0.0737 | |
| 25 - 34 | 0.0575 | | 0.0085 | |
| 45 - 54 | 0.0301 | | -0.0507 | |
| 55 - 64 | -0.1201 | ** | -0.1624 | ** |
| 65 and over | -0.0487 | | -0.0679 | |
| *Joint Significance* | | ** | | * |
| **Education (Relative to High School Graduate)** | | | | |
| Did not complete high school | 0.0601 | | 0.0585 | |
| Attended some college or post-secondary technical or vocational school | 0.0488 | | 0.0977 | ** |
| Graduated from college or more | 0.0849 | * | 0.1049 | ** |
| *Joint Significance* | | ns | | ns |
| **Current Income (Relative to $40,000 to $60,000)** | | | | |
| Less than $20,000 | -0.0055 | | -0.0218 | |
| $20,000 - $40,000 | 0.0035 | | 0.0232 | |
| $60,000 - $80,000 | 0.0270 | | 0.0654 | |
| $80,000 - $100,000 | -0.1322 | ** | -0.1631 | ** |
| Over $100,000 | 0.1257 | * | 0.1266 | * |
| *Joint Significance* | | ** | | ** |
| **Internet Purchases in Last Year (Relative to No Purchases)** | | | | |
| One to three purchases | 0.0245 | | 0.0098 | |
| Four or more purchases | 0.0754 | * | 0.0361 | |
| *Joint Significance* | | ns | | ns |
| **Payment Mechanism Used (Relative to Paying with Credit Card)** | | | | |
| Cash | -0.0596 | | -0.0832 | |
| Check | 0.0033 | | -0.0195 | |
| Online payment service | -0.0292 | | -0.0407 | |
| Seller took money directly from checking account | 0.0439 | | 0.0221 | |
| Amount charged on telephone bill | -0.0223 | | 0.0639 | |
| Money order | -0.0374 | | -0.1051 | |
| Question not asked | 0.0334 | | 0.0050 | |
| *Joint Significance* | | ns | | ns |
| *Number of Observations* | 753 | | 598 | |
| *Percent Positive Values* | 69.32% | | 70.74% | |
| *Chi-square for Overall Significance*[b] | 168.46 | *** | 128.92 | *** |

**(Notes on next page)**

**Table 5-4 (cont.)**

**Notes.**

*** significant at 1 percent level

** significant at 5 percent level

* significant at 10 percent level

ns not significantly different from zero in joint test

a   Regressions also controlled for the type of fraud involved.

Marginal effects by fraud type for equation (1) are reported in Table 5-11.  In both equations, the type of fraud variables are jointly significant at the 1 percent level and the likelihood of complaining is significantly higher than for consumers who paid an advance fee for a loan or credit card, the control group, at the 5 percent level or above, for (i) consumers who received an unauthorized bill for Internet-related services ("Q19"), (ii) consumers who received an unauthorized bill for a product other than those specifically listed ("Q22"), (iii) consumers who paid for a product that they never received ("Q48"), or (iv) consumers whose long distance service was changed without their authorization ("Q28").  The likelihood of complaining is significantly below that for the control group for consumers who purchased a membership in a pyramid scheme ("Q33").  In addition, in equation (1), the likelihood of complaining is significantly greater for consumers who (i) were victims of a credit improvement fraud ("Q13") or (ii) were billed for a buyers' club membership that they had not agreed to join ("Q21").  In equation (2), no one who had purchased a business opportunity where false claims about earnings or assistance were made ("Q35") filed a complaint.

b   Includes the effect of type of fraud variables.

*Consumer Fraud in the United States: An FTC Survey*

**Table 5-5:** **Likelihood of Filing a Complaint, Probit Estimation, Marginal Effects, Complaints Filed with Official Sources**[a]

| | Conditional Mean Imputation (1) | | Complete Cases Only (2) | |
|---|---|---|---|---|
| **Race and Ethnicity (Relative to Non-Hispanic Whites)** | | | | |
| Hispanics | -0.0270 | | -0.0419 | |
| African Americans | -0.0264 | | -0.0269 | |
| American Indians or Alaska Natives | 0.1155 | | 0.1708 | * |
| Other | 0.0727 | | 0.0849 | |
| *Joint Significance* | | ns | | * |
| **Gender (Relative to Male)** | | | | |
| Female | -0.0312 | * | -0.0366 | |
| **Marital Status (Relative to Married)** | | | | |
| Single | 0.0105 | | -0.0039 | |
| **Age (Relative to 35 - 44)** | | | | |
| 18 - 24 | 0.0303 | | 0.0430 | |
| 25 - 34 | -0.0327 | | -0.0461 | |
| 45 - 54 | 0.0052 | | -0.0199 | |
| 55 - 64 | 0.0057 | | -0.0173 | |
| 65 and over | -0.0055 | | -0.0060 | |
| *Joint Significance* | | ns | | ns |
| **Education (Relative to High School Graduate)** | | | | |
| Did not complete high school | -0.0190 | | -0.0488 | |
| Attended some college or post-secondary technical or vocational school | -0.0168 | | -0.0297 | |
| Graduated from college or more | 0.0246 | | 0.0226 | |
| *Joint Significance* | | ns | | ns |
| **Current Income (Relative to $40,000 to $60,000)** | | | | |
| Less than $20,000 | 0.0294 | | 0.0316 | |
| $20,000 - $40,000 | 0.0282 | | 0.0279 | |
| $60,000 - $80,000 | 0.0138 | | 0.0092 | |
| $80,000 - $100,000 | -0.0033 | | -0.0230 | |
| Over $100,000 | 0.0686 | | 0.0475 | |
| *Joint Significance* | | ns | | ns |
| **Internet Purchases in Last Year (Relative to No Purchases)** | | | | |
| One to three purchases | -0.0139 | | -0.0436 | |
| Four or more purchases | 0.0109 | | 0.0041 | |
| *Joint Significance* | | ns | | ns |
| **Payment Mechanism Used (Relative to Paying with Credit Card)** | | | | |
| Cash | 0.1223 | ** | 0.1116 | ** |
| Check | 0.0588 | ** | 0.0521 | * |
| Online payment service | 0.3386 | *** | 0.2733 | ** |
| Seller took money directly from checking account | 0.1443 | ** | 0.1263 | ** |
| Amount charged on telephone bill | 0.0878 | | 0.1156 | |
| Money order | 0.0662 | | 0.0123 | |
| Question not asked | 0.0358 | ** | 0.0599 | ** |
| *Joint Significance* | | ** | | ns |
| *Number of Observations* | 742 | | 545 | |
| *Percent Positive Values* | 8.49% | | 8.26% | |
| *Chi-square for Overall Significance*[b] | 51.28 | * | 48.71 | ns |

**(Notes on next page)**

**Table 5-5 (cont.)**

**Notes.**

 \*\*\* significant at 1 percent level

 \*\* significant at 5 percent level

 \* significant at 10 percent level

 ns not significantly different from zero in joint test

a   Regressions also controlled for the type of fraud involved.

   Marginal effects by fraud type for equation (1) are reported in Table 5-11.  In both equations, the type of fraud variables are not jointly significant.  However, in equation (1), the likelihood of complaining to an official source is significantly greater for victims of Q13.  In equation (2), none of the fraud type variables was individually significant. In both equations, no one who (i) was a victim of  Q35 or (ii) paid someone who promised that the consumer would get a government job ("Q38") complained to an official source.  Therefore these observations were not used in the estimation.

b   Includes the effect of the type of fraud variables.

*Consumer Fraud in the United States: An FTC Survey*

**Table 5-6:**   **Likelihood of Filing a Complaint, Probit Estimation, Marginal Effects, Complaints Filed with Seller or Manufacturer[a]**

| | Conditional Mean Imputation (1) | | Complete Cases Only (2) | |
|---|---|---|---|---|
| **Race and Ethnicity (Relative to Non-Hispanic Whites)** | | | | |
| Hispanics | -0.0317 | | 0.0043 | |
| African Americans | -0.1406 | ** | -0.1636 | ** |
| American Indians or Alaska Natives | -0.0824 | | -0.0297 | |
| Other | -0.0396 | | -0.0538 | |
| *Joint Significance* | | ns | | ns |
| **Gender (Relative to Male)** | | | | |
| Female | 0.0744 | ** | 0.1006 | ** |
| **Marital Status (Relative to Married)** | | | | |
| Single | 0.0062 | | -0.0183 | |
| **Age (Relative to 35 - 44)** | | | | |
| 18 - 24 | 0.0847 | | 0.0606 | |
| 25 - 34 | 0.0736 | | 0.0543 | |
| 45 - 54 | 0.0119 | | -0.0749 | |
| 55 - 64 | -0.1260 | ** | -0.1164 | |
| 65 and over | -0.1056 | | -0.1291 | * |
| *Joint Significance* | | *** | | * |
| **Education (Relative to High School Graduate)** | | | | |
| Did not complete high school | 0.1018 | | 0.0744 | |
| Attended some college or post-secondary technical or vocational school | 0.0579 | | 0.1096 | ** |
| Graduated from college or more | 0.0416 | | 0.0597 | |
| *Joint Significance* | | ns | | ns |
| **Current Income (Relative to $40,000 to $60,000)** | | | | |
| Less than $20,000 | -0.1082 | * | -0.1150 | * |
| $20,000 - $40,000 | -0.0462 | | -0.0291 | |
| $60,000 - $80,000 | 0.0382 | | 0.0582 | |
| $80,000 - $100,000 | -0.1545 | ** | -0.1727 | ** |
| Over $100,000 | 0.0761 | | 0.0807 | |
| *Joint Significance* | | ** | | ** |
| **Internet Purchases in Last Year (Relative to No Purchases)** | | | | |
| One to three purchases | -0.0053 | | 0.0178 | |
| Four or more purchases | 0.0329 | | 0.0220 | |
| *Joint Significance* | | ns | | ns |
| **Payment Mechanism Used (Relative to Paying with Credit Card)** | | | | |
| Cash | -0.1291 | | -0.1435 | |
| Check | -0.0235 | | -0.0352 | |
| Online payment service | 0.1291 | | 0.0784 | |
| Seller took money directly from checking account | -0.1064 | | -0.1015 | |
| Amount charged on telephone bill | 0.0783 | | 0.1571 | |
| Money order | -0.0451 | | -0.0875 | |
| Question not asked | -0.1708 | *** | -0.1671 | *** |
| *Joint Significance* | | ** | | ** |
| *Number of Observations* | 753 | | 552 | |
| *Percent Positive Values* | 53.65% | | 54.71% | |
| *Chi-square for Overall Significance[b]* | 169.29 | *** | 137.10 | *** |

**(Notes on next page)**

**Table 5-6 (cont.)**

**Notes.**

 \*\*\* significant at 1 percent level

 \*\* significant at 5 percent level

 \* significant at 10 percent level

 ns not significantly different from zero in joint test

a  Regressions also controlled for the type of fraud involved.

   Marginal effects by fraud type for equation (1) are reported in Table 5-11.   In both equations the type of fraud variables are jointly significant at the 1 percent level, and  victims of (i) Q19, (ii) Q22, (iii) Q28, and (iv) Q48 are significantly more likely to complain to a seller or manufacturer than are those in the control group at the 5 percent level or above.  In addition, in equation (1), victims of Q21 are significantly more likely to complain to a seller or manufacturer than are those in the control group, while victims of Q33 are significantly less likely to complain to a seller or manufacturer than those in the control group.  In equation (2), no victims of Q35 complained to a seller or manufacturer.  Therefore, these observations were dropped in estimating the equations.

b  Includes the effect of the type of fraud variables.

*Consumer Fraud in the United States: An FTC Survey*

**Table 5-7:  Likelihood of Filing a Complaint, Probit Estimation, Marginal Effects, Complaints Filed with Bank or Credit Card Company[a]**

| | Conditional Mean Imputation (1) | | Complete Cases Only (2) | |
|---|---|---|---|---|
| **Race and Ethnicity (Relative to Non-Hispanic Whites)** | | | | |
| Hispanics | -0.0044 | | 0.0092 | |
| African Americans | 0.0716 | | 0.0490 | |
| American Indians or Alaska Natives | 0.1571 | | 0.1610 | |
| Other | 0.1292 | ** | 0.1410 | * |
| *Joint Significance* | | ns | | ns |
| **Gender (Relative to Male)** | | | | |
| Female | 0.0383 | | 0.0110 | |
| **Marital Status (Relative to Married)** | | | | |
| Single | -0.0776 | ** | -0.0696 | * |
| **Age (Relative to 35 - 44)** | | | | |
| 18 - 24 | 0.1073 | * | 0.0927 | |
| 25 - 34 | 0.0156 | | -0.0150 | |
| 45 - 54 | 0.0396 | | 0.0304 | |
| 55 - 64 | 0.0468 | | 0.0329 | |
| 65 and over | 0.0451 | | 0.0403 | |
| *Joint Significance* | | ns | | ns |
| **Education (Relative to High School Graduate)** | | | | |
| Did not complete high school | -0.0107 | | 0.0269 | |
| Attended some college or post-secondary technical or vocational school | -0.0384 | | -0.0594 | |
| Graduated from college or more | 0.0093 | | 0.0066 | |
| *Joint Significance* | | ns | | ns |
| **Current Income (Relative to $40,000 to $60,000)** | | | | |
| Less than $20,000 | 0.0446 | | 0.0280 | |
| $20,000 - $40,000 | -0.0262 | | -0.0266 | |
| $60,000 - $80,000 | 0.0240 | | 0.0236 | |
| $80,000 - $100,000 | 0.0606 | | 0.0171 | |
| Over $100,000 | 0.0070 | | 0.0089 | |
| *Joint Significance* | | ns | | ns |
| **Internet Purchases in Last Year (Relative to No Purchases)** | | | | |
| One to three purchases | -0.0093 | | -0.0154 | |
| Four or more purchases | 0.0275 | | 0.0229 | |
| *Joint Significance* | | ns | | ns |
| **Payment Mechanism Used (Relative to Paying with Credit Card)** | | | | |
| Cash | -0.1718 | ** | -0.1675 | * |
| Check | -0.1244 | *** | -0.1283 | *** |
| Online payment service | 0.0531 | | 0.0468 | |
| Seller took money directly from checking account | -0.0098 | | -0.0036 | |
| Amount charged on telephone bill | -0.0604 | | 0.0324 | |
| Money order | -0.1887 | ** | -0.1929 | ** |
| Question not asked | 0.0573 | | 0.0613 | |
| *Joint Significance* | | *** | | *** |
| *Number of Observations* | 719 | | 526 | |
| *Percent Positive Values* | 19.47% | | 21.10% | |
| *Chi-square for Overall Significance[c]* | 119.79 | *** | 89.25 | *** |

**(Notes on next page)**

**Table 5-7 (cont.)**

**Notes.**

 *** significant at 1 percent level

 ** significant at 5 percent level

  * significant at 10 percent level

 ns not significantly different from zero in joint test

a   Regressions also controlled for the type of fraud involved.

   Marginal effects by fraud type for equation (1) are reported in Table 5-11.  In both equations, the type of fraud variables are jointly significant at the 1 percent level.  In both equations, victims of Q28 are significantly less likely to complain to a bank or credit card company than those in the control group.  In addition, in equation (1), victims of Q19 are significantly more likely to complain than those in the control group.  In both equations, no victims of (i) Q35, (ii) Q38, or (iii) Q44 filed complaints with a bank or credit card company.  Therefore these observations were not used in estimating the equation.

b   (n) indicates that no complaints were filed with a bank or credit card company by victims with this characteristic.  Therefore, these observations were dropped in estimating the equation.

c   Includes the effect of the type of fraud variables.

*Consumer Fraud in the United States: An FTC Survey*

or a money order.[199]  Since we also find that younger consumers, those with higher levels of income, and those who use credit cards are more likely to file complaints, it is difficult to identify which factor is actually leading to the higher level of complaints.

### Education Level

Figure 5-2 and Panel B of Table 5-3 show the simple relationship between the likelihood of complaining and the consumer's educational level.  These cross-tab results suggest that education beyond the high school level is associated with an increase in complaints filed.  Overall, the relationship between complaining and educational level is statistically significant.  Although consumers who had only graduated from high school complained in 62 percent of cases, those who had attended



some college or had attended a post-secondary technical or vocational school complained 70 percent of the time.  Consumers who had graduated from college complained 78 percent of the time.[200]  However, consumers with less than a high school education were not less likely to complain than were high school graduates.

---

[199.] Just over half of those who said that they had made Internet purchases in the last year also said that they had used a credit card to pay for the fraudulent transaction.  In comparison, less than 25 percent of those who had not made any Internet purchases said that they had paid with a credit card.  By contrast, those who used cash to pay for the transaction falls from 12 percent for those who had no Internet purchases to 3 percent for those who had 4 or more such purchases, while the use of money orders falls from 11 percent to 5 percent.

[200.] The percentage of consumers with some post-secondary education who file a complaint is significantly greater, at the 10 percent level, than the percentage of consumers with a high school degree.  If the consumer has a college degree, the proportion of those filing a complaint is significantly greater, at the 1 percent level, than the percentage of those who only have a high school diploma.  Overall, the relationship between the percentage of consumers filing a complaint and education level is significant at the 1 percent level.

As shown in Table 5-4, the effect of education on the likelihood of filing a complaint is smaller and less significant when we control for other factors.  We still find that consumers with college degrees are more likely to complain than those with a high school degree.  However, the difference is only about 8.5 percentage points and is only significant at the 5 or 10 percent level (depending on the equation used) rather than the 1 percent level in the cross-tabs.  Similarly, consumers with some post-secondary education are 5 or 10 percentage points more likely to complain, though the results are only significant in one of the two equations.[201]

*Age*

The cross-tab relationship between age and the share of consumers who complain is shown in Figure 5-3 and in Panel C of Table 5-3.  This analysis suggests that about 70 percent of consumers under age 55 complain.  The likelihood of filing a complaint drops to around 50 to 60 percent for consumers aged 55 to 64.[202]  Those over age 65 are more likely to complain than the 55 to 64 year old group but less likely than the younger consumers.



**Figure 5-3
Likelihood of Complaining
By Age**

Source: Table 5-3

The results of the more sophisticated probit analysis in Table 5-4 show a smoother relationship between age and the likelihood that a consumer complains.  In both equations, consumers aged 18 to 24 were the most likely to complain, and the likelihood falls rather steadily through the 55 to 64 year old group.[203]  As in the cross-tab results, those who are 65 or older appear somewhat more likely to complain than those in their late 50s and early 60s.  The relationship between

---

[201] Looking at the analyses of the separate types of complaints in Tables 5-5 through 5-7, we find that the effect of education is also insignificant in each of them.

[202] The percentage of instances in which a complaint was filed when the consumer was less than 55 years old is significantly higher than the complaint rate where the consumer was 55 or over.  This difference is significant at the 1 percent level.  Overall, the relationship between age and the percentage of those filing a complaint is significant at the 5 percent level in the cross-tab analysis.

[203] The one exception is that those between 45 and 54 are found to have a 3 percentage point greater likelihood of complaining than those who are 35 to 44 in the conditional-mean-imputation equation.  However, this difference is far from being statistically significant.

SJX28 - 120

age and the likelihood of complaining, however, is only statistically significant at the 10 percent level in the complete case equation, and many of the individual differences are not statistically significant.

Examining Tables 5-5 to 5-7, which show complaints to each of the three types of entities separately, we find that younger consumers are more likely to complain to a seller or manufacturer than older consumers.[204]  There is no clear relationship between age and the likelihood of complaining to a bank or credit card company, however.  There is also no clear relationship when we examine complaints to official sources.[205]

### Income

Panel F of Table 5-3 shows the simple relationship between income and the likelihood of complaining.[206]  In both the cross-tab and the probit results (set forth in Table 5-4), there appears to be little variation in the likelihood of complaining at income levels below $80,000.  Those with lower incomes – particularly those with incomes under $20,000 – may be slightly less likely to complain.  Regardless of the estimation technique used, however, the differences are not statistically significant.

There are some differences in the rate of complaining at income levels above $80,000.  While it is not clear why such differences should exist, both the cross-tab and the probit results show that consumers with incomes between $80,000 and $100,000 are less likely to complain than those with lower income levels.  On the other hand, consumers with incomes in excess of $100,000 are the most likely to complain.[207]

---

[204] See Table 5-6 where the age variables are jointly significant at the 1 percent level in the conditional-mean-imputation equation and at the 10 percent level in the complete case equation.

[205] The overall relationship between complaints and age is not significant in either Table 5-5, which examines complaints to official sources, or Table 5-7, which examines complaints to banks or credit card companies.

[206] The relationship between the income variables and the likelihood of filing a complaint is jointly significant at the 1 percent level in the simple cross-tabs and at the 5 percent level in both regression equations.

[207] The difference between the likelihood of complaining for those with incomes of $80,000 to $100,000 and those with incomes of $40,000 to $60,000 is significant at the 10 percent level in the simple cross-tabs and is significant at the 5 percent level in both regression analyses.  Comparing the over-$100,000 group with the $40,000 to $60,000 group, the differences are significant at the 5 percent level in the simple cross-tabs and at the 10 percent level in the regression results.

Looking separately at complaints to the three different types of entities, we see that those with incomes between $80,000 and $100,000 are significantly less likely to complain to a seller or manufacturer than those with incomes of $40,000 to $60,000.  For complaints to official sources and to banks or credit card companies, the differences are not statistically significant.

## *Gender and Marital Status*

Women are more likely to complain about fraud or slamming than men.  The simple relationship between complaining and gender, as set forth in Panel D of Table 5-3 and in Figure 5-4, indicates that women who experienced fraud or slamming are about ten



**Figure 5-4
Likelihood of Complaining
By Gender**

Source: Table 5-3

percentage points more likely to complain than are men.  The regression results show virtually the same difference.  Furthermore, this difference is statistically significant in both the regression equations and the cross-tabs.[208]

Considering complaints to each of the three types of entities separately, Table 5-6 shows that women are a statistically significant 7.5 to 10 percentage points more likely to complain to a seller or manufacturer than men.[209]  The results in Table 5-7 also suggest that women are more likely to complain to a bank or credit card company than men, although the difference is not statistically significant.  On the other hand, the results in Table 5-5 suggest that women are somewhat less likely to complain to official sources, although the difference is only statistically significant in the conditional-mean-imputation equation.

The estimates in Panel E of Table 5-3 suggest that married consumers are more likely to complain about fraud or slamming than singles.  However, the difference in complaint rates is only 4 percentage points in the cross-tabs and between 4 and 7 percentage points in the regressions.  In none of the cases is the difference statistically significant.

---

[208.] The level of significance is 1 percent in the simple comparisons and at 1 or 5 percent in the regressions.

[209.] The difference is significant at the 5 percent level.

*Consumer Fraud in the United States: An FTC Survey*

### Race and Ethnicity



The results of our simple cross-tab analysis by race and ethnic group are reported in Panel G of Table 5-3 and in Figure 5-5. We find that complaint rates are the lowest for African Americans. The simple analysis suggests that the likelihood of complaining is a statistically significant 16 percentage points lower for African Americans than for non-Hispanic whites.[210] The regression results in Table 5-4 also show that African Americans are the least likely to complain and that they are 9 to 13 percentage points less likely to complain than non-Hispanic whites, depending on which equation one examines. The differences are significant at the 10 percent level.[211]

The simple cross-tab results presented in Table 5-3 suggest that American Indians or Alaska Natives, Hispanics, and those in the "Other" racial category are slightly less likely to complain than non-Hispanic whites. For American Indians or Alaska Natives, the difference is about 7.5 percentage points – 64.7 percent versus 72.1 percent. For Hispanics and "Others," the difference is approximately 1 percentage point. In none of these cases are the results statistically significant. By contrast, the regression results suggest that, after controlling for other factors, Hispanics and American Indians or Alaska Natives may be <u>more</u> likely to complain than non-Hispanic whites. Again, however, the differences are small and are not statistically significant.[212]

---

[210] The difference is significant at the 1 percent level.

[211] The separate analyses of complaints to different types of entities show that African Americans are significantly less likely to complain to a seller or manufacturer than are non-Hispanic whites (Table 5-6). The results also suggest that they are less likely to complain to an official source, though the difference there is not statistically significant (Table 5-5). The results in Table 5-7 suggest that African Americans may be somewhat more likely to complain to a bank or credit card company, though the differences again are not statistically significant.

[212] With two exceptions, members of these three groups are neither significantly more or significantly less likely to complain to any of the three types of complaint entities, when we look at them individually. The results in Table 5-7 indicate that those in the "Other" category are significantly more likely to complain to a bank or credit card company, while the results in Table 5-5 suggest American Indians or Alaska Natives are more likely to complain to official sources. In both cases, the differences are only significant at the 10 percent level if we focus on the complete case analysis, which gives more reliable measures of statistical significance.

As with our analysis of victimization, we also attempted to investigate the role of language on the likelihood of filing a complaint. If victims of fraud are not fluent in English, they may be less likely to complain about a fraudulent experience. We therefore examined whether Hispanics who said that they spoke Spanish at home were less likely to file a complaint than other Hispanics.[213] When we added a Spanish-language variable to the regressions in Table 5-4, the results suggested that Hispanics who spoke Spanish were only about 60 percent as likely to complain as other Hispanics. This difference is significant at the 5 percent level in a one-tailed test.[214]

### Method of Payment

The results in Panel H of Table 5-3 do not appear to provide much support for the hypothesis that consumers who paid with a credit card would be the most likely to complain. Although complaint rates appear to be slightly higher when consumers paid by credit card than when they paid with cash, the differences are not statistically significant. Indeed, the only statistically significant result is that those who pay by money order are significantly less likely to complain than those who use other methods of payment.[215] Similarly, the probit analyses presented in Table 5-4 suggest that the method of payment does not have a significant effect on the likelihood of complaining, either jointly or individually.

In Table 5-7, however, we find that consumers who paid with a credit card are significantly more likely – 3 to 4 times as likely – to complain to a bank or credit card company as those who paid with cash, a check, or a money order. By contrast, Table 5-5 shows that consumers who paid with a credit card are significantly less likely to complain to an official source than are those who used any of the other means of payment. Indeed, those who paid with cash were 4.5 to 5 times as likely to complain to an official source as were those who paid with a credit card. It may be that consumers who used a credit card are more likely to complain to the credit card company and have their problem adequately resolved. As a result, there may be less need to complain to an official source.[216]

---

[213.] As with the analysis of victimization, we limit Spanish-speaking Hispanics to those who said that Spanish was the only language other than English spoken in their homes.

[214.] A one-tailed test – *i.e.*, a test of whether Hispanics who spoke Spanish at home were less likely to complain than Hispanics who did not speak Spanish at home – is appropriate here, rather than a test of just whether there are differences between the two groups, because the hypothesis is that Spanish-speaking Hispanics will be less likely to complain than other Hispanics. We do not examine the effect of speaking Spanish separately for the three types of entities to whom complaints might be made because of the small number of non-Spanish speaking Hispanics in the sample.

[215.] In the simple comparisons, the complaint rate for those who paid with a money order is significantly lower than the rates for those who paid with a credit card or with a check (both significant at the 5 percent level), and those situations where the seller took the money directly from the consumer's checking account (significant at the 10 percent level).

[216.] As discussed on page 81, a simple comparison shows that complaint rates differ significantly by type of fraud. To determine whether this remained true after we controlled for the other characteristics in our regressions, we also included type-of-fraud variables in our regressions. Although the results for these

(continued...)

*Consumer Fraud in the United States: An FTC Survey*

Another noteworthy feature of the relationship between complaints to official sources and the means of payment is that consumers who used an online payment service were the most likely to complain to an official source. Indeed, these consumers were about twice as likely to complain to an official source as those who paid with cash, and were 10 to 12 times as likely to complain to an official source as consumers who used a credit card.[217] Again, this result suggests that consumers who are most comfortable using the Internet are more likely to complain than those who are not.

## How Satisfied Are Those Who Complain?

Finally, the survey asked consumers who complained how satisfied they were with what happened as a result.[218] The distribution of responses to this question are shown in Table 5-8. In about 60 percent of cases, consumers indicated that they were satisfied (either "Very Satisfied" or "Somewhat Satisfied"). In the remaining 40 percent of cases, consumers stated they were dissatisfied (either "Not too Satisfied" or "Not at All Satisfied").[219]

We have also examined whether satisfaction with the outcome of filing a complaint varies depending on the entity to which the consumer complained, the characteristics of the transaction at issue, or the characteristics of the individual

---

[216] (...continued)
variables are not reported in the body of Tables 5-4 to 5-7, the footnotes to the tables report on the overall significance of these variables, as well as noting those types of fraud where complaints are more or less likely to be made. The marginal effects by fraud type are also reported in Table 5-11. When we examine total complaints, complaints to official sources, or complaints to sellers or manufacturers, the type-of-fraud variables are jointly significant at the 5 percent level or better. The type-of-fraud variables were not jointly significant when the variable analyzed was complaints to banks or credit card companies.

[217] The difference between the rate of complaining to an official source for those who paid with an online mechanism and those who paid with a credit card is statistically significant at the 5 percent level in the complete case regression. The difference between the rates for those who paid with an online service and those who paid with cash is not significant in the complete-case regression.

[218] Survey question 69. Survey participants who said that they had (1) asked for a refund or replacement, (2) stopped payment or refused to pay, (3) stopped buying from the company, (4) consulted a lawyer, or (5) complained to family or friends, were not asked about satisfaction. Participants who indicated that they had complained to multiple entities about the same incident were asked how satisfied they were with the outcome of their complaints to the first two entities they mentioned. Although this approach might have the potential to bias responses – because consumers may be more likely to mention reporting their experiences when they were particularly satisfied or dissatisfied with the experience – no significant problem appears to have been introduced with our data because very few consumers indicated they had complained to more than two entities.

[219] The 1993 AARP survey also asked consumers who had complained how satisfied they were with the results of their complaints. (AARP (1994)) The level of satisfaction reported by participants in our current survey appears to be somewhat higher than AARP found. Compared to nearly 60 percent of complaint-filers who said that they were very or somewhat satisfied in this survey, AARP found that only about 45 percent of complaint-filers were similarly satisfied. The difference in satisfaction levels is significant at the 5 percent level.

**Table 5-8:   Degree of Satisfaction with Results of Complaints**

| | | Percent |
|---|---|---|
| **Satisfied** | | **59.6%** |
|     Very satisfied | 36.5% | |
|     Somewhat satisfied | 23.1% | |
| **Not Satisfied** | | **40.4%** |
|     Not too satisfied | 7.2% | |
|     Not at all satisfied | 33.2% | |

consumer.  As with our earlier analyses, we have used both simple cross-tabulation analysis and the more sophisticated probit regression analysis.  We present the cross-tab results in Table 5-9 and the probit results in Table 5-10.[220]

*Entity To Whom Complaint Was Made*

The simple cross-tab analysis, which is reported in Panel A of Table 5-9 and also in Figure 5-6, shows that consumers' satisfaction with the outcome of their complaints varies significantly depending on the entity to whom the consumer complained.  Satisfaction levels are highest – around 80 percent – for complaints made to a credit card company or a bank.  This rate is significantly different from the 54 percent satisfaction rate when the consumer complained to an official source or to a seller or manufacturer.[221]



Figure 5-6
Complaint Satisfaction
By Party Complained To

Source: Table 5-9

[220.] As with the earlier regression analyses, we have used both complete case analysis and conditional mean imputation.  As with our analysis of complaining, we had to limit the number of variables included in the impute routine because of a limitation in our software.  See footnote 188, above.  Finally, as with our regression analysis of complaining, we also allow the proportion of consumers who are satisfied with the results of complaints to vary across different types of frauds.  The marginal effects for various types of fraud and for slamming are reported in Table 5-11.

[221.] In both cases, the difference is significant at the 1 percent level.

*Consumer Fraud in the United States: An FTC Survey*

**Table 5-9:   Satisfaction with the Results of a Complaint, By Single Characteristic**

**A.  By Who Complained To**

|  | Percent Satisfied |
|---|---|
| Complained to an official source | 54.0% |
| Complained to a bank or credit card company | 80.7% |
| Complained to a seller or producer | 53.7% |
| *Number of Observations* | 407 |

**B.  By Amount Lost**

|  | Percent Satisfied |
|---|---|
| $0 | 77.0% |
| $1 - $49 | 51.6% |
| $50 - $99 | 34.0% |
| $100 or more | 28.2% |
| *Number of Observations* | 390 |

**C.  By Purchases Made on the Internet in the Last Year**

|  | Percent Satisfied |
|---|---|
| None | 55.6% |
| One to three purchases | 66.7% |
| Four or more purchases | 62.2% |
| *Number of Observations* | 428 |

**D.  By Education**

|  | Percent Satisfied |
|---|---|
| Did not complete high school | 43.5% |
| Graduated from high school | 58.9% |
| Attended some college or post-secondary technical or vocational school | 57.4% |
| Graduated from college or more | 64.7% |
| *Number of Observations* | 419 |

**E.  By Gender**

|  | Percent Satisfied |
|---|---|
| Male | 59.5% |
| Female | 59.7% |
| *Number of Observations* | 428 |

**F.  By Marital Status**

|  | Percent Satisfied |
|---|---|
| Single | 61.7% |
| Married | 57.9% |
| *Number of Observations* | 428 |

**(Table continued on next page)**

*Chapter 5: Who Complains?*

**Table 5-9 (cont.)**

**G.  By Age**

|  | Percent Satisfied |
|---|---|
| 18 - 24 | 59.0% |
| 25 - 34 | 55.9% |
| 35 - 44 | 55.4% |
| 45 - 54 | 64.0% |
| 55 - 64 | 68.9% |
| 65 and over | 63.4% |
| *Number of Observations* | 410 |

**H.  By Current Income**

|  | Percent Satisfied |
|---|---|
| Less than $20,000 | 65.6% |
| $20,000 to $40,000 | 51.0% |
| $40,000 to $60,000 | 66.2% |
| $60,000 to $80,000 | 57.8% |
| $80,000 to $100,000 | 58.1% |
| Over $100,000 | 66.7% |
| *Number of Observations* | 376 |

**I.  By Race and Ethnicity**

|  | Percent Satisfied |
|---|---|
| Hispanics | 57.1% |
| African Americans | 48.7% |
| American Indians or Alaska Natives | 27.3% |
| Non-Hispanic Whites | 63.0% |
| Others | 62.5% |
| *Number of Observations* | 403 |

**J.  By Method of Payment**

|  | Percent Satisfied |
|---|---|
| Credit card | 62.6% |
| Cash | 28.0% |
| Check | 49.4% |
| Online payment system | 40.0% |
| Seller took money directly from the consumer's checking account | 41.7% |
| Seller placed charge on consumer's telephone bill | 50.0% |
| Money order | 33.3% |
| *Number of Observations* | 253 |

*Consumer Fraud in the United States: An FTC Survey*

**Table 5-10:  Satisfaction with Results of Complaints, Probit Estimation, Marginal Effects[a]**

| | Conditional Mean Imputation (1) | | Complete Cases Only (2) | |
|---|---|---|---|---|
| **To Whom Complained (Relative to an Official Source)** | | | | |
| Bank or credit card company | 0.0534 | | 0.1033 | |
| Seller or producer | -0.1609 | ** | -0.1430 | * |
| *Joint Significance* | | *** | | *** |
| **How Much Lost (Relative to $0)** | | | | |
| $1 to $49 | -0.2517 | *** | -0.1710 | * |
| $50 to $99 | -0.4031 | *** | -0.3353 | *** |
| $100 or more | -0.4733 | *** | -0.3762 | *** |
| *Joint Significance* | | *** | | *** |
| **Race and Ethnicity (Relative to Non-Hispanic Whites)** | | | | |
| Hispanics | -0.0084 | | 0.0039 | |
| African Americans | -0.0133 | | -0.0677 | |
| American Indians or Alaska Natives | -0.2556 | * | -0.2101 | |
| Other | -0.0420 | | -0.1050 | |
| *Joint Significance* | | ns | | ns |
| **Gender (Relative to Male)** | | | | |
| Female | 0.0877 | * | 0.1006 | * |
| **Marital Status (Relative to Married)** | | | | |
| Single | 0.0765 | | 0.0632 | |
| **Age (Relative to 35 - 44)** | | | | |
| 18 - 24 | 0.0425 | | 0.0737 | |
| 25 - 34 | -0.0042 | | -0.0366 | |
| 45 - 54 | 0.0044 | | -0.0097 | |
| 55 - 64 | 0.1435 | * | 0.0905 | |
| 65 and over | -0.0350 | | -0.1640 | |
| *Joint Significance* | | ns | | ns |
| **Education (Relative to High School Graduate)** | | | | |
| Did not complete high school | -0.0126 | | -0.0397 | |
| Attended some college or post-secondary technical or vocational school | -0.0012 | | -0.0153 | |
| Graduated from college or more | -0.0147 | | 0.0150 | |
| *Joint Significance* | | ns | | ns |
| **Current Income (Relative to $40,000 to $60,000)** | | | | |
| Less than $20,000 | 0.0727 | | -0.0160 | |
| $20,000 - $40,000 | -0.0381 | | -0.1107 | |
| $60,000 - $80,000 | -0.0276 | | -0.0741 | |
| $80,000 - $100,000 | -0.0211 | | -0.2517 | ** |
| Over $100,000 | -0.0814 | | -0.1978 | |
| *Joint Significance* | | ns | | ns |
| **Internet Purchases in Last Year (Relative to No Purchases)** | | | | |
| One to three purchases | 0.0802 | | -0.0254 | |
| Four or more purchases | 0.0640 | | 0.0633 | |
| *Joint Significance* | | ns | | ns |
| **Payment Mechanism Used (Relative to Paying with Credit Card)** | | | | |
| Cash | -0.2077 | * | -0.2322 | ** |
| Check | 0.0102 | | -0.0725 | |
| Online payment service | -0.0527 | | -0.0645 | |
| Seller took money directly from checking account | -0.0856 | | -0.0953 | |
| Amount charged on telephone bill | 0.0031 | | -0.0061 | |
| Money order | 0.0423 | | -0.0577 | |
| *Joint Significance* | | ns | | ns |
| *Number of Observations* | *406* | | *299* | |
| *Percent Positive Values* | *59.36%* | | *60.20%* | |
| *Chi-square for Overall Significance[b]* | *135.56* | *** | *106.72* | *** |

**(Notes on next page)**

**Table 5-10 (cont.)**

**Notes.**

 *** significant at 1 percent level

  ** significant at 5 percent level

   * significant at 10 percent level

 ns not significantly different from zero in joint test

a  Regressions also controlled for the type of fraud involved.

   Marginal effects by fraud type for equation (1) are reported in Table 5-11.  In both equations, the type of fraud variables are jointly significant at the 1 percent level.  In equation (1), the likelihood of being satisfied with the results of a complaint is significantly higher than for someone who paid an advance fee for a loan or credit card, the control group, at the 5 percent level or above, for (i) someone who received an unauthorized bill for Internet-related services ("Q19"), (ii) someone who received an unauthorized bill for a product other than those specifically listed ("Q22"), and (iii) someone whose long distance service was changed without their authorization ("Q28").  In equation (2), the likelihood of being satisfied with the results of complaining is significantly higher for victims of Q28 than for the control group.  In both equations, no one who purchased a business opportunity that involved false earnings claims or false promises of assistance ("Q35") or (ii) who was promised a government job ("Q38") was satisfied with the results of their complaints.  Therefore, these observations were not used in estimating the equation.

b  Includes the effect of type of fraud variables.

*Consumer Fraud in the United States: An FTC Survey*

The probit equations, which control for the effect of other characteristics, provide somewhat similar results. Again, we find statistically significant differences in the level of satisfaction depending on the entity to whom the consumer complained.[222]  Complaints to a seller or manufacturer yielded the lowest level of satisfaction.[223]  Unlike the cross-tab results, however, the regression results show no significant difference in satisfaction between complaining to a bank or credit card company and complaining to an official source.

### Amount Lost

Not surprisingly, the percentage of consumers who are satisfied with the outcome of their complaints declines as the amount of money they lost increases. For consumers who lost no money as a result of the transaction at issue, just over 75 percent indicated they were satisfied, as shown in Panel B of Table 5-9.  In cases involving a loss of $100 or more, however, less than 30 percent of consumers who complained stated they were satisfied.  This difference is statistically significant.[224]  The probit results provide a very similar picture – consumers who lost no money were almost 2.5 times as likely to be satisfied as those who lost $100 or more.

### Internet Usage, Education, Marital Status, Gender, and Age

We find no statistically significant relationships between complaint satisfaction and Internet usage, education, marital status, or age, in either the cross-tab or regression analyses.[225]  Nor do we find any difference in satisfaction levels between men and women in the cross-tab analysis, as shown in Panel E of Table 5-9.  In the probit equations in Table 5-10, the conditional-mean-imputation results suggest that women are more likely than men to be satisfied with complaint outcomes and that the difference is statistically significant at the 10 percent level.  However, there is no such significant difference in the complete-case regression, and we put more weight on the significance tests from that equation because of the tendency of the conditional-mean-imputation technique to overstate significance levels.

---

[222] In both equations, the variables indicating to whom the consumer complained are jointly significant at the 1 percent level.

[223] The differences in the level of satisfaction when a consumer complained to a seller or producer and when the consumer complained to either an official source or to a bank or credit card company are statistically significant at the 5 percent level or better.

[224] Jointly, the relationship between the amount lost variables and satisfaction is significant at the 1 percent level.  In addition, for each of the three positive levels of loss, the degree of satisfaction is significantly lower than when no money was lost.

[225] The simple cross-tab results are found in Panels C, D, F, and G of Table 5-9.

### Income

As shown in Panel H of Table 5-9, the cross-tab analysis of the relationship between complaint satisfaction and consumers' income level suggests that those with incomes between $20,000 and $40,000 are the least likely to be satisfied. The difference in satisfaction between those with incomes between $20,000 and $40,000 and those with incomes of $40,000 to $60,000 is statistically significant at the 5 percent level.  However, the relationship between consumers' incomes and the level of satisfaction is not jointly significant in the cross-tab analysis.

The probit results in Table 5-10 show very different pictures of the relationship between income and complaint satisfaction, depending on which estimation technique is used.  The complete-case results seem to suggest that income has a significant effect on complaint satisfaction.  However, there is no consistent pattern to the relationship.  Although the level of satisfaction of consumers with incomes in the $20,000 to $40,000 range is lower than for those in the $40,000 to $60,000 range, we find the lowest levels of satisfaction among those with higher levels of income.  In particular, those with incomes of $80,000 to $100,000 have the lowest rates of satisfaction – 45 percentage points lower than the rate for consumers with incomes of $40,000 to $60,000.

On the other hand, the results with conditional mean imputation seem to provide a more consistent pattern of declining satisfaction as income rises. Consumers with incomes under $20,000 are the most likely to be satisfied, and those with incomes over $100,000 are the least likely.  The income variables, however, are not jointly or individually significant in this equation.

### Race and Ethnicity

Our cross-tab analysis, set forth in Panel I of Table 5-9, shows that African Americans and American Indians or Alaska Natives are less likely to be satisfied with the outcome of their complaints than non-Hispanic whites.   The difference is particularly striking for American Indians or Alaska Natives.  The difference in the rate of satisfaction between American Indians or Alaska Natives and non-Hispanic whites is 36 percentage points – 27.3 percent v. 63.0 percent.  That is, non-Hispanic whites are twice as likely to be satisfied as American Indians or Alaska Natives.[226]   Once we control for other factors, the difference in satisfaction levels for American Indians or Alaska Natives and non-Hispanic whites falls to 23 percentage points – the level for American Indians or Alaska Natives is about 60 percent of that for non-Hispanic whites.[227]

---

[226.] The difference in satisfaction level between American Indians or Alaska Natives and non-Hispanic whites is significant at the 5 percent level in the simple analysis, although the number of observations for American Indians or Alaska Natives is small.  Overall, the relationship between the level of satisfaction and the race and ethnicity is significant at the 10 percent level.

[227.] In the regression results, the difference in satisfaction levels between American Indians or Alaska Natives and non-Hispanic whites is significant at the 10 percent level in the conditional-mean-imputation case.  It is not significant in the complete-case regression.  In neither regression are the race and ethnicity variables jointly significant.

*Consumer Fraud in the United States: An FTC Survey*

Satisfaction levels differ less between African Americans and non-Hispanic whites. As shown in Table 5-9, satisfaction levels between these groups differ by just over 14 percentage points, and the difference is statistically significant at the 10 percent level. Once we control for other factors in the regression analysis, the difference falls to 3 to 6 percentage points – and the differences are not statistically significant.

The percentage of Hispanics who indicated that they were satisfied with the outcome of their complaints was about 6 percentage points lower than the level for non-Hispanic whites, using the simple analysis. The probit analyses yield similar results – 1.5 percentage points lower in the conditional-mean-imputation results and 6 percentage points lower in the complete case analysis. None of these differences is statistically significant. In the cross-tab analysis, the satisfaction level for those in the "Other" group was less than 1 percent lower than that for non-Hispanic whites. In the regression results, the differences are somewhat higher, but are not statistically significant.

### Payment Mechanism

Satisfaction levels also vary depending on the payment mechanism used. This finding is consistent with what we would have expected. The cross-tab results in Panel J of Table 5-9 and Figure 5-7 show that consumers who paid with cash and money orders



reported the lowest satisfaction levels, whereas consumers who paid with a credit card reported the highest satisfaction levels.[228] The regression analysis provides a similar pattern of results with satisfaction rates lowest when cash is the payment mechanism and much higher when a credit card is used.[229] The differences in satisfaction are not significant if we compare any of the other payment mechanisms to cash.

---

[228] Jointly, the method of payment variables are statistically significant at the 5 percent level in the cross-tab analysis. (In performing this test, it was necessary to leave out the observations involving payment by an online payment service, because there were too few observations to satisfy the conditions for conducting a Chi-square test.) The level of satisfaction is significantly higher where credit cards and checks are the payment mechanism than with cash, at the 1 percent and 10 percent levels respectively. The level of satisfaction is also significantly higher, at the 5 percent level, where a credit card was the means of payment than where a money order was used.

[229] The level of satisfaction when using a credit card is significantly greater than when paying with cash at the 5 percent level.

## Conclusion

Approximately 30 percent of consumers who have experienced one of the types of fraud examined in this study or slamming did not file a complaint about their experience.  Just over 50 percent of consumers complained to the seller or manufacturer.  Only 8 percent complained to an official source such as a governmental agency or the Better Business Bureau.

Women are about 10 percentage points more likely to complain than men.  In addition, younger consumers are more likely to complain than older consumers.  Rates of complaining are lowest for consumers between 55 and 64 years of age.

Finally, we examined the extent to which consumers who complained were satisfied with the outcome of their complaints.  We find that those who complained to a bank or credit card company were more likely to be satisfied than those who complained to a seller or manufacturer.  Similarly, consumers who ultimately did not lose money or who lost only a small amount were more likely to be satisfied than those who suffered larger losses.

*Consumer Fraud in the United States: An FTC Survey*

**Table 5-11:  Marginal Effects by Fraud Type, Conditional-Mean-Imputation Probit Equations[a]**

| | Table 5-4 Likelihood of Filing a Complaint, Complaints Filed with Anyone | Table 5-5 Likelihood of Filing a Complaint, Complaints Filed with Official Sources | Table 5-6 Likelihood of Filing a Complaint, Complaints Filed with Seller or Manufacturer | Table 5-7 Likelihood of Filing a Complaint, Complaints Filed with a Bank or Credit Card Company | Table 5-10 Satisfaction with Results of Complaining |
|---|---|---|---|---|---|
| **Specific Types of Fraud Included in Survey** | | | | | |
| Purchased credit repair | 0.1853 * | 0.1928 ** | 0.0719 | 0.0073 | 0.1960 |
| Purchased credit card insurance | -0.0435 | 0.0177 | -0.1598 * | 0.0154 | 0.2457 * |
| Billed for Internet services you did not agree to purchase | 0.3682 *** | -0.0055 | 0.2616 *** | 0.1599 ** | 0.2496 ** |
| Billed for information services provided either over the Internet or by pay-per-call that you had not agreed to purchase | 0.2632 ** | -0.0113 | 0.2178 * | 0.0399 | 0.0459 |
| Billed for buyers' club memberships you did not agree to purchase | 0.2419 *** | 0.0062 | 0.2089 *** | 0.0381 | 0.1660 |
| Purchased a membership in a pyramid scheme | -0.2719 ** | -0.0047 | -0.2435 ** | -0.1324 | 0.1207 |
| Purchased a business opportunity where promised earnings were not realized or promised assistance was not provided | -0.0557 | — | 0.0174 | — | — |
| Made a payment to someone who represented that you would receive a government job | -0.1048 | — | 0.0015 | — | — |
| Paid money or made a purchase to receive a promised prize and did not receive the prize or the prize was not as promised | -0.1477 | 0.0778 | -0.0528 | — | -0.3161 |
| **More General Types of Frauds Included in Survey** | | | | | |
| Billed for a product or service you did not agree to purchase or billed an amount significantly more than you expected, products other than those identified above | 0.3272 *** | 0.0060 | 0.2512 *** | 0.1009 * | 0.1835 * |
| Paid for a product but did not receive it | 0.2977 ** | 0.1225 * | 0.2719 ** | -0.0958 | -0.0439 |
| **Unauthorized Change in Long Distance Service** | **0.2770 ***** | **0.0135** | **0.3992 ***** | **-0.1003 **** | **0.2992 ***** |
| *Chi-square for Joint Significance* | *87.95 **** | *12.43* | *85.18 **** | *33.90 **** | *22.01 **** |

112

**Note.**

\*\*\* significant at 1 percent level

\*\* significant at 5 percent level

\* significant at 10 percent level

ns not significantly different from zero in joint test

a Marginal effects relative to paid an advance fee to obtain a loan or credit card that you were promised or guaranteed you would receive ("Advance Fee Loans"). After controlling for all other variables included in the regression, predicted complaint rates for advance fee loans are 0.4870 for complaints to any source, 0.0657 for complaints to official sources, 0.3408 for complaints to sellers or manufacturers, and 0.1692 for complaints to a bank or credit card company.  Of those who complained about an advance fee loan, predicted satisfaction rate is 0.3939 after controlling for other variables.

113

*Consumer Fraud in the United States: An FTC Survey*

# Chapter 6:  Conclusion

This study provides the first systematic look in the last decade at the problem of consumer fraud.  We examine both the extent of this problem and the degree to which certain groups of consumers may be more or less likely to become victims of fraud.  Finally, we analyze the actions consumers take when they experience what appears to be a fraud:  Do they complain to anyone?  If so, to whom do they complain, and how satisfied are they with the results?

The underlying data for this report is drawn from an FTC-commissioned survey that was conducted in 2003.  The survey asked consumers whether they had been a victim of any of ten specific types of fraud in the previous twelve months.  In addition, consumers were asked about experiences with two more general types of fraud and whether their long distance telephone service had been changed without their authorization.

Based on the survey results, we estimate that in the year prior to the survey 24.45 million adults in the United States – 11.2 percent of U.S. adults – were victims of one or more of the types of fraud we studied.  We also estimate that there were 35.45 million incidents of these frauds during the year.  The most common fraud – affecting 4.55 million consumers and occurring 6.55 million times – was the advance payment of money for a promised or guaranteed loan or credit card which the consumer never received.  The second most common fraud was the unauthorized billing for a membership in a buyers' club that the consumer had not agreed to purchase.  An estimated 4.05 million consumers were victims of this fraud and an estimated 4.80 million incidents of this type of fraud occurred in the year before the survey.

We also find that an estimated 13.90 million adults were "slammed" – that is, their long distance telephone service was changed without their authorization.  Slamming occurred an estimated total of 17.60 million times during the year.

In total, 35.60 million consumers – 16.3 percent of the adult population – encountered at least one type of fraud and/or slamming in the year preceding the survey.

One-third of fraud victims surveyed said that they first learned of the fraudulent offer through print advertising such as newspaper and magazine advertising, direct mail advertising and catalogs, and posters.  Telemarketing was the second most frequently cited source, accounting for about one in six frauds, or 17 percent.  The Internet and email were the next most common source at 14 percent.

The likelihood of being a victim of one of the types of fraud investigated in this study varies with the consumer's demographic characteristics.  In particular, we find that members of several racial and ethnic minorities are more likely to be victims than are non-Hispanic whites.  Even for non-Hispanic whites the risk is by

*Consumer Fraud in the United States: An FTC Survey*

no means trivial.  Of non-Hispanic whites, 6.4 percent had been a victim of one or more of the frauds covered by the survey during the last year.  When we add slamming to the analysis, 12.5 percent of non-Hispanic whites had been a victim.

Our results suggest that American Indians or Alaska Natives faced the greatest risk.  Almost 34 percent of the American Indians or Alaska Natives who participated in the survey had been a victim of one or more of the frauds covered by the survey in the last year; including slamming, 38 percent had been a victim.

Hispanics and African Americans are also significantly more likely to have been victims than were non-Hispanic whites.  During the year prior to the survey, 14.3 percent of Hispanics and 17.1 percent of African Americans had been victims of one or more of the frauds we examined.  If we include slamming, 26.7 percent of Hispanics and 24.1 percent of African Americans were victims.  On the other hand, members of the "Other" racial and ethnic category – which included Asians, Hawaiian and Other Pacific Islanders, and those who identified themselves as belonging to more than one racial group –  were not significantly more likely to be victims than non-Hispanic whites.  Including both fraud and slamming, 11.7 percent of this group were victims; focusing only on fraud, the rate was 7.3 percent.

The likelihood of being a victim also varied depending on how consumers expected their income to change in the next three years, and how comfortable they were with their current level of debt.  Participants who expected their incomes to remain largely unchanged over the next three years and those who had no debt were the least likely to be victims – five percent of those who said that their incomes would remain steady and 2.7 percent of those with no debt were victims of one or more of the frauds we examined.  Participants who anticipated a large increase or decrease in their incomes in the next three years were much more likely to have been a victim, with more than 10 percent of these consumers reporting they had been a victim.  Participants who felt they had more debt than they could comfortably handle were even more likely to be victims, with 19.2 percent of this group indicating that they had been a victim of fraud.

One group that we anticipated might be at greater risk of being a victim was older Americans.  However, we find that consumers aged 65 or older did not face any greater risk than younger consumers.  When we look simply at the percentage of consumers in various age groups who were victims of fraud, we find that those who are 55 or over were significantly less likely to be a victim than those who are younger.  Once we control for other factors that we expect to affect the likelihood that a consumer will be a victim, we find that the risk of being a victim of fraud did not vary with age.

## Issues for Future Studies

As with any study, there are areas that could be improved.  One area for improvement is the estimation of total dollars lost as a result of fraud.  For several reasons, we concluded that we could not develop reliable estimates of total dollar losses in this survey.  Instead, we limited ourselves to providing median estimates of the costs associated with each of the ten specific types of fraud.

The primary problem we faced in estimating total costs was that the monetary losses reported by a handful of victims accounted for a very high proportion of the apparent total losses suffered by survey participants.  Specifically, the losses reported by six individuals accounted for almost half of the total losses reported by 320 fraud victims.  Given the relative magnitude of these six loss figures, and evidence we had of potential problems with some of those figures, we opted not to use these figures unless we could verify them.  Verification proved infeasible, however.  In any future survey work, it would be useful to include checks within the survey instrument to verify any values that seem unusually large.

Another problem with estimating total losses stemmed from the fact that the survey only asked victims how much they had paid as a result of each fraudulent transaction and how much they had lost.  In some instances, participants indicated that they had lost more than they had paid.  It is not clear what such responses mean.  In any future survey, it might be worthwhile to craft the questions more carefully to ensure that the responses provide exactly the information that the researchers hope to obtain.  It may also be useful to ask participants to verify their responses if the amount lost appears to be greater than the amount paid.

A final problem arose in cases where the survey participant had used a credit card to pay for a transaction that turned out to be fraudulent.  The survey asked consumers how much they paid as a result of the fraudulent transaction.  However, consumers who charge an item on a credit card and later dispute that charge with their credit card company may not ultimately pay for the transaction at all.  In such instances, it is not clear how the consumer answered the survey question about how much money they paid.  Some consumers may have reported the amount that appeared on their credit card statement, while others may have reported that they did not pay anything because they never actually paid that amount.  In any future study, it would be useful to be clear about how such transactions should be reported.

Another area for improvement in future studies involves the question about how consumers learned about the fraud to which they fell victim.  Our survey directed the person conducting the survey to read a list of possible sources of initial contact including "through an Internet auction site," "from an Internet web site, other than an auction site," "from an email," "from a telemarketer," and "from a television advertisement or infomercial."[230]  With one exception, the list

---

[230.] Survey question 62.

*Consumer Fraud in the United States: An FTC Survey*

was to be read in random order until the participant indicated that a particular response was how he or she learned about the fraud.

The exception was that "through an Internet web site, other than an auction site" always followed "from an Internet auction site." We adopted this rule because we were concerned that participants might not correctly distinguish between Internet auction sites and other Internet web sites unless we asked the questions in that order. However, the survey responses suggest that the opposite problem occurred in some instances – that is, that some consumers heard the word "Internet" in "from an Internet auction site" and answered in the affirmative even if it was a non-auction site.

To avoid this problem in future surveys, we recommend that the questions not initially attempt to differentiate between auction and non-auction sites, but instead include only "from the Internet" as an initial option. If participants select this option, a follow-up question could then ask whether this was from an Internet auction site, a non-auction site, or an email.

Finally, our results show the importance of asking specific questions about different types of fraud. Consumers are unlikely to provide a full picture of their experiences with fraud if they are asked only general questions about whether they have been a victim. On the other hand, to obtain reliable figures on the extent of fraud from specific questions, it is important to ask questions that cover the spectrum of the types of fraud of interest. The responses to our open-ended questions indicated some types of fraud that were not covered by our closed-ended questions – in particular, problems with solicitations by bogus charities. Furthermore, the questions should be sufficiently specific to enable researchers to differentiate between the types of fraud being studied and other incidents that survey participants may believe constitute fraud.

Implementing all of our suggestions into a single future survey is likely to be difficult. In addition, administering such a comprehensive survey may take more time than consumers are generally willing to give. Thus, rather than attempting to obtain an overall picture of the problem of consumer fraud, the better approach for future studies may be to focus on a subset of types of frauds. This approach would permit more detailed questions without rendering the survey so long that consumers will be unwilling to complete it.

*Appendix A:  The Survey Instrument*

# FTC NATIONAL SURVEY
## DRAFT 4c

*Project # 03151*                                             *May 20 - June 3, 2003*
*Public Opinion Strategies*                                   *N= 2,500 Adults*
*Alexandria, Virginia*                               *Margin of Error = ± 2.0%*

---

Hello, I'm _____ of _____, a national research firm.  We're talking with people around the country  today, and would like to ask you a few questions on a confidential basis.  We are not calling to sell anything nor will this call result in any future sales calls.  We are simply speaking to people for research purposes only.

A.     First, are you at least 18 years of age or older?

     1     YES **(CONTINUE TO QUESTION 1)**

     IF NO THEN ASK: May I please speak to someone in your household who is 18 years of age or older?

     **(REPEAT QUESTION A WITH NEW RESPONDENT)**

---

The first few questions are about some experiences you personally might have as a consumer...

1.     Have you, yourself, received a telemarketing phone call in the past year?

     1     YES
     2     NO
     3     DON'T KNOW/REFUSED **(DO NOT READ)**

---

*Consumer Fraud in the United States: An FTC Survey*

Now, please tell me whether, yes or no, you have done any of the following in the past YEAR.

In the past YEAR have you...**(RANDOMIZE AND INSERT Q2-Q6 STATEMENTS)**

| NO | YES ONCE | YES TWICE | YES THREE | YES FOUR | YES FIVE | YES ETC. | YES DK | (DNR) DK/REF |
|---|---|---|---|---|---|---|---|---|
| 0 | 1 | 2 | 3 | 4 | 5 | ETC. | 998 | 999 |

**(IF YES, ASK:)** And how many such (purchases/contributions) would you estimate that you have made in the last year? **(RECORD EXACT NUMBER)**

**(IF Q1:1, ASK Q2)**
2.      Purchased something in response to a telemarketing call from a company with whom you have not previously done business

**(IF Q1:1, ASK Q3)**
3.      *Contributed to a charity to which you have not previously donated in response to a telemarketing call.*

4.      Purchased something from an internet web site

5.      Placed an order for a product by phone, internet, or mail after seeing a television advertisement or infomercial

6.      Placed an order for a product by phone, internet, or mail after receiving an unsolicited piece of mail from a company with whom you have not previously done business

*Appendix A:  The Survey Instrument*

*Talking some more about the internet...*

7.  *Whether or not you use the internet,* how likely do you think it would be that your credit card information would be stolen and misused if you used your credit card to purchase something on the Internet or World Wide Web **(ROTATE TOP TO BOTTOM, BOTTOM TO TOP)** — very likely, somewhat likely, not very likely, or not likely at all?

|   |   |
|---|---|
| 1 | VERY LIKELY |
| 2 | SOMEWHAT LIKELY |
| 3 | NOT VERY LIKELY |
| 4 | NOT LIKELY AT ALL |
| 5 | DON'T KNOW/REFUSED **(DO NOT READ)** |

*Now, moving on...*

8.  In general, thinking about how your close friends or family would be most likely to describe the way you deal with people you do NOT know, would they be more likely to describe you as being... **(ROTATE PUNCHES 1-2)**

|   |   |
|---|---|
| 1 | Trusting and Friendly |
|   | ...or... |
| 2 | Cautious and Suspicious |
| 3 | BOTH **(DO NOT READ)** |
| 4 | NEITHER **(DO NOT READ)** |
| 5 | DON'T KNOW/REFUSED **(DO NOT READ)** |

*Consumer Fraud in the United States: An FTC Survey*

9.      Now, thinking about YOUR experiences as a consumer, was there ever a time you felt you were the subject of a consumer fraud?

    1       YES
    2       NO
    3       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q9:1, ASK)**

10.     When was the last time this happened?  **(DO NOT READ LIST, OPEN-END PRE-CODE)**

    1       During the past year
    2       One to two years ago
    3       Two to three years ago
    4       Three to five years ago
    5       More than five years ago
    6       DON'T KNOW/REFUSED

---

*(IF Q9:1, ASK)*
**(ASK SAMPLE A)**

11.     Can you BRIEFLY tell me what kind of fraud it was? And can you tell me anything else you can think of that is important about that experience?

**RECORD RESPONSE VERBATIM**

---

**(ASK SAMPLE A)**

12.     Now if you learned there was a federal government web site or a toll free number that provides consumers with information on how to recognize and avoid fraudulent or deceptive offers and how to avoid becoming a victim of identity theft...How likely would you be to visit this web site or call the toll free number? Would you be...**(ROTATE TOP TO BOTTOM, BOTTOM TO TOP)**

        1       VERY LIKELY
        2       SOMEWHAT LIKELY
        3       NOT TOO LIKELY
        4       NOT LIKELY AT ALL

        ...to visit this website or call the toll free number?

        5       DON'T KNOW/REFUSED **(DO NOT READ)**

*Consumer Fraud in the United States: An FTC Survey*

Now we would like to ask you about some types of fraud that happen to consumers.  Since there are a lot of ways in which a consumer might be cheated or be a victim of fraud, I am going to read you descriptions of some ways in which consumers are sometimes cheated or become victims of fraud.  Please tell me which of these things, if any, have happened to YOU in the past YEAR.

**(RANDOMIZE AS BLOCKS: Q13-Q17, Q18-Q30, Q31-Q38, AND Q39-Q44)**

In the past YEAR, have you paid money to anyone who promised or guaranteed...**(RANDOMIZE)**

**(IF YES, ASK:)**  How many times has this happened to you in the past year?

| **YES ONCE** | **YES TWICE** | **YES THREE** | **YES FOUR+** | **YES DK** | **NO** | **(DNR) DK/REF** |
|---|---|---|---|---|---|---|
| **1** | **2** | **3** | **4** | **5** | **6** | **7** |

13.  To remove negative, but true, information from your credit record, but failed to get the information removed

14.  To provide information to help you create a new identity or new credit record

15.  To provide insurance to protect you against the unauthorized use of your credit cards

16.  To provide you with a credit card or loan, other than a mortgage loan, but required you pay a fee before receiving the credit card or loan
     **(IF Q16:1-5, ASK Q17 BEFORE CONTINUING WITH REST OF SERIES)**

---

**(IF Q16:1-5, ASK)**
**(IF Q16:2-5,  READ:)** Thinking now about the most recent time this happened to you...

17.  Did you actually receive the promised loan or credit card?

     1     YES
     2     NO
     3     DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(RANDOMIZE AS BLOCKS: Q13-Q17, Q18-Q30, Q31-Q38, AND Q39-Q44)**

18.     In the past year, have you been billed for a product or service which you did not agree to
        purchase or were you billed for an amount that was substantially more than you expected to pay?

        1       YES
        2       NO **(SKIP TO Q26)**
        3       DON'T KNOW/REFUSED **(DO NOT READ)(SKIP TO Q26)**

---

**(IF Q18:1, ASK Q19-Q22)**

        Did you have this experience while purchasing...**(RANDOMIZE Q19-Q22)**

        **(IF YES, ASK:)**  How many times has this happened to you in the past year?

        **(WHEN RETURNING TO Q19-Q22 FROM Q23-Q27 PROMPT:** "Thinking again about
        being billed for a product or service which you did not agree to purchase or being billed for an
        amount that was substantially more than you expected to pay..."**)**

| YES | YES | YES | YES | YES | | (DNR) |
|-----|-----|-------|------|-----|----|--------|
| ONCE | TWICE | THREE | FOUR+ | DK | NO | DK/REF |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |

19.     Internet-related services, such as internet access or a web-site **(IF Q19:1-5 ASK Q26 & Q27
        BEFORE CONTINUING WITH REST OF SERIES)**

20.     900 number pay per call or internet information services, such as adult entertainment, gambling
        or psychic services **(IF Q20:1-5 ASK Q26 & Q27 AFTER BEFORE CONTINUING WITH
        REST OF SERIES)**

21.     A publication or membership in a club that the seller told you would allow you to purchase
        something for a lower price than is generally available
        **(IF Q21:1-5, ASK Q24-Q27 BEFORE CONTINUING WITH REST OF SERIES)**

**(ALWAYS ASK LAST)**
22.     Some other product or service

---

*Consumer Fraud in the United States: An FTC Survey*

**(IF Q22:1-5, ASK:)**
**(IF Q22:2-5, READ:)** Thinking now about the most recent time this happened to you...

23.     What was the product or service?

### RECORD VERBATIM RESPONSES

---

**(IF Q21:1-5, ASK)**
**(IF Q21:2-5, READ)** Thinking now about the most recent time this happened to you...

24.     Did the membership or the information in the publication enable you to purchase something for a lower price as you had been promised?

     1     YES
     2     NO
     3     DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q21:1-5, ASK)**
25.     And what kinds of products were you supposed to be able to purchase at a reduced price?
        **(DO NOT READ)(OPEN-END PRE-CODE)**

     1     Automobiles that had been seized by the government or had been repossessed.
     2     Houses where the owner had fallen behind on their mortgage payments and the mortgage holder had foreclosed
     3     Travel services
     4     Medical goods and services, such as dental care, eye care, or prescription drugs
     5     Entertainment, such as restaurant meals or movie tickets
     6     General Merchandise, like food or household products
     7     OTHER **(SPECIFY)** _____
     8     Don't know/refused

---

*Appendix A:  The Survey Instrument*

**(IF Q19:1-5, Q20:1-5, Q21:1-5 OR Q22:1-5, ASK)**
**(IF Q19:2-5 OR Q20:2-5, READ:)** Thinking now about the most recent time this happened to you...

26.     Did you try to get the seller to give you a refund or otherwise make an adjustment?

        1       YES
        2       NO
        3       DON'T KNOW/REFUSED **(DO NOT READ)**

_____

**(IF Q26:1, ASK)**
27.     And was the seller willing to provide a refund, or otherwise make an adjustment that satisfied you?

        1       YES
        2       NO
        3       DON'T KNOW/REFUSED **(DO NOT READ)**

_____

SJX28 - 150

*Consumer Fraud in the United States: An FTC Survey*

28.     And in the past year, has your long distance telephone service been switched to another company without your knowledge or consent?

     1     YES
     2     NO
     3     DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q28:1, ASK:)**
29.     How many times has this happened to you in the past year?

     1     ONCE
     2     TWICE
     3     THREE TIMES
     4     FOUR OR MORE TIMES
     5     DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q28:1, ASK:)**
**(IF Q29:2-5, READ:)** Thinking now about the most recent time this happened to you...
30.     Was the first time you found out about this when you received a bill?

     1     YES
     2     NO
     3     DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(RANDOMIZE AS BLOCKS: Q13-Q17, Q18-Q30, Q31-Q38, AND Q39-Q44)**

In the past year, have you paid anyone...**(RANDOMIZE)**

**(IF YES, ASK:)**  How many times has this happened to you in the past year?

| YES ONCE | YES TWICE | YES THREE | YES FOUR+ | YES DK | NO | (DNR) DK/REF |
|----------|-----------|-----------|-----------|--------|-----|--------------|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |

31.  For an opportunity to operate your own business, such as a work-at-home plan, a business opportunity or a franchise?
     **(IF Q31:1-5, ASK Q33-Q37 BEFORE CONTINUING WITH REST OF SERIES)**

32.  Who promised that you would obtain a job at the U.S. Postal Service or another branch of state or federal government?
     **(IF Q32:1-5, ASK Q38 BEFORE CONTINUING WITH SERIES)**

---

**(IF Q31:1-5, ASK)**
**(IF Q31:2-5, READ:)** Thinking now about the most recent time this happened to you...

33.  Were you led to believe that most of the money you earned from this business would be from recruiting others to join the business, rather than from the sale of products?

     1     YES
     2     NO
     3     DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q31:1-5, ASK)**
34.  And was the business to be operated out of your home?

     1     YES
     2     NO
     3     DON'T KNOW/REFUSED **(DO NOT READ)**

---

*Consumer Fraud in the United States: An FTC Survey*

**(IF Q31:1-5, ASK)**

35.    Were you led to believe that you would earn a certain amount of income or profit from this business?

   **(IF YES ASK:)** Did you earn at least roughly as much money as you had been led to expect?

   1    YES - Promised level of earnings was realized
   2    YES - Promised level of earnings was NOT realized
   3    NO
   4    DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q31:1-5, ASK)**

36.    Were you promised help in locating customers who would use your services or allow you to sell your products from their premises?

   **(IF YES ASK:)**  Did you obtain the promised assistance?

   1    YES - Promised assistance was provided
   2    YES - Promised assistance was NOT provided
   3    NO
   4    DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q35:2 OR Q36:2, ASK:)**

37.    And how many months ago did you purchase this business?

   _____    **RECORD NUMBER OF MONTHS**

---

**(IF Q32:1-5, ASK)**
**(IF Q32:2-5, READ:)** Thinking now about the most recent time this happened to you...

38.    Did you get the job that was promised?

   1    YES
   2    NO
   3    DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(RANDOMIZE AS BLOCKS: Q13-Q17, Q18-Q30, Q31-Q38, AND Q39-Q44)**

39.     In the past year, has anyone told you that you had won a prize or been selected to receive an award such as money, a free vacation, or other product or service?

    1       YES
    2       NO
    3       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q39:1, ASK:)**
40.     Were you told that you had to pay something, purchase a good or service, or attend a sales presentation in order to receive your prize or award?

    1       YES
    2       NO
    3       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q40:1, ASK:)**
41.     Did you make the required payment or purchase or did you attend the required sales presentation?

    1       YES
    2       NO
    3       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q41:1, ASK:)**
42.     How many times has this happened to you in the past year?

    1       ONCE
    2       TWICE
    3       THREE TIMES
    4       FOUR OR MORE TIMES
    5       DON'T KNOW/REFUSED **(DO NOT READ)**

---

*Consumer Fraud in the United States: An FTC Survey*

**(IF Q41:1, ASK)**
**(IF Q42:2-5, READ:)** Thinking now about the most recent time this happened to you...
43.      Did you ever receive the prize or award?

        1       YES
        2       NO
        3       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q43:1, ASK)**
44.      And was the prize or award essentially what had been described to you?

        1       YES
        2       NO
        3       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(ROTATE AS A BLOCK Q45-Q49 WITH Q50-Q55)**
45.     Other than the things we have already discussed, in the past year have you purchased something which you paid for but NEVER received?

          1       YES
          2       NO
          3       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q45:1, ASK:)**
46.     How many times has this happened to you in the past year?

          1       ONCE
          2       TWICE
          3       THREE TIMES
          4       FOUR OR MORE TIMES
          5       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q45:1, ASK)**
**(IF Q46:2-5, READ:)** Thinking now about the most recent time this happened to you...
47.     Did you try to get the seller to give you a refund or otherwise make an adjustment?

          1       YES
          2       NO
          3       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q47:1, ASK)**
48.     And was the seller willing to provide a refund or otherwise make an adjustment that satisfied you?

          1       YES
          2       NO
          3       DON'T KNOW/REFUSED **(DO NOT READ)**

---

*Consumer Fraud in the United States: An FTC Survey*

**(IF Q45:1, ASK:)**
49.    What was the item that you purchased?  **(DO NOT READ LIST)(OPEN-END PRE-CODE)**

    1      Business opportunities / franchises / distributorships / work-at-home plans
    2      Buyers clubs
    3      Cameras (including digital cameras and camcorders)
    4      CDs / video tapes / DVDs
    5      Computers: equipment or software
    6      Health care products and services
    7      Information such as psychic or adult entertainment services delivered over the internet
    8      Internet access services
    9      Internet web site design / advertising on the internet
    10     Investments
    11     Magazines
    12     Office supplies
    13     Pay-per-call and information services such as adult entertainment, gambling or psychic services delivered over the telephone or internet
    14     Real estate (including timeshares)
    15     Travel services / vacations
    16     Other **(SPECIFY)** _____
    17     DON'T KNOW/REFUSED

**(ROTATE AS A BLOCK Q45-Q49 WITH Q50-Q55)**

50.   Other than the things we have already discussed, in the past year have you purchased something where the item you received turned out to be of substantially lower quality than what was originally represented to you?

    1      YES
    2      NO
    3      DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q50:1, ASK:)**
51.   How many times has this happened to you in the past year?

    1      ONCE
    2      TWICE
    3      THREE TIMES
    4      FOUR OR MORE TIMES
    5      DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q50:1, ASK:)**
**(IF Q51:2-5, READ:)** Thinking now about the most recent time this happened to you...

52.   Did you try to return the item or seek to get the seller to make some other kind of an adjustment?

    1      YES
    2      NO
    3      DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q52:1, ASK)**
53.   And was the seller willing to take the item back or otherwise make an adjustment that satisfied you?

    1      YES
    2      NO
    3      DON'T KNOW/REFUSED **(DO NOT READ)**

---

*Consumer Fraud in the United States: An FTC Survey*

**(IF Q50:1, ASK)**

54.     What was the item that you purchased?  **(DO NOT READ LIST) (OPEN-END PRE-CODE)**

1       Business opportunities / franchises / distributorships / work-at-home plans
2       Buyers clubs
3       Cameras (including digital cameras and camcorders)
4       CDs / video tapes / DVDs
5       Computers: equipment or software
6       Health care products and services
7       Information such as psychic or adult entertainment services delivered over the internet
8       Internet access services
9       Internet web site design / advertising on the internet
10      Investments
11      Magazines
12      Office supplies
13      Pay-per-call and information services such as adult entertainment, gambling or psychic services delivered over the telephone or internet
14      Real estate (including timeshares)
15      Travel services / vacations
16      Other **(SPECIFY)** _____
17      DON'T KNOW/REFUSED

**(IF Q54:1-16, ASK)**

55.     Could you please briefly describe how the item differed from what you expected?

**RECORD RESPONSE VERBATIM**

56.   In the past year, has anyone misused your credit card or credit card number to place charges on your account without your permission?

  1   YES
  2   NO
  3   DON'T KNOW/REFUSED **(DO NOT READ)**

---

57.   In the past year, has anyone misused any of your existing accounts other than a credit card account – for example, a bank or wireless telephone account – without your permission to run up charges or to take money from your accounts?

  1   YES
  2   NO
  3   DON'T KNOW/REFUSED **(DO NOT READ)**

---

58.   In the past year, have you been the victim of an Identity Theft that involved more than just the misuse of existing accounts or numbers?  That is, has anyone used your personal information without your permission to obtain new credit cards or loans in your name, to run up debts in your name, open other accounts, or otherwise commit theft, fraud, or some other crime?

  1   YES
  2   NO
  3   DON'T KNOW/REFUSED **(DO NOT READ)**

---

SJX28 - 160

*Consumer Fraud in the United States: An FTC Survey*

59.     Now, we've been talking about some SPECIFIC ways in which you might have been cheated or defrauded in the last year.  Now I'd like to know if there were any other occasions in the past year that you felt a person or company cheated you out of money or property?

    1       YES
    2       NO
    3       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q59:1, ASK:)**
60.     How many times has this happened to you in the past year?

    1       ONCE
    2       TWICE
    3       THREE TIMES
    4       FOUR OR MORE TIMES
    5       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q59:1, ASK)**
**(IF Q60:2-5, READ:)** Thinking now about the most recent time this happened to you...

61.     Can you briefly tell me what happened?  And can you tell me anything else you can think of that is important about that experience?

**RECORD RESPONSE VERBATIM**

---

**GENERAL FOLLOW-UP QUESTIONS (Q62-Q70) ARE TO BE ASKED AFTER EACH INSTANCE OF FRAUD REPORTED BY A RESPONDENT IN Q19-Q53**

**(IF Q13:1-5, Q14:1-5, Q15:1-5, Q16:1-5, Q19:1-5, Q20:1-5, Q21:1-5, Q22:1-5, (Q33:1 OR Q35:2 OR Q36:2), Q38:2, (Q43:2 OR Q44:2), Q48:2, Q53:2, ASK:)**

62.   How did you first learn about [Insert language describing the product or service involved in the fraud]?  **(RANDOMIZE, EXCEPT PUNCH 2 MUST FOLLOW PUNCH 1)**

1       through an internet auction site
2       from an internet web site, other than an auction site
3       from an email
4       from a television advertisement or infomercial
5       from a mail advertisement or solicitation, including from a catalog
6       from a telemarketer
7       from a store you visited
8       from someone who came to your home
9       from a radio advertisement
10      from a poster or flier
11      from a magazine or newspaper advertisement
12      when you received the bill

13      other **(SPECIFY)** _____
14      DON'T KNOW/REFUSED **(DO NOT READ)**

*Consumer Fraud in the United States: An FTC Survey*

**(IF Q13:1-5 OR Q14:1-5 OR Q15:1-5 OR Q16:1-5 OR Q19:1-5 OR Q20:1-5 OR Q21:1-5 OR Q22:1-5 OR (Q33:1 OR Q35:2 OR Q36:2) OR Q38:2 OR Q48:2 OR Q53:2, ASK:)**
**(DO NOT ASK IF Q62:12)**

63.     And how did you purchase this product **(RANDOMIZE)**?

        1       VISITED A STORE
        2       ORDERED ON THE TELEPHONE
        3       MAILED IN AN ORDER
        4       ORDERED FROM INTERNET SITE
        5       OTHER **(SPECIFY)** _____
        6       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q13:1-5, Q14:1-5, Q15:1-5, Q16:1-5, Q19:1-5, Q20:1-5, Q21:1-5, Q22:1-5, Q28:1, (Q33:1 OR Q35:2 OR Q36:2), Q38:2, (Q43:2 OR Q44:2), Q48:2, Q53:2, ASK:)**

64.     How much money did you pay or lose as a result of the person or company who defrauded you?

        PAID _____ **(RECORD EXACT AMOUNT, 9999999 FOR DK/REF)**
        LOST _____ **(RECORD EXACT AMOUNT, 9999999 FOR DK/REF)**

---

**(IF PAID MONEY ON Q64, ASK)**

65.     And how did you pay for this transaction?

        1       Credit Card
        2       Cash
        3       Check
        4       On-line payment system like PayPal,
        5       Seller took money directly from my checking account
        6       Charged to my telephone bill
        7       Other **SPECIFY)** _____
        8       DON'T KNOW/REFUSED **(DO NOT READ)**

---

SJX28 - 163

*Appendix A:  The Survey Instrument*

**(IF Q13:1-5, Q14:1-5, Q15:1-5, Q16:1-5, Q19:1-5, Q20:1-5, Q21:1-5, Q22:1-5, Q28:1, (Q33:1 OR Q35:2 OR Q36:2), Q38:2, (Q43:2 OR Q44:2), Q48:2, Q53:2, ASK:)**

66.     What actions, if any, did you take in attempting to resolve this incident?**(DO NOT READ, OPEN-END PRE-CODE) (PROBE FOR MULTIPLE RESPONSES by following up with "Anything else?")**

1      Did nothing
2      Asked for a refund or replacement
3      Stopped payment or refused to pay
4      Stopped buying from the company
5      Consulted a lawyer or other professional
6      Complained to family or friends / told family or friends not to buy from the seller
7      Complained to salesperson, manager or owner of the company that sold the product
8      Complained to the product manufacturer
9      Complained to the Better Business Bureau
10     Complained to a bank
11     Complained to a credit card company
12     Complained to a local consumer agency
13     Complained to the local police department
14     Complained to the Department of Motor Vehicles
15     Complained to a local consumer help line
16     Complained to the state Attorney General or state consumer agency
17     Complained to the FTC (Federal Trade Commission)
18     Complained to another federal agency (**SPECIFY**) _____
19     Complained to the phone company
20     Other **(SPECIFY)** _____
21     DON'T KNOW/REFUSED

SJX28 - 164

*Consumer Fraud in the United States: An FTC Survey*

**(IF Q66:1-6, 20-21 ONLY, ASK)**
67.    And, did you report your experience to anyone?

      1      YES
      2      NO
      3      DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q67:1, ASK)**
68.    To whom did you report your experience?
        **(DO NOT READ OPEN-END PRE-CODE) (PROBE FOR MULTIPLE RESPONSES by following up with "Anything else?")**

      6      Family or friends / tell family or friends not to buy from the seller
      7      Salesperson, manager or owner of the company that sold the product
      8      The product manufacturer
      9      The Better Business Bureau
      10    A bank
      11    A credit card company
      12    A local consumer agency
      13    The local police department
      14    The Department of Motor Vehicles
      15    A local consumer help line
      16    The state Attorney General or state consumer agency
      17    The FTC
      18    Another federal agency **(SPECIFY)** _____
      19    Complained to the phone company
      20    Other **(SPECIFY)** _____
      21    DON'T KNOW/REFUSED

---

**(IF Q66:7-19 OR Q68:7-20, ASK)**

69.     How satisfied were you with the result of your report of your experience with **(INSERT FIRST PUNCH FROM Q66 OR Q68)**?...**(ROTATE TOP TO BOTTOM, BOTTOM TO TOP)** — Very Satisfied, Somewhat Satisfied, Not Too Satisfied, or Not at all satisfied?

        1       VERY SATISFIED
        2       SOMEWHAT SATISFIED
        3       NOT TOO SATISFIED
        4       NOT AT ALL SATISFIED
        5       DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF MORE THAN ONE PUNCH ON Q66:7-19 OR Q68:7-20, ASK)**

70.     How satisfied were you with the result of your report of your experience with **(INSERT SECOND PUNCH FROM Q66 OR Q68)**?...**(ROTATE TOP TO BOTTOM, BOTTOM TO TOP)** — Very Satisfied, Somewhat Satisfied, Not Too Satisfied, or Not at all satisfied?

        1       VERY SATISFIED
        2       SOMEWHAT SATISFIED
        3       NOT TOO SATISFIED
        4       NOT AT ALL SATISFIED
        5       DON'T KNOW/REFUSED **(DO NOT READ)**

---

*Consumer Fraud in the United States: An FTC Survey*

**(ASK SAMPLE B)**

71.     Now if you learned there was a federal government web site or a toll free number that provides consumers with information on how to recognize and avoid fraudulent or deceptive offers and how to avoid becoming a victim of identity theft...How likely would you be to visit this web site or call the toll free number? Would you be...**(ROTATE TOP TO BOTTOM, BOTTOM TO TOP)**

        1        VERY LIKELY
        2        SOMEWHAT LIKELY
        3        NOT TOO LIKELY
        4        NOT LIKELY AT ALL

        ...to visit this website or call the toll free number?

        5        DON'T KNOW/REFUSED **(DO NOT READ)**

Changing Topics and thinking some more about you...

72.    Do you ever go online to access the Internet or World Wide Web or to send and receive e-mail?

     1     YES
     2     NO
     3     DON'T KNOW/REFUSED **(DO NOT READ)**

---

**(IF Q72:1, ASK)**
73.    How many hours EACH WEEK *in total* would you say you spend on the Internet either at work OR at home ?

     **RECORD EXACT NUMBER OF HOURS, ENTER 999 FOR DK/REF**

---

And for statistical purposes only...

74.    In what year were you born?

    \_\_\_\_  \_\_\_\_  \_\_\_\_  \_\_\_\_  **(9999 = DK/REFUSED)**

---

75.    Are you married, widowed, separated, divorced or have you never been married?

     1     MARRIED
     2     WIDOWED
     3     SEPARATED
     4     DIVORCED
     5     NEVER BEEN MARRIED
     6     NOT SURE/REFUSED **(DO NOT READ)**

---

*Consumer Fraud in the United States: An FTC Survey*

76.   And what was the last grade you completed in school?  **(DO NOT READ CATEGORIES)**

    1       SOME GRADE SCHOOL (1-8)
    2       SOME HIGH SCHOOL (9-11)
    3       GRADUATED HIGH SCHOOL (completed 9-12)
    4       TECHNICAL OR VOCATIONAL SCHOOL (12)
    5       SOME COLLEGE (13-15)
    6       GRADUATED COLLEGE (16)
    7       GRADUATE/PROFESSIONAL SCHOOL (16+)

    8       REFUSED (**DO NOT READ**)

---

77.   Have you or anyone in your household served or are you or a household member currently serving in *the United* States military? **(DO NOT READ LIST, ACCEPT MULTIPLE PUNCHES)**

    1       YES SELF CURRENTLY
    2       YES HH MEMBER CURRENTLY
    3       YES SELF PAST
    4       YES HH MEMBER PAST
    5       NO
    6       DON'T KNOW
    7       REFUSED

---

78.   Other than English, what other languages, if any, are spoken in your home? **(DO NOT READ)**

    1       SPANISH
    2       CHINESE/MANDARIN
    3       JAPANESE
    4       FRENCH
    5       HINDI
    6       OTHER **(SPECIFY)** _____
    7       DO NOT KNOW/REFUSED **(DO NOT READ)**

---

79.     And for statistical purposes only...is your total annual HOUSEHOLD income greater or less than $60,000 dollars?

        **(IF LESS THAN $60,000, ASK:)** Is it...
        **(ROTATE FROM TOP TO BOTTOM/BOTTOM TO TOP)**
        1       UNDER $20,000
        2       BETWEEN $20,000 - $40,000
        3       OVER $40,000

        **(IF GREATER THAN $60,000, ASK:)** Is it...
        **(ROTATE FROM TOP TO BOTTOM/BOTTOM TO TOP)**
        4       UNDER $80,000
        5       BETWEEN $80,000 - $100,000
        6       OVER $100,000

        7       REFUSED (**DO NOT READ**)

80.     Thinking ahead to three years from now, how do you think your income will compare to your income today?  Do you think it will be **(ROTATE TOP TO BOTTOM, BOTTOM TO TOP)**...?

        1       MUCH LOWER
        2       SLIGHTLY LOWER
        3       ABOUT THE SAME
        4       SLIGHTLY HIGHER
        5       MUCH HIGHER
        6       DON'T KNOW/REFUSED (**DO NOT READ**)

*Consumer Fraud in the United States: An FTC Survey*

81.    And thinking for a moment about your personal debt on which you currently make interest payments.  I am talking about your debts you partially pay-off each month for things like mortgages, credit cards, personal loans or car loans.  Would you say the amount of debt you currently have is...**(DO NOT ROTATE)**

       1        More than you can handle financially
       2        About as much as you can handle financially
                ...or...
       3        You could handle more debt than you currently have
       4        Do not have any personal debt **(DO NOT READ)**
       5        DON'T KNOW/REFUSED **(DO NOT READ)**

---

82.    Do you personally or jointly own any stock market investments, such as stocks, bonds, mutual funds, or have a retirement account, such as a 401K (FOUR-O-ONE-K) or other pension plan?

       1        YES
       2        NO
       3        DON'T KNOW/REFUSED **(DO NOT READ)**

---

83.    What would be your estimate of the total value of your household's savings and investments.  By savings and investments I mean things such as savings and money market accounts, stocks, bonds, mutual funds, government securities, CDs, bank accounts, IRAs, Keoghs, (KEY OHS) 401Ks (FOUR-O-ONE KS) and 403bs (FOUR-O-THREE-BEES).  Please do NOT include in your answer any real estate investments or company-sponsored pension plans that are fully funded by your employer.  Would you say that your total investments are...**(READ LIST)**

       1        Zero
       2        Less than $5,000
       3        Between $5,000 and $25,000
       4        Between  $25,000 and $50,000
       5        Between $50,000 and $100,000
                ...OR...
       6        More than $100,000

       7        REFUSED **(DO NOT READ)**

---

83b.   Do you rent or own the home where you currently live?

       1        RENT
       2        OWN
       3        DON'T KNOW/REFUSED **(DO NOT READ)**

---

*Appendix A:  The Survey Instrument*

84.   Are you of Hispanic or Latino origin

    1     YES
    2     NO
    3     DON'T KNOW/REFUSED

85.   I am going to read a list of racial categories.  Please choose one or more categories that best indicates your race.  Are you?

    1     WHITE
    2     BLACK OR AFRICAN AMERICAN
    3     AMERICAN INDIAN OR ALASKA NATIVE
    4     ASIAN
    5     NATIVE HAWAIIAN OR OTHER PACIFIC ISLANDER
    6     OTHER **(DO NOT READ)**
    7     DON'T KNOW/REFUSED **(DO NOT READ)**

*Consumer Fraud in the United States: An FTC Survey*

86.     Gender **(BY OBSERVATION, BUT ASK EVERYONE)** Are you employed outside of the home, are you a homemaker, or are you retired?

   **(IF EMPLOYED OUTSIDE THE HOME, ASK:)** And, are you paid on an hourly basis or do you draw a yearly salary?

   1       MALE/EMPLOYED/HOURLY
   2       MALE/EMPLOYED/SALARY
   3       MALE/HOMEMAKER
   4       MALE/RETIRED
   5       MALE/NOT IN LABOR FORCE

   6       FEMALE/EMPLOYED/HOURLY
   7       FEMALE/EMPLOYED/SALARY
   8       FEMALE/HOMEMAKER
   9       FEMALE/RETIRED
   10      FEMALE/NOT IN LABOR FORCE

   11      MALE REFUSED **(DO NOT READ)**
   12      FEMALE REFUSED **(DO NOT READ)**

---

This survey was sponsored by the Federal Trade Commission (FTC).  The FTC works for the consumer to prevent fraudulent, deceptive and unfair business practices in the marketplace and to provide information to help consumers spot, stop and avoid them. You can file a complaint or get free information on consumer issues – including telemarketing, identity theft or Internet fraud -- from the FTC by visiting *WWW-DOT-FTC-DOT-GOV* or calling toll-free, 1-877-FTC-HELP.

**(IF Q79:7 OR Q83:7 SAY)**
Now that you know the sponsor of this survey, would you NOW be willing to answer a question or two that you initially did not answer?  **(IF YES ASK Q79 OR Q83 AGAIN)**

FRAUD DEFINITION
**(IF Q13:1-5, Q14:1-5, Q15:1-5, Q16:1-5, Q19:1-5, Q20:1-5, Q21:1-5, Q22:1-5, Q28:1, (Q33:1 OR Q35:2 OR Q36:2), Q38:2, (Q43:2 OR Q44:2), Q48:2, Q53:2, ASK:)**



SJX28   174

# ATTACHMENT B

# Aries Systems Corporation

# Editorial Manager

Editorial Manager® is the industry leading, cloud-based manuscript submission and peer-review tracking system for scholarly journals, reference works, books and other publications.

## Core Functionality

Editorial Manager® users are authors, editors, and reviewers. Authors submit  manuscript files and metadata, as well as act on revision requests. Editors use the system to review submissions, assign to reviewers, and make and communicate decisions to accept, revise, transfer or reject manuscripts. Reviewers are invited to work on manuscripts, can accept or reject assignments, flag their own availability and specialties  for editors,  and perform and submit all review tasks right in the system.

## Publishers

Editorial Manager adopters include: Wolters Kluwer, Springer Nature, BMC, Geological Society of America, American Psychological Association, Endocrine Society, Wiley-VCH, Brill, Taylor & Francis, University of Chicago Press, American Association for the Advancement of Science, American Society of Civil Engineers, PLOS, the American Meteorological Society, Microbiology Society, and hundreds more.

## Users of Editorial Manager benefit from:

- Easy manuscript submission allowing for the capture of manuscript metadata, forms, and files

- Reviewers  can accept or decline assignments, without even logging in, via secure deep links

- Similarity Check, and Artwork Quality Check options instantly surface information useful to editors

- Automatically link submitted references to CrossRef® and PubMed, and reformat to journal style

- Save time in the reviewer discovery process with ProQuest's Pivot™ database integrated into Editorial Manager

- Conveniently transfer rejected manuscripts and associated reviewer comments to collaborating journals

- Enterprise Analytics Reporting offers quick visualization of key data such as submitting authors by region or country

- Easily ingest manuscripts from third party services such as Editage, Overleaf (https://www.ariessys.com/views-press/press-releases/overleafpr/)and ManuscriptsApp

- Export accepted manuscripts and data to downstream production systems like ProduXion Manager

- Manage user permissions by configuring roles for Editors-in-Chief, Managing Editors, Editorial Assistants and administrators

- Open Access fee processing using RightsLink and other eCommerce platforms

- Integration with standards such as ORCID, Ringgold, FundRef, JATS and CRediT

- Personalized client service. Support centers in UK, Germany, Japan and US

- Participation in an active and engaged user community. Three user group meetings per year, listserv and weekly webinars

- Free functionality upgrades featured in 2-3 new releases per year

## PRODUCT TOOLBOX

**Download Product Sheet**

## RESOURCES & LINKS

**Solutions**

**Testimonials**

## SUBSCRIBE TO OUR NEWSLETTER

**Sign Up to Stay Informed**

 (https://www.ariessys.com/views-and-

press/resources/video-library/editorial-manager-overview/)

# Introductory Video

View Video Library   (https://www.ariessys.com/views-and-press/resources/video-library/editorial-manager-overview/)

SJX28 - 178

Case 2:16-cv-02022-GMN-VCF   Document 97-1   Filed 05/22/18   Page 179 of 180

# Client Services

Rather than dealing with an anonymous help desk, each publication is assigned a nominated Account Coordinator. This means that your support contact has a deep understanding of your particular workflows and needs. Client Services teams operate from multiple global locations, including USA, UK, Germany and Japan. Support is provided by telephone, e-mail, instant message and WebEx; and professionally managed using a state-of-the-art CRM system (NetSuite). Publications are encouraged to participate in Client Services' regular webinars, user community listserv, and three annual user group meetings (Boston, Tokyo and London). Curious what other customers are saying? (https://www.ariessys.com/about/testimonials/)

Read more about Client Services   (https://www.ariessys.com/software/client-services/)

# Frequently Asked Questions



Typical questions asked by prospective customers.

Learn More   (/views-press/faqs)

SJX28 - 179

Case 2:16-cv-02022-GMN-VCF   Document 97-1   Filed 05/22/18   Page 180 of 180

 # Looking for more information?

We're happy to answer questions and provide free demonstrations.

Request a Demo   (https://www.ariessys.com/request-a-demo/)

© 2018 Aries Systems Corporation. Editorial Manager,
ProduXion Manager, and Commerce Manager are trademarks
and the property of Aries Systems Corporation. All Rights
Reserved. Subject to change without notice from or liability to
Aries Systems Corporation. Privacy Policy
(https://www.ariessys.com/about/privacy-policy/).

Japanese Version (https://www.editorialmanager.jp)

(https://www.linke
systems-
corporation): (https:

SJX28 - 180