D. NEAL TOMLINSON
Nevada Bar No. 06851
neal@hyperionlegal.com
KRISTINA R. KLEIST
Nevada Bar No. 13520
kristina@hyperionlegal.com
Hyperion Advisors
3960 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
Telephone: (702) 990-3901
Fax: (702) 999-3501

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | Case No. 2:16-cv-02022-GMN-VCF |
| Plaintiff, | |
| v. | **DEFENDANTS' OPPOSITION TO FTC'S MOTION FOR SUMMARY JUDGMENT** |
| OMICS GROUP INC., et al., | |
| Defendants. | |

Defendants, OMICS GROUP INC. ("OMICS"), IMEDPUB LLC ("iMedPub"), CONFERENCE SERIES LLC ("Conference Series"), and SRINUBABU GEDELA ("Dr. Gedela"), by and through their counsel of record D. Neal Tomlinson, Esq. and Kristina R. Kleist, Esq., of the law firm Hyperion Advisors, hereby oppose Plaintiff's Motion for Summary Judgment (Dkt. No. 86).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1    This Opposition is made pursuant to Fed. R. Civ. P. 56 and is based on the attached

2  Memorandum of Points and Authorities, the papers and pleadings on file in this action, and any

3  oral argument this Court may consider.

4          DATED this 22nd day of June, 2018.

5                                             Respectfully submitted,

6

7                                             HYPERION ADVISORS

8                                             /s/ D. Neal Tomlinson
                                              D. NEAL TOMLINSON
9                                             Nevada Bar No. 06851
                                              KRISTINA R. KLEIST
10                                            Nevada Bar No. 13520
                                              3960 Howard Hughes Parkway, Suite 500
11                                            Las Vegas, Nevada 89169

12                                            *Attorneys for Defendants*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................5

II.     STATEMENT OF DISPUTED FACTS ................................................................8
        A.   FACTUAL BACKGROUND ..............................................................................................8
        B.   STATEMENT OF FACTS ...............................................................................................11
        C.   THE FTC IS BEING MISLED BY FAKE NEWS BLOG.....................................................13
        D.   DEFENDANTS DO NOT MAKE MATERIAL MISREPRESENTATIONS TO INDUCE CUSTOMERS TO SUBMIT THEIR ARTICLES TO THEIR JOURNALS .................................................................................................14
             i.    Defendants do not Misrepresent Their Peer Review Practices .............................15
             ii.   Defendants do not Misrepresent the Review and Editing of Their Journals ........15
             iii.  Defendants do not Misrepresent the Impact Factors of Their Publications ..........16
             iv.   Defendants do not Misrepresent Their Journals With Respect to Indexing Databases ..........17
        E.   DEFENDANTS DO NOT FAIL TO ADEQUATELY DISCLOSE THEIR PUBLISHING FEES .......18
             i.    Allegation on charging significant publishing fee .............................................19
             ii.   Allegation of Deceptive Failure to Disclose Publishing Fees ...........................19
        F.   DEFENDANTS CONFERENCE PRACTICES ARE NOT DECEPTIVE ....................................19
             i.    Allegation on deceptive conference practices ...................................................20
             ii.   Allegation on inducing consumers to register for the conferences by giving false commitments ...............20
        G.   THE FTC'S CALCULATION OF CONSUMER INJURY IS GROSSLY INFLATED ...................21

III.    THE FTC HAS FAILED TO SHOW THAT, AS A MATTER OF LAW, DEFENDANTS VIOLATED SECTION 5 OF THE FTC ACT ....................................22
        A.   SUMMARY JUDGMENT STANDARD ...............................................................................22
        B.   THE FTC FAILS TO SHOW SUFFICIENT EVIDENCE TO PROVE THAT CONSUMERS DID NOT UNDERSTAND THE PUBLISHING PROCESS .....................................................................................................22
        C.   DEFENDANTS' RESPONSE TO FTC'S STATEMENT OF FACTS ......................................23
             v.    Responsibilities of Authors:............................................................................24
             vi.   Review Comments on this manuscript:..............................................................25
        D.   THE FTC HAS FAILED TO SHOW THAT DEFENDANTS OPERATIONS VIOLATE SECTION 5 OF THE FTC ACT ..31
             i.    Defendants Practices Do Not Cause Substantial Injury Which Is Not Avoidable by Consumers Themselves 31
             ii.   Any Perceived Unfairness of Defendants' Practices are Outweighed by the Benefits to Consumers and Competition ..........................................................................................................34
        E.   EVEN UNDER THE LOWER STANDARD OF PROOF, THE FTC HAS FAILED TO SHOW THAT DEFENDANTS' OPERATIONS VIOLATE SECTION 5 OF THE FTC ACT ......................................................................36
        F.   THE FTC HAS FAILED TO SHOW A COMMON ENTERPRISE ...........................................36

IV.     THE FTC HAS FAILED TO MEET ITS BURDEN OF PROOF TO SUPPORT AN AWARD OF MONETARY RELIEF ........................................................................39
        A.   LEGAL STANDARD .....................................................................................................39
        B.   THE EVIDENCE SHOWS THE FTC'S "APPROXIMATION" IS NOT REASONABLE ..............39
             i.    Actual consumer testimony and complaint rates show that not all consumers were misled by the publishing fee   40
             ii.   Revenues received from repeat, satisfied consumers are not the result of deception and must be excluded   41
        C.   ANY MONETARY AWARD MUST BE SUBJECT TO TEMPORAL LIMITATIONS ....................42
             i.    Due process prohibits recovery before Defendants were put on notice that they were allegedly violating Section 5...................................................................................................................42
             ii.   Any monetary award is subject to statutes of limitations in the FTC Act ..........42

V.      DEFENDANTS AFFIRMATIVE DEFENSES ARE SUPPORTED BY EVIDENCE AND MUST PROCEED TO TRIAL .........................................................................43

VI.     THE FTC'S PROPOSED ORDER IS OVERLY BROAD ..................................43

VII.    CONCLUSION....................................................................................................44

1

**TABLE OF AUTHORITIES**

2

Cases
*Conley v. Int'l Bhd. of Elec. Workers, Local 639*, 810 F.2d 913, 914–15 (9th Cir. 1987)...........42
Del. Watch Co. v. FTC, 332 F.2d 745, 746 (2d Cir. 1964)............................................................37
*F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) .......................................42
*FTC v. Commerce Planet*, 878 F. Supp. 2d 1048, 1088–89 (C.D. Cal. 2012)............................39
*FTC v. Inc21.com Corp.*, 475 Fed. Appx. 106, 110 (9th Cir. 2012) ...........................................40
FTC v. J.K. Publ'ns, 99 F.Supp.2d 1176, 1202 (C.D. Cal. 2000)................................................37
*FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010) ............................................................41
*FTC v. Publishers Bus. Servs., Inc.*, 540 F. App'x 555, 558 (9th Cir. 2013)...............................40
FTC v. Wolf, No. 94-8119, 1996 WL 812940, at * 7 (S.D. Fla. Jan. 31, 1996)........................37
*Gaub v. Prof'l Hosp. Supply, Inc.*, 845 F. Supp. 2d 1118, 1128 (D. Idaho 2012).......................23
*Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) ...........................................22
*Leslie v. Grupo ICA*, 198 F. 3d 1152, 1158 (9th Cir. 1999)........................................................22
*Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). ........................................................................22
*Lucas v. Bell Trans*, 773 F. Supp. 2d 930, 935 (D. Nev. 2011) ..................................................22
*Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010) ..........................................................22
Sunshine Art Studios v. FTC, 481 F.2d 1171, 1173, 1175 (1st Cir. 1973)...................................37
*United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008)
......................................................................................................................................................42
Waltham Precision Instrument Co. v. FTC, 327 F.2d 427, 431 (7th Cir. 1964).........................37
*Winnemucca Farms, Inc. v. Eckersell*, 2009 WL 1360378, at *4 n.8 (D. Nev. May 13, 2009) ..23

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Defendants oppose the Federal Trade Commission's ("FTC") Motion for Summary Judgment (Dkt. No. 86). The FTC has spent nearly three years attempting to craft a case against Defendants, first through a civil investigative demand beginning in September 2015 and then through this litigation beginning on August 25, 2016 (Dkt. No. 1). After nearly two years of litigation the FTC still cannot substantiate its claims that Defendants publishing policies are deceptive, nor have they put forth an evidence supporting the reasonableness, and which substantiates the more than $50 million it seeks in "monetary equitable relief."

The individually-named Defendant, Dr. Gedela, was the founder of the corporate Defendants OMICS Group Inc. ("OMICS"), iMedPub LLC ("iMedPub") and Conference Series LLC ("Conference Series"). His vision was to help scholars who, like himself, faced extreme difficulty in obtaining access to quality articles while completing research for his masters and doctorate degrees from Andhra University in India. Through OMICS, Dr. Gedela realized his vision by creating an "Open-Access" model which publishes scientific journals and disseminates research articles *free-of-charge* to the global community – thereby removing the cost and permission barriers that normally limit access and usage of published literature to only subscribed or licensed journals.

Dr. Gedela started the business in 2008 in Hyderabad, India and attended a post-doctorate program at Stanford University in 2009 on invitation for his application of mathematical modeling. In June and July of 2017, each of the corporate Defendants, originally registered in India in 2008, were dissolved as United States entities as all corporate activities remained in Hyderabad, India. The incorporation in the United States was for accounting purposes only as all corporate activities remained in Hyderabad, India. Today, the Indian entity, Omics Online Publishing continues to operate its core businesses of academic publishing and hosting of international scientific conferences from its headquarters in Hyderabad, India.

The FTC's Complaint against the Defendants alleges violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) generally relating to "unfair or deceptive acts or practices in or

affecting commerce." The FTC's allegations center primarily around perceived misrepresentations relating to the process by which the corporate Defendants' marketed their academic journal publishing and scientific conference services. However, as demonstrated herein, the FTC's allegations are misguided and without merit because there was nothing unfair or deceptive about the manner in which Defendants' sought academic articles from highly educated authors, there was nothing unfair or deceptive about the manner in which Defendants' marketed and hosted international scientific conferences, and there was nothing unfair or deceptive about the manner in which Defendants' disclosed and charged publication fees prior to publication of such academic articles. Prior to the filing of the Complaint, the Defendants fully cooperated with FTC, but instead of allowing the investigative and settlement processes to work, the FTC proceeded by filing this suit without notice. The FTC then issued self-serving press releases, thereby tarnishing the good business reputation of the Defendants and causing them to suffer severe financial and business losses.[1]

The purported basis for the FTC investigation and lawsuit was due to consumer complaints and a "fake news" article written by blogger Jeffrey Beall.[2] However, the complaint "evidence" the FTC has proffered to support its claims that the Defendants engaged in unfair or deceptive practices comes from a grand total of ***74 consumer complaints*** during a 7-year period between 2012 – 2018, including 42 complaints relating to its journals and 32 complaints relating to its conferences. Of the 74 complaints, only 20 involve a monetary issue -- 2 of those monetary complaints relating to journals and 18 relating to conferences (only 74 complaints generated out of millions of transactions is extremely small in the business world).  To date, ***all 74 consumer complaints have been resolved***.[3] Furthermore, the FTC has based this entire action on a mere 13 declarations from actual customers and declarations from FTC employees "investigating" the matter and seeking to create complaints to support their position.

The facts set forth herein establish that Defendants did not, and do not, engage in unfair or deceptive trade practices for following the reasons: (1) the Defendants' publications ***did***

---

[1] *See* Motion Exhibit F.
[2] *See* Motion Exhibit B at ¶ 10-15, and Attachment 6.
[3] The 20 monetary complaints resulted in less than $10,000 in refunds.

follow their peer review process; (2) the Defendants' publications **did** have editors and/or editorial boards; (3) the Defendants' publications **did** have the Journal impact factors they represented; (4) the Defendants' publications **were** included in well-known indexing services; (5) the Defendants' conferences **were** conducted as advertised; (6) the Defendants **did** adequately disclose to authors/consumers that the authors must pay a publishing fee ranging from $149 to $1819 ; (7) the Defendants **did not** cause substantial injury to authors/consumers that authors/consumers could not have reasonably avoided themselves because the authors/consumers engaged in academic publishing have both general and specific knowledge that fees are associated with publication; (8) any minimal risk of potential injury to authors/consumers that they cannot reasonably avoid themselves is outweighed by the countervailing benefits to both students/researchers/academics/consumers and publishing competition provided by Defendants' "Open-Access", **free-of-charge** publishing model; and (9) Defendants practices **are not** likely to mislead consumers acting reasonably under the circumstances in a way that is material.

In considering this backdrop, it is unfathomable the FTC has taken such an aggressive approach and committed extensive resources to this action. Ultimately, the FTC has come nowhere close to satisfying the summary judgment standard, and repeatedly invites the Court into reversible error while seeking in excess of $50 million.

The FTC filed the Complaint against Defendants relying primarily on the fake news bloggers contentions. In reality, Defendants have not conducted any major business from the United States or from elsewhere with the above-mentioned businesses. Moreover, Defendants have never had physical operations or major financial operations from the United States. On this basis alone, these proceedings are filed in bad faith and the Complaint was filed contradictory to Section 5 of FTC Act. Furthermore, the FTC has done everything in its power to discredit each Defendant prior to resolution of this matter by publishing press releases without proper evidence. Most of the 74 complaints that the FTC relies on, were received after the press releases were made. These Complaints were handled accordingly and have been fully resolved.

In countless cases within the Ninth Circuit, the FTC has prevailed at summary judgment

against defendants whose products and services have harmed the public.  This case is unlike those cases, however, for at least four reasons: (1) Defendants' customer base is not the average consumer, rather they are highly educated individuals more than capable of understanding publishing procedures; (2) the FTC has failed to substantiate its alleged monetary relief; (3) the customer complaints amount to 74 complaints; and, (4) the FTC has failed to produce evidence or testimony from a single consumer that any complaint relating to the alleged deceptive practices which this litigation is based upon has not been resolved by Defendants.

Because these distinctions are dispositive, summary judgment should not be entered. Additionally, it is important to note that the FTC has itself identified that issues of material fact continue to exist by filing a Motion to Compel and for Sanctions ***eight days after*** the filing of their Motion for Summary Judgment. By demanding that Defendants continue to provide documents and information, long after discovery has ended, they are establishing that they do not have enough evidence to sustain their claim. If the information is so important that they must have it, the filing of the Motion to Compel precludes determination of summary judgment in their favor.

## II.   <u>STATEMENT OF DISPUTED FACTS</u>

### A. Factual Background

#### a. Company Origin

OMICS origin itself witnesses the Company has started not for business, but rather to make science "Open Access" and help scholars all over the world. Dr. Gedela's own bitter experiences to produce the required literature to his research paper and to attend an international conference at Human Proteome Organization, Seoul, Korea, where he received the Young Scientist Award, prompted him to begin an initiative that would free scientific knowledge from all barriers. Encouraged by his fellow scientist friends, Dr. Gedela started OMICS International in the year 2007.

OMICS International is an amalgamation of Open Access publications and worldwide international science conferences and events. Established in the year 2007 with the sole aim of making scientific and healthcare information "Open Access", OMICS International publishes

scholarly journals in all major disciplines of science, engineering, management and medical journals. OMICS International has been instrumental in taking the knowledge on science and technology to the doorsteps of ordinary men and women. Research scholars, students, libraries, educational institutions, research centers and the industry are main stakeholders that benefitted greatly from this knowledge dissemination. OMICS International also organizes 3,000+ annual international events (2,000 international conferences, 500 workshops and 500 symposiums) across the globe, where knowledge transfer takes place through debates, round table discussions, poster presentations, workshops, symposia and exhibitions.

As Dr. Gedela's initial interests were in the field of proteomics and diabetes, he named his organization as 'OMICS'. As he was well aware of the difficulties of his fellow scientists in accessing current information and knowledge, he committed himself to the mission of 'Open Access' to guarantee free and immediate access to information for any academic or research requirement. Today, OMICS International is an ever-expanding publishing group that publishes 700 online open access journals in the fields of clinical, medical, engineering and technology, management, and life sciences that publish thousands of scientific research articles annually.

OMICS is working to make healthcare and scientific information open access, and that is the reason they are able to get support from 50,000+ scientists as editorial board members and 25,000 organizing committee members. OMICS publishes approximately 70% of its articles with waivers and discounts. Dr. Gedela could transform the benefits of the economic liberalization in the world to the young and budding science graduates out of colleges and universities by providing employment to them. Around 3,000+ post graduates are working for OMICS International in various capacities for its journals and international conferences at administrative, research, collaboration, event management, journal publication and so on. Dr. Gedela is proud that his open access-publishing platform provides free scientific literature to 5 million readers (online visitors) from America and 20 million readers from rest of the world. Exclusive poster presentations and 'Young Science Awards' in all OMICS International conferences are meant to encourage budding scientists from across the globe.

**b. Brief About Dr. Gedela**

**As an Entrepreneur**

Dr. Gedela is from a lower middle-class family, his failure to access advanced journals when he was a student in Visakhapatnam gave strong will to promote open access journals and organize scientific conferences and symposiums. Encouraged by his fellow scientist friend's majority from Andhra University and Stanford University where he completed his Graduation and Post Doctorate, Dr. Gedela started OMICS International in the year 2007.

Dr. Gedela was quick in realizing the bitter truth that job opportunities for life science graduates were hard to come the moment they stepped out of the university as neither aid nor infrastructure was available. He was quick in grasping the fact that life sciences as a field was not well explored and linked to industry requirements.

**A Philanthropist**

**Moral support** - In a bid to offer back what he gained from society, Dr. Gedela supports 7 villages in Srikakulam District of Andhra Pradesh. He is supporting by providing safe drinking water to Allenna, Burja, Kilentra, G B puram and its nearby villages where the contaminated water is resulting in dreadful cancer. He is also into promoting schools, healthcare and sanitation for the past seven years to these villages.

**Educational Support** - Education lays the foundation for the success of any society. Education is the torch bearer for any progress. Be it scientific development or technological advancement, the first step should be the school where we lay our first step towards knowledge acquisition. OMICS Educational Society sets the curriculum, trains the human resources, provides technical assistance and works on capacity building through faculty development workshops to the teacher and taught in schools that are already functioning at various levels. It strives to strengthen the pedagogy by supplementing audio-visual teaching learning equipment. OMICS Educational Society made inroads into seven interior villages of Srikakulam District, where it has extended support to strengthen the primary and secondary education through his educational society providing assistance to 3,000+ students from primary education to higher education.

**B.  Statement of Facts**

Defendants OMICS, iMedPub and Conference Series, are headquartered in Hyderabad, India. *See* Exhibit A, Declaration of Srinubabu Gedela at ¶ 6.[4]  From 2012 to 2017, OMICS was part of a group of companies that published "Open Access" scientific journals through the primary internet website (https://www.omicsonline.org/).  From 2015 to 2017, iMedPub published academic journals. From 2015 to 2017, Conference Series organized scientific conferences around the world.  *Id*, at ¶ 8.  Dr. Srinubabu Gedela is a founding director of OMICS.  *Id*, at ¶ 5.  Dr. Gedela graduated from Andhra University, B.Pharm, M.Tech, Ph.D, and attended a post-doctorate program at Stanford University.  *Id*, at ¶ 2.  He was awarded his Ph.D in 2007 at the age of 25 and, during his doctorate, received the Young Scientist Award from the Asian Human Proteome Organization (HUPO).  *Id*, at ¶ 3.

OMICS followed an "Open Access" publication model which enables the dissemination of research articles to the global community free-of-charge.  *Id*, at ¶ 9.  This "Open Access" model removes price and permission barriers that normally limit access and usage of published literature to only subscribed or licensed journals.  *Id*, at ¶ 10.  OMICS' "Open Access" publications were made available online, free-of-charge to anyone and everyone having internet access.  *Id*, at ¶ 11.  OMICS developed its "Open Access" model in order to expand the knowledge base and advance the development of science, because its founder believes scientists require unrestricted access to relevant scientific data and scholarly literature.  *Id*, at ¶ 12.  A more complete description of OMICS' corporate origin, publication model, and method of organizing conferences is included as Attachment 1 to Exhibit A.

Although the Defendant companies are dissolved, as expected revenues were not being generated from the United States, OMICS primary internet website continues to publish "Open Access" scientific journals, through OMICS International Private Limited Company, an Indian

---

[4] OMICS Group Inc. was originally formed as a Nevada corporation on March 29, 2012, and filed a Certificate of Dissolution on June 23, 2017; iMedPub LLC was originally formed as a Delaware limited liability company on February 18, 2015, and filed a Certificate of Cancellation on July 20, 2017; Conference Series was originally formed as a Delaware limited liability company on July 28, 2015, and filed a Certificate of Cancellation on June 26, 2017. *See* Exhibit D to Defendants' Motion for Summary Judgment (Dkt. No. 89).

1   entity, that currently has over 30 million readers.  *See* Exhibit A at ¶ 14, Attachment 2[5].  With

2   more than 700 open access journals, the OMICS model has become a global forum for

3   discussion and knowledge sharing through both its internet platform and global conferences.  *Id*,

4   at ¶¶ 14-15.  OMICS has received appreciation and invitation letters for hosting its conferences

5   in many major cities.  *See* Exhibit A at ¶ 16, Attachment 3.  OMICS' reputation as a reputable

6   publisher and conference organizer has grown quickly, and more than 900 well-respected

7   scientists who serve as executive editors/editor-in-chiefs have recommended OMICS' journals

8   be published in PubMed central.  *See* Exhibit A at ¶ 17, Attachment 4.

9       The Defendants' publishing practices and charges are and have been completely

10  transparent and are neither unfair nor deceptive. Authors/consumers wishing to publish an

11  article may go to the website https://www.omicsonline.org/ and access the red button/link in the

12  *middle of the home page* entitled "Article Processing Charges". *See* Motion Exhibit C at ¶ 6.

13  When an author/consumer accesses this link, they are brought to the web page at

14  https://www.omicsonline.org/article-processing-charges.php, where the fees to publish in each

15  of the journals are clearly listed in USD, Euros and GBP. *Id*. Depending on the journal, the

16  publication fee ranges from US $149 to US $1,819 (Referenced at the link

17  https://www.omicsonline.org/article-processing-charges.php). *Id*.

18      Next to the red button/link for "Article Processing Charges" are separate red button/links

19  to web pages describing the practices for "Journal Impact Factor"

20  (https://www.omicsonline.org/article-processing-charges.php),  "Peer Review Process"

21  (https://www.omicsonline.org/peer-review-process.php),  and  "Article Impact Factor"

22  (http://www.articlesmetrics.com/). *Id*. at . Each of these red buttons/links outline in detail the

23  relevant subject matter and, respectively, explain the impact factor for each journal (along with a

24  citations report for each journal), the process for conducting peer review for each article, and the

25  measurements in calculating article quality. *Id*.  There is also a button/link at the top of the

26  primary       web       page       entitled       "Submit       Manuscript"

27

28  _____
    [5] Attachments 1-5 have previously been filed as the same attachments to his prior declaration submitted with
    Defendants' Motion for Summary Judgment (Dkt. No. 89).

(https://www.omicsonline.org/Submitmanuscript.php) which fully describes the process for the submission and processing of manuscripts for authors, editors and reviewers using the online submission and review systems called Editorial Manager and Tracking System. *Id*. The information included in these links is detailed and specific to the subject matter. *Id.*

## C.  The FTC is Being Misled by Fake News Blog

As evidenced by the initial pleadings in this matter, it is evident that the FTC has the clear intention of attacking the open access publishing model. It appears the FTC started its investigations without having the knowledge of the basic facts and relied upon scholarlyoa.com, a questionable website blog run by a fake news blogger named Mr. Jeffrey Beall, who hates the open access model of publishing. Later, the existence of the scholarlyoa.com disappeared without any notice for some reason, maybe trying to defame the open access publishers whose intention is to make the scientific information accessible to everyone. All the references that are available on the web are originated from this blog and are sourced by Wikipedia and other news agencies. *See,* Exhibit A, Attachment 6.

After filing the lawsuit against the Defendants, the FTC did not find any valid evidence to prove the Defendants were engaged in unlawful business practices. Then the FTC extended this case further by issuing numerous press releases which in turn caused significant damages to Defendants in terms of reputation and actual business loss. To further extend this case, the FTC engaged in extensive discovery in an effort to support its case, and during this same time the FTC approached hundreds of scientists in an attempt to get their support, but in contrast to what they expected most of the scientists did not extend their support to the FTC. Finally, the FTC had to rely upon declarations of the fake news bloggers and other individuals who are not qualified to understand the journal publishing and peer review system. During this long duration of 3 years the FTC could accumulate very little evidence, most of which is not relevant to support the FTC's allegations.

The FTC could trace out only 74 complaints out of millions of the consumers of the Defendants served during a 7-year period between 2012 –2018 which there is no monetary related complaints which were left unattended to date; all consumer complaints have been

resolved. In addition, the FTC published numerous defamatory press releases to harm the reputation and the business of the Defendants**.**

All the above facts clearly demonstrate how the FTC has committed an organized, legally deceptive activity for which Defendants request the Honorable Court issue directions to the FTC to compensate for the loss caused by the FTC and incurred by the Defendants estimated to be $10 million for the business loss up to May 2018, and $100 million for the personal defamation loss up to May 2018 caused to young scientist awardee and youngest entrepreneur awardee Dr. Gedela. Furthermore, Defendants request the Honorable Court to include in the directive for the FTC to compensate Defendants' employees for the irreparable reputation damage estimated to be $1 million to each employee.

### D. Defendants Do Not Make Material Misrepresentations to Induce Customers to Submit Their Articles to Their Journals

The FTC's allegation is baseless since in the nature of the business Defendants always invite to service, someone on board or to submit their research articles; as do many publishers. This invitation is not an inducement or any other form of force. The invitation is given since the contributions by the scientist do serve the scientific community. Further, "scientists" are not illiterate. These individuals are highly educated and have a level of sophistication which does not make them amenable to any inducements or lacking the ability to determine the reputation of the journal they are seeking to publish with. They are well qualified and have the capacity to judge journals where they wish to publish. They do not require any guidance from anyone nor do they need to be told or induced to submit their articles to Defendants' journals.

However, the complaint "evidence" the FTC has proffered to support its claims that the Defendants engaged in unfair or deceptive practices comes from a grand total of ***74 consumer complaints*** during a 7-year period between 2012–2018, including 42 complaints relating to its journals and 32 complaints relating to its conferences. Of the 74 complaints, only 20 involve a monetary issue --2 of those monetary complaints relating to journals and 18 relating to conferences (only 74 complaints generated out of millions of transactions is extremely small in the business world). To date, ***all 74 consumer complaints have been resolved***.

The entire scientific community knows Defendants to be one of the reputed publishing companies in the world which holds 700+ journals and has organized more than 3,000+ conferences all over the world. Further, there is nothing wrong for Defendants to send mails as one of the marketing activities. Defendants follow proper guidelines, maintain an unsubscribe list, and make every attempt to avoid sending non-solicited emails

### i.     Defendants do not Misrepresent Their Peer Review Practices

Defendants state that they follow a single blind peer review process for most of the journals, where authors' details are revealed to the independent peer reviews who are experts in the particular subject. Usually the peer-review is done by esteemed scholars from a post-doctoral to Professor Cadre, who work voluntarily and can contribute to the peer-review process based upon their subject expertise and interest. Defendants' further state that all their journals are open access journals, as such it is creating free scientific literature and to this noble cause the scientist community is supporting them

### ii.     Defendants do not Misrepresent the Review and Editing of Their Journals

The FTC alleges that Defendants' statements regarding peer review are misleading simply because the time table is often very quick. Technological advancements and innovation of the industry have accelerated the process whereby peer review does not have to take months as the FTC's "expert" Joyce Backus contends. Simply because they have found a handful of individuals willing to say that peer review ***must*** take a certain amount of time, does not mean that peer review is not taking place, or is insufficient, for the journals which Defendants' publish.

Seemingly, through its motion and purported expert, the FTC would like this Court to determine, *as a matter of law*, what constitutes proper peer review. Specifically, the FTC would like Court to determine, *as a matter of law*, that peer review ***must*** take a certain amount of time and that peer review ***must*** generate a certain amount of comments/revisions.

The bottom line is that Defendants are merely publishers of the journals and do not make the editorial decisions for any given journal. Defendants seek and do have qualified editorial

boards and staff who conduct the peer review for each journal. Contrary to the FTC's allegations and in accordance with their "expert's" opinion, Defendants do follow standard peer review practices. When articles are submitted by authors they are either accepted for peer review or rejected, then reviewed by editors prior to publication. No misrepresentations are occurring because the procedure is being followed

### iii.     Defendants do not Misrepresent the Impact Factors of Their Publications

Impact factors are one of the metrics to measure a journal's reputation. Similarly, there are many other metrics which are followed by a majority of journals and publishers. Hence, they are not only following impact factors to measure the journal credibility. For example; Journal Impact (provided by ResearchGate.net), Cite Factor/ Global impact factor, Index Copernicus values, H-Index, Journal Impact Factor etc., and OMICS regarding its Journal Impact Factor. Article Impact Factor (Trademarks registered by OMICS), clearly mentioned that Journal Impact Factor is based on citation calculations from Google Scholar Database Index, which is clearly displayed on its website page and the similar or other criteria is followed by other publishers also. *See*, https://www.omicsonline.org/open-access-journals-impact-factors.php

For reference, please see the following:

1. https://journalmetrics.scopus.com/ : Followed by Elsevier, the world largest publisher of science, technology and medicine.

2. https://en.wikipedia.org/wiki/Altmetrics : Altmetrics are followed by most of publishers of science, technology and medicine.

3. https://en.wikipedia.org/wiki/Citation_impact

4. https://en.wikipedia.org/wiki/Article-level_metrics

5. https://www.researchgate.net/ :Followed by all publishers of science, technology and medicine and academic community.

6. Cite factor: journal impact: http://www.citefactor.org/

As stated and clarified previously, most of the publishers are following a number of

journal metrics like IC values, Journal impact, journal score, H-Index, and similarly we are following our own metric with our own formula. For your information, as clarified earlier, Thomson Reuter's ISI impact factor (now owned by Clarivate Analytics) was not being followed by a majority of the scientific journals in the world as this deceptive business practice of Clarivate Analytics was opposed by a majority of the scientists in the world. However, Defendants are willing, and have been throughout the entire civil investigative demand and this litigation, to make necessary changes to comply with the applicable laws in the United States

### iv.   Defendants do not Misrepresent Their Journals With Respect to Indexing Databases

Defendants state that PubMed Indexing service is one of the major indices for medical journals. There are so many other indexing services for other subjects like Chemical Abstracts, Scopus, EBSCO, Index Copernicus, CNKI and Ulrich, etc. Defendants have been following the guidelines regarding usage of PubMed logo, although it is true there was an issue with regard to the usage of the logo but this has been rectified. *See*, Exhibit A, Attachment 7.  Defendants further state that it is a major contributor to PubMed Central. PubMed has also rectified itself after realizing that certain allegations were wrong against Defendants and is completely satisfied now with regards to the usage of their logo at this tim*e* as evidenced by the NIH funded articles available for review [https://www.omicsonline.org/NIH-funded-articles.php] It is false to state that Defendants have used the names of NIH employees without their consent. Defendants have obtained the necessary consent/permission to use any name listed or associated with Defendants from any such person in advance. Hence this allegation is unsustainable. Medline/PubMed/PubMed Central are with reference to the United States only, and limited to medical health information only. There are many other databases for different subjects with reference to different countries.  There are 100+ databases following in different countries and for different subjects, such as:

1. For African Countries: https://www.ajol.info/

2. For Great Britain: http://www.rsc.org/, https://www.therai.org.uk/

3. For India: http://www.indiancitationindex.com/

4. For China: http://www.cnki.net/

**For other subjects:**

1. Agriculture: http://www.fao.org/

2. Anthropology: https://www.therai.org.uk/

3. Computer science, engineering: http://www.acm.org/

4. Biology, Ecology, and Environmental Science: http://www.bioonepublishing.org/

Similarly, there exist many other databases for different subjects with reference to different countries.

5. Proquest : http://www.proquest.com/products-services/Ulrichsweb.html

6. Hinari of WHO : https://extranet.who.int/hinari/en/journals.php

More : https://en.wikipedia.org/wiki/List_of_academic_databases_and_search_engines

### E.  Defendants Do Not Fail to Adequately Disclose Their Publishing Fees

The Defendants' publishing practices and charges are and have been completely transparent and are neither unfair nor deceptive. Authors/consumers wishing to publish an article may go to the website https://www.omicsonline.org/ and access the red button/link in the middle of the home page entitled "Article Processing Charges". See Motion Exhibit C at ¶ 6, Attachment 1. When an author/consumer accesses this link, they are brought to the web page at https://www.omicsonline.org/article-processing-charges.php, where the fees to publish in each of the journals are clearly listed in USD, Euros and GBP. Id. Depending on the journal, the current publication fee ranges from US $149 to US $1,819. *See*, Exhibit A at ¶53.

Next to the red button/link for "Article Processing Charges" are separate red button/links to web pages describing the practices for "Journal Impact Factor" (https://www.omicsonline.org/article-processing-charges.php), "Peer Review Process" (https://www.omicsonline.org/peer-review-process.php), and "Article Impact Factor"(http://www.articlesmetrics.com/). *Id*.at ¶ 7, Attachment 1. Each of these red buttons/links outline in detail the relevant subject matter and, respectively, explain the impact factor for each journal (along with a citations report for each journal), the process for conducting peer review for each article, and the measurements in calculating article quality. Id.

There is also a button/link at the top of the primary web page entitled "Submit Manuscript" (https://www.omicsonline.org/Submitmanuscript.php) which fully describes the process for the submission and processing of manuscripts for authors, editors and reviewers using the online submission and review systems called Editorial Manager and Tracking System. *Id.* at ¶ 8. The information included in these links is detailed and specific to the subject matter. *Id.*

### i.    Allegation on charging significant publishing fee

`Defendants do not charge a significant publishing fee. All publications are qualified on merit and happen only after the editorial board and author approve of it. Whenever there has been a request for withdrawal of publication Defendants have always honored such a request and immediate actions were initiated. While having leveled such an allegation against Defendants it appears the FTC has not gone into the aspects that if such an article is published against the wishes of the authors then the author would have initiated copyright infringement proceedings against us. No such proceedings have been initiated and none are pending against Defendants being the largest publisher of journals.

### ii.    Allegation of Deceptive Failure to Disclose Publishing Fees

Defendants clearly disclose publication fees in their website http://www.omicsonline.org/article-processing-charges.php Withdrawal fees are only requested when an article passes through the processing. Since the publisher has certain expenditures to process the articles, authors are requested to pay to cover the expenses that are incurred by the Publisher. Processing charges for withdrawals have been displayed very clearly on our website (http://www.omicsonline.org/article-processing-charges.php). Further, Defendants are providing 40% waivers and 30% discounts on the total published articles on the mentioned rates at Defendants' websites. This is the precise reason Defendants are getting repeat business and more article submissions.

### F.  Defendants Conference Practices are Not Deceptive

Defendants are surprised by the nature of such an allegation since it has not been a case where the members have not attended the conferences. In most of our conferences one of the speakers and member have attended the same and to secure their attendance it is not a onetime

process as it takes a few weeks before the member confirms their attendance. It goes without saying that a member attends such a conference as his or her own decision and as alleged if they have been induced to attend under a representation that certain other eminent scientists are attending there is nothing that prevents the member from withdrawing in attending the conference since to arrive at registration it is a long process. It is submitted by Defendants that they have never misrepresented their conferences or organizing committee members. It is a complete false claim. Defendants have organizing committee members who host the events that are held at different places all over the world. All the organizing committee members who are on the board are working on a volunteer basis. They have joined and accepted to be on board with their full consent. A defendant has documentary proof for the same.

### i. Allegation on deceptive conference practices

We are bringing all the scientists under one platform to promote science, technology and medicine innovation. Again, scientists or participants are not uneducated people who attend our conferences without return on knowledge or innovation. All the scientific conferences provide a great contribution for society. Defendants are conducting conferences to disseminate knowledge to the scientific community. Our International Conferences work with the slogan: Meet, learn and explore. The expenses incurred for organizing conferences are very high as there are certain basic requirements we follow to provide quality services. Defendants also provide discounts to many participants upon request. This is in itself a classic demonstration as to how Defendants encourage academic interests amongst students, scientists and the academic community.

### ii. Allegation on inducing consumers to register for the conferences by giving false commitments

The FTC has failed to produce proper evidence to show that Defendants deceptively induce individuals to register and attend their conferences. The FTC is largely relying on declarations containing only hearsay statements of individuals *other than* the declarant and their desires/experiences with Defendants and their conferences. The FTC also relies heavily on somewhat indiscernible online complaints, most of which the FTC has misinterpreted and mischaracterized. The FTC continues to improperly spin their "evidence" in a disingenuous

manner. However, Defendants submit that they have never falsely induced any person to attend any of their conferences. Obvious to anyone who has ever attended or organized a conference, speakers and agendas are fluid and sometime change, but Defendants make every best effort to provide the most relevant and accurate information with respect to their conferences.

## G.  The FTC's Calculation of Consumer Injury is Grossly Inflated

The FTC alleges that "between August 25, 2011 and July 31, 2017, Defendants have taken in gross revenues, in the form of publication and conference registration fees from consumers, of at least approximately $50,740,100.05, and have paid out $609,289.13 in chargebacks and refunds. (SJX26 at 9 -11 ¶¶ 21-25.) Accordingly, the net consumer injury caused by Defendants' unlawful publication and conference practices is at least $50,130,810.92. (*Id.* at 11 ¶ 25.)"

**Total earnings from the United States and the Rest of the world:** Defendants strongly object to the FTC's claim that the Defendants' gross revenues from all the Defendant companies is $50 million, because the actual revenues of the defendant companies from the United States and the rest of the world is not even close to that figure.  The table below depicts the amount of actual earnings for one or more defendant companies each year from 2011 to 2016 (the period during which one or more defendant companies were operational). *See*, Exhibit A at ¶ 54.


**Table showing the year, taxable income/net profit earned, tax paid, and net profit after tax from United States.**

| YEAR | Taxable income/Net profit earned | Tax Paid | Net Profit After tax |
|------|----------------------------------|----------|----------------------|
| 2011 | 35,171 | 4,919 | 30,252 |
| 2012 | 58,486 | 10,649 | 47,837 |
| 2013 | 50,181 | 7,296 | 42,885 |
| 2014 | 45,169 | 6,569 | 38,600 |
| 2015 | 47900 | 6,524 | 41,376 |
| 2016 | 29201 | 4039 | 25162 |

## III.   THE FTC HAS FAILED TO SHOW THAT, AS A MATTER OF LAW, DEFENDANTS VIOLATED SECTION 5 OF THE FTC ACT

### A. Summary Judgment Standard

At summary judgment, the district court's "function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. The evidence of the nonmovant is 'to be believed, and all justifiable inferences are to be drawn in his favor.'" *Lucas v. Bell Trans*, 773 F. Supp. 2d 930, 935 (D. Nev. 2011) (Navarro, J.) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A justifiable inference is not necessarily the most likely inference or the most persuasive inference." *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010). Rather, it only has to be "rational or reasonable." *Id.*

Critically, "at summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). To this end, the Ninth Circuit has "specifically rejected the notion that a court [can] disregard direct evidence on the ground that no reasonable jury would believe it." *Id.* All of these standards apply even though this case will be tried to the Court instead of to a jury. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc) (explaining important distinctions between summary judgment and a bench trial).

### B. The FTC Fails to Show Sufficient Evidence to Prove that Consumers Did Not Understand the Publishing Process

At this stage, it is not appropriate to determine the truthfulness of the evidence, rather whether there are issues for trial. The FTC has relied on entirely self-serving declarations from its own employees who conducted "investigations" by actively contacting individuals to create complaint evidence for their case rather than utilizing ***actual*** consumers to provide sworn testimony regarding.

In contrast, Dr. Cindy Orser recently published an article in the Natural Products Chemistry and Research journal published by Defendants. *See* Exhibit B, Declaration of Dr.

Cindy Orser at ¶ 10. Having not only a bachelors degree, but also a PhD, she represents the type of individual who is a typical consumer who does business with Defendants. *Id.* at ¶ 5. She submitted her article using the online manuscript submission system and found the entire process efficient and the editorial staff helpful. *Id.* at ¶ 12-13. She also found that the article charges/publication fees were clearly disclosed and reasonable. *Id.* at ¶ 14. She never felt misled or deceived about either the fee or the process. *Id.*

At summary judgment, as the non-movant, Defendants' evidence is to be believed and all inferences are to be drawn in their favor. Here, it is rational and reasonable that consumers are able to understand Defendants' publishing process and the associated fees. As such, the Court should deny the FTC's request for summary judgment.

## C. Defendants' Response to FTC's Statement of Facts

The FTC sets forth 55 paragraphs in its Statement of Material Facts. (Motion at 2-26). In violation of LR 56-1, which requires a "concise statement" of facts that cites to a "particular portion" of evidence in the record for support. As a global matter, the FTC disregards this local rule by (1) using argumentative language; (2) including multiple sentences and compound statements within most numbered paragraphs; (3) containing additional statements alongside record citations in dense footnotes; (4) often failing to cite evidence for statements; and (5) when citing to the record, lumping together strings of citations to wide ranges of exhibits and pages without linking them to particular statements. *Gaub v. Prof'l Hosp. Supply, Inc.*, 845 F. Supp. 2d 1118, 1128 (D. Idaho 2012) ("[S]tatements based on speculation, improper legal conclusions, personal knowledge, or argumentative statements are not facts and can only be considered as arguments, not as facts, on a motion for summary judgment."). Such defects are addressed as necessary, although the Court need "not wade through the record on [the movant's] behalf to find support for its contention." *Winnemucca Farms, Inc. v. Eckersell*, 2009 WL 1360378, at *4 n.8 (D. Nev. May 13, 2009) (denying motion for summary judgment).

Not only has the FTC done this with exhibits to this Motion, but it has also included references to many exhibits attached to prior pleadings in this matter. Defendants themselves

have had to expend significant time and resources weeding through the references; this Court should not conduct its own search for evidence on their behalf.

Disputes to particular factual statements and responses to specific evidence are listed below.

**Response 1: Response to The Declaration of Thomas Spears**

Mr. Spears is a renowned mischievous fake news blogger, who is often involved in questionable practices for which he was sued in various circumstances. Moreover, he is not a scientist or a scholar to understand the fundamentals of journal publishing or peer review process.

Defendant's website clearly showcases the instruction for authors which states the responsibilities that authors have to honor in order to get their research work published in the respective journals of the Defendants and with this, authors are expected to submit the manuscript which is genuine and accurate. Before submitting any manuscript, the author should check the scope of the journal and submit their work in an appropriate manner. It is the responsibility of the authors to go through the "author guidelines" before submitting any manuscript to the publisher. As mentioned below, content authors hold the responsibility for the data presented in the article which is clearly mentioned in the following url: https://www.omicsonline.org/publication-policies-and-ethics.php#authors.

*v.* **Responsibilities of Authors:**

An author is expected to be accountable for the data and information presented in their respective article along with taking responsibility for the significance. The authors are expected to present genuine original outcome of their research, and an appropriate and relevant citation should be considered while representing the data and documenting the discussion. Authors must provide information which is comprehensible and reproducible. Supporting information such as figures and tables provided by the authors should be legible and must be reproducible technically.

Mr. Spears' article was sent for peer-review and it was accepted by the reviewer considering the statements provided in the article as personal opinion of the author which was

found not having any conflict or bias towards anything. As the article was a perspective one, information provided by the author was considered as an opinion to be expressed through publication. Soon after the publication of the paper, Defendants' witnessed some concerns and many of them argued that the paper is a personal perspective and had not discussed any relevant ethical issue considered under the journal scope. Moreover, the paper is neither innovative nor thought provoking. The Publisher made the decision to make the article available online solely based on the reviewer's suggestion which considered the article a personal opinion of the author. However, it was found that the article had other unavoidable mistakes and issues and, therefore, is being retracted from the journal.

*vi.*   **Review Comments on this manuscript:**

> "The author presents his personal perspective on an old problem that is the independence of moral expression of academics in their professional environment. In my opinion, it is an interesting point of view that is worthy to be published. The manuscript is brief and clearly written with a perfect use of the language. A historical review about the problem and a comparative presentation of the author's perspective could be added, but the author declares that he is presenting just his personal perspective."

As an open access journal, "Journal of Clinical Research and Bioethics" requested the author to pay the requisite article processing charges. The information related to article processing charges is mentioned on the journal website. For reference please refer to the Url (https://www.omicsonline.org/instructionsforauthors-clinical-research-bioethics-open-access.php)

The claims made by Mr. Spears are baseless, and all this was done with the wrong intention to defame the Defendant's reputation, but this itself proves Mr. Spears failed in his attempt.

**Response 2: Exhibits 3-15, 19, 21 -22 Defendants Discovery Responses**

1.   Almost all the exhibits provided by the FTC in their motion are referred to the requests for admissions and interrogatories provided by the defendants during the discovery period as ordered by the Court. All the requests during this discovery were framed in such a way

that defendants had to admit in many cases. The FTC was lacking the supportive evidences against their allegations, so they are now left with an option to choose from the responses given by the defendants and make use of these responses in such away so as to defend their allegations.

2. FTC did not do any preliminary research on the business practices of the defendants nor did it interacted with the defendants to understand the genuinity or validity of the complaints they have received from various available sources.

3. FTC has taken few declarations from the persons like Mr. Spears who is often involved in questionable practices for which he was sued in various circumstances and even in his declaration he violated the specified guideline he supposed to follow while submitting a manuscript to a scholarly journal. For that reason the manuscript submitted by him initially was accepted as the reviewer felt it his personal opinion regarding the content mention in the manuscript he submitted later the publisher has to retract the article as it didn't met the guidelines specified on the publisher website. For your reference you can still find a retraction note for the specified article on the journal website.

4. In the similar way FTC tried to get the email confirmations from most of the OCM-(Organizing Committee Members) associated with defendants conferences, by using an embarrassing email template which says "as part of our investigation of a case against OMICS Group, Inc., Conference Series LLC, and Insight Medical Publishing (iMedPub LLC), a civil action currently pending in the United States federal district court in Nevada". But in reality FTC did not get any favorable support from the OCM's against defendants and finally FTC had to rely on the EXHIBITS (declarations) provided by the fake news bloggers.

**Response 3: Exhibit 18 and 20 – Declaration of FTC Expert Joyce Backus**

Defendants dispute the statement that peer-review process takes several months as many peer-reviewed journals follow rapid review process which usually takes 3-4 weeks. For reference please find the following links:

https://peerj.com/benefits/peer-review-timeline/

http://ieeeaccess.ieee.org/the-rapid-peer-review-advantage/

Ms. Backus opined that in the scientific publishing industry the "impact factor" is often used as one such measure of the prestige or relative importance of a journal in its field. It measures the average number of citations in scholarly literature to the articles published by that journal. (SJX. ¶ 16.) A higher impact factor would indicate a more important or credible journal. (Id. ¶ 15.) In reality, a higher impact factor does not necessarily indicate the quality of a journal. Many researchers and academicians believe that editorial policies, quality of reviews, quality of editing, efficiency in the processing of manuscripts, and the (real) impact of the journal on the field are better indicators of quality than impact factor. As impact factor merely depends on journal citations, it cannot be considered as measure for the quality and credibility of a journal. Moreover, the impact factor can be manipulated by pumping up the citations. Please read the information in the following articles which are supporting the above statements.

https://journals.lww.com/epidem/Fulltext/2012/07000/We_Are_Number_One_But_Nobody_Cares_That_s_Good.1.aspx#R1-1

https://journals.lww.com/epidem/pages/articleviewer.aspx?year=2008&issue=05000&article=00003&type=fulltext

https://journals.lww.com/epidem/pages/articleviewer.aspx?year=2008&issue=05000&article=00007&type=fulltext

https://journals.lww.com/epidem/pages/articleviewer.aspx?year=2009&issue=05000&article=00001&type=fulltext

Indexing can help a journal in increasing the visibility of its article which in turn helps in reaching a larger audience/readers. As mentioned in the above section related to impact factor, indexing and impact factors are not the ideal indicators of a journal's credibility and prestige.

**Regarding the two articles which Ms.Backus addressed in her declaration:**

1. Regarding the article titled "7-Chloronorlichexanthone inhibits the growth of murine SV40 transformed lymphoid sarcoma cells in vitro" which was published due to technical error but later it was retracted from the respective Journal.

2. The second article titled "Psoromic acid inhibits the growth of murine polyploid gastric sarcoma cells in vitro" was not accepted for publication by OMICS Group Inc. As stated, the article was published in July 2013, which at that time the journal was under the control of the previous publisher. OMICS is a co-publisher for Journal biology and medicine along with Aston Journals. OMICS started processing articles from October 2013. Defendants assert that the publisher's responsibility is to provide the guidelines and it is the moral responsibility of the authors to go through the "author guidelines" before submitting any manuscript to the publisher. As mentioned in the below content, authors hold the responsibility for the data presented in the article which is clearly mentioned in the below URL: https://www.omicsonline.org/publication-policies-and-ethics.php#authors

**Deposition transcript related responses of FTC Expert Joyce Backus**

Conclusions drawn from the deposition transcript of Ms. Backus:

1. Joyce Backus admitted that she did not know and was not familiar about the impact factor and she admitted that she does not use impact factor in her routine work.

2. Joyce Backus says she is not familiar with different subject maters that OMICS publishes.

3. She is not aware of any other databases i.e. ajol, rsc.org, therai.org.uk, H-Index, indiancitationindex.com, www.cnki.net.

4. She herself admitted that she was the person who decides and was responsible for de-indexing decision of the journals, was just based solely on the fact that they were now owned by OMICS. She also conveyed the message that she did not try to even check the standard of the acquired journals of OMICS and she simply de-indexed all the journals of OMICS along with the acquired journal only on the basis that they are listed on the OMICS official website. She herself admitted she doesn't follow any guidelines framed by the NIH when it comes to the analyzing the standards of OMICS journals.

NIH stopped including new content for the OMICS Journals in PubMed Central, PubMed, or MEDLINE; however, this occurred for only some of OMICS journals and there was no proper notices nor reason provided. The letter sent by HHS Office of the General Counsel

was titled as cease and desist letter, but the contents only requests to stop improper usage of PubMed Central logo and it instructed to use it properly as and when required. In this respect, OMICS is following PubMed guidelines and using the PubMed Central logo accordingly.

OMICS is following PubMed Central guidelines to deposit NIH funded articles from National Institute of Health (NIH) public access. Accordingly, OMICS is depositing the articles with PubMed Central and requesting authors to do so. There are a considerable number of OMICS articles that are indexed in PubMed and PubMed Central. Defendants listed the name of the Scientist in the Editorial board only after obtaining their consent.

For example, two national cancer institute Scientists reported OMICS used their names as editorial board members without their consent. The consent of the editorial board member who is associated with NIH is available at (http://www.omicsonline.org/Legal-Replies/Dr.Raymond-Editor-in-Chief-Nomination.pdf ) (http://www.omicsonline.org/Legal-Replies/Acceptance-as-Edirorial-Board-Member-Journal-of-Proteomics-and-Bioinformatics.pdf)

The same scientists later admitted that they had agreed to be on the Editorial Board and forgot about giving their consent to join the editorial board. Therefore, it is only a misunderstanding about Defendants' use of their names and not a regular practice.

Medline/PubMed/PubMed Central are with reference to the United States only and limited to medical health information only. There are many other databases for different subjects with reference to different countries. There are 100+ databases following in different countries and for different subjects.

1. For African Countries: https://www.ajol.info/

2. For Great Britain: http://www.rsc.org/, https://www.therai.org.uk/

3. For India: http://www.indiancitationindex.com/

4. For China: http://www.cnki.net/

**For other subjects:**

1. Agriculture: http://www.fao.org/

2. Anthropology: https://www.therai.org.uk/

3. Computer science, engineering: http://www.acm.org/

4. Biology, Ecology, and Environmental Science: http://www.bioonepublishing.org/

Similarly, there exist many other databases for different subjects with reference to different countries.

5. Proquest :  http://www.proquest.com/products-services/Ulrichsweb.html

6. Hinari of WHO : https://extranet.who.int/hinari/en/journals.php

More: https://en.wikipedia.org/wiki/List_of_academic_databases_and_search_engines.

**Response 4: Exhibit 24 – Declaration of Amanda Lorusso Wilson**

**Editors**

The editors list is provided journal wise, so there is a chance for duplication because some editors are working for two or more interdisciplinary journals.

**Articles**

Some of the articles appeared twice in the article list because of the following reasons

1. Sometimes authors fail to complete the submission process as a result of which empty fields appear in the sheet. When the authors complete the submission process it will appear as a new record.

| 15 | Journal of Community & Public Health Nursing | A New Focus in Healthcare Conflict Research | Sara Kim |
| 16 | | A New Focus in Healthcare Conflict Research | Sara Kim |

For example, when you compare 15 and 16 records in the articles list, the journal name is missing in the 16th cell because of an incomplete submission by the author. The 16th record is an incomplete submission by Dr. Kim and 15th record is a complete submission by Dr. Kim.

2. Sometimes authors submit the same article to two different journals

| 14 | Neonatal and Pediatric Medicine | Canadian Practice Patterns of Venous Thromboembolism Prophylaxis for Adults with | Ethans K, Deng G, Townson A, Jacquemin G, Smith K, |

| | | Spinal Cord Injury | O'Connell C, Askari S and Ho C |
|---|---|---|---|
| 17785 | Journal of Pediatric Neurological Disorders | Canadian Practice Patterns of Venous Thromboembolism Prophylaxis for Adults with Spinal Cord Injury | Ethans K, Deng G, Townson A, Jacquemin G, Smith K, O'Connell C, Askari S and Ho C |

3. As mentioned earlier, some of the data was lost prior to 2016, so we have provided only the review data that is available with the defendants which might be the reason for "no matching title" in the Review Data Files.

**RESPONSE 5: Declaration of Andre Myburgh**

These invitations might have been sent to the subject experts considering their research. Moreover, Defendants have never insisted that researchers must submit articles or join the editorial board.

**D. The FTC has Failed to Show That Defendants Operations Violate Section 5 of the FTC Act**

In order to prevail under Section 5 of the FTC Act, the FTC must satisfy the standard of proof articulated under § 45(n) for each of its three causes of action:

> The Commission shall have no authority under this section or section 57 of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

Under this standard, the analysis is 1) whether the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves, and 2) if the act or practice is deemed unfair, whether such unfairness is outweighed by countervailing benefits to consumers or to competition.

**i. Defendants Practices Do Not Cause Substantial Injury Which is Not Avoidable by Consumers Themselves**

It is important to note in this case the particular identity of the consumers. The authors/consumers publishing in these journals are highly educated academics, doctors and researchers from various scientific fields such as medical, clinical, pharmaceutical, engineering, technology and management. The authors/consumers publishing their articles in these journals are not ordinary consumers or lay people -- they are educated individuals with a need and/or desire to publish their research articles. These individuals are highly capable of reading a simple process stated directly on Defendants' website regarding the publishing procedures that Defendants follow.

With respect to the FTC's alleged Misrepresentations Regarding Journal Publishing (Count I), the Defendants web site, *on its home page*, includes red buttons/links that clearly define the publishing practices relating to 1) "Journal Impact Factor" (https://www.omicsonline.org/article-processing-charges.php), 2) "Peer Review Process" (https://www.omicsonline.org/peer-review-process.php), and "3) Article Impact Factor" (http://www.articlesmetrics.com/). *See* Motion Exhibit C at  ¶ 7. Each of these red buttons/links outline in detail the relevant subject matter and, respectively, explain the impact factor for each journal (along with a citations report for each journal), the process for conducting peer review for each article, and the measurements in calculating article quality. *Id*. There is also a button/link *at the top of the home page* entitled "Submit Manuscript" (https://www.omicsonline.org/Submitmanuscript.php) which fully describes the process for the submission and processing of manuscripts for authors, editors and reviewers using the online submission and review systems called Editorial Manager and Tracking System. *Id*. at ¶8.  The information relating to journal publishing is presented in a clear and concise manner and is neither unfair nor deceptive.

With respect to the FTC's alleged Misrepresentations Regarding Conferences (Count II), authors/consumers wishing to attend a scientific conference may also go to the same website https://www.omicsonline.org/ and access the button/link at the *top of the home page* entitled "Conferences"   https://www.omicsonline.org/international-scientific-conferences/,  and  from there they may select either "Upcoming" or "Previous" conferences, and then they may select

conferences by "Continents", subject matter, dates and other methods. *Id*. at ¶11. By way of example, the 20th World Congress on Nutrition & Food Science will be held on May 14-16, 2018 in Tokyo, Japan. The organizing committee and keynote speaker are listed along with a program schedule detailing the tentative agenda and anticipated speakers, along with a host of other information. *Id*.  Obvious to anyone who has ever attended or organized a conference, speakers and agendas are fluid and sometime change, but the Defendants transparently post the most relevant and best information available for each conference, which is neither unfair nor deceptive.

With respect to the FTC's alleged Deceptive Failure to Disclose Publishing Fees (Count III), authors/consumers wishing to publish an article may go to the website https://www.omicsonline.org/ and access the red button/link in the *middle of the home page* entitled "Article Processing Charges". *Id*.  at ¶ 6-7.  When an author/consumer accesses this link, they are brought to the web page at https://www.omicsonline.org/article-processing-charges.php, where the fees to publish in each of the journals are clearly listed in USD, Euros and GBP. *Id*. Depending on the journal, the current publication fee ranges from US $149 to US $1,819. *See,* Exhibit A, ¶53. The fees schedule detailed on the "Article Processing Charges" web page could not be any more clear, and is plainly neither unfair nor deceptive.

Further, when an individual submits an article for publication, it is reviewed under a single blind review process.  *See* Exhibit A at ¶ 23 and Attachment 1.  This process is monitored by Editorial Manager System, developed and supported by Aries Systems Corporation, USA. *Id*. at ¶ 24.  This system is also supported by Aries Systems Corporation, USA and has also been adopted by many other well-known publishers.  *Id*. at ¶ 25.  As such, OMICS' peer review process in not misleading or deceptive.  *Id*. at ¶ 26.

OMICS use of impact factors is also not misleading or deceptive.  *Id*. at ¶ 28.  OMICS does not use Thomson Reuters impact factors nor do they advertise as such. Rather, OMICS utilizes Journal Impact Factors.  *See* Exhibit A at ¶ 29 and Attachment 5. The FTC alleges that OMICS is deceiving and misleading consumers to believe it is using the Thomson Reuters impact factors; however, no evidence has been provided which supports that allegation.

With respect to its scientific conferences, OMICS does organize and present well-known and respected conferences throughout the world. *Id*. at ¶ 31. These conferences are in fact attended and promoted by well-known academics and researchers. *Id*. at ¶ 32. As with any conference, occasionally people cancel or cannot attend for a variety of reasons. *Id*. at ¶ 33. However, OMICS never intends to present any conference without respectable and qualified individuals. *Id*. at ¶ 34. OMICS at no point in time has ever intended to deceive or mislead any individual.

The information detailed above relating to each of the FTC's 3 causes of action is detailed and specific to the subject matter. Certainly, educated professionals seeking to publish articles on the Defendants "Open Access" website could "reasonably avoid" any confusion, misunderstanding and the required "substantial injury" by simply reviewing the information plainly available to them on the home page of that same website. All the information is presented in a clear manner and is neither unfair nor deceptive. In the event certain acts or practices were deemed to be unfair, any such unfairness would be outweighed by the countervailing benefits to consumers of providing transparent, "Open Access" publication and dissemination of research articles to the global community -- free-of-charge.

As set forth herein, the facts and exhibits set forth herein conclusively demonstrate that there are no material factual disputes as to the allegations and three causes of action contained in the FTC's Complaint. Moreover, the evidence establishes that Defendants' actions are not unfair or deceptive which cause substantial injury to consumers that consumers cannot reasonably avoid themselves and which are not outweighed by countervailing benefits to consumers or other competition.

    **ii.**    **Any Perceived Unfairness of Defendants' Practices are Outweighed by the Benefits to Consumers and Competition**

The FTC's allegations of unfairness stem from the disruption of the publishing industry by the open access model. Advancements and a shift in the consumer mindset have demanded changes to the typical format for article publishing, the pay access or subscription model. Similar pushback has occurred in other industries where technology and innovation have

drastically changed the traditional model. Take, for example, the transportation industry and the conflict between the traditional taxi and the new rideshare companies (i.e. Uber and Lyft). Rideshare companies identified inefficiencies in taxi service and developed ways to provide individuals in need of transportation with more options. They have made it more convenient by allowing people to use their smart phones to request a ride, streamlining payment, lowering the cost, and providing a different level of service. Clearly, taxi companies take issue with losing large portions of their customers and therefore revenues, but there is nothing unfair about offering a competing product which customers eagerly support.

Open access is a benefit to consumers for many reasons. First, it increases visibility for authors. Under the subscription model an author typically pays a nominal fee to publish their article; however, any person who wishes to access the article must have a costly subscription. Due to the extremely high-cost of these subscriptions, typically only libraries or universities have a subscription and if an individual is not associated with the library or university they have no way to access academic articles for further important research and innovation. With increased access by readers due to the free access of the open access model, the impact of research can be much greater. Second, open access publishing allows a larger variety of readership. It fosters international research communities because it allows scientists and academics from non-traditional settings to interact when they could not before due to the high cost barriers of subscription-based access. Third, even though there are still fees associated with open access publishing, they are significantly lower than the subscription costs. Additionally, Defendants often reduce or waive these fees by request of the author. Fourth, open access publishing, particularly online based open access publishing, allows information to be disseminated to the target audience more quickly.

Defendants do not deny that they have had some consumers who were unhappy in their dealings with Defendants. However, in ordinary course every business has dissatisfied customers. The percentage of unhappy consumers when looking at the total number of authors, conference attendees/organizers, peer-reviewers, editors, and in general all customers is very low. Clearly, the allegations being made by the FTC are based on pay-access publishers

suffering economic losses and the desire to keep open access publishing from becoming the preferred publishing method. The resources wasted by the FTC as a federal agency, and this Court, for a matter such as this is incomprehensible.

As set forth above, and further detailed in Exhibit A and its Attachments, Defendants simply do not engage in deceptive or misleading actions as alleged by the FTC. The FTC has failed to show evidence which supports the allegations that Defendants practices (1) cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and (2) not outweighed by countervailing benefits to consumers or competition. As such, the FTC has no authority to deem Defendants' processes unfair under the FTC Act. Accordingly, their Motion should be denied.

**E.  Even Under the Lower Standard of Proof, the FTC Has Failed to Show That Defendants' Operations Violate Section 5 of the FTC Act**

The FTC next argues that this Court should grant summary judgment because they have met the requirements for a deception claim under the FTC Act. Defendants incorporate by reference their Reply in Support of Motion for Summary Judgment where they more fully brief these arguments. (Dkt. No. 107)

**F.  The FTC Has Failed to Show a Common Enterprise**

The FTC baldly claims, without any specific facts or supporting evidence, that Defendants operate as a common enterprise because "There is substantial evidence of the entities' intertwinement." (Motion, 36:2). Additionally, the FTC rests its claim on the fact that "Among other things, the various business entities share common ownership and management and operate from the same place of business in India" and "The websites belonging to the three corporations use similar language and often link to one another." (Motion, 36:2-6). Furthermore, the FTC alleges that "Defendant Gedela is the authorized signatory on the financial accounts of the Corporate Defendants, as well as the registrant for their websites" and "Defendant Gedela also registered the Corporate Defendants in Nevada and Delaware." (Motion, 36:6-9) While participants in a "common enterprise" may in some cases share liability for the unlawful

1    practices of any of the participants without regard to their corporate identities or affiliation, the

2    FTC must establish the existence of such an enterprise in order to state a claim against

3    Defendants and obtain a summary judgment. The FTC has not shown, and cannot show, that by

4    having relative common ownership that all Defendants are part of a common enterprise so as to

5    establish any liability for the alleged conduct or the need for injunctive relief.

6        The factors courts typically consider to determine the existence of a "common

7    enterprise" include: (1) whether purportedly separate corporations share employees, officers and

8    office space; (2) whether corporate entities deal at arm's-length; (3) whether corporate entities

9    have their own substantive businesses; and (4) whether there is a commingling of corporate

10   assets. See, e.g., FTC v. J.K. Publ'ns, 99 F.Supp.2d 1176, 1202 (C.D. Cal. 2000) (common

11   enterprise found where corporate defendants were under individual defendant's common control,

12   shared office space, employees, and officers); see also Sunshine Art Studios v. FTC, 481 F.2d

13   1171, 1173, 1175 (1st Cir. 1973); Del. Watch Co. v. FTC, 332 F.2d 745, 746 (2d Cir. 1964);

14   Waltham Precision Instrument Co. v. FTC, 327 F.2d 427, 431 (7th Cir. 1964). Generally, courts

15   look to evidence that "reveals that no real distinction existed between the Corporate

16   Defendants." FTC v. Wolf, No. 94-8119, 1996 WL 812940, at * 7 (S.D. Fla. Jan. 31, 1996)

17   (internal citations omitted). The FTC has used all the right buzz words but has failed to provide

18   sufficient factual detail of each corporate defendant to determine the extent of possible

19   employee and business relationships, as well as the handling of business assets. Based upon

20   these factors the FTC has not established and cannot prove that the Defendants acts establish a

21   "common enterprise".

22       First, the FTC has associated the corporate defendants as a common enterprise only due

23   to utilization by all three companies of a United States based incorporation company. The FTC

24   clearly fails to state with particularity how the defendants' businesses are intermingled

25   constituting a common enterprise. In fact, the FTC consistently references OMICS' business

26   practices, but fails to mention either iMedPub or Conference Series and how their business

27   practices other than the fact that that they are also involved in publishing academic journals and

28   hosting scientific conferences.

Second, the FTC fails to allege that the corporate defendants are not separate legal entities. In fact, the FTC simply states that "Among other things, the various businesses share common ownership and management and operate from the same principal place of business in India." (Motion, 36:2). The FTC has not provided evidence which substantiates the organization of each entity, nor has the FTC provided evidence which proves the type of address the principal place of business is. With each corporate Defendant being an internet-based company, it is highly likely that the address is simply a common registered agent similar to those based in the United States where companies have no actual relationship to each other, but simply pay for services which are provided from the same location.

Third, the FTC does not allege, nor does it attach any evidence showing, that the Defendants have not dealt with any of the other corporate defendants at arm's length. Defendants' businesses center on similar subject matters; however, the FTC does not state with particularity in what way these entities in the past, or presently, are working together within an arm's length matter.

Finally, the FTC has not alleged, nor has it offered any evidence to demonstrate, that any one Defendant has commingled any of its funds with that of any of the other defendant. The only evidence proffered by the FTC as to the Defendants' relationship is the allegation that Dr. Gedela is the founder, principal, and owner of each corporate defendant. Additionally, the FTC contends that Dr. Gedela has signing authority, is the registrant for Defendants' websites, pays registration fees with his personal credit card, and is the point of contact for Defendant's services. (Motion, 36:6-9). However, these allegations do not come with one piece of evidence which would support the contention that funds have been comingled.

Application of these factors unequivocally demonstrates that Defendants do not operate as a common enterprise, and therefore, cannot be held responsible for any actions or omissions of the other entities that the FTC alleges here, much less subject to a Summary Judgement. The bare conclusions pled by the FTC, the total lack of credible or competent evidence attached to the FTC's Motion, and the evidence presented by Defendants, confirm that the FTC cannot succeed on the merits of its claims against each Defendant. Specifically, the FTC cannot

1  establish that the Defendants participated in the alleged conduct, that each Defendant was so

2  intertwined with the other defendants as to lose its separate identity, or that the Defendants are

3  not separate and distinct from the other defendants.

4  **IV.   THE FTC HAS FAILED TO MEET ITS BURDEN OF PROOF TO SUPPORT AN**

5  **AWARD OF MONETARY RELIEF**

6      **A.  Legal Standard**

7  There is no dispute that the FTC bears the burden to prove a reasonable approximation of the

8  causally-connected monetary relief before Defendants are required to put forth any contrary

9  evidence and before any monetary relief can be awarded. Motion at 61. Courts have adopted the

10 following framework in determining damages in an FTC Act case:

> Irrespective of the measure used to calculate monetary equitable relief, courts apply a burden-shifting framework to determine the specific amount to award. First, the FTC bears the initial burden of providing the district court with a reasonable approximation of the monetary relief to award. A reasonable estimate, rather than an exact amount, is proper because that may be the only information available, as when defendants do not maintain data necessary to calculate the precise amount. Second, once the FTC satisfies this burden, the defendant has an opportunity to demonstrate that the figures are inaccurate.

*FTC v. Commerce Planet*, 878 F. Supp. 2d 1048, 1088–89 (C.D. Cal. 2012).

19     Before the burden shifts, the court must "first assess the reasonableness of the FTC's

20 approximation of unjust gain." *Verity*, 443 F.3d at 69. "If the law were otherwise, the FTC

21 would be relieved at the first stage from submitting a reasonable approximation . . . and could

22 recover any amount that it chose to submit, however unreasonable, that fit within the

23 presumption against the wrongdoer." *Id*.

24     **B.  The Evidence Shows the FTC's "Approximation" is Not Reasonable**

25     The figures the FTC offers with respect to monetary relief are patently unreasonable.

26 The FTC bases their determination on assumptions of Defendants' gross revenues tabulated by

27 their internal paralegal. These tabulations are based solely on tax return data which has then

28 been estimated and assumed to arrive at the $50 million amount. The FTC's request, however,

erroneously assumes that every single author/consumer was misled by Defendants' publishing process and that every single dollar paid to Defendants was directly attributable to a Section 5 violation. The FTC has made sweeping assumptions, false tabulations, and seeks this Court to impose a significantly inflated monetary relief. However, the Ninth Circuit recognizes, calculating the injury to consumers "does not mean that the district court must accept the calculation proposed by the FTC." *FTC v. Publishers Bus. Servs., Inc.*, 540 F. App'x 555, 558 (9th Cir. 2013). Rather, the Court should consider the defendants' evidence and arguments "in determining the appropriate measure of damages to be awarded." *Id.*

As such, this Court should not accept the FTC's approximation and, if warranted, should further evaluate the evidence to determine an appropriate measure of damages.

> ### i.   Actual consumer testimony and complaint rates show that not all consumers were misled by the publishing fee

Moreover, the FTC has relied on only 74 complaints, only 20 involve a monetary issue -- 2 of those monetary complaints relating to journals and 18 relating to conferences (only 74 complaints generated out of millions of transactions is extremely small in the business world). This affirmative evidence of non-confusion proves that the critical assumption underlying the FTC's approximation—that all consumers were uniformly misled by the publishing fee—is false. Similarly, as noted above, the FTC cites only a handful of declarations; when in fact, declarations such as Dr. Orser's are affirmative evidence of non-confusion.

Her declaration shows that the target audience (highly educated individuals seeking to publish academic articles) are able to submit articles efficiently and with help from editorial staff, with knowledge of the processing/publication fees. *See* Exhibit B, Declaration of Dr. Cindy Orser generally.

These facts distinguish this case from those cited by the FTC where courts have granted summary judgment based upon the FTC's damages approximations. In each case, the defendants presented no evidence rebutting the reasonableness of the FTC's approximation. *See*, *e.g.*, *FTC v. Inc21.com Corp.*, 475 Fed. Appx. 106, 110 (9th Cir. 2012) ("defendants offered no evidence to rebut the FTC's approximation of loss" and "defendants offered no evidence to

substantiate their claims"); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010), *as amended*, 2010 WL 2365956 (9th Cir. June 15, 2010) (defendant "put forward nothing more than a few bald, uncorroborated, and conclusory assertions rather than evidence"); *Stefanchik*, 559 F.3d at 931 (defendants "have offered no affirmative evidence whatsoever to controvert this amount"); *Figgie*, 994 F.2d at 609 (defendant "has offered no contrary evidence to suggest that they paid any other price"); *Febre*, 128 F.3d at 534-35 (defendants did "not offer any evidence as to why or how the Commission's calculations [were] not appropriate"); *FTC v. EDebitPay, LLC*, 2011 WL 486260, at *13 (C.D. Cal. Feb. 3, 2011) ("Defendants have not shown that these calculations are inaccurate."); *but see FTC v. Commerce Planet, Inc.,* 878 F. Supp. 2d 1048, 1092 (C.D. Cal. 2012) (after bench trial, reducing amount requested by FTC because "not all consumers were in fact deceived").

Here, Defendants have provided evidence which proves that not all consumers were misled and evidence which indeed proves that any monetary relief, if warranted, should be significantly lower than $50 million. *See*, Exhibit A at ¶54.

### ii.    Revenues received from repeat, satisfied consumers are not the result of deception and must be excluded

Perhaps the most significant flaw in the FTC's "approximation" is its inclusion of the most demonstrably unconfused customer—the repeat author. Repeat authors are authors who published articles in Defendants' journals after having previously published an article in one of Defendants' journals. Additionally, the FTC fails to take into consideration individuals who attended multiple conferences. These repeat customers were not misled by the publishing process and were aware that publishing with an open access journal required fees to be paid by the author following acceptance of the article. This Court must take into account evidence of the large number of unconfused consumers, including many who came back to Defendants multiple times after completing transactions on the same terms. *See Publishers*, 540 Fed Appx. at 558 (on remand, the district court should consider defendants' arguments that repeat customers "necessarily knew the actual terms of the transaction at the time of renewal.").

Given the demonstrable behavior of the repeat customers, the FTC's inclusion of them in

its calculation renders its $50 million "approximation" unreasonable as a matter of law.

### C. Any Monetary Award Must be Subject to Temporal Limitations

#### i. Due process prohibits recovery before Defendants were put on notice that they were allegedly violating Section 5

Due process limits any monetary award to the causally-connected amount received after Defendants were first put on notice that the publishing practices allegedly violated Section 5 of the FTC Act. *See United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008) ("Due process requires that an agency provide 'fair notice of what conduct is prohibited before a sanction can be imposed.'"). "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). Therefore, here, the earliest date from which a monetary award could accrue is August 25, 2016, when the FTC filed its Complaint and put Defendants on notice.

#### ii. Any monetary award is subject to statutes of limitations in the FTC Act

Where the FTC Act is deemed to control, the three-year statute of limitation in Section 19 of the FTC Act bars any award for monetary relief before August 25, 2016. Section 19 provides the sole authority for an award of monetary relief under the FTC Act and the Ninth Circuit has long held that when a particular provision of statutory law does not provide a statute of limitations, it is proper for a court to borrow a limitations period from an analogous statute. *See Conley v. Int'l Bhd. of Elec. Workers, Local 639*, 810 F.2d 913, 914–15 (9th Cir. 1987). Here, the Court need not look to another statute, but instead to a nearby section of the FTC Act: Section 19. *See Publishers*, 821 F. Supp. 2d at 1227 ("no action may be brought by the Commission under this section [Section 13] more than 3 years after the rule violation . . . or the unfair or deceptive act or practice to which an action' relates."). Thus, the FTC is incorrect in the assertion that the statute of limitations fails as a matter of law.

## V. **DEFENDANTS AFFIRMATIVE DEFENSES ARE SUPPORTED BY EVIDENCE AND MUST PROCEED TO TRIAL**

The FTC has already attempted to strike all of Defendants' affirmative defenses and failed to succeed with respect to multiple asserted defenses. In fact, multiple arguments in the Motion are disingenuous given the language contained in the Report and Recommendation on the matter (Dkt. No. 61). In fact, the Court stated that "this very motion to strike affirmative defenses, while meritorious in some respects, does not assist in streamlining the case as it addresses defenses that will undoubtedly be relevant to the case". (R&R: 9, fn2). The Report and Recommendation made it clear that the remaining affirmative defenses were valid and should proceed to trial. The FTC has improperly attempted a second bite at the apple, and their requests should be denied.

## VI. **THE FTC'S PROPOSED ORDER IS OVERLY BROAD**

The 24-page Proposed Order submitted by the FTC (Dkt. No. 86-32) fails to apply the law and overstates the FTC's evidence against Defendants. The FTC seeks to impose unprecedented conditions and restrictions on Dr. Gedela and the Corporate Defendants. Even a cursory review of the case law cited by the FTC confirms that the Proposed Order is overbroad. The FTC's failure to guide the Court on the correct procedures and overreaching requirements are additional reasons why the Court should conduct a trial, compile a sufficient factual record, and enter a judgment that will withstand Ninth Circuit scrutiny

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1 | **VII.**     <u>**CONCLUSION**</u>

2       For the above reasons, Defendants respectfully request that this Court deny Plaintiff's

3 Motion for Summary Judgment.

4       DATED this 22nd day of June, 2018.

5                        Respectfully submitted,

6

7                        HYPERION ADVISORS

8                        */s/ D. Neal Tomlinson*

                       D. NEAL TOMLINSON

9                        Nevada Bar No. 06851

                       KRISTINA R. KLEIST

10                        Nevada Bar No. 13520

11                        3960 Howard Hughes Parkway, Suite 500

                       Las Vegas, Nevada 89169

12

13                        *Attorneys for Defendants*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 22, 2018, a true and correct copy of the foregoing **DEFENDANTS' OPPOSITION TO FTC'S MOTION FOR SUMMARY JUDGMENT** was filed electronically with the United States District Court for the District of Nevada using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system.

/s/ *D. Neal Tomlinson*
Attorney for Defendants
