# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:16-cv-02022-GMN-VCF |
| vs. | ) | |
| | ) | **ORDER** |
| OMICS GROUP INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Pending before the Court is the Motion for Summary Judgment, (ECF No. 86), filed by Plaintiff Federal Trade Commission ("the FTC"). Defendants OMICS Group Inc. ("OMICS"), iMedPub LLC ("iMedPub"), Conference Series LLC ("Conference Series"), and Srinubabu Gedela ("Gedela") (collectively "Defendants") filed a Response, (ECF No. 110), and the FTC filed a Reply, (ECF No. 115). Also, before the Court is the Motion for Summary Judgment, (ECF No. 89), filed by Defendants. The FTC filed a Response, (ECF No. 97),[1] and Defendants filed a Reply, (ECF No. 107). For the reasons discussed herein, the FTC's Motion for Summary Judgment is **GRANTED,** and Defendants' Motion for Summary Judgment is **DENIED**.

## I.     BACKGROUND

### A.  Overview

The FTC brings this action pursuant to Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), alleging that Defendants engaged in unfair and deceptive practices with respect to the publication of online academic journals and organization of scientific conferences. (*See* Compl., ECF No. 1). Defendants claim to operate hundreds of online academic journals on a

---

[1] The FTC additionally filed a Motion to Strike portions of the Declaration of Kishore Vattikoti submitted in support of Defendants' Motion for Summary Judgment. (ECF No. 96). The Court addresses this Motion in the Discussion section below.

wide variety of topics, including medicine, chemistry, nursing, engineering, and genetics. (*Id.* ¶ 20); (Gedela Decl. ¶¶ 14–15, Ex. 1 to Defs.' MSJ, ECF No. 89-1).  In order to persuade consumers to submit articles for publication, the FTC alleges that Defendants make numerous misrepresentations regarding the nature and reputation of their journals. (Compl. ¶¶ 11, 12).  The FTC also alleges that Defendants fail to disclose the significant fees associated with their publishing services. (*Id.* ¶ 13).  Finally, the FTC alleges that Defendants make numerous misrepresentations in connection with the marketing of their scientific conferences. (*Id.* ¶ 14).

The FTC asserts that Defendants OMICS, iMedPub, and Conference Series (collectively "Corporate Defendants") have operated as a common enterprise in violating Section 5(a) and therefore are jointly and severally liable. (*Id.* ¶ 10).  The FTC further asserts that Gedela has "formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise." (*Id.*).  Based on these allegations, the FTC initiated this action against Defendants on August 25, 2016.  On September 29, 2017, the Court granted the FTC's request for a preliminary injunction, requiring Defendants to preserve records, provide financial accounting to the FTC, and refrain from engaging in deceptive practices. (Prelim. Inj. Order, ECF No. 46).  The parties now submit their respective motions for summary judgment on the FTC's unfair and deceptive practices claim.

### B. Background on Academic Publishing[2]

#### 1) Traditional Model vs. Open Access

Academic or scholarly journals are peer-reviewed publications that focus on a particular academic or scientific discipline. (*See* SJX18 Backus Decl. ¶ 5, Ex. 18 to FTC's MSJ, ECF No.

---

[2]  Defendants oppose the facts incorporated in this order predominantly through arguments of counsel. "[A]rguments of counsel are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment." *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.,* 289 F.3d 589, 593 n. 4 (9th Cir.2002).  Defendants also oppose the facts through inadmissible external hyperlinks that lack a foundation in evidence and fail to articulate specific factual assertions. Fed. R. Evid. 901(a); Local Rule 56-1. Accordingly, unless otherwise indicated, the facts in the background sections are predominantly uncontroverted.

86-18).[3]  These publications are comprised of articles, which typically take the form of "original research, review articles, commentaries, or clinical case studies." (*Id.*).

Under the traditional model, publishers charge libraries and individuals "user subscription fees" to gain access to the published material. (*Id.* ¶ 6).  The articles remain accessible to the extent users remain subscribed to the journal. (*See id.*).  In contrast, under the newer "open access" model, journals make their content available to the public at no cost, subsidizing their operations primarily through author-funded publication fees. (*Id.* ¶ 7); (Gedela Decl. ¶ 9, Ex. 1 to Defs.' MSJ).  By removing price and permission barriers, this model increases access to a broader community. (SJX18 Backus Decl. ¶ 9); (Gedela Decl. ¶ 10).

### 2) Peer Review

"Peer-review" is the process of subjecting an author's scholarly work, research, or ideas to the scrutiny of qualified experts in the same field prior to publishing in a journal. (SJX18 Backus Decl. ¶ 12).  When an author submits their work for publication, the journal makes an initial determination regarding whether to accept the article for peer review or reject it outright. (*Id.*).  If accepted, authors are expected to respond to peer reviewer commentary, implement recommendations, and, if necessary, justify the rejection of any proposed revisions. (*See id.* ¶¶ 14–15).  The peer-review process typically takes several months. (*Id.*).  Prior to publishing, authors are usually required to sign a publication agreement that gives the journal the right to publish the submitted article. (*Id.* ¶ 14).

### 3) Impact Factors

In the academic publishing industry, a journal's "impact factor" is often used as an objective measure of the prestige or relative importance of a journal in its field. (*Id.* ¶ 15). "Impact factor" typically measures the average number of scholarly citations that articles

---

[3]  The exhibits titled "SJX" can be found attached to the FTC's Motion for Summary Judgment, (ECF No. 86). The exhibits titled "PX" can be found attached to the FTC's Motion for Preliminary Injunction, (ECF No. 9). For the remainder of this Order, the Court will refer to these exhibits only by their respective "SJX" and "PX" numbers.

receive in a published journal. (*See id.* ¶ 16).  A higher impact factor indicates a more reputable journal. (*Id.* ¶ 15).  Amongst those in the industry, the term is specifically understood to mean the proprietary citation measure calculated and published by Thomson Reuters in its Journal Citation Reports. (*Id.* ¶ 16).[4]  A journal must be indexed by Thomson Reuters in either its Science Citation Index Expanded or its Social Sciences Citation Index to receive an impact factor. (*Id.*).

### 4)  Indexing

Aside from impact factors, "indexing" also serves as an indicator of a journal's reputation. (*Id.* ¶¶ 17–22).  The United States National Library of Medicine ("NLM") produces and manages three freely accessible bibliographical resources: PubMed, Medline, and PubMed Central. (SJX11 Admissions Nos. 42, 43).  Journals must apply for inclusion in Medline and PubMed Central, upon which time an NIH-chartered advisory committee reviews the submission. (*See id.*).  Due to the selective nature of these indexes, a journal's inclusion is considered indicative of a journal's quality. (*See id.*).

### C.  Gedela and the Corporate Defendants

### 1)  Corporate Structure

Defendants OMICS, iMedPub, and Conference Series are corporate entities registered in the United States with a principle place of business located in Hyderabad, India. (SJX02 Answer ¶¶ 6–8); (Gedela Decl. ¶ 6).[5]  Each entity shares the same principal address at SEZ Unit, Building No. 20, 9th Floor, APIIC Layout, HITEC City, Hyderabad, AP 500081. (*Id.*).  Furthermore, each entity at various points has utilized common addresses for their United States locations and business registrations. (*Id.*); (*See, e.g.,* PX12 Att. D at 116, Att. I at 257,

---

[4]  Thomson Reuters has been succeeded by Clarivate Analytics. (SJX11 Request for Admissions No. 35)
[5]  Gedela filed dissolution papers in each of these entities in June/July of 2017. (SJX 17 Dissolution Papers Att. B).  To the extent these entities are dissolved, the Court will continue to refer to them in present tense in the interest of clarity.  Defendants do not argue that dissolution bars liability nor does the Court find any basis to so conclude. *See* N.R.S. § 78.585; Del. Code tit. 6 § 18-804.

Att. K at 367, Att. L at 667, Att. M at 945); (SJX26 Att. J at 284, 290, 296, 299, Att. K at 323, Att. L at 328, Att. M at 338); (Internet Archives at 10, 17, 96, ECF No. 84).[6]  In general, these entities operate as a group with comingled assets. (*See generally* FTC's MSJ 6:10–7:27, ECF No. 86).

Gedela is the sole owner and founding director of the three Corporate Defendants. (SJX02 Answer ¶ 9); (SJX03 OMICS Int. Resp. 2); (SJX04 iMedPub Int. Resp. 2); (SJX05 Conference Series Int. Resp. 2); (Defs.' MSJ 5:3–4, ECF No. 89).  Gedela first began using the fictitious business name "OMICS Publishing Group" for his publishing and conference services in 2009. (SJX23 Gedela Dep. 23:1–18, 30:1–25); (Defs.' MSJ 5:3–11).  Until at least 2015, Gedela held revenue from the Corporate Defendants in a Citibank account set up in Palo Alto for OMICS Publishing Group. (*See* SJX23 Gedela Dep. 27:1–30:25).  As founding director, Gedela has authority and control over Defendants' conference and publishing practices. (SJX10 Admission Nos. 1–4, 20); (*See* FTC's MSJ 4:26–5:22).  Furthermore, Gedela has signatory authority over OMICS and iMedPub's financial accounts. (SJX02 Answer ¶ 9); (SJX10 Admission No. 22).  Gedela operates as the main contact for the Corporate Defendants' servicers, including their payment processor. (PX12 Att. P at 1007; Att. O at 997, 999; Att. D at 109).

### 2) *Defendants' Peer Review Practices*

Defendants advertise throughout their websites and email solicitations that they strictly adhere to standard peer-review practices. (*See* SJX11 Admission No. 60); (SJX12 Admission Nos. 61–64); (SJX13 at 6–14); (SJX 15 at 4–8, 11–14); (*See* SJX1 Solicitation Email at 8); (SJX26 Att. Q at 576, 585, 588, 630, 698); (*See* PX12 Att. L at 657).  For example, in 2014,

---

[6] The FTC moves for judicial notice of archived web pages pursuant to Federal Rule of Evidence 201. (Mot. for Judicial Notice, ECF No. 84).  Defendants did not file an objection.  Accordingly, the FTC's request for judicial notice is granted. *See* Local Rule 7-2; *Pond Guy, Inc. v. Aquascape Designs, Inc.*, No. 13-13229, 2014 WL 2863871, at *4 (E.D. Mich. June 24, 2014) ("As a resource the accuracy of which cannot reasonably be questioned, the Internet Archive has been found to be an acceptable source for the taking of judicial notice.").

Defendants published web pages stating that OMICS had 25,000 experts serving as editorial board members and reviewers, and that "[a]ll articles submitted for publication are subjected to a blind peer review." (SJX15 ¶¶ 182–186). Over the years, this number has grown to over 50,000 purported experts serving as board members and reviewers for over 700+ "leading-edge peer reviewed" journals. (SJX26 Att. Q at 576, 586); (Gedela Decl. ¶¶ 14–15, Ex. 1 to Defs.' MSJ). Consistently, Defendants have represented their peer review policies as "highly appreciated, accepted and adaptable" to the criteria set forth by agencies such as PubMed. (PX12 Att. L at 773).

In contradiction to these assertions, however, the FTC submits evidence indicating that Defendants' peer review practices are a "sham." (FTC's MSJ 24:4–5). For example, in certain instances, consumers who submitted articles were approved for publication within just several days of submission. (SJX 26 Att. A at 20, 53, 69, 84, 86, 114). In others, consumers reported receiving no comments or proposed revisions from peer reviewers. (*See id.* at 37, 53, 73, 93, 114, 124). The consumers who did receive feedback from reviewers have noted that it was not substantive. (*Id.* at 53); (PX09 Hoevet Decl. ¶ 4); (PX10 Davidson Decl. ¶¶ 6, 10).

In 2012, John Bohannon—a scientist and writer for *Science* magazine—submitted two articles to Defendants' journals with intentionally "egregious" scientific flaws. (PX14 Bohannon Decl. ¶ 3).[7] Defendants' journals accepted the flawed papers without any substantive comments or review. (*See id.* ¶¶ 5, 7). Similarly, in 2016, a journalist for the Ottawa Citizen submitted an "unintelligible" article containing ungrammatical sentences and invented words. (SJX01 Spears Decl. ¶ 2). Defendants' journal published the article without any edits and without contacting the author prior to publication. (*Id.* ¶ 3). After reviewing these cases, the FTC's expert Joyce Backus concluded that the papers were not subjected to peer

---

[7] PX14 can be found attached to the FTC's Reply to their Motion for Preliminary Injunction, (ECF No. 12).

review "as that term is understood in the academic publishing industry." (SJX18 Backus Decl. ¶¶ 29, 31).

In addition to consumer commentary, the FTC also submits statements from multiple of Defendants' journal editors. (FTC's MSJ 25:15–25). In these statements, the editors indicate that they never received any manuscripts to review. (PX01 Woods Decl. ¶¶ 3–4, 9); (PX03 Everett Decl. ¶¶ 3–4). Based on documents received through discovery, the FTC asserts that out of 69,000 published articles, only 49% indicate that some form of review was conducted. (*See* FTC's MSJ 26:8–14).

### 3) Defendants' Expert Reviewers

Defendants advertise that their publications are reviewed and edited by as many as 50,000 experts. (SJX26 Att. Q at 576, 586); (Gedela Decl. ¶¶ 14–15, Ex. 1 to Defs.' MSJ).[8] In support of this claim, Defendants' websites include hundreds of names, pictures, and biographies of scientists and researchers allegedly serving on editorial boards. (PX12 Att. L at 669–82, 734–37, 808–815). Upon the FTC contacting several listed editors, however, many indicated that they had never agreed to be affiliated with OMICS. (PX02 Grace Decl. ¶¶ 4–7); (PX08 Howland Decl. ¶ 7); (PX11 Rusu Decl. ¶ 11). Furthermore, in some instances, Defendants continued to use the researchers' names even after they requested removal. (PX08 Howland Decl. ¶ 7); (PX11 Rusu Decl. ¶ 11); (SJX26 Att. A at 35, 63). More generally, the FTC notes that Defendants have only been able to produce a list of 14,598 unique editors and evidence of an agreement to serve as an editor for only 380 individuals. (SJX24 Wilson Decl. ¶ 3); (SJX26 Freeman Decl. ¶ 15).

### 4) Defendants' Use of Impact Factors

Defendants advertise throughout their websites and solicitation emails that their publications have high "impact factors." (SJX26 Att. Q at 741–768); (PX12 Att. L 657, 691,

---

[8] This number has increased each year, beginning with an advertised 20,000 expert editors in 2012. (SJX15 Admission No. 180).

762, 766, 768–769, 881–935); (SJX15 Admissions Nos. 196, 197). These advertisements include express representations, such as "OMICS International journals are among the top high impact factor academic journals which are publishing scholarly articles constantly." (SJX26 Att. Q. 820). Defendants admit that their journals do not have Thomson Reuters impact factors. (SJX04 iMedPub Int. Resp. 8); (SJX07 OMICS Int. Resp. 15). Rather, Defendants' impact factors are self-calculated ratios based on the number of citations found through a Google Scholar search. (*See* PX12 Att. L at 770); (SJX14 Admission No. 103); (SJX26 Att. P at 467, 763).

Defendants' websites contain inconsistent descriptions of how their impact factors are calculated. In some places, the impact factors are described as based on Journal Citation Reports, which is consistent with the Thomson Reuters Impact Factor. (SJX15 Admissions 198-211). In other places, Defendants describe them as an "unofficial impact factor" based on Google Scholar Citations. (*See, e.g.*, SJX14 Admission No. 103); (Internet Archives at 93, ECF No. 84). Although Defendants provide their alternate definition in disclosures, such explanations often appear buried underneath their journal marketing. (*See* PX12 Att. L at 881–931); (SJX26 Att. P at 450–467). In some instances, Defendants' websites make the general claim that their journals have "high impact factors" without any qualification. (*See* PX12 Att. L at 657, 762); (SJX26 Att. Q at 820). Similarly, Defendants have sent solicitation emails referring to their journals' impact factors without qualification. (*See* SJX27 Email at 3).

### 5) *Defendants' Indexing Representations*

Defendants represent that their publications are indexed in reputable indexing services. (*See* PX12 Att. L at 643, 657, 694). For example, Defendants repeatedly indicate that their journals are indexed in Medline and PubMed Central. (PX10 Att. D at 16); (SJX26 Att. Q at 589, 820, 916, 923). At various points, Defendants have even utilized PubMed and Medline's logos on their websites. (Internet Archives at 8, 11, 14, 17, 20, 24).

Despite these representations, Defendants admit that none of their journals are indexed in PubMed Central or Medline. (*See* SJX07 Admission Nos. 13, 14); (SJX08 Admission Nos. 13, 14). Instead, Defendants claim that more than 900 well-respected scientists have *recommended* OMICS' journals to be published in PubMed central. (Gedela Decl. ¶ 17, Ex. 1 to Defs.' MSJ). Nonetheless, NLM has explicitly refused to index Defendants' publications due to questionable publishing practices and requested that Defendants cease indicating any affiliation. (SJX18 ¶¶ 32–36, Att. B at 25, Att. C at 28, Att. D at 31, Att. E at 33–34). Despite NLM's requests, Defendants have continued to indicate their journals' inclusion in Medline and PubMed Central. (*See* PX10 Att. D at 16); (SJX26 Att. Q at 589).

### 6) *Defendants' Publishing Fees*

Defendants frequently send out solicitation emails inviting individuals to submit articles to Defendants' online publications. (*See* PX04 Att. A at 6); (PX09 Att. A at 4); (PX10 Att. D at 16, Att. G at 37); (PX11 Att. D at 11). In numerous instances, these email solicitations contain no mention of any fees associated with Defendants' publication service. (*Id.*). Defendants have continued this practice even after the Court's entry of its preliminary injunction. (*See* SJX01 at 6); (SJX26 Att. A at 65); (SJX27 Att. A at 3–7). Defendants' solicitation emails invite consumers to submit articles for publication by responding directly to the email. (*Id.*). Additionally, Defendants solicit article submissions through their online portals. (*See* SJX15 at 25–26). In many instances, Defendants' article homepages do not contain clear reference to fees associated with submitting articles. (*See, e.g.,* PX12 Att. L at 652–654, 734–738); (SJX26 Att. Q at 631–640). In other instances, Defendants' fee disclosures are contained on secondary webpages but lack specificity. (PX12 Att. K at 375–381). Notably, consumers going to a journal's homepage can submit a manuscript without ever seeing any fee disclosures. (*See, e.g.* PX12 Att. K at 340–341).

Some consumers only learn of Defendants' fees after Defendants have accepted their articles for publication. (*See, e.g.,* PX04 ¶ 5); (SJX26 Att. A at 20, 26, 33, 45, 59). Furthermore, when consumers contest Defendants' publication fees and ask their articles to be withdrawn, Defendants have ignored the requests and continued demanding payment. (*See, e.g.,* PX04 ¶¶ 6–8); (PX06 ¶¶ 6, 8); (PX07 ¶¶ 5, 8).  In some instances, Defendants only removed the articles after the threat of legal action. (*See, e.g.,* PX07 ¶¶ 9–10).  In addition to economic harm, this conduct prevents authors from submitting their work to other journals. (*See* SJX18 Backus Decl. ¶ 11).  The Court notes, however, that at least one consumer has found the publication fees to be clearly disclosed. (*See* Orser Decl. ¶ 14, Ex. B to Defs.' Resp., ECF No. 110-4).

### 7) *Defendants' Conference Practices*

In addition to online publishing, Defendants also organize conferences on various scientific topics. (*See* SJX16 Gedela Decl. ¶¶ 6, 8); (SJX26 Att. B at 170, 185, 188). Defendants note that they have received "appreciation and invitation letters for hosting [their] conferences in many major cities." (Defs.' MSJ 8:15–16); (Letters, Ex. 3 to Defs.' MTD, ECF No. 31).  Many of these conferences occur in the United States. (SJX26 ¶¶ 10–14).

In order to attract consumers, Defendants advertise the attendance and participation of prominent academics and researchers. (*See* PX05 ¶¶ 3,5); (PX12 Att. U at 1045); (SJX26 Att. A at 22, 56, 170).  The FTC has provided evidence, however, that Defendants advertise the attendance and participation of these individuals without their permission or actual affiliation. (*See* PX05 ¶¶ 3,5); (PX12 Att. U at 1045).  In numerous instances, individuals have requested unsuccessfully to have their names removed from Defendants' conference advertising materials. (*See, e.g.,* PX03 ¶¶ 6–12); (SJX26 Att. N at 370).  In some instances, Defendants did not remove an individuals' name until the threat of legal action. (*See, e.g.,* PX05 ¶ 7). According to the FTC's sampling of 100 conferences, approximately 60% advertised

organizers or participants who had not agreed to serve in such capacity. (SJX25 McAlvanah Decl. ¶ 7).

## II.    <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case

on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III.  <u>DISCUSSION</u>

### A.  FTC's Motion to Strike Declaration

The FTC moves to strike the declaration of Defendants' Indian counsel, Kishore Vattikoti ("Vattikoti"), which is attached to Defendants' Motion for Summary Judgment. (FTC Mot. to Strike 1:22–24, ECF No. 96).  In the declaration, Koshore Vattikoti makes numerous

broad assertions regarding the validity of Defendants' conference and publishing practices. (Vattikoti Decl. ¶¶ 6–9, Ex. 3 to Defs.' MSJ, ECF No. 89-3). Additionally, Vattikoti testifies that "all consumer complaints [against Defendants] have been resolved." (*Id.* ¶ 10). Attached to the declaration is what appears to be a summary exhibit of consumer complaints. (*Id.* at Ex. C). The summary exhibit contains notations regarding the manner in which Defendants purportedly resolved the complaints. (*Id.*).

The FTC asserts that this declaration violates Federal Rule of Civil Procedure ("FRCP") 56(c)(4) because it fails to include "specific facts" of which the declarant has personal knowledge. (FTC Mot. to Strike 2:7–9). Specifically, the FTC notes that Gedela has previously testified that Vattikoti's responsibilities are limited to helping Defendants with this specific action, and he is not involved in the business. (*Id.* 2:24–3:4). In response, Defendants claim that Vattikoti has sufficient personal knowledge as Defendants' legal counsel and through assisting in Defendants' prior transactional and marketing matters. (*See* Defs.' Resp. 2:25–3:15).

FRCP 56(c)(4) states that an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Here, Defendants fail to articulate how Vattikoti's role as Defendants' legal counsel gives him personal knowledge of whether 74 specific consumer complaints have been resolved. Defendants also fail to identify the source of the notations on Vattikoti's summary exhibit, thus giving no basis to the evidence he is relying upon. The Court therefore strikes these portions as violating Rule 56.[9] With respect to the remaining portions, the Court finds Defendants have sufficiently demonstrated Vattikoti's personal knowledge and therefore will not strike them. Nonetheless, the Court notes that these vague and conclusory assertions do not raise a genuine

---

[9] The Court notes that even to the extent Defendants had demonstrated personal knowledge, whether consumer complaints have at some point been resolved is immaterial to the underlying action.

issue of material fact. *See Casey v. Lewis*, 4 F.3d 1516, 1527 (9th Cir. 1993); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

**B. Violations of Section 5 of the FTC Act**

The FTC asserts that Defendants engaged in deceptive practices in violation of Section 5 by: (1) misrepresenting the nature of their academic journals; (2) misrepresenting their scientific conferences; and (3) failing to adequately disclose that consumers must pay publishing fees. (*See* FTC's MSJ 32:2–6). The Court addresses each contention below.

　　*1) Deceptive Practices Legal Standard*

Section 5 of the FTC Act prohibits "unfair or deceptive practices in or affecting commerce." 15 U.S.C. § 45. An act or practice is deceptive under Section 5 if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). A misrepresentation is material if it involves facts that a reasonable person would consider important in choosing a course of action. *See FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006). Express claims are presumed material, so consumers are not required to question their veracity to be deemed reasonable. *See Pantron I*, 33 F.3d 1088, 1095–96 (9th Cir. 1994). Furthermore, the FTC need not prove reliance by each consumer misled by Defendants. *See FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1275 (S.D. Fla. 1999); *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993).

In considering whether a claim is deceptive, the Court must consider the "net impression" created by the representation, even when the solicitation contains some truthful disclosures. *See Cyberspace*, 453 F.3d at 1200. The FTC need not prove that Defendants' misrepresentations were made with an intent to defraud or deceive or in bad faith. *See, e.g., Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989); *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir. 1988). A representation is also deceptive if

the maker of the representation lacks a reasonable basis for the claim. *See FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010). Where the maker lacks adequate substantiation evidence, they necessarily lack any reasonable basis for the claims. *Id.* Furthermore, any disclaimers must be prominent and unambiguous to change the apparent meaning and leave an accurate impression. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 325 (7th Cir. 1992). The FTC Act is violated if a seller "induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract." *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975).

### 2) *Misrepresentations Regarding Journal Publishing*

The FTC moves for summary judgment on the basis that no genuine dispute exists as to Defendants' deceptive journal publishing practices. (FTC's MSJ 43:7–44:10). The Court agrees. In their websites and email solicitations, Defendants represent that their journals follow standard peer review processes in the academic journal industry. (*See* SJX11 Admission No. 60); (SJX12 Admission Nos. 61–64); (SJX13 at 6–14); (SJX 15 at 4–8, 11–14); (*See* SJX1 Solicitation Email at 8); (SJX26 Att. Q at 576, 585, 588, 630, 698); (*See* PX12 Att. L at 657). Under standard industry practice, however, the peer review process takes several weeks/months and involves multiple rounds of substantive feedback from experts in that field. (SJX18 Backus Decl. ¶¶ 14–15). In this case, the FTC has submitted uncontroverted evidence showing that Defendants' peer review practices often took a matter of days and contained no comments or substantive feedback. (*See* SJX 26 Att. A at 20, 53, 69, 84, 86, 114). Although Defendants challenge the length of time required for peer review, Defendants fail to provide any evidence to support such a short review time. Furthermore, the FTC has submitted uncontroverted statements from purported "editors" indicating that they never even received manuscripts to review or else even agreed to be listed as an editor. (*See* PX02 Grace Decl. ¶¶ 4–7); (PX08 Howland Decl. ¶ 7); (PX11 Rusu Decl. ¶ 11).

Defendants also expressly represent that their publications have high impact factors. (SJX26 Att. Q at 741–768); (PX12 Att. L 657, 691, 762, 766, 768–769, 881–935); (SJX15 Admissions Nos. 196, 197). The term impact factor is understood in the community to mean the annual calculation released by Thomson Reuters. (SJX18 Backus Decl. ¶ 16). In contrast, Defendants base their impact factor off a Google Scholar search. (*See* PX12 Att. L at 770); (SJX14 Admission No. 103); (SJX26 Att. P at 467, 763). Despite this deviation, Defendants repeatedly make misleading representations regarding their journals' impact factors without any qualification. (*See* SJX27 Email at 3); (*See* PX12 Att. L at 657, 762); (SJX26 Att. Q at 820). Furthermore, even when Defendants do provide a qualification, such statements are not prominently displayed. The mere fact that Defendants have some form of disclaimer does not alter the deceptive net impression. *F.T.C. v. Johnson*, 96 F. Supp. 3d 1110, 1146 (D. Nev. 2015); *See Kraft*, 970 F.2d at 325.

Defendants further represent that their publications are included in reputable indexing services, such as Medline and PubMed Central. (*See* PX10 Att. D at 16); (SJX26 Att. Q at 589, 820, 916, 923). These representations are rendered false by Defendants' own admissions. (*See* SJX07 Admission Nos. 13, 14); (SJX08 Admission Nos. 13, 14). Moreover, NLM itself refuses to index Defendants' publications due to questionable publishing practices. (*See* SJX18 ¶¶ 32–36, Att. B at 25, Att. C at 28, Att. D at 31, Att. E at 33–34). Despite NLM's requests to disassociate with Defendants, Defendants continue to misrepresent their inclusion in Medline and PubMed Central. (*See* PX10 Att. D at 16); (SJX26 Att. Q at 589). The uncontroverted evidence in the record therefore demonstrates that Defendants have made numerous express and material misrepresentations regarding their journal publishing practices. As Defendants have failed to raise any genuine issues of material fact, the Court grants the FTC summary judgment on this count.

### 3) Misrepresentations Regarding Scientific Conferences

The FTC moves for summary judgment on the basis that no genuine dispute exists as to Defendants' deceptive conference practices. (FTC's MSJ 44:11–45:3). The FTC is correct. Here, the uncontroverted evidence produced by the FTC demonstrates that Defendants engaged in material misrepresentations regarding their conferences. Notably, the FTC has submitted evidence showing that Defendants advertise the attendance and participation of prominent academics and researchers without their permission or actual affiliation. (*See* PX05 ¶¶ 3,5; PX12 Att. U at 1045); (SJX26 Att. A at 22, 56, 170). In fact, based on a sampling of 100 conferences, approximately 60% advertised organizers or participants who had not agreed to serve in such capacity. (SJX25 McAlvanah Decl. ¶ 7). Had consumers known of Defendants' misrepresentations, it is likely they would not have agreed to attend, participate in, or be affiliated with Defendants' conferences. The fact that some cities may have sent Defendants generic appreciation or invitation letters does not negate Defendants' underlying deception. *See Stefanchik*, 559 F.3d at 928. Accordingly, as Defendants have failed to raise any genuine issues of material fact, the Court grants the FTC summary judgment on this count.

### 4) Misrepresentations Regarding Publishing Fees

The FTC moves for summary judgment on the basis that no genuine dispute exists as to Defendants' failure to adequately disclose publishing fees. (FTC's MSJ 45:4–46:4). The Court again agrees. As noted above, Defendants frequently send out solicitation emails inviting individuals to submit articles to Defendants' online publications. (*See* PX04 Att. A at 6); (PX09 Att. A at 4); (PX10 Att. D at 16, Att. G at 37); (PX11 Att. D at 11). In numerous instances, these email solicitations contain no mention of any associated fees. (*Id.*). Despite these omissions, Defendants invite consumers to submit articles for publication by responding directly to the emails. (*Id.*). Industry practice is to clearly disclose the fees before authors submit their articles. (*See* PX13 ¶¶ 4, 6). A consumer submitting an article through email could

therefore reasonably and mistakenly assume that there is no charge for publishing in Defendants' journals. (*See, e.g.,* PX04 ¶ 5).

Defendants also solicit article submissions through their online portals. (*See* SJX15 at 25–26). In many instances, however, Defendants' article homepages do not contain clear references to fees. (*See, e.g.,* PX12 Att. L at 652–654, 734–738); (SJX26 Att. Q at 631–640). In other instances, Defendants' fee disclosures are contained on secondary webpages but are difficult to find and lack specificity. (PX12 Att. K at 375–381). While Defendants assert that fees are clearly disclosed on their general home page, multiple avenues exist to submit an article without navigating through this page. Additionally, Defendants have provided no evidence to support the assertion that reasonable consumers would check their home page for specific fee disclosures, rather than the actual article submission pages. Indeed, Defendants' Response to the FTC's Motion for Summary Judgment merely asserts broad conclusions based on inadmissible hyperlinks to Defendants' purported websites. (*See* Defs.' Resp. 32:1–33:17, ECF No. 110). Regardless, the fact that some consumers may have seen Defendants' fee information prior to submitting an article does not negate the overall deceptive nature of Defendants' fee disclosures. *See SlimAmerica, Inc.*, 77 F. Supp. 2d at 1275; *Figgie Int'l, Inc.*, 994 F.2d at 605. As Defendants have failed to raise any genuine issues of material fact, the Court grants the FTC summary judgment on this count.

### 5) Defendants Engaged in a Common Enterprise

"[E]ntities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *F.T.C. v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142–43 (9th Cir. 2010). In deciding whether a common enterprise exists, courts may consider such factors as whether the companies were under common ownership and control; whether they pooled resources and staff; whether they shared phone numbers,

employees, and email systems; and whether they jointly participated in a "common venture" in which they benefited from a shared business scheme or referred customers to one another. *Id.* at 1243. Where the same individuals transact business through a "maze of interrelated companies," the whole enterprise may be held liable as a joint enterprise. *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2012).

Here, the undisputed evidence demonstrates that no real distinction exists between the Corporate Defendants. Notably, each Corporate Defendant shares the same principal place of business in India and has at various points utilized common addresses in the United States. (*See* SJX02 Answer ¶¶ 6–8); (Gedela Decl. ¶ 6). Furthermore, Defendants do not dispute that Gedela is the sole owner and founding director of the three Corporate Defendants and has maintained control over their business practices and financial accounts. (SJX10 Admission Nos. 1–4, 20); (SJX02 Answer ¶ 9); (SJX03 OMICS Int. Resp. 2); (SJX04 iMedPub Int. Resp. 2); (SJX05 Conference Series Int. Resp. 2); (Defs.' MSJ 5:3–4, ECF No. 89). With respect to pooled resources, the FTC has submitted undisputed evidence of Defendants' comingled assets, such as the bank account in Palo Alto. (*See generally* FTC's MSJ 6:10–7:27). Lastly, each entity was a beneficiary and participant in Defendants' shared deceptive publishing and conference scheme. The Court therefore finds that the Corporate Defendants operated as a common enterprise.

### 6) *Gedela's Individual Liability for Injunctive and Monetary Relief*

Personal liability for violations of the FTC Act fall into two categories: liability for injunctive relief and liability for monetary relief. Individuals are liable for injunctive relief if they directly participate in the deceptive acts or have the authority to control them. *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997); *F.T.C. v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009). To subject an individual to monetary liability, the FTC must show that the individual had knowledge of the misrepresentations, was recklessly indifferent to

the truth or falsity of the misrepresentation, or was aware of a high probability of fraud and intentionally avoided the truth. *Publ'g Clearing House*, 104 F.3d at 1171; *Stefanchik*, 559 F.3d at 931. "[T]he extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1235 (9th Cir. 1999).

The undisputed evidence in this case clearly demonstrates that Gedela's participation and control over the Corporate Defendants meets the standard for full personal liability. As detailed above, Gedela is the founder, principal, and owner of the Corporate Defendants. He has signatory authority over the corporations' financial accounts and is the billing contact for Defendants' websites. (*See* SJX02 Answer ¶ 9); (SJX10 Admission No. 22). He is also the main contact for the Corporate Defendants' servicers, including their payment processor. (PX12 Att. P at 1007; Att. O at 997, 999; Att. D at 109). The OMICS website itself openly proclaims Gedela as the "CEO and Managing Director," and states that iMedPub LLC and Conference Series LLC are subsidiaries of OMICS International. (PX12 Att. L at 937; PX22 Att. C at 17). In aggregate, the evidence in the record conclusively establishes Gedela's knowledge, control, and participation in Defendants' deceptive acts. The Court therefore finds Gedela liable for monetary and injunctive relief.

## C. Injunctive and Monetary Relief

The FTC requests both a permanent injunction against defendants and monetary equitable relief. (*See* FTC's MSJ 49:16–57:3). Under § 13(b) of the FTC Act, the FTC "may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b); *see also Evans Prods.*, 775 F.2d at 1086. "This provision gives the federal courts broad authority to fashion appropriate remedies for violations of the Act," *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994), including "any ancillary relief necessary to accomplish complete justice," *F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982).

### 1) Permanent Injunction

A permanent injunction is justified if there exists "some cognizable danger of recurrent violation," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), or "some reasonable likelihood of future violations," *CFTC v. Co Petro Mktg. Grp., Inc.*, 502 F. Supp. 806, 818 (C.D. Cal. 1980), *aff'd*, 680 F.2d 573 (9th Cir. 1982). The Court examines the totality of the circumstances involved and a variety of factors in determining the likelihood of future misconduct. *Co Petro Mktg. Grp.*, 502 F. Supp. at 818; *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). Nonexhaustive factors include the degree of scienter involved, whether the violative act was isolated or recurrent, whether the defendant's current occupation positions him to commit future violations, the degree of harm consumers suffered from the unlawful conduct, and the defendant's recognition of his own culpability and sincerity of his assurances, if any, against future violations. *Murphy*, 626 F.2d at 655; *FTC v. Magui Publishers, Inc.*, No. 89–3818, 1991 WL 90895, at *15–16 (C.D. Cal. Mar. 28, 1991). "[I]t must be 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *TRW, Inc. v. F.T.C.*, 647 F.2d 942, 953 (9th Cir. 1981) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

The Court finds that a permanent injunction against Defendants is appropriate under the circumstances to enjoin them from engaging in similar misleading and deceptive activities. Here, Defendants did not participate in an isolated, discrete incident of deceptive publishing, but rather sustained and continuous conduct over the course of years. An injunction is therefore necessary to prevent future misconduct and protect the public interest. Moreover, the FTC's requested conduct provisions bear a reasonable relationship to Defendants' unlawful practices in this case, and the monitoring provisions are necessary to ensure compliance. *See FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965); *FTC v. Ideal Fin. Solutions, Inc.*, 2016 U.S. Dist. LEXIS 23102, at *19 (D. Nev. Feb. 23, 2016). Defendants object to the

injunction on the basis that it is overbroad but fail to provide any actual arguments to support this assertion. (*See* Defs.' Resp. 43:13–19). Defendants have therefore failed to present a basis to depart from the proposed injunction.

### 2) *Monetary Relief*

Section 13(b) permits a panoply of equitable remedies, including monetary equitable relief in the form of restitution and disgorgement, as well as miscellaneous reliefs such as asset freezing, accounting, and discovery to aid in providing redress to injured consumers. *Pantron I Corp.*, 33 F.3d at 1103 n. 34 (9th Cir. 1994); *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 606–08 (9th Cir. 1993); *H.N. Singer*, 668 F.2d at 1113. The FTC Act is designed to protect consumers from economic injuries. *Stefanchik*, 559 F.3d at 931. To effect that purpose, courts may award restitution to redress consumer injury. *F.T.C. v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001) ("We have held that restitution is a form of ancillary relief available to the court in these circumstances to effect complete justice."). Restitution may be measured by the "the full amount lost by consumers rather than limiting damages to a defendant's profits." *Stefanchik*, 559 F.3d at 931 (affirming restitution of over $17 million for the full amount of consumer loss); *see also FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997) (affirming restitution for more than $16 million against company and officer as consumer loss under section 13(b)). Consumer loss is calculated by "the amount of money paid by the consumers, less any refunds made." *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 213–14 (D. Mass. 2009), *aff'd*, 624 F.3d 1 (1st Cir. 2010); *see also Stefanchik*, 559 F.3d at 931; *Figgie*, 994 F.2d at 606; *Gill*, 265 F.3d at 958.

Irrespective of the measure used to calculate monetary equitable relief, courts apply a burden-shifting framework to determine the specific amount to award. *Direct Mktg. Concepts*, 624 F.3d at 15. First, the FTC bears the initial burden of providing the Court with a reasonable approximation of the monetary relief to award. *Commerce Planet*, 815 F.3d at 603. A

reasonable estimate, rather than an exact amount, is proper because that may be the only information available, as when defendants do not maintain data necessary to calculate the precise amount. *FTC v. QT, Inc.,* 512 F.3d 858, 864 (7th Cir.2008) ("A court is entitled to proceed with the best available information[.]"); *FTC v. Verity Int'l, Ltd.,* 443 F.3d 48, 69 (2d Cir.2006) ("Of course, the reasonableness of an approximation varies with the degree of precision possible."), *cert. denied,* 549 U.S. 1278, 127 S.Ct. 1868, 167 L.Ed.2d 317 (2007).

Second, once the FTC satisfies this burden, "the burden then shifts to the defendant to show that the FTC's figures overstate the amount of the defendant's unjust gains." *Commerce Planet*, 815 F.3d at 604. "Any fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendant's burden to show inaccuracy." *Direct Mktg. Concepts*, 624 F.3d at 15; *see also Commerce Planet*, 815 F.3d at 604 ("Any risk of uncertainty at this second step 'fall[s] on the wrongdoer whose illegal conduct created the uncertainty.'") (quoting *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 368 (2d Cir. 2011)).

Here, the FTC requests an amount of $50,130,811.00 in consumer loss between August 25, 2011, through July 31, 2017. (FTC's MSJ 56:26–27). The FTC reaches this amount by calculating Defendants' gross revenue during the at-issue period and subtracting the $609,289.13 that Defendants paid out in chargebacks and refunds. (SJX26 ¶¶ 21–25). The FTC's calculations are consistent with the consumer loss formula, and the Court finds this approximation reasonable.

In Response, Defendants argue that the FTC's figure is overstated because it: (1) "assumes that every single author/consumer was misled by Defendants' publishing process;" and (2) erroneously includes "repeat authors" who were "demonstrably unconfused." (Defs.' Resp. 40:1–27).[10] With respect to Defendants' first argument, the FTC need not prove reliance

---

[10] Defendants also cite a table purporting to show Defendants' taxable income based on net profits in the United States. Even to the extent this table were representative of Defendants' income after tax, profits are irrelevant to the present inquiry. *See Stefanchik*, 559 F.3d at 931. Moreover, the scope of consumer injury is not limited to Defendants' taxes in the United States.

by each consumer misled by Defendants. *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) ("Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of [Section 13(b)]"); *AMG Servs.*, 2017 U.S. Dist. LEXIS 66689, at *38. "[I]t is sufficient for the FTC to prove that misrepresentations were widely disseminated (or impacted an overwhelming number of consumers) and caused actual consumer injury." *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1011 (N.D. Cal. 2010), *aff'd*, 475 F. App'x 106 (9th Cir. 2012).

As to the second argument, Defendants' premise appears to be that an author deceived by Defendants' failures to disclose fees would not submit another article. In making this argument, Defendants fail to cite to any evidence supporting their assertion that "repeat authors" were not "confused." Moreover, Defendants ignore that their other misrepresentations regarding indexing, impact factors, and expert editors could repeatedly deceive a consumer. Lastly, Defendants fail to proffer any evidence that "repeat" authors are substantial or identifiable. *See Direct Mktg. Concepts*, 624 F.3d at 15. Where, as here, consumers suffer broad economic injury resulting from a defendant's violations of the FTC Act, equity requires monetary relief in the full amount lost by consumers. *See Stefanchik*, 559 F.3d at 931. Accordingly, the Court finds Defendants jointly and severally liable for restitution in the amount of $50,130,811.00.

### D. Remaining Affirmative Defenses

In their Answer, Defendants advanced twenty affirmative defenses to liability. (Answer, ECF No. 48). The Court has already stricken nine of these for lack of merit. (Order Adopting R&R, ECF No. 62). Additionally, the Court has already addressed Defendants' defense regarding public interest in the injunction section above. With respect to Defendants' third, fourth, fifth, sixth, eighth, and eleventh affirmative defenses, these assertions are mere denials of wrongful conduct and do not state a valid affirmative defense. With respect to Defendants'

affirmative defense for "failure to state a claim," the Court denied this argument in its prior Order on Defendants' Motion to Dismiss. (Order, ECF No. 46). With respect to Defendants' statute of limitations, laches, first amendment, and due process defenses, these are legally erroneous. *See F.T.C. v. Ivy Capital, Inc.*, No. 2:11-CV-283 JCM GWF, 2011 WL 2470584, at *2 (D. Nev. June 20, 2011) ("Section 13(b) of the Federal Trade Commission Act specifies no statute of limitations period."); *See F.T.C. v. Am. Microtel, Inc.*, No. CV-S-92-178-LDG(RJJ), 1992 WL 184252, at *1 (D. Nev. June 10, 1992) ("[T]he law is well established that principles of laches and equitable estoppel are not available as defenses in a suit brought by the government to enforce a public right or a public interest."); *See United States v. Schiff,* 379 F.3d 621, 629-30 (9th Cir. 2004) (government may prevent dissemination of false or misleading commercial speech). To the extent any affirmative defenses remain, Defendants have failed to support them in response to the FTC's Motion and therefore the Court finds these defenses abandoned. *See* Local Rule 7-2.

## IV.    <u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 89), is **DENIED**.

**IT IS FURTHER ORDERED** that the FTC's Motion for Judicial Notice, (ECF No. 84), is **GRANTED**.

**IT IS FURTHER ORDERED** that the FTC's Motion to Strike, (ECF No. 96), is **GRANTED in part** and **DENIED in part.**

**IT IS FURTHER ORDERED** that the FTC's Motion for Summary Judgment, (ECF No. 86), is **GRANTED** pursuant to the following terms:

/ / /

/ / /

/ / /

# 1) DEFINITIONS

For the purpose of this Order, the following definitions apply:

**A. "Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.    In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.    A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.    An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.    In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.    The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6.    The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

**B. "Conference Activities"** means any activity related to promoting, marketing, advertising, registering, hosting, acquiring or providing venue space for, or soliciting, charging, or accepting fees for, any conference, symposium, forum, workshop, or other meeting of professionals for which consumers pay a fee (however such fee is denominated).

**C. "Defendants"** means the Individual Defendant and the Corporate Defendants, individually, collectively, or in any combination. "Corporate Defendants" means OMICS Group Inc., also doing business as OMICS Publishing Group, iMedPub LLC, and Conference Series LLC, and their successors and assigns and any other entity engaged in Publishing Activities or Conference Activities that is owned or controlled, in whole or in part, by any Defendant, including, but not limited to, OMICS International Pvt. Limited, Srinu Sci Technol Biosoft Pvt. Limited, OMICS Entertainment Pvt. Limited, iMed Publications Limited, Conference Series LLC Limited, Meetings International, Ltd., Allied Academics Limited, Euroscion Limited, Pulsus Group Limited. "Individual Defendant" means Srinubabu Gedela, and any other name by which he might be known, including but not limited to OMICS Publishing Group.

**D. "Impact Factor"** or "**Impact Score**" means, with respect to any journal or other publication, any measure (however denominated) reflecting the number or average number of citations (whether weighted or not) to articles published in that journal or publication during a certain period of time, including, but not limited to, the score assigned to a journal by Clarivate Analytics (or its successor) and published in Journal Citation Reports, a journal's Eigenfactor, or SCImago Journal Rank.

**E. "Person**" means a natural person, organization, or other legal entity, including a corporation, partnership, proprietorship, association, cooperative, or any other group or combination acting as an entity.

**F. "Publishing Activities"** means any activity related to publishing written work of another for a fee (however such fee is denominated and whoever is charged the fee), including promoting, marketing, or advertising any journal or other publication; soliciting written work for any journal or other publication; demanding payment or accepting subscriptions for any journal or other publication; promoting, registering, hosting, acquiring or providing venue space for, or soliciting, charging, or accepting fees for, any conference associated with an existing or promised publication and for which consumers pay a fee (however such fee is denominated).

## 2) ORDER

**PROHIBITED MISREPRESENTATIONS REGARDING PUBLISHING SERVICES**

**I.      IT IS THEREFORE ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with any Publishing Activities, are hereby permanently restrained and enjoined from:

A. misrepresenting or assisting others in misrepresenting, expressly or by implication:

1. the nature, credibility, legitimacy, or reputation of any journal or other publication;

2. that any journal or other publication follows or otherwise engages in peer-review or any other process by which work submitted to that journal or publication is reviewed;

3. that any Person is an editor of, a member of an editorial board for, or otherwise associated or affiliated with any journal or other publication;

4. that any Person is involved in the selection or review of any article, manuscript, or other work submitted for publishing in any journal or other publication;

5. the Impact Factor or Impact Score of any journal or other publication, or that any journal or other publication has a high Impact Factor or Impact Score;

6. the inclusion of any journal or other publication in any academic journal indexing service, including but not limited to PubMed, PubMed Central, or MEDLINE;

7. any costs or fees associated with publishing an article, manuscript, or other work;

8. any material restrictions, limitations, or conditions on publishing an article, manuscript, or other work; or

9. any other fact material to a consumer's decision to submit an article, manuscript, or other work for publishing in any journal or other publication;

B. making any representation, or assisting others in making any representation, expressly or by implication, that any journal or other publication is peer-reviewed unless any work submitted to that journal or publication is reviewed by peers who are subject matter experts, who are not journal employees, and who evaluate the quality and credibility of the work, and the representation is otherwise non-misleading;

C. making, or assisting others in making, expressly or by implication, any representation covered by this Section I, unless the representation is non-misleading and, at the time such representation is made, Defendants possess and rely upon competent and reliable evidence that is sufficient to substantiate that the representation is true.

**PROHIBITED MISREPRESENTATIONS REGARDING SCIENTIFIC CONFERENCES**

**II.     IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with any Conference Activities, are hereby permanently restrained and enjoined from:

> A. misrepresenting or assisting others in misrepresenting, expressly or by implication:
>
>> 1. the nature, credibility, legitimacy, or reputation of any conference, symposium, forum, workshop, or other meeting of professionals;
>>
>> 2. that any Person will attend, participate in, or is otherwise associated or affiliated with any conference, symposium, forum, workshop, or other meeting of professionals;
>>
>> 3. the panels, forums, schedule, agenda, or other presentations of any conference, symposium, forum, workshop, or other meeting of professionals;
>>
>> 4. any costs or fees to register or attend any conference, symposium, forum, workshop, or other meeting of professionals;
>>
>> 5. any material restrictions, limitations, or conditions on registering or attending any conference, symposium, forum, workshop, or other meeting of professionals; or
>>
>> 6. any other fact material to a consumer's decision to register for or attend any conference, symposium, forum, workshop, or other meeting of professionals;
>
> B. making, or assisting others in making, expressly or by implication, any representation covered by this Section II, unless the representation is non-misleading and, at the time

such representation is made, Defendants possess and rely upon competent and reliable evidence that is sufficient to substantiate that the representation is true.

**REQUIRED DISCLOSURES REGARDING PUBLISHING PRACTICES**

**III.**     **IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, in connection with any Publishing Activities, whether acting directly or indirectly, are hereby permanently restrained and enjoined from soliciting from a consumer or publishing articles, manuscripts, or other works solicited from a consumer, without disclosing Clearly and Conspicuously:

   A. all costs to the consumer associated with submission or publication of such work;

   B. if Defendants will not have such work reviewed by peers who are subject matter experts, who are not journal employees, and who evaluate the quality and credibility of the work, a statement informing consumers of such fact; and

   C. if Defendants will not allow consumers to withdraw such work from publication after it has been submitted or will require consumers to pay a fee (however such fee is denominated) to withdraw such work from publication, a statement informing consumers of such fact and any costs to withdraw.

**REQUIRED DISCLOSURES REGARDING JOURNAL IMPACT FACTORS**

**IV.**     **IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, in connection with any Publishing Activities, whether acting directly or indirectly, are hereby permanently restrained and enjoined from making any representation, expressly or by implication, regarding the Impact Factor or Impact Score of any journal or publication, unless the representation is (a) non-misleading and (b) Clearly and Conspicuously discloses (1) whether the Impact Factor or Impact Score is

calculated by Clarivate Analytics (or its successor) and (2) if the Impact Factor or Impact Score is not calculated by Clarivate Analytics (or its successor), who calculated that Impact Factor or Impact Score and how that Impact Factor or Impact Score is or was calculated.

**CONSENT REQUIREMENT FOR CLAIMS ABOUT THIRD PARTIES**

**V.     IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are hereby permanently restrained and enjoined from:

A. in connection with any Publishing Activities, making any representation, expressly or by implication, that any Person is an editor or is otherwise associated with the publishing good or service without (1) having obtained that Person's express written consent to such representation, and (2) providing a copy of such express written consent to the FTC at the address provided in Section X.E below; and

B. in connection with any Conference Activities, making any representation, expressly or by implication, that any Person is an organizer of, participant in, or is otherwise associated with, a conference hosted or otherwise associated with Defendants without (1) having obtained that Person's express written consent to such representation, and (2) providing a copy of such express written consent to the FTC at the address provided in Section X.E below.

**PROHIBITION AGAINST UNSUBSTANTIATED CLAIMS**

**VI.     IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with any Publishing Activities or Conference Activities, are permanently restrained and enjoined from making any representation or assisting others in making any representation,

expressly or by implication, about the benefits, performance, or efficacy of any product or service, unless the representation is non-misleading, and, at the time such representation is made, Defendants possess and rely upon competent and reliable evidence that is sufficient in quality and quantity based on standards generally accepted in the relevant fields, when considered in light of the entire body of relevant and reliable evidence, to substantiate that the representation is true.

### 3) CUSTOMER INFORMATION

**VII.    IT IS FURTHER ORDERED** that Defendants, Defendants' officers, agents, employees, and attorneys, and all other Persons in active concert or participation with any of them, who receive actual notice of this Order, are permanently restrained and enjoined from directly or indirectly:

A. failing to provide sufficient customer information to enable the FTC to efficiently administer consumer redress. If a representative of the FTC requests in writing any information related to redress, Defendants must provide it, in the form prescribed by the FTC, within 14 days;

B. disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant obtained prior to entry of this Order in connection with the marketing publication services and conferences; and

C. failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the FTC.

D. Provided, however, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

### 4) MONETARY JUDGMENT

**VIII.   IT IS FURTHER ORDERED** that:

A. Judgment in the amount of FIFTY MILLION, ONE HUNDRED THIRTY THOUSAND, EIGHT HUNDRED AND TEN DOLLARS ($50,130,810) is entered in favor of the FTC against Defendants, jointly and severally, with post-judgment interest at the legal rate, as equitable monetary relief.

B. The monetary judgment set forth in this Section VIII is enforceable against any asset, real or personal, whether located within the United States or outside the United States, owned jointly or singly by, on behalf of, for the benefit of, in trust by or for, or as a deposit for future goods or services to be provided to, any Defendant, whether held as tenants in common, joint tenants with or without the right of survivorship, tenants by the entirety, and/or community property.

C. In partial satisfaction of the judgment against Defendants in Section VIII.A, any Defendant and any financial or brokerage institution, escrow agent, title company, commodity trading company, business entity, or person, whether located within the United States or outside the United States, that holds, controls, or maintains accounts or assets of, on behalf of, for the benefit of, or as a deposit for future goods or services to be provided to, any Defendant, whether real or personal, whether located within the United States or outside the United States, shall turn over such account or asset to the FTC or its designated agent within ten (10) business days of receipt of notice of this Order by any means.

D. Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

E. All money paid to the FTC pursuant to this Order may be deposited into a fund administered by the FTC or its designee to be used for equitable relief, including consumer redress and any attendant expenses for the administration of any redress fund. If a representative of the FTC decides that direct redress to consumers is wholly or partially impracticable or money remains after redress is completed, the FTC may apply any remaining money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint. Any money not used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement. Defendants have no right to challenge any actions the FTC or its representatives may take pursuant to this Subsection.

## 5) ORDER ACKNOWLEDGMENTS

**IX.** **IT IS FURTHER ORDERED** that Defendants obtain acknowledgments of receipt of this Order:

A. Each Defendant, within 7 days of entry of this Order, must submit to the FTC an acknowledgment of receipt of this Order sworn under penalty of perjury.

B. For 5 years after entry of this Order, the Individual Defendant for any business that such Defendant, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, and each Corporate Defendant, must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur

within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C. From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## 6) COMPLIANCE REPORTING

**X.** **IT IS FURTHER ORDERED** that Defendants make timely submissions to the FTC:

A. One year after entry of this Order, each Defendant must submit a compliance report, sworn under penalty of perjury:

1. Each Defendant must: (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the FTC may use to communicate with Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which the Individual Defendants must describe if he knows or should know due to his own involvement); (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the FTC.

2. Additionally, the Individual Defendant must: (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which

such Defendant has any ownership interest; and (c) describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B. For 20 years after entry of this Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1. Each Defendant must report any change in: (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2. Additionally, the Individual Defendant must report any change in: (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

C. Each Defendant must submit to the FTC notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D. Any submission to the FTC required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E. Unless otherwise directed by a FTC representative in writing, all submissions to the FTC pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. OMICS Group, X160049.

## 7) RECORDKEEPING

**XI.** **IT IS FURTHER ORDERED** that Defendants must create certain records for 20 years after entry of the Order, and retain each such record for 5 years. Specifically, each Corporate Defendant and the Individual Defendant for any business that such Defendant, individually or collectively with any other Defendants, is a majority owner or controls directly or indirectly, must create and retain the following records:

A. accounting records showing the revenues from all Publishing Activities and Conference Activities sold;

B. personnel records showing, for each Person providing services, whether as an employee or otherwise, that Person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D. all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the FTC; and

E. a copy of each unique advertisement or other marketing material.

## 8) COMPLIANCE MONITORING

**XII.** **IT IS FURTHER ORDERED** that, for the purpose of monitoring Defendants' compliance with this Order and any failure to transfer any assets as required by this Order:

A. Within 14 days of receipt of a written request from a representative of the FTC, each Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The FTC is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B. For matters concerning this Order, the FTC is authorized to communicate directly with each Defendant. Defendants must permit representatives of the FTC to interview any employee or other Person affiliated with any Defendant who has agreed to such an interview. The Person interviewed may have counsel present.

C. The FTC may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Defendants or any individual or entity affiliated with Defendants, without the necessity of identification or prior notice. Nothing in this Order limits the FTC's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D. Upon written request from a representative of the FTC, any consumer reporting agency must furnish consumer reports concerning the Individual Defendant, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

## 9) RETENTION OF JURISDICTION

**XIII.  IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

The Clerk of Court shall enter judgment accordingly and close the case.

      **DATED** this ___29___ day of March, 2019.

_____
Gloria M. Navarro, Chief Judge
United States District Judge